# EXHIBIT 2

Deposition of Sami Halabi as Corporate Representative of CPR Certification, LLC (TTAB Oct. 18, 2023)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

In the matter of Application Serial No. 97/016,512
Published: March 08, 2022

CPR Certification, LLC,

Opposer,

Proceeding No. 91276058

vs.

CPR, LLC,,

Applicant.

______________________________/

REMOTE
DEPOSITION OF: **SAMI HALABI, AS COPORATE REP.**

DATE: WEDNESDAY, OCTOBER 18, 2023

TIME: 1:07 P.M. - 2:42 P.M.

PLACE: ALL PARTIES APPEARING VIA ZOOM VIDEOCONFERENCE

STENOGRAPHICALLY REPORTED BY: BRITTANY O'NEILL VALLADAREZ
Shorthand Reporter
Notary Public
State of Florida at Large

Pages 1 - 50

APPEARANCES: (via Zoom)

BRITTANY J. MAXEY-FISHER, ESQUIRE
OF: MAXEY-FISHER, PLLC
100 2ND AVENUE S
SUITE 401N
ST. PETERSBURG, FLORIDA 33701
(727) 230-4949, FAX (727) 230-4827
bmaxeyfisher@maxeyfisher.com
APPEARING ON BEHALF OF THE PLAINTIFF

JOSEPH F. SOUTHRON, ESQUIRE
OF: FOUR RIVERS LAW FIRM
400 NORTH ASHLEY DRIVE
SUITE 1720
TAMPA, FLORIDA 33602
(813) 773-5105, FAX (813) 773-5103
joe@fourriverslaw.com
APPEARING ON BEHALF OF THE DEFENDANT

# I N D E X

Page

TESTIMONY OF SAMI HALABI -

DIRECT EXAMINATION BY MR. SOUTHRON...............4

CERTIFICATE OF OATH..............................47

CERTIFICATE OF DEPOSITION TRANSCRIPT.............48

SIGNED ERRATA SHEET..............................49

NOTIFICATION LETTER..............................50

## INDEX OF EXHIBITS

(NONE MARKED)

## S T I P U L A T I O N

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

P R O C E E D I N G S

*********

THE REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth?

THE WITNESS: Yes.

THEREUPON,

**SAMI HALABI, AS CORPORATE REP.,**

was called as a witness and, after having been duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. SOUTHRON:

Q. Sam, we're going to begin the 30(b)(6) deposition, which means we're deposing a corporate entity. Specifically that entity is CPR Certification, LLC. You just concluded sitting for your personal deposition, and the rules are different for this part of the deposition today. During this part you're not testifying on your personal knowledge. You're testifying based on your preparation for this part of the deposition, and so we've told you in advance what topics we're going to discuss and you have a responsibility to be prepared to answer any questions

about those topics on behalf of CPR Certification, LLC. Your answers will be binding on CPR Certification, LLC.

So we talked earlier in your personal deposition and I told you if you don't remember that's fine or if you don't know that's fine. That is not the case during this deposition. You need to remember and you need to know. Okay?

A. Okay.

Q. All right. Have you reviewed the topics that we noticed in the subpoena issued to the corporate entity?

A. Have I -- may you repeat the question?

Q. Have you reviewed the topics we noticed for this deposition?

A. The 30(b)(6) topics?

Q. Yes.

A. I have.

Q. And what did you do to prepare to answer those?

A. I -- I read through them and, you know, talked it over with my attorneys.

Q. Did you talk to anybody at the company?

A. I spoke with miss -- yes. I did.

Q. Who did you talk to?

A. The chief operating officer.

Q. Who's that?

A. Laura Ahammer.

Q. Did you talk to anybody else?

A. No.

Q. I want to talk about the entity itself and its filing of the opposition. Why does CPR Certification, LLC, have standing to oppose Doug's filing?

A. Why did -- why do -- can you repeat that question?

Q. Why does CPR Certification, LLC, have standing to oppose Doug's filing?

A. Because we -- the CPR Certification, LLC, has standing to oppose CPR, LLC's, standing -- I mean, CPR, LLC's, application because of the -- the date -- they applied during the time that we -- there were -- there was a restricted covenant in -- in our territories.

Q. Does CPR Certification, LLC, offer CPR training?

A. Does CPR Certification, LLC, offer CPR training? Yes.

Q. How?

A. We -- can you be more specific on that question?

Q. How does -- and let me think on this. I'm going to refer to CPR Certification, LLC, as the corporate entity.

A. Okay.
Q. So we don't have to say that over and over again. Or I might just say the entity. How does the entity offer CPR training?
A. We hold classes.
Q. How does CPR Certification -- how does the entity relate to 842?
A. 842 is the -- is the company that holds -- CPR Certification, LLC, is under 842.
Q. Are you saying it's a subsidiary?
A. In a manner of -- yeah. Yes.
Q. What is that -- I mean, I want to be precise here. What do you mean under it?
A. So 842 Industries is the owner per se of CPR Certification, LLC.
Q. I'm looking at Sunbiz right now and it says, Sam Halabi is the owner of CPR Certification.
A. Okay.
Q. Do you know why?
MS. MAXEY-FISHER: Objection.
BY MR. SOUTHRON:
Q. You can answer.
A. I didn't -- I didn't personally file. Let me think about that. Why is my name -- my name is -- my personal name is under CPR Certification, LLC? I'll

have -- could you show me that on the screen?

