# EXHIBIT 6

Deposition of Sami Halabi (TTAB Oct. 18, 2023)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

In the matter of Application Serial No. 97/016,512
Published: March 08, 2022

CPR Certification, LLC,

Opposer,

Proceeding No. 91276058

vs.

CPR, LLC,,

Applicant.

_____________________________/

REMOTE DEPOSITION OF: **SAMI HALABI, PERSONALLY**

DATE: WEDNESDAY, OCTOBER 18, 2023

TIME: 10:03 A.M. - 12:19 P.M.

PLACE: ALL PARTIES APPEARING VIA VIDEOCONFERENCE

STENOGRAPHICALLY REPORTED BY: BRITTANY O'NEILL VALLADAREZ
Shorthand Reporter
Notary Public
State of Florida at Large

Pages 1 - 81

APPEARANCES: (via Zoom)

BRITTANY J. MAXEY-FISHER, ESQUIRE
OF: MAXEY-FISHER, PLLC
100 2ND AVENUE S
SUITE 401N
ST. PETERSBURG, FLORIDA 33701
(727) 230-4949, FAX (727) 230-4827
bmaxeyfisher@maxeyfisher.com
APPEARING ON BEHALF OF THE PLAINTIFF

JOSEPH F. SOUTHRON, ESQUIRE
OF: FOUR RIVERS LAW FIRM
400 NORTH ASHLEY DRIVE
SUITE 1720
TAMPA, FLORIDA 33602
(813) 773-5105, FAX (813) 773-5103
joe@fourriverslaw.com
APPEARING ON BEHALF OF THE DEFENDANT

# I N D E X

TESTIMONY OF SAMI HALABI - Page
DIRECT EXAMINATION BY MR. SOUTHRON...............4
CERTIFICATE OF OATH...................................78
CERTIFICATE OF DEPOSITION TRANSCRIPT.................79
SIGNED ERRATA SHEET...................................80
NOTIFICATION LETTER...................................81

INDEX OF EXHIBITS

(NONE MARKED)

------

S T I P U L A T I O N

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

------

P R O C E E D I N G S

*********

THE REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth?

THE WITNESS: Yes.

THEREUPON,

**SAMI HALABI, PERSONALLY,**

was called as a witness and, after having been duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. SOUTHRON:

Q. Good morning, Mr. Halabi. My name is Joe Southron, and I represent Doug Joos. Give me a second. Okay. Good morning. Is it okay if I call you Sam?

A. Yes.

Q. Thank you, Sam. Have you ever had a deposition before?

A. Yes.

Q. Was that deposition over Zoom?

A. No, sir.

Q. Okay. How long ago was your deposition?

A. In the vicinity -- approximately six, seven years ago. Maybe we're going on eight. Somewhere in that range.
Q. What was that case about?
A. That was a personal injury.
Q. Were you injured?
A. No, sir.
Q. Did you injure someone else?
A. No, sir.
Q. And why were you called as a witness in that case?
A. I was called as a -- because I had witnessed -- I had witnessed the event.
Q. Was it a car accident?
A. No, sir.
Q. What happened?
A. A friend at the time had gotten injured.
Q. How was he injured?
A. He was hit by a -- a door.
Q. Okay. And you were -- you were not a party to that case. Correct?
A. Would you repeat the question, please?
Q. Were you a party in that case?
A. I don't believe that -- I don't believe so. I don't know if that's a legal term, but no. To the best

of my knowledge, no.

Q. All right. So it's been a while since you've had a deposition, so I'll remind you the ground rules and explain a little bit about how today's deposition is going to work, because you're being deposed in two capacities today.

In the morning we're going to take your personal deposition, which is based upon your personal knowledge of the questions I ask you. You're not required to know anything, but if you know you are required to answer the questions truthfully and accurately. You cannot say you don't know if you, in fact, do know. If you don't remember something the best thing to say is you don't remember. However, if you do remember you are required to give an answer.

Because we're on Zoom it's important that the ordinary rules for a deposition are followed a little more closely. Like for example, try your best to wait until I'm done talking until you start talking and I'll do the same because there's a court reporter here and she'll be trying to transcribe what they're saying. Sometimes there's a bit of lag in the Zoom transmission, so it helps for us to have that little pause. If you don't understand my question tell me you don't understand the question rather than guess. I'll try to

rephrase. Sometimes -- and I try not to do this, but I'll ask you two questions at one time. You don't have to answer that. You can ask me to break it up. So for example, if I ask you a compound question and you answer yes, it would be better if I break that up so you can separately answer.

And finally, your attorney may object to some of my questions and most of the time you'll be required to answer anyway because your attorney is simply preserving those objections for later. There are some exceptions, and one of them is if your attorney wants to object on the basis of privilege, and in that case you will not answer my question. I will not be asking you privileged questions. If I do so it's inadvertent. But it's another reason for you to pause and process the question and give your attorney a moment to try and answer.

Now, in the afternoon you're going to be taking what's called a 30B deposition, which is a deposition of an entity. We'll be deposing CPR Certification, LLC. You've been designated as a corporate representative. And that means that you are expected to prepare in advance for the questions, know the answers to the questions, and to give answers which are binding upon the entity. I'll talk a little bit more about that

later when that part of the deposition starts, but from now until then this is just your personal deposition. Okay?

A. Okay.

Q. All right. Please state your name for the record.

A. Sami Halabi.

Q. Date of birth?

A. October 16, 1983.

Q. Happy birthday belated. How does it feel to be 40?

A. It's just another day.

Q. Did you know that Flea from Red Hot Chili Peppers was also born on October 16th?

A. Okay.

Q. He just turned 62.

A. Oh.

Q. What's your address?

A. I reside in 3205 Sandspur Drive, Tampa, Florida 33618.

Q. How long have you lived there?

A. I would -- I've lived there on three separate occasions.

Q. Is that a house or an apartment?

A. A house.

Q. Could you tell me the address again?
A. 3205 Sandspur Drive, Tampa, Florida.
Q. What do you mean you've lived there on three separate occasions?
A. I was -- I lived there from zero to seven, and then I lived there from approximately 26 to thirty- -- man, what is the timeline on that -- 28 to thirty- -- mid 30s, and then I moved out for about two years, and I've been living there now for another year and some change.
Q. And who also lives at that location?
A. I'm the only resident.
Q. Was that your parents' house when you were young?
A. Yes, sir.
Q. Did you buy the house or inherit it from them in some manner?
A. No, sir.
Q. So do you currently own that residence?
A. No, sir.
Q. Who is the owner of that residence?
A. My father and maybe my mother, too, since they're married. I don't know whose name is on the deed exactly, but I know my father's name is, at least.
Q. Where did you live -- so we're going to go

backwards chronologically.

A. Okay.

Q. Not until you were seven, but just until you were 18. Okay? So prior to living at Sandspur what was your prior address?

A. So you want -- okay. Prior to --

Q. You can just tell me city and state, by the way. I don't need the address right now.

A. All right. I lived in Gainesville from 17 to 21, 22, then I moved back to Tampa. There was a six-month Los Angeles stint for a while, I lived in Austin for three months, and then the majority -- you know, back to Tampa.

Q. Did you attend the University of Florida?

A. Yes.

Q. All right. I want to go through your education in reverse chronological order. What is your highest degree of education?

A. I hold a bachelor's degree in business admin.

Q. Did you receive that from Florida?

A. Yes, sir.

Q. What year did you graduate?

A. 2004.

Q. Where did you go to high school?

A. Gaither High School.

Q. You graduated in 2000 or 2001?
A. 2001.
Q. All right. I want to go through your job history, and we're going to separate that between Fit Industries and all of the entities involved in this lawsuit and prior to that. And right now I just want to ask you prior to that. So where did you work upon graduating from UF?
A. Upon graduating from UF I worked at a -- at Mercury Insurance.
Q. What years?
A. I don't know the exact, but I can give you a ballpark if that's all right with you.
Q. Yeah. That's fine.
A. 2005 or '6.
Q. So just in the '05, '06 we can say?
A. Yeah. Somewhere in that range I started there. Yeah.
Q. When did you end there?
A. I ended there about 89 days after I got employed there.
Q. What was your job title?
A. I was an auto insurance claims adjuster.
Q. Why did you leave?
A. I was dismissed. Let go. Fired, as they would

say.