Q. Sure. Here's the entity. There's your name. So it says here you're the manager. It doesn't technically make you the owner.

A. Okay.

Q. I'm looking here and this is the original articles. You were listed as member. Let's look at the amendment. So this looks like in this amendment you are just changing your registered agent. Oh, wait. Here we go. Article 4. And it looks like it's converting this to a manager-managed LLC, whereupon you became the manager. Do you know if at this time of this amendment, which is 2021, there was a change in ownership?

A. I -- I will get back to you on that one.

Q. Well, it's kind of important for today.

A. Yeah. If you allow me --

Q. You just said that 842 owns CPR Certification. So I don't want us to get tripped up by this paperwork. What's filed on Sunbiz is not always reflective of your operating agreement, which would determine who the owners are.

A. Right. I'll have to locate the operating agreement and, you know, get brushed up on that and get back to you with an accurate answer.

Q. All right. So when a customer signs up for

training who do they pay money to?
A. When a customer signs up for training --
Q. Or I -- let me rephrase that. Who receives the money from the customer?
A. The CPR Certification, LLC.
Q. Does C- -- so CPR Certification has its own bank account?
A. That is correct.
Q. And what happens after CPR Certification takes the money from the customer? Does it pay that money to 842?
A. It -- after it takes the money from the customer it pays -- you know, it pays out expenses through CPR Certification, LLC, and it -- yeah. It pays expenses and then I -- any residual moneys after expenses, offices, instructor expenses, payments, independent contractor payments, advertising, all that -- legal, it would then -- yeah. If there -- if there's any money left over it would -- it would then be sent to -- yeah. The -- yeah. 842 Industries.
Q. Well, that would be all the money. You said that it pays 842 expenses. Is that what you said?
A. I would say most of them.
Q. And then if there's money left over is that considered profit?

A. You know, I don't do the accounting, but for lack of argument I'm going to give you a soft yes on that. But there are other, you know, complexities that, you know, the moneys have to go further from that to -- to receive profit.
Q. All right.
A. But yeah.
Q. But where does the money go when it is called profit if --
A. It --
Q. -- [unintelligible] complexities?
A. I'm...
Q. So if we skip through the accounting complexities eventually there's money left over and it's profit. Where does it go at that point?
A. It would then be -- yeah. It would be more than likely sent to 842 Industries.
Q. So why doesn't --
A. Yeah.
Q. -- CPR just send all the money to 842?
A. Why doesn't CPR just send all the money to 842? Because it -- we want to keep everything CPR related under one umbrella.
Q. All right. So why is CPR Certification, LLC, opposing Doug's mark?

A. Why is CPR -- so why -- so why are we opposing -- why is CPR Certification opposing CPR, LLC's, mark?

Q. Yeah.

A. Because he -- you know, that was filed -- that application was filed during the noncompete covenant that protected -- or that was blanketing all 50 states, including the territories I was awarded.

Q. Is that the only reason?

A. There are other -- there are other reasons that -- that my chief operating officer will be happy to, you know, go into further detail about and that my legal team knows more about.

Q. Well, your attorney had told me you're here to talk about that.

THE WITNESS: Is that one of those hybrid ones?

MS. MAXEY-FISHER: It's -- if you have a -- do you understand the question?

THE WITNESS: I think so.

MS. MAXEY-FISHER: He's asking you about the opposition proceeding.

THE WITNESS: Right.

MS. MAXEY-FISHER: So it's okay to speak about why you filed.

A. Yeah. Because that -- you know, they applied

during the noncompete period.

BY MR. SOUTHRON:

Q. Is that the only reason?

A. And also they applied -- Doug Joos, CPR, LLC, applied for a word mark. And the words CPR and certification were also protected and given to both parties in the dissolution agreement.

Q. Are you opposing his word mark?

A. We're -- you know, we're opposing the application. The word mark's a subset of that.

Q. It's not. It's a different filing. It's not, in fact, the one that you've opposed. The word mark has been abandoned, you might say. I think it was -- it was the SPTO denied it and it was abandoned. You're opposing his picture mark. Did you review your opposition in preparation for today's deposition?

A. I did.

Q. Is this the first time you're being made aware of which application you're actually opposing?

A. No.

Q. So again, my question is: In addition to him applying for a national trademark during the restriction -- the restriction period, what other reasons are you opposing it?

A. I didn't hear the first part of the question.

Q. What other reasons are you opposing Doug's mark?

A. Other than the restricted-covenant period reason?

Q. Yeah.

A. Well, I -- I'd -- I would have to -- I would have to review more documents.

Q. Actually, you're required by the federal rules to review them before you got here. Are you saying you're unprepared to answer the questions?

A. No, sir. I did review them. I did prepare.

Q. Why [unintelligible] --

A. I gave you an answer.

Q. -- the reason you're opposing the mark? That's what this whole case is about.

MS. MAXEY-FISHER: Objection to form. He's answered the questions a lot of times --

MR. SOUTHRON: He's not.