Q. Why did you get fired?

A. Performance issues.

Q. What were the performance issues?

A. I had to take on a certain amount of cases, as you -- claims, and I couldn't -- I couldn't -- they were coming in faster than I could close them.

Q. Where did you work after Mercury?

A. I worked -- now, the following is pretty hazy, but I can -- you know, so if they don't line up exact chronological I apologize ahead of time, but I believe Starbucks.

Q. What did you do at Starbucks?

A. I was a barista.

Q. How long did you work there?

A. About five or six months.

Q. Why did you leave?

A. I quit.

Q. Where did you work after Starbucks?

A. Tampa Ale House.

Q. What was your job?

A. I was a server.

Q. How long did you work there?

A. Roughly, you know, roughly five months.

Q. Why did you leave?

A. I quit.
Q. Where did you work after that?
A. Diesel Clothing.
Q. The jean company?
A. Correct.
Q. And shoes?
A. Yeah.
Q. What did you do there?
A. I was a sales -- salesman.
Q. How long did you work there?
A. Probably about five months.
Q. Why did you leave?
A. I quit.
Q. Which -- were you at a retail location?
A. Yes.
Q. Where at?
A. International Plaza in Tampa.
Q. Where was the Starbucks you worked at?
A. Westshore Boulevard.
Q. The one that's up by the late-night clubs?
A. Correct.
Q. Got it. All right. Where did you work at after Diesel?
A. I don't -- I started -- I started doing more entrepreneurial things at that point.

Q. Okay. What was your --
A. I'm not sure --
Q. What was --
A. I'm not sure --
Q. -- your first company? So -- yeah. What was the first company you started?
A. I sold things on eBay.
Q. How long did you do that for?
A. 10-ish-or-so years.
Q. And in between eBay and Fit Industries anything else?
A. Yeah.
Q. Any other ventures?
A. And then I -- well, I sold things on Craigslist, too, and -- and then I became a CPR instructor, and then I instructed for a CPR company.
Q. Which company was that?
A. It was called Tampa Certified CPR.
Q. How long did you work there?
A. That part's a little hazy, but to the best of my knowledge it's maybe about two years.
Q. Why did you leave there?
A. I -- I quit.
Q. Okay. And after CPR Tampa Certified what did you do?

A. I -- well, sort -- during that period I -- probably about halfway through my stint there I opened up my own CPR company called Orlando Certified CPR. I was concurrently working for the Tampa Certified CPR and started Orlando Certified CPR.

Q. Was that permitted under your agreement with Tampa Certified CPR?

A. I had no agreement. So it wasn't --

Q. No written agreement. So you're at-will employment?

A. I assume that -- I don't know that term, but yeah. If that's what that means, sure.

Q. At-will means either party can terminate the employment at any time.

A. Okay. Yeah. Then that's exactly what it was.

Q. If you don't have a written agreement saying otherwise, in Florida all employment is at-will.

A. Okay.

Q. All right. So then you became owner of Orlando Certified. So walk me through the evolution of Orlando Certified to Fit Industries.

A. I started Orlando Certified CPR in the summer of 2014? 2014. And started that company. It ended not too long after that. A year or so went by, and then that's when -- you know, that's when things transpired

into -- that's the route that led to Fit.
Q. Okay. So -- and I'm sorry. You just said this. What year did you start Fit?
A. We incorporated Fit --
Q. Well, just --
A. Yeah.
Q. And that's not the question specifically. I just want to know like when did you start working on Fit and putting it together?
A. Roughly at the end of 2015.
Q. Okay.
A. It wasn't -- it was unincorporated until 2017.
Q. So I want to go back to your time doing odd jobs. It seems there's this magic number around five months where things would get out of sorts and you would quit. What was the reason for that?
A. I -- you know, I couldn't -- I couldn't tell you.
Q. During any of those jobs did you get in any arguments with other employees?
A. A couple.
Q. Did you ever get in arguments with your managers?
A. Not typically.
Q. Did that have any influence on your lack of a

desire to stay at any of these jobs?
A. Not typically.
Q. It looks like you just weren't made to be an employee; you were made to be the boss.
MS. MAXEY-FISHER: Objection to form.
BY MR. SOUTHRON:
Q. Would you say that's true?
A. I couldn't -- I couldn't say for certain.
Q. Well, some people are chiefs and some people are Indians. What would you consider yourself?
MS. MAXEY-FISHER: Objection to form.
A. It's a tough question.
BY MR. SOUTHRON:
Q. Why?
A. I guess I -- you know, I'm a -- I'm a complex, you know, human. So I wouldn't put myself in --
Q. It's not -- it's not a dig. You've been pretty successful as an entrepreneur and not so successful working at these other companies, and I'm just wondering if that has to do with sort of who you are as an individual or if you identified that.
A. Can you repeat the question?
Q. We'll move on. I want briefly to go through your health background. Do you presently or have you prior been diagnosed with any mental illness?

A. You know, I would have to check on that because it's -- if there was an official diagnosis I've never -- I haven't seen it written or anything in there in anywhere, so I'd have to check records and stuff and get back to you on that.

Q. Have you ever seen a psychologist or a psychiatrist or a therapist for any reason?

MS. MAXEY-FISHER: Objection to form.

A. Yes.

BY MR. SOUTHRON:

Q. Okay. And what were those reasons?

A. I sought a psychiatrist for depression and a psychologist for sort of just main- -- to maintain good mental health.

Q. Do you take any medications?

A. Yes. Yes, I do.

Q. What do you take?

A. I take Klonopin. And up until recently after COVID I had insomnia, so I was prescribed Lunesta. And I'm --

Q. How long have you been prescribed Klonopin?

A. Roughly approximately seven, eight years.

Q. How many milligrams are you prescribed?

A. I'm prescribed anywhere from .5 to 2, and it's taken as needed. On a taken as-needed basis.

Q. Okay. What are some of the symptoms that you might feel that leads you to feel like it's needed?

A. Anxiety.

Q. Have you ever had difficulty managing your anger?

A. Not -- no.

Q. Have you ever seen a therapist for anger management or a doctor?

MS. MAXEY-FISHER: Objection to form.

A. I have brought that up certainly just to clear myself, so to speak.

BY MR. SOUTHRON:

Q. Could you explain what you mean by that, clear yourself?

A. I wanted to -- to, you know, have the cleanest bill of health mentally that I could, so I wanted to confront any possible, you know, obstructions.

Q. Has anger been an obstruction for you?

A. No.

Q. Then why would you discuss it with someone?

A. Because I wanted to make sure, you know, it wasn't -- I'm not delusional or anything. I wanted to make sure others, especially a medical doctor, you know, their -- their -- their medical expertise also didn't think, you know -- well, you know, I wanted to run it by

a medical doctor, too.

Q. I understand. So is that because other people have told you you have anger issues?

MS. MAXEY-FISHER: Objection to form. He's answered the question.

MR. SOUTHRON: No. He didn't.

BY MR. SOUTHRON:

Q. You can answer.

A. I don't think any more than the average person.

Q. So what I'm asking you is that you -- you just said you wanted to sort of clear yourself and make sure you're not delusional. You said that you personally don't believe you have anger issues. So the question is: Have other people, not doctors, told you that they believe you have anger issues?

A. People have, you know, voiced their unprofessional opinions.

Q. What were those unprofessional opinions that were voiced to you?

A. I can't recall, you know, specifically. But it's been brought to my attention that I have shown signs of anger, outward anger.

Q. And who has told you that?

A. I don't recall the people, but -- exactly the names or anything, but the -- you know, people around me

in my life.

Q. Was Doug one of those people?

A. I don't recall.

Q. How about Rich- --

A. To the best of my knowledge, no.

Q. How about Rich Bussey [ph]?

A. To the best of my knowledge, no.

Q. Did you hear the things he said Monday?

A. I didn't. No.

Q. So who were the people that made the unprofessional opinions?

A. Just people in my, you know, past. You know, friends.

Q. What were their names?

A. I can't recall like specific instances.

Q. All right. Have you ever been involved in another lawsuit in civil court?

A. Not -- not beyond Douglas Joos and his entities. No.

Q. Have you ever been arrested?

A. I don't think so. I don't think so.

Q. You don't think so or you haven't been?

A. I don't think I have been officially arrested.

Q. Okay. Well, what is in your mind the difference between officially being arrested and

unofficially?