MS. MAXEY-FISHER: -- in his personal deposition, and now here again. You've asked the same --

MR. SOUTHRON: Excuse me.

MS. MAXEY-FISHER: -- question.

MR. SOUTHRON: He hasn't. He keeps saying he doesn't know.

MS. MAXEY-FISHER: Perhaps ask the question again.

BY MR. SOUTHRON:

Q. Okay. Why are you opposing Doug's mark other than the restricted covenant? Is there any other reason or is that the only reason?

A. There's other -- there's other reasons.

Q. What are they? What are they?

A. I could get back to you on that one after I brush up -- I look through the documents again. Because I did prepare. I did read --

Q. Why don't you take some time and then come back?

A. Okay.

Q. All right? Because I don't feel like doing this again, and I'm sure you don't either. There's a reason we tell you in advance what we're going to talk about, and that's to avoid precisely this situation. Why don't you take 15 minutes, 20 minutes? We'll come back at 1:45 and then you can let me know what the other reasons are.

A. Okay.

Q. All right.

(Break was taken.)

BY MR. SOUTHRON:

Q. Sam, what are the reasons that the entity is opposing Doug's mark?

A. Okay. So the reasons we are opposing Doug's mark, we originally opposed multiple -- for multiple -- for a plurality of reasons. That's where I was getting. That's what I was alluding to earlier, that there were more than one reason other than the restricted-covenant reason.

So the -- the other reasons included, you know, the word mark, which you told me got thrown out anyway. And then another point of contention was the fact that he has CPR and certification in his design mark or in his, you know, mark. So we were -- that was a point of contention for us. We were given the rights to those names -- those words to use, so we were, you know, protecting -- protecting those awarded rights.

Another two things were the two counts of fraud, which have since been thrown out. That was another thing that was on my mind that I wasn't quite -- I couldn't quite, you know, put in the forefront of my mind, but on the break I was able to look through the document here, the notice of opposition, and brush up on. So I hope that clears the reasons and that completes the reasons of opposition from our party to yours.

Q. All right. So to summarize, as of today in addition to the geographic restriction you're opposing because the logo specimen he submitted includes the words CPR and certification. Is that accurate?

A. That's -- that's accurate.

Q. Are you aware that in his application he has disclaimed via what's called an exclusion any rights to the words CPR and certification?

MS. MAXEY-FISHER: Objection. Legal conclusion.

BY MR. SOUTHRON:

Q. You can answer.

A. I -- that's not -- you know, with all due respect, that is not my wheelhouse. I -- that's why I have attorneys.

Q. Right. But it's not a legal conclusion. I'm asking you: Are you factually aware that in his application he's placed an exclusion on those words?

A. Yeah. Oh. I mean, I -- okay.

Q. It's a yes-or-no answer.

A. Yes.

Q. You are aware he excluded any rights to those words?

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. Are you aware of that?
A. Yes.
Q. Okay. So why are you still opposing on that basis?
A. I am opposing on the restricted -- the basis of the file -- you know, when he filed was during the -- the covenant agreement. Was during the period in time in which I was awarded the 11 geographical areas. This is a federal blanketed situation nationwide that would have -- that would have clashed with -- with my territories.
Q. All right. So that is the sole-remaining basis for the opposition?
A. If -- if -- you know, I mean, barring any other kind of legal -- legal situation with the words CPR and certification in the mark, that's it.
Q. Well, I'll show you what I'm referring to just so there's -- there's no confusion here. So this is an examiner's amendment, and the way these come about is the PTO -- I'm sorry. What are you looking at? Are you looking at a screen?
MS. MAXEY-FISHER: Yeah. There's a big TV here.
MR. SOUTHRON: Okay.
MS. MAXEY-FISHER: And it's small unless you

want to blow it up.

BY MR. SOUTHRON:

Q. So this is the examiner's amendment, and the way this comes about ordinarily and probably in this case is the examiner will say, Hey, there's a problem. Will you let us amend for you? And then the filer can say yes or no. And when the filer says, Yes, go ahead, it typically results in what you see here, which is an examiners's amendment. And what the office amended to add and Doug consented to is this disclaimer: No claim is made to the exclusive right to use CPR Certification. So does that resolve concerns about that part of your opposition?

MS. MAXEY-FISHER: Objection.

A. I -- I -- I don't know the -- enough legal things in the world to -- to be able to give you an affirmative yes. I don't want to go on record exonerating anything in this court. I'm going to -- I'm going to lean on my -- all my rights as much as I -- are within my legal rights, so that's where I stand.

BY MR. SOUTHRON:

Q. You're the client. You have the right to oppose something or not oppose it. The decision's ultimately yours.

A. Yeah. I understand.

Q. So does this amendment resolve your concerns over the right to use the words CPR or certification?

MS. MAXEY-FISHER: Objection.

A. It doesn't. Not fully. No.

BY MR. SOUTHRON:

Q. All right. Why are you --

A. I still have --

Q. -- still [unintelligible]?

A. Because you're not my attorney, either, and you're giving me an education here. I appreciate that, though, but I'm going to have to look further into this.