A. I was -- if it was a juvenile delinquent-type thing.

Q. So let me break it down. Have you ever been arrested as an adult?

A. No.

Q. But you had some encounters with the police as a juvenile?

MS. MAXEY-FISHER: Objection to form.

BY MR. SOUTHRON:

Q. Have you had encounters with police as a juvenile?

A. I had one encounter that comes to mind.

Q. And what was that about?

A. It was a -- it was a shoplifting situation.

Q. Did you steal something?

A. You know, did I steal something? That's what I was -- that's what I had the encounter for, so...

Q. So yes?

A. I mean, that's what they would say.

Q. Okay. I'm going to ask you one question about your personal relationships with women. Have any of your female friends or girlfriends, people that you're personally involved with, told you that you have anger issues?

A. There's been anger on both ends because it's a relationship. But anger issues? Nothing comes to mind.
Q. Okay. How did you meet Doug Joos?
A. We met in high school.
Q. At Gaither?
A. That's correct.
Q. How did you meet in high school?
A. I don't -- I don't recall exactly how, but I knew him sort of through, you know, friends.
Q. Did you have any classes together?
A. I don't recall. But we both were in the musical arena.
Q. What -- did the school -- was it like marching band or school band? What did you guys play?
A. I think he was in a group called Showcase, and I was --
Q. Was that through the school or was that just a band he was in?
A. It was related to the school. He was also in a band unrelated to the school, and we both participated in the talent show.
Q. All right. Did either of you play sports together?
A. No.
Q. How did the two of you link up on Fit?

A. I went on Facebook and I put a post to the public that said, you know, something along the lines of, If anyone knows how to build web pages and sort of rank them on Google -- I don't think I said that part specifically -- but, you know, and if you also know, you know, how to edit video, that's a plus. He publicly messaged on -- you know, he commented on the post and said, you know, something along the lines of, That's what I do, Sam. I said, I'll message you offline. And that's how we connected on that.

Q. Was that the first time you had heard from him since high school?

A. No. No.

Q. So in between high school and the Facebook posting what encounters did you have with Doug?

A. We -- we had -- we went out a few times and hung out at mutual friends', you know, houses, including his girlfriend at the time who's Jackie, Joe's his wife, now, his mo- -- her mother and father's home. I mean, because we had mutual friends, I had a friend and he was dating Jackie's sister and stuff like that, so we kind of, you know, got together indirectly.

Q. Were you guys close friends?

A. I wouldn't say close.

Q. When you ran into him at these get-togethers

were those planned get-togethers with Doug or did you run into him there?

A. Ran into him.

Q. All right. So in between high school and Fit did you and Doug ever make plans together socially?

A. Not that I can recall.

Q. All right. So then fast forward to Fit, you put a Facebook posting out and Doug replies to it. What type of professional -- I'm talking professionally now, not the social stuff -- but what type of professional relationship did you two enter into at that time?

A. During the Fit formation or when we -- in two- -- at the end of 2015 when we first started talking about it? The business.

Q. Well, I'm going in chronological order, so whichever came first.

MS. MAXEY-FISHER: Objection. What year are you speaking to?

MR. SOUTHRON: The question is -- so I asked -- I asked him first how him and Doug started working on Fit, and he said he put up the Facebook ad and Doug replied.

MS. MAXEY-FISHER: Right.

MR. SOUTHRON: That's what I'm talking about.

BY MR. SOUTHRON:

Q. And the question specifically is: After he replies to your Facebook ad what type of relationship did you two enter into?

A. A pretty unique one, actually.

Q. Why?

A. It was a business -- business-heavy relationship.

Q. What was unique about it?

A. It was unique because we -- we weren't really friends, but we weren't not friends, but the common thread was business.

Q. Okay. So you're acquaintances?

A. Yeah.

Q. And then entered into a professional relationship. What's unique about that?

A. Because people -- I have -- you know, it's unique because one -- to describe it is like, How did you find? And it's like, He's not my friend, but he's from my past. You know, it's a little intricate. It's not like I just went into business with my friend.

Q. All right. So -- but what was the business relationship that you two agreed to enter into initially just in response to the ad?

A. Initially I was going to pay him for him to build me I think it was four websites, two -- one or two

which were CPR related.
Q. What were the other two?
A. They were deep-cut tanks, and the other one I can't recall off the top of my head.
Q. What's a deep-cut tank?
A. It's a -- it was something I was sort of into at the time. It's a tank top, and the part that makes it deep is the sides are cut a little bit longer than a typical tank top showing your obliques more --
Q. Gotcha. Understood. What's an YOLO freakazoid?
A. What's an YOLO freakazoid? I -- I -- I -- I don't -- I don't know totally.
Q. So I'm just -- do you see my screen here?
A. Yes.
Q. I think this is the ad you put out. Right?
A. Yep.
Q. What's a YOLO freakazoid?
A. I was just being like, you know, being a little bit fun.
Q. Okay. And what's a Sony Vegas 13?
A. It's an editing software for video.
Q. Okay. And what type of work -- what type of video editing were you trying to do?
A. I can't really remember where my mindset was at

that time.

Q. Was it CPR related?

A. That could have been a subset of it.

Q. So after you enter into the arrangement with Doug to do four websites how did he do? How would you rate his performance according to what you expected him to do for you?

A. He put up a landing page. A home page, essentially. Really more like a landing page because a home page kind of gives -- the definition is that it's built out and ready, so a landing page consists of sort of a logo and maybe a background kind of with the Coming Soon type of feel, so that there was at least something on the URL.

Q. He put up a Coming Soon page?

A. Yeah. I don't think he put the words coming soon, but he may have. I don't remember. But he -- he -- I had -- you know, I had to furnish him with the logos and I --

Q. All right. Let me ask the question differently. I can break it down. This will be easier. So you hired him to do four websites. Did he deliver them on time?

A. I don't remember the timeline or the deadline.

Q. Were you satisfied with the timing of his

delivery?
A. I don't recall.
Q. How about the quality of the work he did? Are you satisfied with the quality?
A. One of them looked okay. The deep-cut tanks I remember looking good. He had bricks in the background. That was interesting.
Q. Bricks?
A. The other -- yeah. Like...
Q. Like construction bricks?
A. Right.
Q. And you liked the way that looked?
A. I liked the way that looked. So some of his work was good. I couldn't say it was impeccable and, you know, unbelievably great or anything. But then again, I can't recall fully all the work he submitted. That one just --
Q. How about --
A. -- is the only one that's really sticking out in my head.
Q. How about the cost? Did he do a good job doing it in a manner that was not ridiculously expensive?
A. Yes.
Q. So it sounds like you were overall satisfied with his performance. So describe to me --

MS. MAXEY-FISHER: Objection --
BY MR. SOUTHRON:
Q. -- how -- well, go ahead. You can correct that characterization if I'm wrong.
A. It's hard to go back into that brain, into the brain --
Q. Well, what happens --
A. -- of yesteryear.
Q. -- is you guys deepened your relationship. Correct? You become business partners.
A. What's the question?
Q. So what happens next after he does these websites is you guys become business partners. Right?
A. Right.
Q. All right. So I guess what I'm getting at is: Why? Is it because he did a good job with the websites or were there other reasons you decided to partner with him?
A. It was -- it was more of a nothing-to-lose situation.
Q. What were the benefits of partnering with Doug?
A. The benefits were there was a guy that, you know, had a meeting with me, so he showed up to that, so he had that reliable thing going for him, and that he knew web -- you know, how to build a website.