Q. All right. So, again, you're just not prepared to discuss the topic?

A. No. I am. I just -- I wasn't prepared to go into legal jargon with you. I'm not an attorney.

Q. It's not legal jargon. I've been asking you all day the same thing. Why are you opposing the mark? What are the reasons?

A. Yeah. No. And I -- I understand. I believe I've -- I've met my corporate requirement for this subject matter.

Q. Okay. I disagree with you, for the record. Are you opposing Doug's mark because it was filed in the name of CPR, LLC?

A. So I don't -- that sounds pretty -- like a

frivolous reason to oppose. Could you -- is that as superficial as it sounds? I mean --

Q. Yeah. It is, actually.

A. Okay. So the question is: Because he named his company CPR, LLC, that drove -- that drove me to oppose the mark?

Q. Yeah. That's the question. Yeah.

MS. MAXEY-FISHER: Objection. Are you asking the questions or is -- is Mr. Halabi?

MR. SOUTHRON: Ma'am, there's no need to coach the witness here. He understands exactly what I'm saying and he's about to answer. There's no need to interject here.

BY MR. SOUTHRON:

Q. Please answer the question, Sam.

MS. MAXEY-FISHER: Can the court reporter repeat the question?

MR. SOUTHRON: I'll repeat the question.

BY MR. SOUTHRON:

Q. Are you opposing his mark because he filed it under the name CPR, LLC?

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. You may answer.

A. That is not the reason.

Q. Okay. Thank you.
MR. SOUTHRON: Give me one second. I need to pull something up.
(Break was taken.)
BY MR. SOUTHRON:
Q. Sam, as I understand it CPR Certification, LLC, has filed its own trademark. Is that correct?
A. CPR Certification, LLC. Yes.
Q. Is this the filing that the entity made?
A. It -- it appears so. There's the USPTO official seal. I don't see why -- just glancing at it right now it looks -- looks like it's ours. See, there's the name. Yeah.
Q. And so I can pull up the application. That's the entity's name, that's the Gunster Law Firm address where your entity is based out of, there's your attorney's information. So this is your mark. Right? The entity's mark?
A. Let me see it again --
Q. Your application?
A. -- if you don't mind?
Q. I'm sorry. What's the question?
A. May I see -- when you say, This is the mark, may I see the visual representation?
Q. Yeah. I'm going to go to that now. This is

the drawing. That's it right there.

A. That appears to be it.

Q. Okay. Don't you think this is a violation of the dissolution agreement?

A. No, sir.

Q. Why not?

A. It's not a violation of the dissolution agreement because it is a different mark than the one Mr. Joos has.

Q. Different how?

A. It's different in a multitude of ways.

Q. Explain that.

A. Okay. Well, the heart shape is different, the sinus -- sinus vital wave is different, the heart is lower than his -- on a lower plane than his. A side by side would show that, but I -- we can get into that later. Our -- his sinus vital wave comes out of the center of his "R." In other words, the hole part of the letter, the circular hole, like a donut hole kind of hole part of the "R" and shoots out of the "R" into the heart, and his sinus vital wave is thinner, thinner tracing, and it's way more flailing. In other words, his is more of a sign of a -- closer to a heart attack than -- than ours. His heart is right up against the -- the "R." It makes contact with the "R," where ours is

-- our heart is isolated completely away from the "R," from the CPR. It's completely in a different space. And not to mention, like I said, it's lower -- lowered -- lower than his. Yep.

Q. Okay. Well --

A. Another big difference is his reads --

Q. Just hold on. Hold on.

A. -- certification --

Q. Hold on. I'm showing now on the screen what I think are his and your marks for Tampa. Do you agree?

A. Yeah. I wasn't done giving the differences.

Q. I know. I'm going to let you continue. I just wanted to pull his up alongside, so go ahead and continue describing those --

A. Okay. His --

Q. -- differences.

A. -- his mark actually in English as we read from top down to left to right he would -- his mark reads, Certification CPR Tampa, while ours reads, CPR Certification Tampa. That's a big differentiation. Our fonts are different.

Q. Well, I'm just talking about the heart, which is what you've filed for trademark protection under. Because you agree that if your trademark application is granted you're going to be able to stop other people

from using similar marks. Correct?
A. Well, right. Yeah.
Q. All right. If your application is granted do you intend to file an infringement case against Doug for the mark you're looking at on the screen right there?
MS. MAXEY-FISHER: Objection.
A. I -- you know, that's proprietary information, but --
BY MR. SOUTHRON:
Q. Well, it's not. It's not.
A. I have no --
Q. It's very public information.
A. I have no plans. You know, it's not on my to-do list or anything like that. But if there's something objectionable --
Q. All right. Let's do this. All right? I'll break this down for you. Okay? Let's say you're granted protection over the heart alone. Do you believe Doug's logo has a similar appearance to the mark that you've filed for registration for?
A. His is -- his and mine are different.
Q. I understand they're different. The question is: Are they similar?
A. They're similar in the sense that they have red. They're both red. Although, they have a different

type of red. It's -- it's a different color. It's a hex -- different hex.