Q. In hindsight do you think you were correct in assuming there was nothing to lose in partnering with someone who showed up at a meeting?
A. That's a -- can you rephrase that?
Q. Well, I'm trying to understand why you partnered with Doug, and your answer was you had nothing to lose. And I am trying to like get a little bit deeper than that because that's not typically why people partner with others in business. Usually there's a broader set of considerations and tradeoffs. You owned the company at that time, if I understand correctly, 100 percent. Right? When you hired him to do the websites.
A. Right.
Q. And you chose to give him some ownership. I think it was 50 percent. Correct?
A. Right. He -- yeah. We basically -- so, yeah. The deep-cut tank, that was a different project, so that wasn't related to the 50 percent. The other ones weren't -- that I can't recall were not related to the 50 percent. It was most -- it was the CPR.
Q. Well, why did you give him 50 percent of the CPR business?
A. Since I had -- you know, since I had previously done the CPR business and it didn't succeed I felt this

was a, you know, keep-going-try-again kind of thing and --

Q. All right. So I --

A. -- he showed up to the meeting.

Q. Let's -- I think -- now I think I'm starting to understand.

A. Yeah.

Q. So you previously did CPR and were unsuccessful. And then you bring on Doug to hire -- to do websites and he demonstrated that he un- -- that he knew what he was doing. And --

MS. MAXEY-FISHER: Objection -- sorry.

BY MR. SOUTHRON:

Q. -- I'm assuming -- and you can correct any of my characterizations. I'm trying to lay down a predicate here. All right? Assuming then when you say you had nothing to lose what you're saying is prior CPR venture failed, this guy knows how to do websites, maybe if I bring him in it can be successful. Is that -- is that why you did it?

A. Maybe if I bring him in -- that's fair.

Q. You had nothing to lose because the company, the CPR line of business, wasn't making any money at the time?

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. Is that accurate?

A. Yeah. I had no web presence, so...

Q. Were you making any money on the CPR business?

A. No. Just making money instructing for the company.

Q. All right. So at that time what made you think that taking the CPR business online would be more profitable? Or would just be profitable at all versus not profitable?

A. Take it online? I don't understand the taking it online part.

Q. You said you had no web presence.

A. Right.

Q. Today your entire business is an online-business model. Correct? Except for the training part.

A. Yeah. Most of our leads are found online.

Q. So going back in time to when you partnered with Doug, what made you think that adding the online component would make it more successful?

A. Because I understood the power of the Internet and how -- the shift from brick and mortar to everybody going online. I noticed the trend.

Q. And what was the trend specifically in

CPR-training businesses?
A. No different than any other -- for the most part, any other industry. Your leads are going to be done mostly online.
Q. Were there oth- -- and what -- when is this that we're -- like what time period are we talking about when you and Doug start to talk about partnering?
A. End of -- end of 2015.
Q. So at the end of the 2015 were there other CPR-training businesses that were successful online?
A. Well, they didn't -- yeah. I mean, they had an online presence, were getting leads from online, and were hence successful. Yes.
Q. So when you hired Doug were you trying to emulate those other businesses --
MS. MAXEY-FISHER: Objection.
BY MR. SOUTHRON:
Q. -- or were you just kind of like organically trying what works and what doesn't?
A. I -- I was inspired by some companies.
Q. And specifically what were you inspired by those other companies? What were they doing right that you wanted to start doing?
A. They were -- they put up a website, they -- they ran -- they did well on Google search results, and

so they had a lot of traffic relatively speaking, and people --

Q. What would you say today, fast forward 2023, are the strengths of your company?

A. We've got a good legal team; we've got good leadership.

Q. What were your profit margins?

A. I couldn't -- well, that's proprietary.

MS. MAXEY-FISHER: And is this in his personal capacity? Because you started with --

MR. SOUTHRON: Yeah.

MS. MAXEY-FISHER: -- that he didn't need to prepare anything.

MR. SOUTHRON: This is his personal capacity.

MS. MAXEY-FISHER: Okay.

A. Then, yeah, that's proprietary.

BY MR. SOUTHRON:

Q. It's not. You'll have -- you need to answer the question.

MS. MAXEY-FISHER: If you -- if you know.

A. I don't --

MS. MAXEY-FISHER: -- you can answer.

A. Well, I don't know the number.

BY MR. SOUTHRON:

Q. What's the percentage?

A. I don't know the percentage.
Q. How many cities do you operate in?
A. In about roughly 60 or more.
Q. How many human beings do you have to employ in each one of those cities? And I don't mean trainers; I don't mean instructors.
MS. MAXEY-FISHER: Objection.
BY MR. SOUTHRON:
Q. You can answer.
A. How many employees, not instructors, do we have to employ in every location?
Q. Yeah.
A. Zero.
Q. Right. Is that a strength of your business?
A. I'm not -- I don't know if that's considered -- I don't know.
Q. These aren't trick questions, by the way. I mean, it's obvious to me as an outsider what the strengths of your businesses are. You operate in 60 cities, you don't have to employ anybody there, the cost of rolling out into a new city for you is roughly nothing, and you continue to just add profit with almost no new cost, so I imagine your margins are quite high. It's a great business.
MS. MAXEY-FISHER: Objection. He's -- he

answered the question, what he thought his strengths were.

MR. SOUTHRON: I'm not done, so there's nothing to object to.

BY MR. SOUTHRON:

Q. So those are -- it's a strong business. Right? How much of that is related to your capabilities online?

A. Some.

Q. All right. So what else -- what other strengths are needed to successfully execute that business model other than your online capabilities?

A. You've got to -- even though the instructors are not employees that is a key component.

Q. Recruiting instructors?

A. Yes, sir. The proc- -- not just recruiting, but the whole process of finding, being available to -- to communicate with them around their schedule. You know, marketing yourself and your company to them, and then finding the right -- you know, vetting, and then finding the right talent.

Q. How difficult is that?

A. It's -- it's an art. It gets refined all the time.

Q. How do you find instructors?

A. I'm sorry?

Q. How do you find instructors?
A. We put out online ads, job ads.
Q. Where?
A. Most heavily on a platform called Indeed.
Q. And how is that different than the way you hire employees here in Tampa?
A. How is that different? It's not very different.
Q. Right. So it's really not that hard, at least relative to anyone else who just hires employees in the local area. Agreed?
A. It's -- I would have to say it's very hard because many factors.
Q. What are those factors?
A. Well, you know, for one -- and this isn't the biggest one, but -- so in no particular order, the dried-up job market. Nobody seems to want to work. So finding people that even want to work in the first place, that's challenging. There's a lot of scammers out there, there's a lot of shiesty individuals, there's a lot of -- you know, people that want to do nothing more than start their own enterprise and maybe copy your systems. And, you know, you let in one drop of poison and the next thing you know it's poisoning the whole plan because the person is dramatic with the rest of the

crew and, you know. And not to mention, you know, you have -- retention's really challenging. The world is getting more and more competitive as online becomes more of a widely used and ubiquitous vehicle. Anybody -- virtually anybody can just make a profile for something and head off on their endeavor, so you're going up against, you know, a lot -- a lot of people.

Q. So how many people are you going up against?

A. I couldn't spec- -- I couldn't speculate on that.

Q. You don't know who your business' competitors are?

A. We -- we -- I know a -- I could name you a few offhand.

Q. Yep. Go for it.

A. Okay. So there's CPR, LLC, and what they do, there is CPR and More, and Nation's Best, there's CPR Classes Near Me, and a company called Impulse CPR.

Q. And among those companies you mentioned which do you believe are a threat to your business?

A. I don't -- I -- I don't take anything lightly. I don't take any -- I don't -- I don't take any of those lightly.

Q. So all of them are threats to your business?

A. Anything that isn't my business is competing

with, so competition is a -- is a threat.

Q. All right. So of those companies you just listed, are those your only competitors or are those just your largest competitors?

A. Just some of the large -- larger ones.

Q. Do all of them operate nationally?

A. No.

Q. Of those -- of your leading competitors that you identified, how many of them have you challenged their trademark registrations?

MS. MAXEY-FISHER: Objection. Are you speaking to him personally?

MR. SOUTHRON: Yeah.

A. I would -- just one.

BY MR. SOUTHRON:

Q. Why?

A. Can you complete the -- can you ask that in a complete question?

Q. Well, some of those companies have branding that are quite similar to yours. Why haven't you also challenged their trademark registrations?

A. There's -- there -- you know, in the CPR space there's about hundreds or thousands or millions of CPR with hearts next to it and they're mostly red colored and, you know, it's quite ubiquitous.