Q. You don't understand that similar and the same are different things? I didn't ask you if they're the same.

A. Okay.

Q. I asked you if you think Doug's would be similar to yours.

A. No.

Q. You disagree that they are similar?

A. To me they are not similar; they're different.

Q. So you don't think the fact that they're both hearts makes them similar?

A. In this industry that is -- most CPR sites -- most CPR companies are -- have a heart in their logo.

Q. All right.

A. It's kind of --

Q. Well, if the consumers are looking at these do you think that both of these marks would give the consumer the same commercial impression?

MS. MAXEY-FISHER: Objection.

A. No.

BY MR. SOUTHRON:

Q. Why not? You just said that in so many other words.

MS. MAXEY-FISHER: Objection.

A. Because they are different.

BY MR. SOUTHRON:

Q. Okay.

A. I think a --

Q. But they're both hearts, they're both red, some type of red, and they both have lines in the middle of the heart. So there are some similarities, even though you believe they're not similar, and you just said that that is common in the industry. So do you agree that you and Doug, the entity and Doug's entity, are selling related goods and/or services?

A. We are selling related goods and services.

Q. Okay. Have you experienced any actual confusion by consumers of your company and Doug's company?

A. Have I experienced actual confusion? I -- people have been -- I believe people have been confused. I don't handle the customer service firsthand. I've seen some exhibits you guys have presented. Some look manufactured. Some or most or all. I'm not -- not to say confusion hasn't happened, but it's my conviction that it's -- nobody's confused us because of the logo.

Q. Why have they confused you?

A. Because to a consumer CPR is CPR is CPR. Where

they get their CPR sort of they're not that picky. It's not a sexy industry. It's not like picking out the best designer clothing or anything like that. They just typically need it for their place of employment. So when they have a problem or they can- -- they have to cancel -- you know, they want a refund, they want a -- they want a -- you know, some something comes up and they need to get in contact with the company, they will -- they're not very savvy. They will click on the first thing that pops -- pops up and call and think that all CPR purveyors are connected somehow. Because it's like a -- you know, they just think it's like a government sort of operation so that they can just pick up the phone, dial the first number or send an e-mail and the first e-mail they see and that -- you know, that person can help them with their problem. That's where the confusion lies most of the time.

Q. But isn't it true that your company and Doug's company use the same marketing channels?

A. We both -- I -- our company heavily uses Google, and I believe his does, too.

Q. Okay. How would you characterize the amount of care that your customers use in selecting who they're going to work with and trying to figure out who they are?

A. Could you -- could you repeat that and possibly shorten the question?

Q. Would you characterize your customers as sophisticated?

A. Not terribly.

Q. And I don't mean that, you know, are they -- who they are on a personal level. You know, sophisticated parties in business transactions has a special meaning. Do you understand what that means?

A. Repeat that?

Q. A sophisticated buyer in a commercial transaction has a specific meaning. Are you familiar with that phrase?

A. Has a special meaning. No.

Q. A sophisticated buyer is someone with a lot of capital represented by an attorney, well educated in the area. Ordinarily we use that phrase to talk about commercial parties who have a lot of experience buying or selling what they're doing. Would you say that your customers are sophisticated?

A. Not in that sense.

Q. Would you say that your customers likely have some -- have no experience, some experience, or a lot of experience in buying your services when they shop your services?

MS. MAXEY-FISHER: Objection to form.

A. If you could -- that was very confusing. If you could repackage that I would be happy to answer that if I could fully understand it.

BY MR. SOUTHRON:

Q. On a scale from some, none, or a lot, how much experience do your customers typically have in getting trained in CPR when they come to you to get trained in CPR?

A. I could not speculate. There is -- it's the rainbow. It's the whole spectrum.

Q. So many or some or many of your consumers have never been trained before?

A. Right. I mean, never been trained, many are intermediaries, and many are expert.

Q. Okay.

A. It's -- yeah.

Q. When Fit Industries was dissolved Doug was granted the rights to the logo. Correct?

A. Right.

Q. Okay. So then explain to me how you went upon choosing your logo.

A. I commissioned the art. I commissioned the art.

Q. What does that mean?

A. I -- I contacted an artist and, you know, said I needed a CPR logo and communicated to him that. And he -- he or she gave me renditions of mockups for -- you know, rough drafts, if you will. And I took those --
Q. Who did you commission?
A. An artist off -- on the website Fiverr.
Q. How much did you pay?
A. I don't recall.
Q. When did you do that?
A. I started working on that I believe the end of December-ish. The end of 2020, I think. And then --
Q. Did you tell him to design a heart logo for you?
A. I'm sorry?
Q. Did you tell them to design a heart logo?
A. I -- I believe I wanted them to design a CPR logo.
Q. Did you tell them to use a heart?
A. I would have to look in the -- it's -- we provided a lot of the exhibits of the communications, maybe all of the communications. I'd have to give that another read to give you an accurate answer.
Q. Are you saying it's possible that they just came back to you with a heart totally on their own?
A. Quite. Quite possible.

Q. Did you tell them that you had just signed a dissolution agreement granting exclusive rights to your former partner over another heart logo?