Q. Then what's your problem with Doug's registration?
A. The problem there is when he filed the trademark applic- -- his trademark application it was -- he was doing so on a federal level blanketing all 50 states which -- which covered and overlapped with our competing territories during the -- during the restricted-covenant period of the dissolution agreement.
Q. And is that all?
A. There -- you know, is that all? That's the -- that's -- that's the big one.
Q. What are the other ones?
A. I -- I turn that over to the legal team. I let them -- my trademark and patent attorneys, I let them handle that. I don't really know too much about the other stuff.
Q. Well, if Doug were to disclaim rights within the restricted territories during the time of the restrictive covenant would that resolve your opposition?
A. Could you -- you were covering your mouth when you scratched your mouth and --
Q. Oh.
A. -- face so I couldn't hear.
Q. If he were to disclaim or exclude his registration to not cover those restricted territories

during the time of the restrictive covenant would that resolve your opposition?

MS. MAXEY-FISHER: Objection to form. Calls for a legal conclusion.

BY MR. SOUTHRON:

Q. You can answer.

A. I -- I wouldn't have that -- I wouldn't have the answer today.

Q. Well, I just asked you what your problem with his registration was, and you very intelligently articulated it. So how do you not know what resolving your opposition would be? What would resolve your opposition? What do you want to happen? What do you want the TTAB to do?

A. What do I want the TTAB to do? I -- I would have to -- I would have to congregate with my legal team on that.

Q. Really. I don't want to know anything your legal team told you, but you are the opposer. Presumably you hired them to oppose. You're the one making the opposition, not your lawyers, and you're telling me you have no idea what you want the TTAB to do?

MS. MAXEY-FISHER: And just to clarify, the appli- -- the opposer is the entity, not Sam in his

personal capacity.

MR. SOUTHRON: We're in his personal deposition here and he owns the entity.

A. I -- I don't have an answer for that at the moment.

BY MR. SOUTHRON:

Q. Why not?

A. There's a -- there's just a conflagration of things.

Q. A what? What was that word --

A. I don't even know.

Q. -- you just used?

A. There is a -- there's a multitude of things, you know, that are -- that are impacted that need to go down due process, certain timelines I have to -- so I couldn't -- because of how complex this could -- this might be, could be, I couldn't answer that right now.

Q. So I just want to get this straight. You cause an opposition to be filed against Doug's registration, and at this time you have no idea what you want the USPTO to do with his registration?

A. All I know is, you know -- not all I know -- there was a filing that was not kosher, for lack of a better term, and we opposed it for -- we opposed it.

Q. Could you be more precise? When you say there

was a filing, are you talking about Doug's filing?

A. I'm talking about Doug's filing.

Q. Okay. So Doug filed a trademark and it's not kosher. In your opinion why is it not kosher?

A. Because at the -- he -- the dates in which he -- the date in which he filed was still within the noncompete 11 territories of the dissolution agreement that were awarded to me. So by applying for a federal trademark that would blanket all 50 states and every city that's in them, that would be -- that would be a faux pas.

Q. Okay. Why?

A. Because it would -- it's -- he's basically saying, All right. I'm going to have trademark rights federally, and that covers my areas, and he's not permitted to be in my areas.

Q. Is it your opinion that filing a trademark means he's doing business in your areas?

A. It's -- could you repeat the question?

Q. I'm trying to understand why you are conflating trademark rights with doing business in a particular geography.

MS. MAXEY-FISHER: Objection to form.

BY MR. SOUTHRON:

Q. So for example --

MR. SOUTHRON: I haven't asked the question yet.

BY MR. SOUTHRON:

Q. -- the dissolution agreement divides up some territories for a period of 12 months. Correct?

A. Uh-huh. Yes.

Q. Also, Section 7 of that agreement gives Doug the rights to the logo. Correct?

A. Right.

Q. Meaning you have zero rights to that logo at that point in time. Correct?

MS. MAXEY-FISHER: Objection.

BY MR. SOUTHRON:

Q. You can answer.

A. It -- I -- that means I could not use Douglas' logo.

Q. Anywhere. Right?

A. Anywhere.

Q. Anywhere in the country of the United States. Correct?

A. Yeah.

Q. So why can't he protect his rights across the entire United States solely in the logo?

A. I would have to get back with you on that.

Q. Why?

A. Because I don't -- I don't have the answer right now.

Q. When did you file your opposition?

A. We filed the opposition -- I don't recall the exact date.

Q. Is it approximately a year ago?

MS. MAXEY-FISHER: I need to take a restroom break, but --

THE WITNESS: Me, too.

MS. MAXEY-FISHER: -- answer the question.

MR. SOUTHRON: Okay. Just hold on. I'll let you guys go. I'll wrap up here in a second.

THE WITNESS: Okay.

BY MR. SOUTHRON:

Q. So you admitted that you had no right to use the logo anywhere in the United States, and I just asked why Doug cannot use the logo anywhere in the United States. You don't know the answer, but let me ask you this question: Doesn't he have a right to stop you from using that logo in those restricted territories? Who are you looking at?

A. I'm just looking at the wall. Does he have the -- can you repeat that question?

Q. During the time of the restricted covenants do you agree that Doug had the right to stop you from using

the logo that was granted to him in the same agreement?

MS. MAXEY-FISHER: Objection to form.

BY MR. SOUTHRON:

Q. You can answer.

A. During the dissolution agreement did Doug have the right to stop me? It wasn't a matter of stopping. It was just that logo is -- I couldn't use it.

Q. Which means he had the right to stop you from using it in your territories. Correct?

A. I couldn't use it in my territories.

Q. Okay. I'll rephrase it. The dissolution agreement said that you can't use that logo anywhere including in the territories you were given for 12 months. Correct?

A. The dissolution said I couldn't use this logo anywhere including my territories. Yeah.

Q. So why are you opposing Doug from protecting his logo across the entire United States if you have no rights to use that logo anywhere?

A. It was within -- you know, it's -- it -- because he is trying -- you know, was -- was blanketing all 50 states, including my territories he -- he shouldn't be given that -- awarded that trademark in those territories. He can't be in there whatsoever, even with his logo.

Q. Just because he can't do business there doesn't mean he can't stop other people from using the logo there. Do you agree?

A. Just because he can't do business there doesn't mean he can't stop others from using the logo there? That's -- that's beyond my -- my pay grade. I don't -- I don't know.

Q. Okay. Do you agree --

A. I don't think --

Q. -- that he could stop you from using the logo there during those 12 months?

A. Sure. If I'm using the logo it says that in the dissolution I can't use the logo. I suppose, yeah, he -- he could say, Hey, that's -- you're breaking the dissolution agreement at that point.

MR. SOUTHRON: Okay. We'll take a break now.

MS. MAXEY-FISHER: Thank you.

MR. SOUTHRON: We'll come back at -- how long do you need?

MS. MAXEY-FISHER: 11:25? Like five minutes.

MR. SOUTHRON: Okay. All right. See you then.

MS. MAXEY-FISHER: Thank you.

(Break was taken.)

BY MR. SOUTHRON:

Q. Sam, I'd like to talk about the dissolution

agreement and compliance with that agreement. You've got a couple different companies. You've got 84- -- and, actually, let me ask you a little bit about that. Because you've got 842 Industries, UCPRA, and CPR Certification, LLC. Which of those entities hires all of the employees?

A. 842.

Q. All right. And in your opinion is 842 required to comply with the dissolution agreement?

A. Absolutely.

Q. Same question for CPR Certification, LLC.

A. Absolutely. It -- it...

Q. And same question for UCPRA.

A. Absolutely.

Q. And does CPR Certification, LLC, have any employees?

A. No.

Q. And does UCPRA have any employees?

A. No.

Q. All right. So all of the people that have to understand the agreement and make sure they're complying with it are at 842 Industries?

A. Correct.

Q. All right. So let's go back in time to -- the dissolution agreement is signed. Does 842 already

exist?

A. Yes.

Q. Had it been operating prior to the dissolution agreement?

A. Not operating.

Q. All right. When 842 began operating what did you do to make sure that 842 and the people working for it would comply with the dissolution agreement?

A. We made sure we didn't solicit any persons, instructors, anybody in the 11 cities and counties that the cities were in that were awarded to Mr. Joos or CPR, LLC, and we made -- we did not -- we abstained from doing any marketing efforts, any presence online through -- we ensured we didn't have any Google My Business Profiles, we ensured we didn't have any websites that had any cities that were involved in -- any cities or counties that the cities were in.