A. I believe I left the reason, you know, for -- for needing a logo out of that, especially a legal matter.

Q. Well, who took care to make sure that your new logo did not breach the contract?

MS. MAXEY-FISHER: Objection.

A. We -- you know, we -- it was a different logo. The contract required a dif- -- a logo that was different, and we satiated that term -- those terms of the dissolution agreement. We satisfied that.

BY MR. SOUTHRON:

Q. In your opinion or someone else's opinion?

A. In fact.

Q. Well, who's to determine that fact? Who made the determination on behalf of CPR Certification that the logo you're using now is different than Doug's logo?

MS. MAXEY-FISHER: Objection.

A. I'm the CEO. I ultimately, you know, have to make that final decision as the CEO.

BY MR. SOUTHRON:

Q. So the Fit Industry's logo was a heart, and it said, CPR Certification, and then it said the city name.

Is that correct?
A. It said certification, CPR, city name --
Q. Correct.
A. -- in the word --
Q. And the dissolution agreement says you can both use the words CPR Certification. Correct?
A. Right. Yes.
Q. So what portion of the logo did the dissolution agreement give to Doug?
A. It gave him the present visual -- the visual representation of -- the representation of Fit Industries, which was what you had put up on your screen there a short while ago.
Q. But not the words CPR Certification. Correct?
A. Right.
Q. So what part of that visual representation was given to him?
A. What -- everything the eye sees on that.
Q. So you mean the heart?
MS. MAXEY-FISHER: Objection.
A. Yep. That would be right. That would be correct.
BY MR. SOUTHRON:
Q. All right. So the dissolution agreement gave Doug the rights to use the heart as it was used by Fit?

A. That is accurate.
Q. Okay. So what was your intention in commissioning a designer to design a heart for you?
A. The -- you know, I knew I would be abandoning the -- you know, give -- Doug would be inheriting the logo, so I needed -- and I knew we'd be running our separate -- going our separate ways, so I needed a logo that represented, you know, CPR in a -- as a reputable as a -- as in a visual sense as possible, and that was my objection. That was my -- excuse me -- that was my objective in getting that art.
Q. Is it true that your intention was to continue saying CPR Certification?
A. Well, since that's the name that I was awarded in the --
Q. Just yes or no is fine.
A. -- dissolution it was important.
Q. Is it your intention at the time you designed your new logo to use the words CPR and Certification in the logo? Yes or no.
A. At the -- at the -- I would -- I -- it was a big possibility. Let's put it that way. I didn't want to box myself in.
Q. All right. So then you commissioned a designer to design a heart for you. So it was your intention at

the time to use a heart, plus the word CPR, plus the word certification --

MS. MAXEY-FISHER: Obje- --

BY MR. SOUTHRON:

Q. -- in your new logo?

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. Yes or no?

A. Not necessarily.

Q. Why not?

A. I -- at the time I was in a -- more of a brainstorming situation. I wanted to, like I said earlier, pick out the best representation for CPR, you know, that would -- that would ooze CPR to the -- to the consumer and do the best thing for our company's bottom line. So if that meant -- you know, I want -- I was --

Q. Did you consider any other shapes other than a heart?

A. I don't recall any other considerations on shapes.

Q. All right.

A. If you'd give me a moment I can ponder that.

Q. When you finally made the decision to combine a heart with the word CPR with the word Certification did it occur to you that that might cause confusion in the

minds of consumers?
A. Can you repeat the question?
Q. When you finally resolved on what your new logo would be and you chose to use a heart plus CPR plus Certification in some arrangement that that might confuse some consumers between you and Doug's company?
A. I couldn't speculate on other people and their mentality and their psychology.
Q. Are you telling me --
A. I would -- I was -- I was satiating the dissolution agreement. I saw a good solid logo that was different than Mr. Joos's and -- yeah.
Q. But different and likelihood of confusion are not the same thing.
MS. MAXEY-FISHER: Objection.
BY MR. SOUTHRON:
Q. What I'm asking you right now is: Did you ever consider that your new logo was likely to cause confusion between you and Doug's logo and his company?
A. Was I -- repeat it one more time? I'm sorry.
Q. When you chose your new logo did you consider that the consumers may likely be confused between your company and Doug's company?
A. I -- I didn't think there would be confusion. Especially --

Q. So you did consider it?
A. I don't think I even considered it. I'm trying to think.
Q. It was not a factor in your decisionmaking when you designed your new logo. Correct?
MS. MAXEY-FISHER: Objection.
A. What were factors were, like I spoke about earlier, I wanted to pick the -- the best logo that represented our company, that oozed --
BY MR. SOUTHRON:
Q. I guess --
A. -- CPR and gave a good --
Q. I'm just trying to get a clear answer here because you're not being clear. I think what you said, and tell me if I'm wrong, is that likelihood of confusion between you and Doug's company was not a factor in designing your new logo.
MS. MAXEY-FISHER: Objection.
A. I don't -- I -- on this I can only speak to my present mind, and presently I don't think -- yeah. They don't -- I don't think there's likelihood of confusion for -- for the logos. I can't --
BY MR. SOUTHRON:
Q. That's not the question. I'm not asking you if there is likelihood of confusion.