Q. How about Nuance Industries, LLC? What does that company do?

A. That company has since been dissolved.

Q. What did it do while it was operating?

A. It's -- it attempted to do an online learning program, CPR program.

Q. Did that operate concurrently with Fit?

A. Let me think. Yes.

Q. In your opinion was Nuance Industries required to abide by the terms of the dissolution agreement?
A. Absolutely. Although I don't even think it was in existence anymore, so I think that's irrelevant. But if it was, absolutely.
Q. What is CPR Classes, LLC?
A. That is a -- it's a LLC formed for specific reasons. For internal --
Q. What are they?
A. -- internal structuring.
Q. What are those reasons?
A. That's more of a proprietary situation.
Q. Yeah. I don't -- I don't think so.
A. Okay. It's a -- we -- I don't know which direction we're going to take, but it's going to house our -- it's going to house a future project.
MR. SOUTHRON: And just -- I'd like to clarify something for you. Something being proprietary doesn't make it privileged.
MS. MAXEY-FISHER: Right.
MR. SOUTHRON: If you believe something is a matter of privilege your attorney will object. Otherwise, you have to answer the question. This deposition is being done under a uniform protective order which affords some protections there. So if you

want to tell me something that's confidential you can do that and it will be handled according to the protective order.

THE WITNESS: Would your client, Douglas Joos, be privy to the transcript of today's session?

MR. SOUTHRON: Well, yeah.

THE WITNESS: So he's a major competitor, so [unintelligible] things like what are my future plans --

MR. SOUTHRON: I haven't asked you that.

THE WITNESS: Right. And I appreciate that. I would appreciate not being asked that.

BY MR. SOUTHRON:

Q. All right. So what is CPR Classes?

A. It's an LLC -- our latest-formed LLC that was LLC'd for a specific reason. And I -- that reason eludes me at the moment because we've just been running the main company, which is CPR Certification, LLC, which handles the AHA in-person, so I haven't had time to give that really more thought. As of right now it's an empty shell.

Q. What is Certification Classes, LLC?

A. That's a company we formed to house our Red Cross beta test. We wanted to test out Red Cross and see how that performed.

Q. Does CPR Classes have something to do with your

future plans that you don't want to talk about?

A. It might -- it might hold the -- it might be the LLC that holds the projects, but I haven't [unintelligible] the projects yet.

Q. What do you mean by projects?

A. Yeah. New --

THE WITNESS: [Unintelligible] peanut butter.

A. New endeavors that are not AHA in-person CPR classes.

BY MR. SOUTHRON:

Q. Did you just say peanut better?

MS. MAXEY-FISHER: Yes. I asked him if he was okay. He seemed to be choking, and he said peanut butter.

BY MR. SOUTHRON:

Q. Do you have blood sugar problems?

A. Not on paper, but -- not on paper.

Q. I'm just asking because I know your attorney made it a point to inquire when we're having lunch.

A. Okay.

MS. MAXEY-FISHER: Yeah.

BY MR. SOUTHRON:

Q. And I'm aski- -- and I'm now wondering: Is that's because you're hungry or because you might have hypoglycemia?

A. I should be good.
Q. Okay. Let me know if you're not.
A. I appreciate it.
Q. But don't do that in the middle of some critical line of questioning. Okay?
A. Okay.
Q. Like you did last time. All right. So now I understand all these entities, and they're all under compliance and they're all controlled by you. Right?
A. Yes, sir.
Q. All right. So we're talking about what you did to make sure they comply with the agreement, and you talked about the restricted territories, described that. But what did you do to make sure that these entities and all of the people under your control complied with the rest of the dissolution agreement?
A. We -- we contacted the instructors and told them to discard any materials with the logo on it, and we -- yeah.
Q. Okay. How about the non-disparagement clause?
A. Yes. We took it seriously --
Q. Did you --
A. -- and we did not, you know, disparage the company, the CPR, LLC.
Q. Okay. Then why did you ask your employees

offshore to make false Google reviews about Doug's companies?

A. I -- I don't recall that. And although there might have been body sort of speech about that, that was never green lit and it was never executed.

Q. Could you describe the language you just referred to?

A. Body?

Q. Uh-huh.

A. I don't know. It means like, you know, sort of --

Q. I know what it means. I want you to give me examples of that language that was used.

A. I'm not quite sure what that -- what that word fully means, but --

Q. Look, I don't need -- we're not talking about definitions of words. Tell me the language that was used that you're talking about.

A. Well, for example, we -- we received -- we received some pretty dicy-looking sort of manufactured negative attacks. And, you know, I -- I might have spoken out in a -- in a sort of -- he -- you know, anger -- angry sort of way that -- you know, I might have said, Oh, yeah. Let's -- you know, I want to do this. I want to -- I want to give a review, a negative

review, to get him back or something like that, but it was never -- it was never actually done.

Q. Did you say that?

A. Something along those lines. I can't remember the exact words.

Q. Did you ever make violent comments about Doug at staff meetings?

A. Not that I can recall.

Q. What did you do to make sure that you weren't hiring instructors that already worked for Doug?

A. We -- during the dissolution agreement period of noncompete we made sure we did not teach in his awarded cities and the surrounding counties that they're in. But we didn't -- what was the -- I'm sorry. What was the question?

Q. What did you do to make sure that you weren't hiring instructors that were currently working for Doug?

A. We -- we did -- there was no -- there was no delineation in the agreement that we were not allowed to. Since they're independent contractors they're -- he -- you know, there was no delineation that, Hey, we couldn't hire or utilize his independent contractors and vice versa. But certainly we would not use his or our independent contractors for competing in territories that were his.

Q. Did you ever hire any of his instructors?
A. I believe so. I believe so.
Q. Did you do that knowingly?
A. You know, I couldn't -- I don't know who their -- it's sort of they're independent contractors and they can work for whoever they want, so I didn't make it a point to ask them who they're, you know, working for. I might have asked, Are you working for Doug? But I don't -- it wasn't a major point of -- you know, it wasn't a major sticking point or anything like that.
Q. Have you ever talked to your employees about Doug?
A. I have. Yes.
Q. What did you say about him?
A. He's my ex-business partner and we went our separate ways.
Q. What else?
A. That kind of thing.
Q. What else?
A. What else? You know, he has a competing business.
Q. Have you ever told your employees that Doug was your enemy?
A. I don't recall in the moment right now. I

don't recall that.

Q. Do any of your employees now or in the past have an opinion that Doug is your enemy?

A. I couldn't speculate to their thoughts.

Q. Who is Samuel Halpern?

A. That is -- I don't know. I don't know any real person by that name.

Q. But you do know of that name. Right?

A. It -- it -- I've heard -- right. I've seen the name. I've heard the name.

Q. Yeah. You've used that name as an alias for yourself. Correct?

A. I wouldn't -- I wouldn't say that.

Q. What would you say?

A. It -- it was a -- it was an anonymous -- that's an interesting question. I wouldn't -- okay. What's the question again?

Q. Why did you use Sam Halpern as an alias for yourself?

A. I wanted anonymity. I wanted some -- I used that as an anonymity to be anonymous.

Q. Why?

A. I -- you know, I don't -- I want to protect my privacy as much as possible whenever possible, especially being a CEO.

Q. Isn't it true that you used the name Sam Halpern to offer CPR-related services online?
A. That was -- that name was in a -- in the -- yeah.
Q. Yeah. Why would you want to do that and be anonymous?
A. I guess I didn't really give it thought beyond I don't want my real name floating around out there.
Q. Isn't it true that you were selling fake CPR certificates under that name?
A. That's incorrect.
Q. Why?
A. They -- the certifi- -- well, the certificates that I think you're speaking about are not fake.
Q. Why not?
A. Because the person signing up, the student, had to go through some kind of training to earn that credential.
Q. What type of training? Like what exactly would they have to do?
A. They would have -- there was some feedback.
Q. Why are you looking at your attorney?
MS. MAXEY-FISHER: We're -- we're getting feedback.
THE WITNESS: We're getting feedback. Is it

still there? Testing one, two. Okay. I think it's good.