A. Okay.
Q. I'm asking you if potential likelihood of confusion was a factor in designing your new logo.
A. Was --
MS. MAXEY-FISHER: Objection.
A. Was the potential likeness -- was the potential likeness of confus- -- likelihood of confusion or likeliness of confusion a factor when I selected the logo? I don't think so. No. I don't know.
BY MR. SOUTHRON:
Q. You never even thought about whether people might be confused when you designed your new logo. Is that accurate?
MS. MAXEY-FISHER: Objection.
A. In my mind it wasn't even -- yeah. Like these things are different, so [unintelligible].
BY MR. SOUTHRON:
Q. That's not what I'm asking you. I'm not asking you if they are different. I'm asking if you actually took care to make sure that they weren't. Where you [unintelligible] at all that customers might be confused when you designed your new logo?
A. So what's the -- what's the end question here?
Q. Were you concerned that consumers might be confused between you and Doug when you designed your new

logo?

A. Was I concerned that -- the confusion of customers didn't really cross my mind, so...

Q. Right. So you didn't consider it. Correct?

MS. MAXEY-FISHER: Objection.

A. So I didn't --

BY MR. SOUTHRON:

Q. This is a yes-or-no question we've been going around for 10 minutes.

A. So --

Q. Yes or no? Was it a factor in designing the new logo?

A. The likelihood of confusion, was that a factor in designing the logo?

Q. That's the question.

A. I -- I guess not since I built -- yeah -- didn't think there'd be likeliness of confusion.

Q. At the time you were designing your new logo was it likely that when the restrictive period ended that you would expand into the same territories as Doug?

A. Can you -- I'm sorry to do this to you, but do you mind repeating the question again? You did it well. I just -- I want to make sure I'm listening.

MR. SOUTHRON: Madam court reporter, can you read back the question?

(Question was read back as requested.)

A. As I was designing the logo was I thinki- -- at the time of -- that I was designing the logo did I have the foresight to go, I -- when this dissolution agreement ends I'm going to go into Doug's territories? I -- I can't really speculate about that specific time in the recent -- you know, not-so-recent past. I can't speculate on that. I think I was just wanting to get the logo. I was concerned about -- you know, Man, I had a lot on my plate. The dissolution, separating, with the transition date. There was a lot going on. Most stressf- -- very stressful time. So, yeah, I don't know if I was --

Q. Why was the restrictive covenant only 12 months?

A. Why was the restrictive covenant only 12 months? Why was the restrictive covenant only 12 months? Those were the terms agreed upon by both parties. I don't...

Q. Why?

A. I -- I can't recall the origin- -- the origination. I hope that's --

Q. Why didn't you make them perpetual? Why didn't you agree to stay out of each other's territories forever?

MS. MAXEY-FISHER: Objection.
A. You know, if I -- that's proprietary, but do I have to still answer?
BY MR. SOUTHRON:
Q. It's not proprietary.
A. Huh?
Q. It's not proprietary.
A. So you're asking why did -- what is it? What is this? Why did we say --
Q. I'm sorry. Are you -- are you intoxicated? Are you -- have you taken anything --
A. No, sir.
Q. -- that would impair your ability to testify today?
A. No, sir. It's just -- no.
Q. Because you don't seem to understand anything I'm asking you.
A. No. It's because I want to ascertain it correctly and to the best of my abilities and I don't want to miss anything.
Q. Have you consumed any alcohol today?
A. No, sir.
Q. Are you on any medications?
A. No, sir.
Q. Did you sleep well last night?

A. Fairly.
Q. Okay. The question is: Why was the restrictive covenant only 12 months?
A. Why was the restrictive covenant only 12 months? I -- those were the agreed-upon terms. Both parties had a chance to formulate that, and that's what we landed on.
Q. If Doug would have countered and said, Let's make it 60 months would you have agreed?
MS. MAXEY-FISHER: Objection to form.
A. I couldn't -- I couldn't speculate at that time. Probably not.
BY MR. SOUTHRON:
Q. Why not?
A. Because, you know, I didn't want to box my company and future opportunities in too much.
Q. Which makes sense.
A. Right.
Q. I think both of you intended at some point to expand without restriction. Correct?
A. Right.
Q. So both of you knew that at some point you'd be operating in the same territories.
A. I did. And I'm assuming Doug did.
Q. So you agreed to 12 months, you probably

wouldn't have agreed to 60, which makes sense because at some point you wanted to get into the same territories he was in.

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. Correct?

A. I wasn't -- that -- you know, it wasn- -- that's not the objec- -- that wasn't my -- you know -- you know, the forefront of my objectives. So, you know, I just -- you know, you want to compete. You just want to compete. Especially being an entrepreneur, you want to compete.

Q. Yeah. I mean, look, it's not a trick question. I -- I would presume without knowing that both of you would want to be in every territory you can.

A. Right.

Q. All right? So for example, Doug was granted the rights to Clearwater. Is that correct?

A. I remember that to be correct. Yeah.

Q. And he was granted the rights to Tampa. He was granted the rights to Miami. Did you intend to expand into those areas at some time?