A. Would you repeat that question?

BY MR. SOUTHRON:

Q. What training specifically would be needed to get a certificate from Sam Halpern?

A. It was a while ago. But to the best of my knowledge, they would need to complete an online course.

Q. Are you saying that they could get a CPR certificate entirely online?

A. Yes.

Q. Isn't that illegal?

A. No.

Q. Does 842 offer online-only CPR certificates?

A. No.

Q. Why not?

A. Why not? So you're asking why doesn't my current company offer online CPR. Is this correct?

Q. Yeah.

A. We just -- we haven't developed it.

Q. Doesn't PAM require in-person training via component of CPR certification?

A. Yes, sir. That's the American Heart Association. They --

Q. So why is Sam Halpern offering online-only

certificates?

A. Because that Sam Halpern one that you're speaking of in no way, shape, or form is -- is connected to the AHA. So it can follow its own guidelines. It doesn't follow the AHA guidelines.

Q. Okay. I want to talk about your logo for 842. Why is it owned by another entity called CPR Certifications? Or strike that.

Who owns the logo that is used by 842?

A. Who owns the logo? Could you present the logo you are speaking about?

Q. It's the logo you put on all your websites.

A. Could you be more specific? I mean, we have a -- could you be more specific? Just so that I know we're talking about the one you want to talk about.

Q. How many logos do your companies use?

A. How many logos did my company use? Well, we've got the -- we've got a Red Cross CPR logo, we've got an American heart CPR logo. They're not afilia- -- I mean, they're not part of the -- you know, they're our own logo, but created in purpose to distribute these trainings from the respective companies. So I just want to make sure, you know, we're talking about apples and apples.

Q. Well, how about the logo that you use to

advertise CPR training in Tampa?
A. Well, again, you would want to have to be more specific. Because we do Red Cross also in Tampa, so that has a different logo.
Q. How about that one?
A. Yeah. That's -- I believe that's your client's company and logo.
Q. That's Doug's logo?
A. If Doug is the owner of that company, then yes.
Q. Okay. How about that one?
A. Okay. Yep. That -- that's our logo. Yeah. That's our website.
Q. Do you think this logo complies with the dissolution agreement?
A. Yes, sir.
Q. How do you know that?
A. Because this logo is different than that of Mr. Joos'.
Q. Well, if your logos are different then why are you opposing his logo with the TTAB?
A. I'm a -- yeah. I stated the reason earlier. It had -- has nothing to do with my logo. It has to do with --
Q. Okay. So you're not arguing that the logos are similar?

A. Correct. I am not -- yeah. It is not my contention that the logos are similar.

Q. Then what's the problem with him registering his logo?

A. I stated -- I believe I stated that earlier.

Q. Yeah. What you said earlier is he was using -- he was registering it federally and that there's a restrictive covenant that said that he couldn't operate in certain cities for 12 months, but you haven't really explained why that's a big deal to you.

MS. MAXEY-FISHER: Objection to form.

BY MR. SOUTHRON:

Q. So I might be confused, because I thought the problem you had is that his logo that he was registering might confuse people in your restrictive territories. Is that not true?

A. It sounds not true, but can you repeat? Just to make sure I got this right, would you mind repeating the complete question again?

Q. So if Doug were to register his logo on a national basis why would you have a problem with that?

A. And that's the question I answered a little while ago --

Q. I'm asking you again because it seems like unclear to me at this point. Why would you have a

problem with that?
A. Because on the application the date he filed the application it fell within the 12-month restricted covenant period of competing in each other's territories. And by filing a federal trademark he would blanket all 50 states, including the territories that were awarded to me that he could not be in.
Q. But you're not arguing that he was actually selling CPR classes in those territories. Correct?
A. I'm not arguing that he's selling -- yeah. For the best of my knowledge he did not sell CPR in my territories during the 12-month period.
Q. So why do you believe registering a trademark breaches the covenant in the agreement?
A. Why do I believe breaching? Because -- because like I said, he blankets -- he's blanketing -- he's claiming ownership -- he's blanketing all 50 states, all cities, including the ones I'm awarded, including the counties I'm awarded, and so that's a -- that's a -- you know, that's -- I'm challenging that. That's not lawful.
Q. How is that a violation of a dissolution agreement?
A. How is that a violation of a dissolution agreement? Because in the dissolution he was not

permitted to -- you know, he was prohibited from doing any sort of CPR-related activities. And filing for the trademark would be doing an activity that might breach.

Q. But you just admitted that your logos are different.

A. Oh, yeah. That has nothing to do with the similarities or differences. That's just having to do with presence in my territories.

Q. What kind of presence do you believe in registering a trademark creates?

A. It's a -- it's a legal -- it's a legal situation.

Q. Why?

A. You know, I -- I let the -- I let my advisors and attorneys handle that.

Q. Well, when you decided to ask one of your attorneys -- hold on. When you decided to file the opposition why did you do that? Like what is it about registering a logo that's different than your logo that you think is a breach of the dissolution agreement?

MS. MAXEY-FISHER: Objection to-- to form. He's answered this question multiple times.

MR. SOUTHRON: No. He hasn't. He hasn't.

BY MR. SOUTHRON:

Q. But you can answer.

MS. MAXEY-FISHER: I disagree.
MR. SOUTHRON: Your objection has been noted.
A. Would you repeat that question again?
BY MR. SOUTHRON:
Q. Why does registering a logo, which is in your opinion different than your logo, violate the restrictive covenant?
A. It's -- even though it's different it violates the covenant because it -- he's applying on a -- the time in which he applied was during the restricted -- restricted 12-month period.
Q. All right. But I just kind of want to get this clear. So you're not going to tell me why, but is the sole basis of your opposition that he tried to register a trademark during the time of the restricted covenant?
A. Is the sole basis of my opposition? That's a -- that's a component.
Q. What are the other components?
A. I -- I don't have it. I don't have that right now. My legal team sort of and advisors kind of handles that.
MR. SOUTHRON: Give me one second.
BY MR. SOUTHRON:
Q. So I'm showing you the dissolution agreement that was signed by the two of you. I will scroll to

signature pages here. Is that your signature there?

A. It would appear so. Yeah.

Q. These are your initials on each and every page in the top-right corner?

A. It would look like. It would look so. Yeah.

Q. This Section 5, the post-dissolution restrictive covenant, that is the restriction that you're talking about -- that we're both talking about right now. Correct?

A. If I could read that just to make sure?

Q. We're going to go through it. I just want to be certain that this Section 5 is the section that we should go through.

A. Okay.

Q. Sections 1, 2, and 3 don't really have to do with restrictive convenance. Section 6 is the transition. And then 7 and 8 are the logo, which we'll get to later. Right? And then we have some -- some other stuff.

A. Okay.

Q. This Section 5 you agree is the section that creates the territories and the restricted -- the prohibited activities that you believe Doug's filing a trademark violated. Correct?

A. Right.

Q. All right. So right here in the middle you'll see it's got this defined term, prohibited activities, and I want to go through them. All right? The first one says, Engage in, be associated with, employed by, perform services for, or have ownership directly or indirectly and a business in any manner similar or in competition with the company's business of providing training and certification for CPR, first aid, bloodborne pathogen. So that would include basically owning a company that performs those services. Do you agree? Fit's business services, which is what Fit provided?

A. Okay.

Q. All right. So the first prohibited activity is engaging in business that's similar to Fit in the geographic area. Do you agree?

A. All right.

Q. So that would include, for example, selling CPR services in the territory?

A. Okay.

Q. All right. Do you agree with me?

A. Do I agree that that's the only restrictive thing we were --

Q. No.

A. -- unable to do?

Q. Just the one we just went through.
A. Okay.
Q. I'm going to go --
A. Sure.
Q. -- through a couple other. I'm going to go through them.
A. Sure.
Q. So selling CPR or having anything to do with a company that sells CPR would be one type of prohibited activity. Right?
A. Okay. Yeah.
Q. Right. And then it says, Other acts of competition. Bullet point 1, I, The pursuit of customers through the use of websites or by other means where customers are solicited. Do you believe that by registering a trademark that Doug violated Bullet Point No. 1?
A. It doesn't appear that way.
Q. Right. And that's because he -- you answered this earlier, but to your knowledge he was not soliciting customers in the territories during the period. Correct?
A. To the -- yeah. To the best of my knowledge. Right.
Q. And then Bullet Point No. 2 says, Setting up

training sites in the other member's restricted territory. Do you believe Doug was setting up training sites in your territories?