A. Yeah.

Q. I think it's true that you are, in fact, in all those areas today. Right?

A. I don't think we're in Clearwater.

Q. All right. But you are in Tampa and you are in Miami?

A. Correct.

Q. And you were born and raised in Tampa?

A. Correct.

Q. So is it not reasonable to assume that you intended like the day that restrictive covenant was over that you would open up in Tampa?

A. No. I mean, I -- you know, no. You know, my birthplace had little-to-no weight on my propensity or eagerness to open in Tampa.

Q. But I think it's fairly obvious that when you designed your new logo you kind of knew you would be in the same territories as Doug eventually --

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. -- with that logo. I'm talking beyond the restrictive-covenant period.

A. Uh-huh. Yeah. I mean, right. There are certain things that are -- what's the word I'm looking for? Ev -- what's the word? Inevitable. And so inevitably I thought into the future, yeah, we're probably going to be in the same territories.

Q. Right. So at the time you were designing your

logo there's a strong possibility you would end up in the same territories as Doug?

MS. MAXEY-FISHER: Objection.

A. At the -- at the time I was designing the logo that's when I was having these thoughts, you're saying?

BY MR. SOUTHRON:

Q. Not having the thoughts. I'm just saying there was a strong possibility.

A. Right. But my mindset at the time of the design of the logo was just to satisfy the dissolution agreement, have a clean and amicable -- you know, have a clean separation and have a clean transition. So my mentality at that time was just to do things right, abide by the terms of the agreem- -- agreement, and -- and go our separate ways.

Q. So you gave no consideration at all to the strong possibility that you'll be going to the same customers that Doug would be going for?

A. Not at the time of the design of the logo. I can't speak to that.

MR. SOUTHRON: All right. Give me --

THE WITNESS: You -- you cut out. What did you say, Mr. Southron?

MR. SOUTHRON: Give me a few moments. I just need to check my notes.

(Break was taken.)

MR. SOUTHRON: Okay. I'm back.

MS. MAXEY-FISHER: Can you hear us, Joe?

MR. SOUTHRON: [Unintelligible] questions today. I just want to put on the record that the 30(b)(6) deposition of CPR Certification has not concluded. The personal deposition has concluded. We are going to conclude the 30(b)(6) deposition on Friday when Ms. Ahammer takes her deposition to address the topics that the entity has chosen her as the rep for. Okay?

MS. MAXEY-FISHER: And with that, if I have any cross on the personal you had said that I would do that now.

MR. SOUTHRON: Yeah. You can do that now.

MS. MAXEY-FISHER: I just need to take like a five-minute restroom break.

MR. SOUTHRON: All right. Let's come back at 2:40.

MS. MAXEY-FISHER: Okay. Thank you.

(Break was taken.)

MS. MAXEY-FISHER: I actually have no questions.

MR. SOUTHRON: Okay. Madam court reporter, we're concluded. Will your client read or waive?

MS. MAXEY-FISHER: Read.
MR. SOUTHRON: We'll order.
MS. MAXEY-FISHER: As will we.
(Deposition concluded at 2:42 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, BRITTANY O'NEILL VALLADAREZ, Notary Public, State of Florida, do hereby certify that SAMI HALABI personally appeared before me, via Zoom, on OCTOBER 18, 2023, and was duly sworn and produced a Florida driver's license as identification.

Signed this 24th day of OCTOBER 2023.

/s/ Brittany O'Neill Valladarez
BRITTANY O'NEILL VALLADAREZ
Notary Public, State of Florida
My Commission No.: GG986657
Expires: 07/06/2024

Notary Public State of Florida
Brittany O'Neill Valladarez
My Commission GG 986657
Expires 07/06/2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, BRITTANY O'NEILL VALLADAREZ, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of SAMI HALABI; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 46, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 24th day of OCTOBER 2023.

/s/ Brittany O'Neill Valladarez
BRITTANY O'NEILL VALLADAREZ
Shorthand Reporter

CPR CERTIFICATION, LLC, VS. CPR, LLC

OCTOBER 18, 2023 / SAMI HALABI, AS CORPORATE REP.

ERRATA SHEET

PAGE 22 LINE 14 CHANGE sinus vital to sinusoidal

REASON

PAGE 22 LINE 17 CHANGE sinus vital to sinusoidal

REASON

PAGE 22 LINE 21 CHANGE sinus vital to sinusoidal

REASON

PAGE 29 LINE 14 CHANGE I, mean to many

REASON

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

November 2, 2023 [signature]

DATE SAMI HALABI

SAMI HALABI
C/O BRITTANY J. MAXEY-FISHER, ESQUIRE
MAXEY-FISHER, PLLC
100 2ND AVENUE S
SUITE 401N
ST. PETERSBURG, FLORIDA 33701

(OCTOBER 18, 2023)

IN RE: CPR CERTIFICATION, LLC, VS. CPR, LLC

Dear SAMI HALABI:

The above-referenced deposition is available for review.

Sami Halabi should read the testimony to verify its accuracy. If there are any changes, Sami Halabi should note those with the reason on the attached Errata Sheet.

Sami Halabi should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Reporters on Madison and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from the receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Sincerely,
Reporters on Madison

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)