A. During the restricted period? Nothing comes to mind on that right now, so...

Q. So we have offering CPR training, that's restricted. Soliciting customers, that's restricted. Setting up training sites, that's restricted. How is it that registering a trademark is restricted? Which of those categories does it fit into?

A. Setting up? It might be attributed to setting -- to setting up -- the setting-up process.

Q. Well, the paragraph goes on to say that prohibited activities does not include ownership of domain names that are not in active use, so the dissolution agreement actually expressly excludes at least one type of branding. So if it's okay to set up a domain name that says CPR Certification Oklahoma, why is it a violation to simply register his trademark?

A. The domain is -- is the -- the exception in this, but I don't see any other exceptions.

Q. But you agree that it doesn't say filing a trademark is a prohibited activity?

A. But -- I don't see that clause in there, but I see setting up.

Q. Setting up what?
A. Setting up training sites in other member's restricted territory, prohibited activities.
Q. Are you saying that registering a trademark is equivalent to setting up a training site?
A. It's part of the -- it's part of the process.
Q. What is a training site?
A. A training site -- well, I guess it's a site in which training takes place.
Q. What is a training site? I don't understand this term as it's used in this contract. What does it mean?
A. Setting up training sites. A place where training is undergone.
Q. What type of training?
A. I mean, I would fathom that it would be CPR related.
Q. So does that mean setting up a territory?
A. What's the full question?
Q. I asked you if that means setting up a territory.
A. Yeah. But could you state a full sentence?
Q. I'm asking you if in your opinion a training site and a territory are the same thing.
A. No. They're not the same thing.

Q. All right. Is a training site basically a physical location where trainers will teach CPR?

A. I imagine that that's how it's depicted here in this --

Q. You signed this agreement. You needed to have a mental impression of what you were agreeing to. What did you think training sites meant when you signed this agreement?

A. Yeah. I thought it meant an area that you're -- you're executing training.

Q. Okay. And you then went on to agree that prohibited activities doesn't include buying domain names so long as they're not actually in use.

A. Right. Is that -- are you -- what's the question?

Q. When you signed this agreement you agreed that prohibited activities does not include owning domain names that are not in use.

A. Sure. Yes.

Q. Why -- why not?

A. I believe that was a -- that was a -- that was a -- what's the word I'm looking for? A clause that Douglas chose. That his camp vied for.

Q. But you agreed to it. Correct?

A. I agreed to it.

Q. And you also agree that the agreement doesn't prohibit either member from conducting online CPR training.

A. It doesn't -- for sake of clarity -- which sentence is that? The for sake of clarity line?

Q. Yeah.

A. For sake of clarity this agreement does not prohibit either member as part of a more-expansive training program, such as certified nurse assistant, other members [unintelligible] online CPR training. And then it says, Halabi and Joos agree that they will not advertise for online training for any Fit's -- of Fit's business services and any other member's restricted territories.

Q. So you agreed that in the restricted territories you could buy domain names if they're not actively used, that you could offer nurse-assistant training in the restricted territory, that you could offer online -- you could conduct online CPR training in the restricted territory, but you are not permitted to advertise for online training in the restricted territory. Is that an accurate summary?

A. It's -- it's a confusing chunk, I will say. And there might have been -- there might have been typos in there.

Q. Well --
A. There might have. Yeah.
Q. What do you think is a typo?
A. I think they -- it was supposed to say you're not able to do online CPR. And does -- it does prohibit either member from conducting online CPR training.
Q. Why do you think that is a typo?
A. Because the -- because from how I recall the verbal negotiations were going that was no -- you weren't to compete in any capacity with CPR. We took that extremely seriously --
Q. Were you --
A. -- both parties.
Q. Without telling me conversations with your attorney, were you working under the advice of an attorney when you signed this agreement?
A. I was. Yeah. I was consulting with an attorney.
Q. Okay. Did the parties through their attorneys both have equal opportunity to make changes to this agreement?
A. We -- we -- yeah. There was some -- yeah.
Q. All right. Setting the typo -- you know, the possibility of a typo aside, if we're looking at what this agreement allows both parties to do even in the

restricted territories, that would include domain names not in use, nurse training, and online CPR training. Correct?

A. Say that list again?

Q. Domain names not in use, nurse training, and online CPR training.

A. Does not prohibit either member as part of a more expansive -- yeah. Except that we couldn't advertise and will not advertise for online training.

Q. Got it. So even though you have this restriction on the territory there were things that you could do in the restricted territory. Right?

A. Yeah. It would seem that way.

Q. It's not that you couldn't do anything at all; there were simply three things that were listed as restricted. That's offering CPR training, advertising it, pursuing customers, and setting up training sites. Right?

A. Okay.

Q. But here's Doug's registration. If you see in his goods-and-services description it describes what he's applying the mark to. And which portion of this do you believe violates the dissolution agreement?

MS. MAXEY-FISHER: Objection to form.

MR. SOUTHRON: All right. We won't do that.

BY MR. SOUTHRON:

Q. Let me just ask you this: It's clear that you believe that at least some types of services are permitted to be offered in a restricted territory. So long as Doug in the restricted territory is only doing those allowed things and not doing any of the prohibited things why can't he register his trademark for those things which are permitted?

A. I saw on that screen that you showed me previously it said, Live CPR. Intended use was live and online, so...

Q. So is your opposition mainly about the word live?

A. I'm not going to -- I can't speak to that at this moment.

Q. If the word live wasn't there would you still be opposing?

A. I couldn't speak to that right now.

Q. You are the person that caused the opposition to be filed. Correct?

A. Yes.

Q. So who could speak to that?

MS. MAXEY-FISHER: Objection to form.

BY MR. SOUTHRON:

Q. Who could tell me whether or not if we took the

word live out that that would resolve your opposition?

A. I would have to consult with my legal team on that and get back to you.

MR. SOUTHRON: All right. Why don't we break for lunch and come back at 1:00 p.m.?

MS. MAXEY-FISHER: Okay. Thank you.

(Deposition concluded at 12:19 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, BRITTANY O'NEILL VALLADAREZ, Notary Public, State of Florida, do hereby certify that SAMI HALABI personally appeared before me, via Zoom, on OCTOBER 18, 2023 and was duly sworn and produced a Florida driver's license as identification.

Signed this 24th day of OCTOBER 2023.

/s/ Brittany O'Neill Valladarez

BRITTANY O'NEILL VALLADAREZ
Notary Public, State of Florida
My Commission No.: GG986657
Expires: 07/06/2024

Notary Public State of Florida
Brittany O'Neill Valladarez
My Commission GG 986657
Expires 07/06/2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA :
COUNTY OF HILLSBOROUGH :

I, BRITTANY O'NEILL VALLADAREZ, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of SAMI HALABI; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 77, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 24th day of OCTOBER 2023.

/s/ Brittany O'Neill Valladarez
BRITTANY O'NEILL VALLADAREZ
Shorthand Reporter

CPR CERTIFICATION, LLC, VS. CPR, LLC

OCTOBER 18, 2023 /SAMI HALABI, PERSONALLY

ERRATA SHEET

PAGE 24 LINE 18 CHANGE "Joe's his wife" to "who's his wife"

REASON

PAGE 38 LINE 25 CHANGE plan to plant

REASON

PAGE 55 LINE 4 CHANGE body to bawdy

REASON

PAGE 55 LINE 8 CHANGE body to bawdy

REASON

page 15 Line 8 Change "so it wasn't" to "so it was"

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

November 2, 2023
DATE

[signature]
SAMI HALABI

SAMI HALABI
C/O BRITTANY J. MAXEY-FISHER, ESQUIRE
MAXEY-FISHER, PLLC
100 2ND AVENUE S
SUITE 401N
ST. PETERSBURG, FLORIDA 33701

(OCTOBER 18, 2023)

IN RE: CPR CERTIFICATION, LLC, VS. CPR, LLC

Dear SAMI HALABI:

The above-referenced deposition is available for review.

Sami Halabi should read the testimony to verify its accuracy. If there are any changes, Sami Halabi should note those with the reason on the attached Errata Sheet.

Sami Halabi should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Reporters on Madison and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from the receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Sincerely,
Reporters on Madison

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)