# EXHIBIT 10

Transcript of Evidentiary Hearing, *Joos v. Halabi*, No. 23-CA-013691 (Fla. 13th Cir. Ct. Dec. 20, 2023)

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS
MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
FOR HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

COPY

CASE NO.: 23-CA-013691
DIVISION: L

DOUGLAS K. JOOS,
Plaintiff

V.

SAMI HALABI,
Defendant

HEARING

WITNESSES:
DOUGLAS K. JOOS
RICH BUSSEY
SAMI HALABI

DATE: DECEMBER 20, 2023
REPORTER: MAYRA HERNANDEZ

APPEARANCES

ON BEHALF OF THE PLAINTIFF, DOUGLAS K. JOOS:
Joseph F. Southron, Esquire
Julia Weber, Esquire
Four Rivers Law Firm
400 North Ashley Drive
Suite 1720
Tampa, Florida 33602
Telephone No.: (813) 331-5056
E-mail: joe@fourriverslaw.com

ON BEHALF OF THE DEFENDANT, SAMI HALABI:
Daniel P. Dietrich, Esquire
Justin Patrick Bennett, Esquire
Audrey Gangloff, Esquire
Gunster, Yoakley & Stewart, P.A.
401 East Jackson Street
Suite 1500
Tampa, Florida 33602
Telephone No.: (813) 228-9080
E-mail: ddietrich@gunster.com

AND

Brittany Maxey-Fisher, Esquire
Timothy O'Keeffe, Esquire
Maxey-Fisher, PLLC
The City Center
100 Second Avenue South
Suite 401 N
Saint Petersburg, Florida 33701
Telephone No.: (727) 565-0316
E-mail: bmaxeyfisher@maxeyfisher.com

Also Present: Honorable Darren Farfante, Judge; Mr. Castro, Deputy; Shelathia Hilliard, Court Clerk; Matthew Ersek, Law Clerk at Maxey-Fisher; Laura Ahammer, Observer; Aleah Joos, Observer; Doug Joos SR., Observer

INDEX


| | Page |
|---|---|
| PROCEEDINGS | 5 |
| TESTIMONY OF DOUGLAS K. JOOS | |
| DIRECT EXAMINATION BY MR. SOUTHRON | 27 |
| CROSS-EXAMINATION BY MR. DIETRICH | 47 |
| TESTIMONY OF RICH BUSSEY | |
| DIRECT EXAMINATION BY MR. SOUTHRON | 72 |
| CROSS-EXAMINATION BY MR. DIETRICH | 80 |
| TESTIMONY OF SAMI HALABI | |
| DIRECT EXAMINATION BY MR. DIETRICH | 86 |


EXHIBITS


| Exhibit | Page |
|---|---|
| Plaintiff's | |
| 3 - Dissolution Agreement of Fit Industries, LLC | 11 |
| 6 - Notice of Opposition | 11 |
| Defendant's | |
| 9 - Dissolution Agreement of Fit Industries, LLC | 9 |
| 13 - E-mail \| 02-24-2021 | 48 |
| 14 - Letter from Mr. Joos to John Schifino | 49 |
| 28 - E-mail to Yes Working \| 02-25-2021 | 57 |

STIPULATION

The hearing was taken at HILLSBOROUGH COUNTY COURTHOUSE, 800 EAST TWIGGS STREET, COURTROOM 508, TAMPA, FLORIDA 33602, on WEDNESDAY the 20th day of DECEMBER 2023 at 2:31 p.m. (ET); said hearing was taken pursuant to the Florida Rules of Civil Procedure.

PROCEEDINGS

THE COURT: Is Madam Court Reporter ready to go?

All right. So I'm going to call case number 23-CA-13691, and we're here on the evidentiary hearing on Plaintiff's Motion for Temporary Injunction. So let me take appearances for Plaintiff first, please.

MR. SOUTHRON: Joseph Southron on behalf of the plaintiff, Doug Joos.

THE COURT: Good afternoon.

MS. WEBER: Kathleen Weber, on behalf of the plaintiff as well.

THE COURT: Good afternoon.

MR. DIETRICH: Douglas K. Joos, Jr.

THE COURT: Good afternoon. All right. And for defendant?

MR. DIETRICH: Good afternoon, Your Honor. Dan Dietrich with Gunster, Yoakley & Stewart on behalf of Sami Halabi.

MR. BENNETT: Good afternoon. Justin Bennett of Gunster on behalf of Mr. Halabi as well.

That's Mr. Halabi.

MR. HALABI: I'm Mr. Sami Halabi.

THE COURT: All right. Good afternoon. All

right, so we're set. We have a two-hour evidentiary hearing.

How did you want to use the time? Have you had any discussion with Counsel about using the time today?

MR. SOUTHRON: We have, Your Honor. We're going to do five-minute openings followed by 45 minutes for each side to offer evidence, with the remaining time for closing arguments.

THE COURT: Okay. Great.

MR. DIETRICH: My only hesitation, Your Honor -- I do agree with 45 minutes on each side. Whatever would be left over, I would ask, I may go 10 or 15 minutes, and I can deduct that from my closing at the opening side.

THE COURT: I lost you there. Say again?

MR. DIETRICH: So we're going to have 45 minutes each. So that's an hour and a half. I may take 10 or 15 minutes in my opening.

THE COURT: Okay.

MR. DIETRICH: And I'll deduct whatever leftover I have from the closing.

THE COURT: Okay. Well, I'll be keeping, sort of, chess time up here. So I'll give you an allocation of time.

301729 Hearing before Judge Farfante 12-20-2023 Page 7

Next question, if there's going to be witness presentation, is anyone invoking the exclusionary rule?

MR. SOUTHRON: Yes, Your Honor.

THE COURT: Okay. So is there anyone in the courtroom who may be testifying that's sitting in the back right now? Can you look, Counsel?

MR. SOUTHRON: A witness behind me, Mr. Bussey.

THE COURT: You're going to call him?

MR. SOUTHRON: Yes, Your Honor.

THE COURT: Okay. Anyone else that you intend to call?

MR. DIETRICH: Nobody on our side, Your Honor.

THE COURT: All right. So we're going to do one thing. If we're invoking the exclusionary rule, we're going to ask anyone who's testifying at the hearing today to just wait outside. The bailiff will walk you out in the hallway. When your testimony is ready and needed, we'll bring you back in.

Once you've testified, you're either free to go, or you can sit back in the courtroom. If you're going to stay in the courtroom after we excuse these witnesses, and someone tries to call you in the witness, I'm not -- as a witness, I'm not going to

permit you to testify.

So I want you to understand, if you remain in the courtroom after we excuse those witnesses, and you're here and someone changes their mind, we're not going to permit that testimony; Counsel, understand that?

MR. SOUTHRON: Appreciate it.

THE COURT: Okay. All right. So who's the individual that's going to walk out? The Bailiff will let you know when we're ready for you.

THE WITNESS: Thank you, sir.

THE COURT: All right. So the record is clear, he has walked outside of the courtroom. All right.

Any other housekeeping matters? Do you want to address any stipulated exhibits before we do opening statements?

MR. DIETRICH: We -- we did have a couple stipulated exhibits, Your Honor, that we can certainly enter now. On our side, we would like to offer Tab 9, which is the Dissolution Agreement.

MR. SOUTHRON: Same in both? Yeah. We can use yours or mine. It doesn't matter.

MR. DIETRICH: Tab 9 in our -- in our defendant's binder, which is the Dissolution Agreement. We would like to enter Exhibit --

MR. SOUTHRON: 10.

MR. DIETRICH: -- 13, which is email correspondence, and Exhibit 14, which is additional correspondence.

THE COURT: Okay. That's everything you believe is stipulated?

MR. DIETRICH: I believe those three are stipulated. There are others that are stipulated. I -- I just don't know, at this point, if we'll be entering them, so I'll -- I'll do it at the time.

THE COURT: Okay. Any objection to Defendant's Exhibits 9, 13, or 14?

MR. SOUTHRON: Your Honor, from the Defendant I have Exhibit 4, Dissolution Agreement, Exhibit 8, Notice of Opposition. And I don't have the other two.

(DEFENDANT'S EXHIBIT 9 MARKED FOR IDENTIFICATION)

MR. DIETRICH: So those are -- those are our internal -- those are our internal numbers. It is 9, 10, 11, 12, 13, 14, 15. We just continued numbering off of yours.

MR. SOUTHRON: Okay.

MR. DIETRICH: So I understand it says 4 there, but in the binder themselves, does -- does he have --

301729 Hearing before Judge Tarrance 12-20-2023 Page 10

MR. SOUTHRON: We're objecting to 20.
THE COURT: Well, this goes -- because the -- I think the data sheet that you gave for each side is probably different than the numbers, you know, I've been working with. So I'm looking at the Dissolution Agreement; the email on February 24th, 2021, from T. Wood to J. Schifino; and the email from March 17th, 2022, from J. -- from -- from you, Mr. Southron, to J. Schifino.
Those are the three. Any objections?
MR. DIETRICH: Those are the three, Your Honor.
MS. WEBER: I just see -- all right.
MR. SOUTHRON: We're -- we're just going to object at this time. The only thing we'll stipulate to is the Dissolution Agreement.
THE COURT: Okay.
MR. SOUTHRON: Regardless of opposition, we may withdraw our objection. We let -- I think there's just some confusion as to what --
THE COURT: Okay. So let's not take too much time. I'll admit Defendant's Exhibit 9. That's the only one that's in by stipulation.
Any Plaintiff's exhibits? It looks like you have 3 as the same document, correct?
MR. SOUTHRON: But Your Honor, I -- I also want

to point out, they're identical to Plaintiff's Exhibit 3 and 6.

(PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)

(PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)

THE COURT: So 3 and 6 of Plaintiff's data sheet?

MR. SOUTHRON: Yeah. They're -- they're the same exhibits: Dissolution Agreement and Notice of Opposition.

THE COURT: All right. So no opposition, Mr. Dietrich, to 3 and 6 of Plaintiff's data sheet?

MR. DIETRICH: No opposition, Your Honor. I just want to clarify, I'm happy to address it at any time, but there were no objections to our 13 and 14. I think those are waived. So, I'm not sure -- what the objection is now.

THE COURT: All right, when you go -- when you go to move it in, if there's -- you can raise that. And if it is, I'll address it then.

MR. DIETRICH: That's fine.

THE COURT: It won't be a stipulated exhibit for right now, but I -- I understand your argument.

MR. DIETRICH: That's fine.

THE COURT: Okay. So let's dispose of that for openings. I'll let you argue from the table. If

301729 Hearing before Judge Farfante 12-20-2023 Page 12

you want to use the lectern, it's your choice, but I don't have a preference. So if you want to, keep your materials in front of you.

Anything else before opening statements?

MR. DIETRICH: No, Your Honor.

MR. SOUTHRON: No, Your Honor.

THE COURT: Okay. So you have the floor. I'll take notes on the computer, if you see me typing.

If you want to shift that, it's kind of an awkward --

MR. SOUTHRON: The wire's caught. I don't even think it's plugged in. It's not plugged in.

I probably don't need the mic, Your Honor. I can speak up, if that's okay.

THE COURT: Is your light on?

MR. SOUTHRON: No, it is not.

THE COURT: Okay.

MR. SOUTHRON: The light's vaguely on.

THE COURT: Okay.

MR. SOUTHRON: I don't think we need it.

THE COURT: Mine's not off.

MR. SOUTHRON: Your Honor, this is largely a case about consumer confusion, and we've brought a motion to enforce certain restrictive covenants. And I think it's important to understand that those

covenants were not just promises made to each other by the parties. Those were covenants to the public, not to confuse the public about their branding. And so what -- the relief we're asking for today is to stop that consumer confusion and also to preserve common sense.

The one theme that you will see throughout all of the defendant's arguments is that they both lack the concern for consumer confusion, and they also lack common sense. For example, you're going to hear today that this logo is different than this logo. And as I hold these up, I don't even know which one is my client's; because while they are different, they're also the same.

They're going to argue, for example, that these are different colors. They are, if you were to look at the hex code. But to the naked eye, they're exactly the same. They're going to argue that the fonts are different, which again, they probably are. But again, to the naked eye, they're completely the same. They're going to argue that this heart is different than this one. But again, they're also the same.

The point is that consumers in the market for CPR services are not likely to see these as

301729 Hearing before Judge Farfante 12-20-2023 Page 14

different. They're very likely to see them as identical, if not similar. And they're very likely, as you will see in testimony today, that they've confused people as to the source of those services.

We're going to present today testimony from my client, Doug Joos. He's going to walk us through the company that was called Fit Industries, which was formed by the plaintiff and the defendant. He's going to talk about the dissolution, why there was a dissolution, and he's going to explain the covenants in that agreement, and why those covenants exist, so that the Court can understand that, again, they're making promises to each other, but they're also making promises to the public in general.

Furthermore, you're going to hear testimony from a whistleblower. He's out in the hallway. His name is Richard Bussey, and he's going to testify to some things that we're also asking to enjoin, which in general I will say are violent and terroristic threats by Mr. Halabi made against his employees and made against my client.

And at the end of that, we're going to ask the Court to do three things. Number one, to stop the nonsense and enjoin the use of this confusingly similar logo. It's gone far enough. It needs to

stop. Number two, to order Mr. Halabi to take down the false reviews that he's posted online intentionally with the intention to destroy my client's brand. And number three, we're asking for a no-contact order, because there has been a lot of threats of violence made by Mr. Halabi. Many people are concerned for their safety around him, my client included, and we think the orderly administration of this case requires that kind of order. Thank you.

THE COURT: Thank you.

MR. DIETRICH: Thank you, Your Honor. I'm going to take a little bit more time than that, because there is more at issue here that was not explained.

Your Honor, we're here today on an injunction, a temporary injunction. There is a significant burden that the plaintiff has to overcome. It's an extraordinary remedy. The Court knows, under the case law, that it's granted sparingly. Significant hurdles being that the plaintiff has to come forward on each of the elements and provide competent substantial evidence to support each of the elements. Each one of them. He has to prove all four.

Not proving with that sufficient evidence any

one of the elements is fatal to the relief that he's requesting today. Your Honor, we believe you can actually summarily deny the motion at this point, based on the undisputed evidence. Your Honor, one of the elements is irreparable harm, and we know under the case law that that element requires that the moving party, the Plaintiff in this case, move with speed and urgency. That's -- that's important, Your Honor.

And what we know is, as Mr. Southron just indicated, one of the main, if not the main issue in this case, are the logos that are at issue. And what we know is that the dissolution agreement, which was negotiated by the parties through their Counsel, has a provision that you're going to see on what the requirements are of my client with respect to the logo. And a company -- the company dissolved and they each went their own way. My client had to then design a logo that was, and this is important, was different than Mr. Joseph's. That's all. It doesn't have to be confusingly dissimilar. It doesn't have to be anything else. It has to be different. Mr. Southron just admitted that they are different.

Doesn't -- there's not levels of difference,

Your Honor. If you'll look up the definition of different, which you're permitted to do under the case law, different means what? I looked it up. It means not the same. That's all. Nothing more or nothing less. Not the same. Are the logos different? They absolutely are. You will hear testimony from my client, with the extraordinary steps that he took to make sure he was in compliance with the dissolution agreement, with making sure it was different. To sit here and say that you can look at these logos and not tell the differences? Your Honor, you can visually look at them, and if you haven't already, and I'm -- I'm sure you will, you will see the visual differences. It's not just the color. It's not just the font. There's sinusoidal waves. There's connecting, the heart connects to different parts of the letters. There's a number of differences that you will hear about today, Your Honor. And that's fatal.

And that's also important because, why can you summarily deny this? Let me tell you why. Speed and urgency. You move for temporary injunction; you move with speed and urgency. The exhibits that, again, are not objected to, that we will offer into evidence through -- through -- through our case; the

one exhibit, Exhibit 13, was that email, back on February 24th, 2021. February 24 -- or 4th, 2021, from Mr. Joos's attorney, Tom Wood, to Mr. Halabi's attorney, John Schifino, my colleague. And in that email, Your Honor, specifically, Mr. Wood says, Doug thinks that there is a legitimate legal question as to whether Sami's new logo is sufficiently different from the company logo that Doug was awarded under the dissolution agreement.

So back on February 24th, 2021, Mr. Joos had concerns about whether my client was in compliance with the dissolution agreement. He didn't file this complaint until July 2023, didn't file the initial motion for temporary injunction until a month later, in August 2023, two and a half years after this email, when he started having concerns about whether the logo was in compliance.

Exhibit 14, another unobjected to exhibit, which is an email -- or which is a letter from Mr. Joos's now attorney, Mr. Southron, to again, Mr. Halabi's attorney, my colleague John Schifino. And when you look at that letter, it's a few pages long. And what does it do? It lays out almost all of the issues that are at issue today. Not almost, it -- it includes all the issues that are at issue today,

back on March 17th, 2022.

And by the way, Your Honor, all these issues point back to one thing: the logo. The same logo that he had concerns about back on February 21st -- 4th, 2021. And in that letter, after they go through all the issues that they're now looking to enjoin today, they even threaten an injunction back in 2022. The delay is significant, Your Honor.

We've cited a number of cases. I'm just going to cite a few because this is a very important issue. Tab 14 in our case law binder is the Wreal, W-R-E-A-L, v. Amazon case. It's 840 F 3rd 1244. Talks about a delay of five months in bringing the motion is fatal to irreparable injury. The Pippen v. Playboy case, which is 2003 Westlaw 21981990, that's Tab 16. And our binder talks about a one-year delay being fatal to the relief requested. Millennium Funding v. 1701 Management, which is 2021 Westlaw 3618227, talks about a delay, and by the way, it's Tab 18 in our binder -- talks about a delay of between two to 12 months being fatal to the claim. And the last case I'll reference is the -- the Seiko v. Swiss Watch Case, 188 F 3rd 2nd 1350. It talks about a three-month delay. Your Honor, we're not even close here. We have a two-and-a-half-year delay. Two and a half years is when they brought this claim.

That alone, Your Honor, supports denying the motion.

Another element: adequate remedy at law. We all know that irreparable injury, under the case law, Your Honor, talks about, that's an injury that cannot be cured by monetary damages. What have they brought here?

They brought three claims in their complaint: breach of contract, tortious interference, injunctive relief. When you look at the complaint -- and I'll -- I have a copy, but if Your Honor needs a hard copy, it's

Paragraph 23 of the complaint, breach of contract. What does he ask for? He asks -- he says that Plaintiff Joos has suffered damages. Paragraph 33, tortious interference: Plaintiff Joos has and will continue to suffer damages. Paragraph 35 of the complaint talks about, if injunction is not granted, my client will profit from the misuse of the sole and exclusive property of the -- of the plaintiff, which is what? The logo. Page 16 of the motion, Your Honor, talks about how Plaintiff Joos could be partially compensated with an award of monetary damages.

Your Honor, everything points back to damages. That is an adequate remedy at law, warranting denial of the motion. Even in the initial demand that they serve, which is the Exhibit 14, the letter from Mr. Southron, he talks specifically about how my -- my client's

301729 Hearing before Judge Tarrance 12-20-2023 Page 21

actions are misappropriating revenue and potential profits of the plaintiff. Your Honor, again, these are -- these are damages that can be calculated and awarded if the plaintiff can succeed on his -- his claims at trial. So there's no issue here on -- on the damages. That is clear from the filings and the pleadings, Your Honor. He also asks in the motion on Page 16, he says that he wants an injunction because my client's actions would bring, would bring, irreparable harm. Your Honor, would bring. An injunction cannot be based on some conjecture, some eventual, some futuristic harm. That is what they want. They want futuristic harm.

Tab 20 of our notebook, the Jacksonville Electric case, Your Honor, talks about this, that you don't get to have an injunction granted if your harm is futuristic, if it's contingent, if it's eventual. Your Honor, that case is 487 Southern 2nd 372. And by the way, Your Honor, we have a number of cases in our binder that we provided, and all these cases are cited in our brief. I'm not going to go through each one for time purposes, but we certainly do incorporate them into our argument today.

In our contract case, they have contract damages. That's what they've alleged. Tortious interference case, they have business loss, as they

allege. They have damages that can certainly remedy any potential tortious interference, if they prove that. Now I want to touch on the last thing, Your Honor, because -- and that is the -- this alleged threat, this alleged fear and the disparagement.

That makes its way into this proceeding through the amended motion. It's not in the initial complaint. It's not in the initial temporary restraining order. It's not in the emergency temporary restraining order. It was filed in November as part of the amended motion, Your Honor. None of it is pled. So I would put forth that they cannot satisfy the success and the elements for those issues because there's nothing to succeed on. They don't have a -- a claim that's pled that they could even go forward with to succeed on the merits, Your Honor. Tab 24 in our -- in our case law binder, the Goldschmidt case, explains that you cannot be held liable on something that is not pled in the complaint in accordance with Rule 1.110, Your Honor. And that's 571 Southern 2nd 422. You look at the -- the civil rules, Rule 1.100: a motion is not a pleading. A pleading is a pleading, a complaint in this case. They have not filed a complaint for disparagement. They have not filed a complaint or alleged a claim of relief for this alleged fear that Mr. Joos has. That's fatal for

purposes of today for their claims that they're seeking.

In addition to that, Your Honor, you -- you -- the case law is clear. You can't obtain injunctive relief to prohibit the type of restraint on speech that they're trying to obtain from my client, Your Honor. I -- I don't have it in the binder, but we do have a copy for you. It's the David v. Textor case, which is 189 Southern 30th 71, talks very specifically that a temporary injunction directed at speech, such as what they're doing here, trying to enjoin any disparagement, is a classic example of prior restraint on speech, triggering First Amendment concerns. And those concerns are the most serious and the least tolerable infringement on the First Amendment rights.

Your Honor, they -- they can't -- you can't enjoin what somebody says in the future. That's not what injunction -- that's not what -- the relief that they can be granted in what they're seeking today. Second, Your Honor, that case, that same David-Textor case, as well as a number of other ones we cite, talk about if there is speech, it's defamatory, disparagement, whatever the case is, you can be remedied through a proper cause of action filed with damages as the remedy. That's what all the -- that's what you can get. You have an adequate remedy at law. If somebody's

saying something that they shouldn't be saying, prove your damages at trial and that's the remedy; not an injunction to prevent somebody from saying something in the future, as what they're trying to do here.

Lastly, Your Honor, on that point, this whole protective injunction thing, not even properly before the Court. I have included under Tab 5 Florida statute 784.064. Lays out the procedure to follow to get a protective restraint, such as what they're asking. And what they're asking is that my client stay 500 feet away from -- from the plaintiff. Your Honor, there's requirements that you have to go through: you have to have sworn affidavits or -- or something verified and in support of that, you have to have an act of violence that took place in the last six months. Your Honor, you're going to hear testimony, Mr. Joos has not spoken to my client in 2023. Everything that he's alleging that he now has a -- a -- this newfound fear of, took place 2022, 2021, or even before. Your Honor, that's when these acts took place. Nothing recently, Your Honor.

You're going to hear how there was in -- well, they've actually alleged it in the motion in Paragraph 43, how my client had outbursts, and as a result of those outbursts, Mr. Joos feared for his family and his

301729 Hearing before Judge Farfante 12-20-2023 Page 25

family's safety. What he doesn't say, but you're going to hear today, is notwithstanding these outbursts, Mr. Joos actually met with my client after these outbursts, in person, on two separate occasions. So fearful of him, asking you to enjoin my client from going near him for 500 feet, but he found it okay to go meet with him in person on two separate occasions. And he's so fearful that these allegations didn't make their way into any of the pleadings or any of the filings, until the third version of the temporary restraining order. Your Honor, the cases Tab 32, the Single Terry Case, 662 Southern 3rd 700, and Tab 33, the Santiago case, 917 Southern 2nd 909, they both talk about this violence for irreparable -- for a temporary injunction. You have to have something imminent. You have to have an imminent fear. There's nothing imminent here. They haven't even spoken to each other. Other than maybe, what, they're seeing each other today, they haven't each other in 2023. They haven't spoken. Nothing is imminent, Your Honor.

So in addition to all the other hurdles, they have to get over these additional hurdles on these other elements, on these other new -- I'm not going to even call them claims because they're not -- they're not pled claims. Your Honor, they can't satisfy their burden. We

only have to knock out one of the elements. That's it. We think we can knock out all four. We only have to knock out one for you to deny the motion. They do not have competent sufficient evidence to support their motion, Your Honor. And you know, for these reasons, we do believe that you can summarily deny this based solely on the delay issue, Your Honor. Thank you.

THE COURT: Okay. Thank you. All right. So just to recap, and I have a couple of questions. So I have you as 15 minutes in, Mr. Dietrich, and then you actually used just three minutes, Mr. Southron. So I'm going to keep that against the hour and 55 where we started.

My question is, is anyone going to call a witness that might overlap with the other side? And can we take the witnesses through completion by agreement? Do we have overlapping witnesses?

MR. SOUTHRON: We're okay with that. If you want to just do direct, redirect, and cross at the same time.

THE COURT: Okay. Is there anyone like that on your respective lists?

MR. SOUTHRON: Not on my side. We're going to call Mr. Joos and Mr. Bussey.

MR. DIETRICH: Your Honor, I don't necessarily

plan on calling you -- or either of them, so I won't -- we'll cross them and finish them.

THE COURT: Okay. All right. Great. All right. So the next witness is Mr. Joos. All right.

So you can take the stand, just follow -- the bailiff will have you pause briefly to be sworn in and just follow him up to the chair after.

THE BALIFF: Okay. Stop here, face the front, raise your right hand.

THE CLERK: Do you solemnly swear or affirm the evidence you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Thank you.

THE BALIFF: All right. Now you have a seat.

THE COURT: All right. Good afternoon.

THE WITNESS: Good day.

THE COURT: Does that microphone -- I only ask -- we have a court reporter here, so please let the attorney finish their question before you answer, and he'll do the same so you're not speaking on top of one another. All right. Go ahead.

THE WITNESS: Okay.

DIRECT EXAMINATION

BY MR. SOUTHRON

Q. Mr. Joos, can you please state your name for the record?
A. It's Douglas K. Joos, Jr.
Q. Mr. Joos, is Mr. Halabi in the Courtroom?
A. He is.
Q. Could you please point at him? Is that your former business partner?
A. It is.
Q. Okay. How did you two meet?
A. He's an acquaintance from high school.
Q. And how did you two begin working together?
A. Mr. Halabi made a post on Facebook, looking for -- wanting to have some help with web design.
Q. And what was -- what was your role in the business initially?
A. You mean after we got together?
Q. Yeah.
A. I was in charge of websites and marketing and business strategy and financial matters.
Q. Could you briefly describe how the business Fit Industries worked?
A. Fit Industries is a business that taught CPR certification classes and first aid training in various cities across the country.
Q. And how would you find customers?

A. We would advertise on -- on Google using profiles and running advertisements. Paid ads.
Q. Was Fit Industries successful?
A. I believe so.
Q. Why do you believe so?
A. Well, we never really went negative. We made a modest profit our first year and made a -- a good -- a good profit our -- our next few years.
Q. Okay. So despite the business being profitable, what ultimately led to the dissolution?
A. Toward the end of Fit Industries, Sam had approached me in June of -- of 2020, about wanting to switch gears and switch our websites to online-only CPR training. And I had stated that I disagree with doing that because it would -- one, it would be deceptive to consumers, and -- and two, I -- would tarnish our brand to the point where it would be associated with non-legitimate CPR training.
Q. And why is that?
A. Why is that not legitimate? The AHA, as well as most organizations, require that the training at least have a partial in-person component, where someone can do a skill assessment on -- on the person receiving the training. And there has to be a -- a specific duration. The class needs to be administered by an

accredited instructor.

Q. And these requirements are set by the American Heart Association?

A. They are. And they have their policies and various organizations have their own minimum criteria that they have to -- to take in order to work at those organizations.

Q. And did Mr. Halabi agree with your concerns?

A. No. He did -- did not. I mentioned that, you know, we have to have a hands-on component. He said, you know, their hands are on a keyboard. And I said, you know, that's not sufficient and you know it.

I convinced him in the -- or at least I thought I convinced him in the conversation that we just needed to focus on opening new branches and hiring more people. We had some locations that were ready, that just lacked an instructor due to turnover. And I suggested we focus our efforts on that rather than giving people something that wouldn't actually help them.

Q. Did Mr. Halabi actually begin offering online-only CPR?

A. Yeah. That's in part what result -- what caused the dissolution to take place, is that I had discovered that even though he had -- was trying to convince me that he wanted to at least try this because

he had never tried it; he'd been waiting to try it for four years. I found out he was actually doing it under -- on a website online. And he was selling online-only training, that he made claims that they would be able to, in 30 minutes or less, take accredited training from their home and, as a result of that training, be able to work as a nurse. And he was doing that all under the alias of Samuel Halper.

Q. Who was Samuel Halper?

A. I assume that is Mr. Halabi.

MR. DIETRICH: Objection, Your Honor.

THE COURT: What's the objection?

MR. DIETRICH: Speculation.

THE COURT: I'll -- I'll overrule that. Overruled. You can answer that.

That's the answer. Go ahead. Next question.

BY MR. SOUTHRON:

Q. Did you say nurse certifications?

A. They were -- it was stated that the CPR training that they would receive would qualify them to continue working as a nurse.

Q. Does that mean they would skip the four or five-year educational program typically required of a nurse?

A. I don't know. Nurses are required to maintain

a -- a basic life support level of CPR certification. Every two years, they have to renew that. And it is -- it is paid attention to and it is supposed to be in-person, or at the very least have an in-person skill check.

Q. Is there anything else that led to your dissolution with Sam?

A. Toward the end, Sam began to -- increasingly demanding to have roles in things that I was typically in charge of. And he seemed to be fixated on the prospect of my death. It was something he brought up quite frequently, about me dying, as if it was imminent. And he was not concerned at all about his own death. It was just about mine.

Q. Could you be more specific?

A. It's just that he -- he would bring it up randomly in conversation about, you know, oh, what's going to happen when you die?

And I would say, I don't know. We're -- we're -- we'll follow the -- the Florida statutes as to however that's supposed to be handled. He wasn't really satisfied with that response.

Q. Any other reasons for the dissolution?

A. Well, Sam -- Sam is the one who initiated the Dissolution Agreement, and actually sent it to me.

MR. SOUTHRON: Okay. Your Honor, I'd like to introduce Plaintiff's Exhibit number 3. Would the bench like a copy?

THE COURT: I think that's already in. Isn't that the Dissolution Agreement?

MR. SOUTHRON: Yes, I'm just wondering if Your Honor needs a copy to follow, or if you have --

THE COURT: No. I have the binder. I have a copy. I do.

MR. SOUTHRON: Do you -- do -- do you have a copy?

MR. DIETRICH: It's the Dissolution Agreement?

MR. SOUTHRON: Yeah.

MR. DIETRICH: I have. Thank you.

BY MR. SOUTHRON:

Q. Mr. Joos, I want to refer you to Paragraph 7 of this agreement. Okay?

What is the purpose of this paragraph?

A. To give me sole and exclusive ownership of the logo that we had used in business for over seven years at the time.

Q. Could you read for the Court the language that you believe grants you that sole exclusive use?

A. The heading of the -- of the line actually reads, "Ownership of company logo." And then it says,

"The members agree that the company's current logo, as seen on the websites operated by Fit, shall become the sole and exclusive property of Joos."

Q. Okay. I want to refer you to Paragraph number 8. And I would you -- like you to read the line in full for the record, starting with, "In addition to changing the logo," ending with, "so that a reasonable person viewing websites operated by Halabi will not be confused," and to the end of that sentence.

A. Yeah. "In the addition of change -- in addition to changing the logo as set forth above, appearance only and not the words, Halabi agrees to change the Hero picture on his websites and change the icons above the words 'BLS CPR classes, CPR and first aid training, and group lessons and private training,' so that a reasonable person viewing websites operated by Halabi will not be confused that the websites are operated by the same company as the ones operated by Fit."

Q. All right. So that says, confused with Fit, not with a company that you may have in the future, correct?

MR. DIETRICH: Object to form, Your Honor. It's --

THE COURT: Oh, wait. I'll sustain. You can

301729 Hearing before Judge Taffante 12-20-2023 Page 35

rephrase it.

MR. SOUTHRON: Okay. All right.

BY MR. SOUTHRON:

Q. Is it your understanding that this paragraph makes it so that Mr. Halabi must change his logo and those words and the other things so a reasonable person viewing them will not confuse Mr. Halabi's new websites with the websites that you operate together under Fit?

MR. DIETRICH: Object to form, Your Honor.

THE COURT: Sustained.

BY MR. SOUTHRON:

Q. What is your understanding of that paragraph?

MR. DIETRICH: I'll object to that as well, Your Honor.

THE COURT: What's the objection?

MR. DIETRICH: There's no -- there is no testimony that this contract is ambiguous. In fact, there's -- everybody agrees. It's a valid and enforceable contract. So we are bound by what the black and white letter of -- of this contract is. What either party believes it says is irrelevant, Your Honor.

THE COURT: Okay. I'll overrule the objection. You can answer that.

THE WITNESS: What I believed is that 7 and 8

-- 8 was a -- a continuation of 7 in -- in -- in the sense that it was -- 7 gave me exclusive ownership of the logo, and 8 was describing how the websites also needed to be different as to not have confusion amongst consumers, and the logo as an element on the websites was incorporated in that as well.

BY MR. SOUTHRON:

Q. And why did you feel it important to have this language in the agreement?

A. There was much discussion at the mediation about how after we were separated, that there could be no confusion between the two companies. And that we should not, for consumers' purposes and for our own business wellbeing, that we needed to be completely independent of one another, and not -- not able to be confused with each other.

Q. Was Mr. Halabi's selling of online-only CPR classes a factor in your desire that the websites did not look like they were coming from the same source?

A. Yeah. I don't --

MR. DIETRICH: Object to form, Your Honor.

THE COURT: I'll sustain it. You -- you can rephrase it.

BY MR. SOUTHRON:

Q. Are there any other reasons that you didn't

want Mr. Halabi's logo and website to look like yours?

A. Yes. Because of the fact that Mr. Halabi had admitted to creating this website where he sold these online-only CPR trainings under the name Samuel Halabi, I knew it was highly likely that he would do something like that in the future or continue doing it. And I did not want to have my brand associated with any type of fraudulent practices.

Q. Mr. Joos, which one of these is your logo?

A. The left one. The one on my left.

Q. This one?

A. Yes.

Q. Okay. Where did this logo come from?

A. That logo is something that I created after Mr. Halabi, again, while we were in business together, purchased several concept logos from the website Fiverr. And then we -- we had -- I had come up with the name, CPR certification to use. Mr. Halabi had a -- a totally different name that he wanted to use. And I took the pieces of the logos that he had purchased from Fiverr, and used my graphic design skills that I possess to create that logo from the elements that -- from the existing logos that he had bought.

Q. Was this logo created for Fit Industries?

A. It was created prior to Fit Industries, but we

used it exclusively in Fit Industries.
Q. Okay. That -- and that's my question. Is this the logo the two of you used when you were partners at Fit Industries?
A. That is the only logo that we used.
Q. And this is a logo that you believe was granted to you in Paragraph 7?
A. It is. It was the logo that was on every single website that was divided in the -- on this document. And it was the logo that we -- it was not ambiguous. We all -- everyone was aware that that was the logo.
Q. And do you object to Mr. Halabi's use of this logo?
A. I do.
Q. Why?
A. Because it's not different.
Q. Don't you think it's a different color?
A. I -- I can't see a different color.
Q. Don't you believe the font is different?
A. It's not different enough to respect the fact that I was granted sole and exclusive ownership of the logo on the left.
Q. All right. So that's your opinion.
Has there actually been any confusion by other

people as to your two businesses after Fit?

A. Yes. We've received --

MR. DIETRICH: Object to form, Your Honor.

THE COURT: I'll overrule that one. Do you understand the question?

THE WITNESS: Can you repeat it?

BY MR. SOUTHRON:

Q. Is your opinion that these are different -- have you witnessed firsthand any confusion in the consumer market between these two brands?

A. Yes.

Q. You understand some issue happened in Pittsburgh?

A. Yeah, that's correct.

Q. What happened?

A. Well, we received a -- a negative review on our Google profile about -- someone had claimed that they had taken an infant CPR class, and was angry about the fact that the class was not actually an infant CPR class. It was more of a general CPR class. We don't offer an infant CPR class or advertise our BLS CPR class to be an infant CPR class. Mr. -- Mr. Halabi, however, does advertise his BLS CPR classes to be infant CPR classes. And they are not.

Q. Okay. I also understand there's some issue

that happened in Louisville?
A. Yeah, that's correct.
Q. What happened there?
A. In February of 2021, I set up an account with Yes, co-working in Louisville, and established a presence there on Google.
Q. If I may interrupt briefly, what is Yes Working?
A. It -- it's a co-working space in -- in Louisville.
Q. Is that, like, a virtual office?
A. It's not completely a virtual office.
Q. Okay.
A. But it's similar. It's --
Q. So what happened with Yes Working?
A. We set up an account there in 2021, in February. And through that account, I was able to create a profile on Google and set up my business at that address. And approximately a year later, the defendant contacted Yes Working to also establish an account there, using the same name and same logo that I was using. And Yes Working was confused by that, and thought they were working with someone from my company, and worked with them for a time to get that set up. However, she stopped short of actually collecting

payment from them once my Google profile had been removed from Google and flagged as a duplicate, saying that someone else had now created a profile with the same name at the same address. And -- and my listing was now taken down as a -- as a result of that, and that someone else was -- the defendant's business that was now there.

Q. Is your Google profile important to your business?

A. Virtually all customers come through -- through Google.

Q. So has your business been damaged by your loss of the profile in Louisville?

A. I believe so.

Q. How?

A. Well, it severely impacted our ability to actually open there, and pushed back the timeline significantly. And my relationship with that co-working space, I feel, is strained at this point, because just being associated with this and having to explain to them that we are not the same business is -- it brings into question of the validity of my organization.

Q. Did Mr. Halabi do this in any other cities?

MR. DIETRICH: Object to form, Your Honor. I don't know what he's referring to, "do this."

THE COURT: I'll -- I'll sustain it. You can rephrase that.

BY MR. SOUTHRON:

Q. Did Mr. Halabi use his confusingly similar logo to force the take-down of your Google My Business profile in any other cities?

MR. DIETRICH: Objection, Your Honor. That was --

THE COURT: What was the objection?

MR. DIETRICH: That was significantly leading.

THE COURT: Sustained.

BY MR. SOUTHRON:

Q. How would you describe what Mr. Halabi did wrong to you in Louisville?

A. It's difficult for me to put that into words, because it's -- it's so damaging and wrong and -- and hurtful to try to -- to do intentionally to somebody.

Q. What did he do? You need to come forward and tell us.

A. To -- to -- to take over, essentially, replace me at an office using the same name and logo, that is -- in my opinion, it's -- it's akin to identity theft. My business identity has now been stolen.

Q. Has he done that in any other cities?

A. We're currently dealing with something in the

Chesapeake. The city of Chesapeake, Virginia.

Q. What's going on in Chesapeake, Virginia?

A. Again, I had established an account with a -- a co-working space in Virginia. And some -- some time later --

Q. I'm sorry, could you be specific about the times? As specific as you can be?

A. Sure. I established a Google profile in -- in Chesapeake in June of this year. In October of this year, a profile by the name of 842 Director or Director -- CPR Director 842 uploaded a -- a photo of the sign in front of the building in which I have registered my address to my profile. There's no reason to have -- to upload a photo of a -- of -- of the sign in front of a building to a competitor's profile, other than -- other than to try to have that profile removed or to --

Q. Did that have an impact on your profile?

A. The damages for that are still ongoing. I don't know, but it -- it hasn't been removed yet. Google does not necessarily remove things instantaneously. It takes them some time to go through it. And however, it had added this photo to my profile, which can be followed and clicked on, and which will take you back to the defendant's profile, and showcases several of his other CPR businesses across the country.

301729 Hearing before Judge Parfante 12-20-2023 Page 44

Q. Okay. Does -- does Mr. Halabi operate a company called 842 Industries, LLC?
A. Yes.
Q. And what was the name of the username, the person that posted this photo at Chesapeake?
A. CPR Director 842.
Q. And when you click on that, that goes back to Mr. Halabi's other business?
A. When you click on that profile, it shows various other positive reviews that that profile has left on Mr. Halabi's businesses. Also, the profile photo on that profile is that of UCPRA, which is another entity that the defendant calls himself by.
Q. And the photo that he posted was -- what was in the photo?
A. It's a -- it's, like, the marquee out by the street of the business.
Q. The signage?
A. It's the sign. Yeah.
Q. And what's so offensive about that?
A. I believe that he was trying to report my profile to Google, and using that as an example as -- that I did not have proper signage, and therefore not eligible for that profile.
Q. Was your name not on the sign?

A. No. There's -- there's no businesses really on -- on the name of that, on that sign, that I recall.
Q. I understand. So in your opinion, a picture of a sign without your name created a -- a negative impression of your business at that location?
A. Yes.
Q. Okay. Are you afraid of Mr. Halabi?
A. I am.
Q. Why?
A. Mr. Halabi has proved himself to be erratic and violent on numerous occasions.
Q. Could you describe some of those?
A. I can. During a -- a business lunch at the -- at the ABC Pizza, the moment we got there, Mr. Halabi began accosting the server.
MR. DIETRICH: Your Honor -- your Honor, may I object before he goes on? Again, I object to this testimony. There's no claim pled for what he's allegedly going to now discuss. I don't know how you move for an injunction on a claim you don't have pled.
THE COURT: Okay. Well, I'll -- I'll just note this. You -- you have about 20 minutes left. So you're 27 minutes in on 45 minutes, right? For testimony. So you have one more witness. I'll

sustain that objection. You keep asking questions, but I understand you have another witness. So I'm just giving you a heads-up.

BY MR. SOUTHRON:

Q. You're asking the Court for a no-contact order?

A. I am.

Q. Why?

A. Because Mr. Halabi frequently mentioned in our business together that if anyone ever got in his way of his CPR empire, that he would kill them.

MR. SOUTHRON: All right. No further questions.

THE COURT: Okay. So like I said, you had 27 used of -- I have 47 for you after the opening, but just keeping accurate track. All right. Mr. Dietrich, any cross?

MR. DIETRICH: Mr. Joos -- your Honor, I -- I would like to admit Exhibit 13, or at least show the witness here, to -- to submit it into evidence.

THE COURT: All right. Is there a stipulation on 13? You --

MR. SOUTHRON: Can we see a copy of it, Your Honor?

THE COURT: Are you asking him to stipulate, or

are you just laying a foundation?
MR. DIETRICH: Not asking to stipulate. It's already been stipulated.
THE COURT: Okay.
MR. SOUTHRON: We object on hearsay, Your Honor.
THE COURT: Okay. But it wasn't objected to based on the order setting the evidentiary hearing?
MR. SOUTHRON: Correct.
THE COURT: Okay. So you can go ahead and show it to the witness. Are you moving it in?
MR. DIETRICH: I'd like to move it into evidence.
THE COURT: Why don't you ask some questions? But I'll have a ruling on the admissibility.

CROSS-EXAMINATION

BY MR. DIETRICH:
Q. Mr. Joos, you've seen this email before, have you not?
MR. SOUTHRON: Objection. Form.
THE COURT: Overruled.
THE WITNESS: I have seen this email.
BY MR. DIETRICH:
Q. Mr. Wood is or was your attorney at the time this email was -- was drafted and sent on February 24th,

2021?

A. He was.

Q. And you're aware this email was sent?

A. I'm sorry, what was the question?

Q. You're aware this email was sent?

A. Yes. I'm aware that this email was sent.

MR. DIETRICH: Your Honor, I'd like to move this into evidence as, I guess, Exhibit -- defendant's Exhibit 2. Exhibit 2, if we're going in order. I don't know how you want to number these.

THE COURT: Okay. So I'm looking at Document 57, which was the Pre-Hearing Meet and Confer Report. There's no objection to that same email, February 24th. So I'll admit -- that would be admitted as Defendant's Exhibit 13. That's okay.

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

MR. DIETRICH: 13.

BY MR. DIETRICH:

Q. Mr. Joos, do you see in that email in the second paragraph, it says, "Also, Doug thinks that there is a legitimate legal question of whether Sam's new logo is sufficiently different from the company logo that Doug was awarded under the Dissolution Agreement"? Did I read that correctly?

A. Yes.

Q. And that is your position as of February 24th, 2021, that you had concerns about whether or not my client was complying with the Dissolution Agreement with respect to his logo, correct?

A. That's correct.

MR. DIETRICH: And I'd like to enter as Defendant's Exhibit 14.

MR. SOUTHRON: No objection.

MR. DIETRICH: May I approach?

THE COURT: Sure.

(EXHIBIT 14 MARKED FOR IDENTIFICATION)

BY MR. DIETRICH:

Q. Mr. Joos, what we've admitted as Defendant's Exhibit 14 is a letter sent on March 20 or March 17th, 2022 from your attorney, Mr. Southron. Have you reviewed this letter before?

A. Yes. I've seen this letter before.

Q. Do you see anything in this letter that -- that talks about disparagement or this fear that you have of Mr. Halabi?

A. I don't see anything specifically about that.

Q. And the letter also includes claims about breach of contract and tortious interference. Same as what you're asking the Court to enjoin today, correct?

A. Some of the things we're asking to enjoin are

already mentioned in here.
Q. I'm done with that. If you can pull up the other exhibit, the Dissolution Agreement that you have in front of you. If you can look back at Section 7 that you were reviewing with your attorney?
The Dissolution Agreement in Section 7 specifically permits Mr. Halabi to use the word "certification" in his logo, does it not?
A. It does.
Q. Specifically, it permits him to use the word "CPR" in his logo, does it not?
A. It does.
Q. Specifically permits him to use the city name in the logo, does it not?
A. It does.
Q. When you were at -- when your attorney was asking you questions about how they're different, when he showed you the two, you were able to point to which logo is yours, correct?
A. Yes.
Q. And that is because they are different? If they were the same or they were not different, you would not be able to tell which one was yours as opposed to my client's, correct?
A. I created them. So I'm intimately familiar

with them. The general public cannot not tell the difference.

Q. When you say you created them, you created your logo. You didn't create my client's logo?

A. I created that logo. The one on -- the one that's on my websites.

Q. You did not create my -- my client's logo, correct?

A. I did not physically edit my logo to create Mr. Halabi's logo.

Q. Correct. So when your attorney was asking you questions, all he asked you was whether or not the color was different and the font was different.

The sinusoidal waves, those are the -- the waves within the heart, correct?

A. Yes.

Q. Those are different in the -- in both logos, are they not?

A. They are physically different.

Q. And your -- in your logo, the heart actually connects to the letter R, correct? And it -- correct?

A. It does.

Q. And in my client's logo, the R is separated from the heart, correct?

A. Yeah. There is a slight space.

Q. There's a space, yes?
A. Yes.
Q. You don't know what color red your heart -- your logo is, do you?
A. I don't have that data in front of me.
Q. And you don't know what color red my client's logo is, correct?
A. They're visually the same.
Q. That's not what I asked you. I asked you, do you know what color my client's logo is?
A. Red.
Q. Do you know what hex code it is?
A. No.
Q. And you don't know which hex code yours is?
A. Not off the top of my head.
Q. And you don't know what font my client's logo is, do you?
A. It's some sort of a serif font, and straight with no accents.
Q. When you look at the logos, your -- your term "Certification" is above the "CPR," correct?
A. It is.
Q. And my client's logo "Certification" is below "CPR," correct?
A. It is.

Q. When you were talking about Pittsburgh, the only issue that you brought up during your testimony was something about you had firsthand knowledge about a review that was posted in Pittsburgh. Do you recall that?

A. I do.

Q. And who was the review by?

A. I don't remember off the top of my head.

Q. Was it by my client?

A. No, it was by a -- a lady who had taken Mr. Halabi's class and mistakenly left a review for my class.

Q. And how do you know that person took my -- a class from my client?

A. She specifically referenced taking an infant CPR class that was not really an infant CPR class. And there's no other person that I'm aware of that -- that advertises their -- their classes in such a way.

Q. Mr. Joos, you have no idea if that review was pointed at my client, do you? As you see it here in court today?

A. I spoke with my training center about that particular individual. At the time, we were both under the same training center. The training center confirmed to me that it was one of Mr. Halabi's clients.

MR. DIETRICH: Your Honor, I'm going to object to that as hearsay, first of all, but I don't even know that it answered my question.

BY MR. DIETRICH:

Q. Do you have any firsthand knowledge?

THE COURT: I'm overruling that. That answer stands. Next question.

BY MR. DIETRICH:

Q. Do you -- do you know what BLS means?

A. Yes.

Q. What does that mean, for the Court?

A. Basic life support.

Q. And is there any circumstance where BLS includes training for CPR for infants?

A. It is a component, in it, a very small component of the course.

Q. It's a component, though?

A. Sure. But it is not an infant CPR class, and no one that I'm aware of advertised that -- that way in the entire country, other than Mr. Halabi.

Q. You then started talking about Louisville. Do you recall that testimony?

A. I did.

Q. And you alleged that you established working space in Louisville. What -- what was the date, if you

can remind me?

A. Sometime in February of 2021.

Q. And at the time, you only had a mailbox, correct?

A. I established business -- had a business address account with her.

Q. But you only had a mailbox; is that correct?

A. It's a co-working space. So again, whether I was utilizing the space or not is somewhat irrelevant.

Q. Well, it's relevant. It -- I -- I think it is relevant.

Did you only have a mailbox? That's a simple yes or no.

A. It's a co-working account, so I wouldn't call it a mailbox.

Q. You never actually paid for anything more than a mailbox; is that correct?

A. I pay for a co-working account that includes mailing services.

Q. Mr. Joos, do you recall corresponding with a representative at Yes Coworking called Tonya?

A. I did speak with Tonya.

Q. Do you recall email correspondence with her in which you specifically told her that you're only looking for a mailbox at the time back in February, 2021?

A. Yes. I also recall email correspondence from her where she said that Mr. Halabi had never actually established any account with her at all.

Q. That's not my question. My question is -- I think you just answered it.

Back in 2021, February, 2021, in your email correspondence with Yes Working, you specifically told her that you're only looking for a mailbox? That's a yes or no?

A. I don't recall.

MR. DIETRICH: Can I have Exhibit 28? May I approach, Your Honor?

THE COURT: Sure.

BY MR. DIETRICH:

Q. If you can take a look at that correspondence, and I'll -- you can actually look on -- it's the February 25th, 2021 at 5:13 p.m. email from you, Doug J.

at Strat505@mail. Do you see that email?

A. I do.

Q. And it says, "Sorry -- sorry. A mailbox. A plan for just mail."

Do you see that?

A. What date and time did you say it was?

Q. It was February 25th, 2021 at 5:13 p.m., right above the -- the stated line.

A. I see that line.

MR. DIETRICH: Okay. Your Honor, I'd like to enter this into evidence as Defendant's Exhibit -- is 28.

MR. SOUTHRON: No objection.

THE COURT: All right. That's in as Defendant's Exhibit 28.

(EXHIBIT 28 MARKED FOR IDENTIFICATION)

BY MR. DIETRICH:

Q. Mr. Joos, do you know what the Google rules are for obtaining a mailbox -- or I'm sorry, strike that.

Do you know what the Google rules are or the policy is for having a physical office space in order to have a Google My Business listing?

A. I'm vaguely familiar with them.

Q. And what -- do you understand that mailbox does not suffice to have a Google My Business listing?

MR. SOUTHRON: Objection. Form.

THE COURT: I'll overrule it. You can answer that.

THE WITNESS: We were setting up an account here with the intention to hold classes shortly after. Again, Mr. -- Mr. Halabi flagged my location down as a duplicate --

BY MR. DIETRICH:

Q. Mr. Joos --

A. -- without an account. We had no account there at all.

Q. That wasn't my question. Mr. Joos, we have limited time here, so I'm going to ask you just answer my questions and we'll go a lot quicker. I asked you about whether or not, you know, the policy about whether or not you need a physical office space in order to have a Google My Business listing.

MR. SOUTHRON: Objection. Assuming facts not in evidence.

THE COURT: Overruled. You can answer.

THE WITNESS: Google's policy is updated frequently. They allow coworking spaces. I don't know.

BY MR. DIETRICH:

Q. You don't know?

A. That's --

Q. Thank you. You alleged that my client contacted Yes Working in January 2022 to -- to establish a business at that Yes Working co-space -- coworking space, correct?

A. The date, I'm not specific on it, but it was about a year after I set up my account.

Q. Mr. Joos, you do not have any evidence that my client knew you had a virtual mailbox at Yes Working, do you?

A. If you try to create a Google profile at the same address with the same name as someone Google stops you and tells you that someone is there. As someone who's created hundreds of Google profiles over his lifetime, I'm very familiar with that. It's virtually impossible to do this on accident.

Q. Again, that wasn't my question. My question was, do you have any evidence that my client knew you had coworking space Yes -- yes Working at the time in January 2022, when he was trying to establish a space there?

A. All he would've to do is conduct a search on Google to find me, which is what I do to see if anyone else is in the space before I approach it.

Q. Let me ask you that. Do you know what the address 816 East Broadway is in Louisville?

A. I'm not familiar at the moment.

MR. DIETRICH: Can I approach, Your Honor?

THE COURT: Sure.

BY MR. DIETRICH:

Q. Now this is not on our exhibit list, but I'm here just to help refresh Mr. Joos recollection if I

may.

THE COURT: Sure.

THE WITNESS: Okay.

MR. SOUTHRON: Objection. Authenticity, Your Honor.

MR. DIETRICH: Again, it's just to refresh his recollection, Your Honor.

THE COURT: Yeah, I'll overrule it.

THE WITNESS: I -- I -- I don't -- I'm not familiar with the address off the top of my head.

MR. DIETRICH: If you look at this document, Your Honor, and I -- I'll represent to the Court that this was retrieved from Way Back Machine, which is a website that retrieves old websites that are at the time. And this is the arrows and some of these pulled out boxes were -- were made by my firm. So those I represent were made by us just to highlight and because some of this language is small.

MR. SOUTHRON: Objection. Same.

THE COURT: What's the objection?

MR. SOUTHRON: Same objection.

THE COURT: Yeah, I'll sustain it. What -- what are we doing here? You -- you gave him a document and he said he didn't know even with this attempt to refresh the recollection. So --

BY MR. DIETRICH:

Q. If you look at the top -- if you look at the top is that your logo, CPR Louisville, top of the first page? Top left.

A. There -- there's a vague -- I can't tell. This is -- seeing as how it's quite faded, it actually could be either of our logos. I can't tell.

Q. You -- you can't tell that the R connects to the -- the heart in this?

A. There's printed copy that I have is quite illegible.

MR. DIETRICH: Your Honor, with -- with the Court's permission, if I may either pull it up on a computer or we can -- we have a projector that we put can put it on the screen to pull it up. I understand the printout is not the best.

THE COURT: That's his answer. Next question.

BY MR. DIETRICH:

Q. Let me ask you this, Mr. Joos, if in fact, at the time in February 2021, and I'll represent that this document was pulled in December 2021, if you had an address on your website in Louisville of 816 East Broadway, how would my client know looking at your website that you are actually having space at the Yes Co-Working space?

301729 Hearing before Judge Parfante 12-20-2023 Page 62

A. By checking Google. We don't rely on a website of solely.

Q. Let me ask you this. 816 East Broadway. That's not the Yes Coworking Space address, is it?

A. I don't believe so.

Q. And other than if he checked around, you don't have any evidence that he actually knew you were at Yes Coworking?

A. If you're establishing Google profiles, you look to see if other people are there. And again, Google stops you hard and its tracks before you it lets you do it. It asks you, is this your business, someone's already here with the same name and logo or the same name at this address. It's what it specifically asks. And it shows it to you. You have to then proceed further. You have to intentionally do this.

Q. How do you know my client intentionally did this?

A. Because he's the one who did it.

Q. How do you know that? What evidence do you have that my client is the one that did this with Google.

A. Do you mean, like, him specifically?

Q. Yes. You're seeking an injunction. I want to

know what evidence you have when you say my client intentionally did this.

A. I can't say whether or not it was physically Mr. Halabi, who did this. Clearly his agents or at the very least someone on his behalf did this.

Q. But you don't know?

A. I -- I'm not God.

Q. And you never actually spoke with anyone at Google to discuss why they did -- why they removed your Google My Business, correct?

A. There's nothing to discuss. They don't have a customer service team you can reach out to and they send you an email that tells you specifically why that another business has taken up residence here at with the same name. And at this address, your listing has now been removed as a duplicate.

Q. So the answer is no, you didn't contact Google.

A. There's no reason to.

Q. You mentioned Chesapeake. Do you recall that testimony?

A. I do.

Q. Is it your position that Mr. Halabi made disparaging statements about you regarding Chesapeake?

MR. SOUTHRON: Your Honor, just point of order.

Can we have a time check?

THE COURT: Well, I've got 20 minutes for you and 19 for Mr. Dietrich at this point.

THE WITNESS: Can you repeat the question?

BY MR. DIETRICH:

Q. Yeah. What -- is your position that Mr. -- Mr. Halabi made disparaging statements about you in Chesapeake?

A. My position is that he's deliberately logged on to my Google profile and tried to interfere with it.

Q. And how do you know he logged onto your Google profile?

A. The username is CPR Director 842.

Q. But how do you know my client, Mr. Halabi, logged onto your Google account and did that?

A. Someone under his authority would have to have access to his email address.

Q. But -- so you're saying if I go to Google My Business, his email address shows up on the Google My Business publicly facing site?

A. The 842 Direct -- or CPR director 842 username shows up on the publicly facing site, which if you click on has left multiple reviews for other of Halabi's businesses and has his UCPRA logo on it.

Q. And what evidence you have of that other than

your -- just your testimony?
A. Do you mean as to whether it transpired?
Q. No. I'm asking what evidence you have that whatever you're saying is on the Chesapeake Google My Business is actually a true statement.
A. It's visible. I mean, we have screenshots and printouts of it.
Q. But you don't have any evidence in front of you right now that -- that supports that, do you?
A. No. No one has handed me any evidence of a photo of what is visible on the internet.
Q. Do you recall the address that you have?
A. I don't.
Q. In Chesapeake.
A. I don't know the address off the top of my head.
Q. Isn't it true that you just recently changed the address on your website to the South Military address, which is where this coworking space is?
A. Yeah, there was a -- a -- a typo on the website and I corrected it to the correct address.
Q. And that was done in the last couple weeks, correct?
A. I believe so.
Q. And prior to that, didn't you have on your

website in Chesapeake an address of 605 Austin Avenue?
A. I don't know what was on it prior.
Q. Do you -- do you recall being your deposition last week?
A. I don't recall.
Q. You don't recall me deposing you last week?
A. Yes. I recall you deposing me last week.
Q. And I can pull it up, but do you -- you don't recall me asking you specifically about 605 Austin Avenue?
A. You asked me if that was my address or an address I was familiar with and I said, it's not my address.
Q. And what about 3409 Cleveland Avenue; not your address either?
A. No.
Q. Do you recall your deposition last week where we reviewed documents that had those addresses on website pages of yours?
A. Yeah, there was a typo on a webpage of mine.
Q. Lastly, Your Honor -- or lastly, Mr. Joos, you were talking about your fear of Mr. Halabi. Do you recall that testimony?
A. I do. Well, no, I don't remember specifically what I said to you at the deposition.

Q. I'm -- I'm talking about today. Not -- not my deposition.

A. Okay.

Q. You haven't seen Mr. Halabi at all other than in -- in a court setting like this right now in 2023, correct?

A. That's correct.

Q. You haven't spoken to him in 2023, correct?

A. I have not.

Q. Any statements, these outbursts in this, you know, whatever violent actions you are fearful of took place either in 2020 or before, correct?

A. It's not the entirety of what I'm fearful of.

Q. That's what you testified to though today.

A. The things that he said to me took place not in 2023.

Q. Prior to 2023, correct?

A. That's correct.

Q. Do you recall email -- or texting Mr. Halabi in July 2021, talking about you never having any intention to harm him. Do you recall that text?

A. Yes, sir. I remember you bringing it up at the deposition.

Q. Is your phone number 813-362-6455?

A. It is.

MR. DIETRICH: May I approach, Your Honor?
MR. SOUTHRON: Objection, Your Honor.
THE COURT: What's the objection?
MR. SOUTHRON: Objection on the authenticity, hearsay, and relevance.
THE COURT: Okay. I'll let him lay a foundation. You're not seeking to admit it at this time, are you?
MR. DIETRICH: I'm -- I -- not yet, but I will admit it.
THE COURT: Okay. You can ask questions for foundation.
BY MR. DIETRICH:
Q. As you review this document, Mr. Joos, do you recall these text messages?
A. I don't recall the specifics of the text message that was sent more than -- more than two years ago.
Q. But that is your -- your telephone number on the top of each page?
A. That number matches my phone number.
Q. And these are text messages that would've been sent from that phone number according to this document, correct?
MR. SOUTHRON: Objection, Your Honor. Renewed.

He says he doesn't remember them. These are copies. These aren't certified copies.

THE COURT: I'll -- I'll overrule it. You can answer the question.

THE WITNESS: What's your question again?

BY MR. DIETRICH:

Q. These are text messages that are sent from that phone number that's on the top of each of these pages, correct?

A. My phone number is at the top of the page. I don't know whether or not I sent these messages. I don't recall.

MR. DIETRICH: And I'd move this into evidence. He already testified that this is his phone number. While I understand he doesn't recall these text messages from two years ago, it is his phone number on the top of each one of these pages.

THE COURT: Okay. Any objection?

MR. SOUTHRON: I'm going to renew our objections.

THE COURT: I'll sustain it. I'm not going to admit it. But his testimony is in. Next question.

BY MR. DIETRICH:

Q. In 2022, do you recall meeting with Mr. Halabi be in person at Avila?

A. I did.
Q. And this would've been after any alleged threats that -- that he would've previously made, correct?
A. And it's after some of the threats that he made. He made new ones.
Q. During --
A. I'm sorry.
Q. He made new ones at the meeting?
A. Yes.
Q. And there were two meetings, right? He made threats at the first meeting.
A. Second meeting.
Q. Okay. Did he make any outbursts or any threats at the first meeting?
A. Yeah, he had some outbursts. They were just the general jump up and slam doors and, sort of, typical behavior that I've come to --
Q. And that was -- I'm sorry, notwithstanding that, you agreed to meet with him on the second occasion at Avila in person again?
A. It's a public setting full of armed guards, and I was desperate to try to figure out a way to save my business from Mr. Halabi.
Q. Are you suggesting there's armed guards at

Avila Country Club?
A. I am.
Q. Are you a member of Avila?
A. No.
Q. One second.
MR. SOUTHRON: Your Honor, just a point of order. We have 35 minutes left total and I believe I have 25 of those minutes.
THE COURT: I think you got 20. If he's got 20 -- I have 20 in -- sorry, 26 for you and nine for him.
MR. DIETRICH: I have no further questions, Your Honor.
THE COURT: Okay. Thanks. All right. Go ahead. Any redirect?
MR. SOUTHRON: No, Your Honor.
THE COURT: Okay. You can return to your table. Thank you. Who's your next witness?
MR. DIETRICH: Mr. Bussey.
THE COURT: All right. Mr. Bussey, good afternoon. Just pause briefly when the deputy tells you to stop.
THE BALIFF: Face the clerk. Raise your right hand.
THE CLERK: Do you solemnly swear or affirm the

301729 Hearing before Judge Palfante 12-20-2023 Page 72

evidence you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE BALIFF: Okay. Please go around there. Have a seat and adjust the mic before you begin talking.

THE COURT: Good afternoon. You can have a seat and we have a court reporter taking your testimony. So please let the attorney finish their question before you answer. He'll do the same for you.

THE WITNESS: I understand.

THE COURT: All right. Go ahead.

DIRECT EXAMINATION

BY MR. SOUTHRON:

Q. Good afternoon, Mr. Bussey. Did you work for Mr. Halabi?

A. Yes.

Q. Is Mr. Halabi in the courtroom?

A. Yes.

Q. Could you point him out? How long did you work for Mr. Halabi?

A. Approximately a year and a half.

Q. And what did you do for him?

A. I was first director of operations and then

vice president of operations.

Q. Okay. And I understand you have firsthand testimony that you believe is relevant to the issues in this case?

A. Yes.

MR. SOUTHRON: All right. Your Honor. I'd like to offer the witness Plaintiff's Exhibit number 1.

THE COURT: What is Exhibit 1?

MR. SOUTHRON: It's the Dissolution Agreement.

THE COURT: Oh, okay.

BY MR. SOUTHRON:

Q. Mr. Bussey, I want to direct you to Paragraph number 11. You probably have not seen this agreement. Let me know if you haven't.

A. I have.

Q. You have? How have you seen this?

A. When I first started working.

Q. Understood. All right. So I want to re-direct you to Paragraph 11.

THE COURT: Just so the record is clear. It's -- it's Plaintiff's Exhibit 3 and Defendant's Exhibit 9, but you showed him 3, right?

MR. SOUTHRON: Yeah.

THE COURT: Okay. Go ahead.

MR. SOUTHRON: Your Honor, if I may have some leeway with the form of the questions just to speed up time?

THE COURT: Well just ask the questions. We'll go from there.

MR. SOUTHRON: All right.

BY MR. SOUTHRON:

Q. Mr. Bussey, could you please read to yourself Paragraph 11?

A. What page?

Q. 6.

A. Okay.

Q. In your opinion, did you witness firsthand Mr. Halabi violate any of the provisions of this paragraph?

MR. DIETRICH: Object to the form, Your Honor.

THE COURT: I'll -- I'll overrule it. You can answer.

THE WITNESS: Yes.

BY MR. SOUTHRON:

Q. Would you describe some of those for me?

A. Specifically, there was a culture of that Mr. Joos was one of the enemy of our company and that, you know, the staff developed a nickname of Voldemort and during the course of time, just negative comments made about Mr. Joos, his operations.

301729 Hearing before Judge Farfante 12-20-2023 Page 75

Q. If I could break that down. What negative comments did you witness?
A. Probably the most severe was around Freedom Day. This one stuck in my head forever. And that he had stated that he wanted to "fuck Doug in the ass until he bled."
Q. Why did he say that?
A. Because he wanted to take him down. We were now allowed to open in his territories.
Q. You're referring to the restrictive covenant in this agreement?
A. Correct.
Q. That prevented them from entering certain territories for 12 months?
A. Correct.
Q. And when that time was up, there was a conversation and this comment, came up?
A. Correct.
Q. Was that the first time you ever heard him make violent statements about Doug?
A. No.
Q. Could you describe some others?
A. It was, kind of, just common regular about either Doug or the company. The only one -- other one as stated in my deposition that stuck out as egregious

more than locker room talk would be he wanted Doug to choke on his cock until he died.

Q. Do you believe he was serious?

A. I don't believe the physical act of being serious, but the nature of compulsion to ruin someone was taken it seriously.

Q. Did Mr. Halabi himself or anybody at his direction actually take steps to, "Ruin Mr. Joos"?

A. Yes.

Q. What happened?

A. Mr. Halabi instructed the Philippine staff to leave negative reviews on the -- Doug's websites.

Q. And how often did he do that?

A. I'm unaware.

Q. Did you personally so did you did you see him instruct them to do that?

A. Yes.

Q. And to your knowledge, did they actually do that?

A. Yes.

Q. Did he do anything else to harm Mr. Joos' business?

A. Specifically don't recall. Those are the most that stood out in my mind right now.

Q. During your deposition, I don't want to say it

ended early, but it ended up abruptly. Do you recall that?

A. Yes.

Q. And why was that?

A. I was having a panic attack.

Q. And what induced that panic attack?

A. A -- one, I -- I diagnosed disability for panic attacks, which Mr. Halabi was aware of since when I -- we began working together. But just the overall pressure of being -- I haven't been exposed to Sam. This is the first time I've seen him since I've fled the company and, you know, just the environment there that day just started --

Q. What's the environment that you fled?

A. Violent workplace. Extremely violent workplace.

Q. Are you scared of Mr. Halabi?

A. My family and I are scared of Mr. Halabi. He has a gun. He has made threats and we worry every day of what angle he will come and attack us.

Q. What threats has he made?

A. He's even threatened to --

MR. DIETRICH: I'll object to this line of questioning. It's -- these are threats I assume that he is saying were made to him. I don't see the

relevance of that. We're here with Mr. Joos' --

THE COURT: All right. I'll overrule it.

BY MR. SOUTHRON:

Q. Are you done? You can answer.

A. I know that he, besides threatening myself, even, you know, I have a five-year-old son and a wife, and he specifically said in Skype that, you know, he doesn't have a wife, a son, a mortgage, and he would take us -- take this, you know, does this job for sport and post leaving the company, has threatened to call my wife's job at Stanford to complain about her, which is just bizarre. You know, I had an opportunity to file with the state as a whistle-blower, file complaints with the state with federal. I chose not to, to just get as far away from Sam as possible.

Q. Do you consider yourself a whistleblower?

A. I -- like I said, I chose to run away from Sam and flee him and not to engage with him at all. The position I've been put in here in this particular case is to give an honest deposition and now have to give an honest testimony. I don't want to be here and I don't want to be involved.

Q. Did you witness him make any other violent threats to anyone else in this company?

A. You know, the culture of violence and violent

work ways -- place was just how we lived. I mean, the girls in the Philippines were reduced to tears, called me crying. The COO called a cunt on group calls and reduced to tears. You know, the lawyers at Gunster heard this firsthand, the screaming and yelling and violence, trying to get the -- get him to calm down and stop abusing us.

MR. DIETRICH: Your Honor, I --

THE COURT: Next question.

BY MR. SOUTHRON:

Q. Is there anything else you want to tell the Court today that you find important?

A. I fear me being here will lead to more of his obsession. Just last month, he used a fake name and a fake debit card to call a girl for -- at the company I work with now and I feel his new obsession, the way he obsessed over Doug. And we are all scared of the ability to not only provide for our families, but it -- will the day come that he snaps and we will be on the news for violence.

Q. Anything else?

A. No.

MR. SOUTHRON: Thank you, Mr. Bussey, for your character.

THE COURT: All right. Any cross?

301729 Hearing before Judge Farfante 12-20-2023 Page 80

MR. DIETRICH: Yeah, may I have one second, Your Honor?

THE COURT: Sure.

CROSS-EXAMINATION

BY MR. DIETRICH:

Q. Afternoon, Mr. Bussey, how are you?

A. Good.

Q. Your appearance today was through a subpoena served by Mr. Joos' attorney, correct?

A. Yes.

Q. These alleged comments that you say Mr. Halabi made, those were during a time when you were employed with a company with Mr. Halabi?

A. Correct.

Q. And you left that company in February 2023, correct?

A. Correct.

Q. So these were statements that were made prior to February 2023?

A. Correct.

Q. You've never actually spoken to Mr. Joos, have you?

A. No.

Q. Never?

A. This is the first time I've ever seen him.

Q. So that's my next question. You've never met him or seen him otherwise?
A. Correct.
Q. You've never asserted any claims for hostile work environment, have you?
A. Yes.
Q. And where were those claims made?
A. They were made to Gunster and my superiors.
Q. When I say claims, I mean, you didn't take any legal action regarding hostile work environment.
A. I consulted the state and we chose not to pursue legal action.
Q. All right. Last couple questions, Mr. Bussey. You mentioned during your questioning with Mr. Southron some discussion about Google reviews. Do you recall that?
A. Yes.
Q. You -- you don't actually know if Mr. Halabi instructed anybody to leave those false reviews, do you?
A. Yes, I do. I was on the call.
Q. And who else was on that call?
A. Sam, Gail, and Dawn.
Q. And do you know if --
A. And Laura.
Q. Do you know if false reviews were ever

actually posted?
A. Yes.
Q. And who posted those?
A. Dawn's boyfriend.
Q. And Dawn is who?
A. Dawn was one of Sam's employees at the time.
Q. And her boyfriend posted it?
A. Yes. And that information was relayed back to Sam that it was done.
Q. And what was this review that was -- what was false about it?
A. One star review.
Q. Is there anything more about it?
A. It -- the goal is to get five star reviews. If you have a one star review, it's negative to your SEO.
Q. And where was this review posted?
A. I do not know this. I don't recall.
Q. It was -- what -- who was it -- who was the one star review of?
A. I don't recall. You'd have to ask Dawn or Gail, the people that posted it. I just know the substance of the call. I was on it and heard the direction.
Q. You don't know otherwise what the review was?

301729 Hearing before Judge Farfante 12-20-2023 Page 83

A. I don't know what city it was specifically. The review is still there and the -- the -- you can have the subject that left the review.

Q. And you don't know who it relates to?

A. I don't know which city it was.

Q. Did you actually see this -- this boyfriend of Dawn make the post?

A. No.

Q. And you never actually yourself looked at the post, did you?

A. I don't recall.

Q. Do you recall being deposed in the last couple months?

A. I was deposed by Mr. Southron.

Q. And do you recall being asked this line of questioning?

A. Correct.

Q. And do you recall what your answer was when you were asked whether or not you reviewed the post?

A. I don't recall. If you can refresh me, that'd be great.

MR. DIETRICH: May I approach, Your Honor?

THE COURT: Sure.

BY MR. DIETRICH:

Q. This is a page from your deposition

transcript. It'd be a -- the A is you and the question is the questioner at the time. Do you see this answer? It says, "No, I didn't even look at the post." Do you see that?

A. Correct.

Q. Does that refresh your recollection of whether or not you even looked at the post?

A. Yeah. I mean, like I said there, I wasn't -- I don't recall. So --

MR. SOUTHRON: Objection, Your Honor. He -- that was his answer. He's not refreshing his memory.

THE COURT: Well, I don't think it was refreshing his recollection. What's the objection?

MR. SOUTHRON: Improper use of the deposition.

THE COURT: Sustained. It's improper. Sustained improper.

MR. DIETRICH: No further questions, Your Honor.

THE COURT: Any redirect?

MR. SOUTHRON: No, Your Honor.

THE COURT: All right. You can either sit in the back of the courtroom or you're free to leave.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. All right. So any

other witnesses?

MR. SOUTHRON: I have no more witnesses, Your Honor.

THE COURT: All right. Mr. Bennett, you going to put on any witnesses?

MR. DIETRICH: Your Honor, we -- we will put on witnesses, but we would like to, in essence, move for a directed verdict at this time before we call our witnesses. Your Honor, I -- I again, don't think that the evidence supports any of the elements. I think, as I said in the opening, the delay factor on its own can warrant denying the motion and these threats, these disparaging issues are not pled. So there's nothing to enjoin on a claim that's not pled, Your Honor. So I think we would move for a -- a dismissal of the motion -- denial of the motion at this time before we call any witnesses.

THE COURT: Okay. I'll -- I've considered that motion and denying that motion. So you -- you're going to call a witness. I have you down for about five minutes remaining. So do you have put testimony on?

MR. DIETRICH: We'll call Mr. Halabi.

THE COURT: Okay. And Mr. Halabi, just follow

the deputy. He'll pause briefly. Let the clerk swear you in.

THE BALIFF: Stand here for me. Face the clerk. Raise your right hand.

THE CLERK: Do you solemnly swear and affirm that the information you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURT: This way, please. All right, Mr. Halabi, you know the drill. Just let the attorney finish the questions. He'll do the same for you.

THE WITNESS: Yes, sir.

THE COURT: You can adjust that microphone if you want.

THE WITNESS: Yes, sir. Thank you.

THE COURT: Go ahead.

DIRECT EXAMINATION

BY MR. DIETRICH:

Q. Mr. Halabi, we -- we only have a few minutes, so we -- we have to go quickly here on these issues. You -- you just heard the testimony of Mr. Bussey. Do you recall making any violent or threatening statements as Mr. Bussey testified?

A. No, I do not.

Q. And did you ever have any intention to cause any harm to Mr. Joos?

A. No.

Q. Did you ever yourself post any negative or false Google reviews in connection with Mr. Joos's company?

A. No, I have not.

Q. Did you direct anybody under your umbrella of employees or independent contractors to post any negative or false reviews of Mr. Joos's company?

A. No, I did not.

Q. Can you explain to the Court quickly what steps you took to ensure your compliance with the dissolution agreement with respect to making sure your logo was different?

A. I commissioned a artist to -- and I gave them the criteria of what we were looking for in the logo. We wanted medical. We wanted a serious tone. They took all those into consideration and came back to me with several renditions. I did several revisions after long and arduous process. And that went back and forth for a couple weeks. And then my team and I sat and we went over which would be the best logo to represent a company. And that's the one we settled on.

Q. And can you explain to the Court what you

believe the differences are in the two logos?

A. Yeah, sure. We -- there is quite a bit of differences. We've got our -- our hard shape is different. Our color is different. The fonts are different. Ours is London Bridge font. His is aerial font. Our hex code is FD0100. His is FF0000. Our heart does not touch the letter R. It is isolated away from it. Our R is under -- is lowered than, you know, where -- than where his is. A big differentiator is the certification that's written above his CPR, which actually phonetically reads CPR. I mean, certification CPR city name. Ours reads CPR, because we put ours underneath the CPR, reads CPR certification, which is the actual name of our company. So we felt that that made a lot of sense. The sinusoidal wave, which is that heartbeat sound or the heartbeat that goes up and down, his -- his is thinner. The tracing they call it is a thinner tracing. Ours is thicker. His look is more indicative of someone having more of a heart failure situation or more of a heart attack. Ours is less of a heart attack because if there's less up and down motions of it. And like I said, the heart placement is lower than his and -- and yeah, I -- I went over the fonts are different, everything.

Q. Thank you for that. I'm going to move on. We

-- we heard some testimony about some actions taken in Louisville. Did you know at the time that you -- your company was retaining space in Louisville, that Mr. Joos was located in the same location that you were looking to establish from space at?

A. No, I -- I did not know.

Q. Do you personally have any -- did you personally take any action with respect to retaining that space in Louisville?

A. No. Did not personally, no.

MR. SOUTHRON: Objection. The time, Your Honor.

THE COURT: What's the objection?

MR. SOUTHRON: Time.

THE COURT: Oh no, he's -- he's fine. I'm going to give you a couple more minutes. I have three more minutes and then I'm going to give you 10 more minutes. So that's what I've got the time at. Good.

BY MR. DIETRICH:

Q. Thank you. Do you have a team that you assign to take care of obtaining locations?

A. Yes.

Q. Can you briefly explain what that team does?

A. They -- their task would be with the duty of

looking for special criteria to -- that we -- we look for in a coworking spot. We need, you know, price to be flexible, parking. There's a whole slew of criteria that they have to fit. There aren't a tremendous amount of co-working spots in cities, especially certain cities such as Chesapeake, Louisville. These places for some reason, don't have a whole ton of coworking, and if they do a lot of them are prohibitively expensive. So the options are narrowed.

Q. And you mentioned Chesapeake. Did you have any personal role in obtaining space in Chesapeake?

A. Not me personally.

Q. Do you know if your team -- well, strike that.

You do have a team similar to Louisville that also scoped out places in Chesapeake?

A. Yes.

Q. And do you know if your team reached out to the Chesapeake location to determine if there were any other CPR tenants offering classes in that location?

A. Yes, they sure did.

Q. And do you know what the response was from the Chesapeake location?

A. Yes, I do.

Q. And what was that response?

A. The response was, there was no other CPR

tenants in that co-working spot and that it was verbally -- verbally stated and in a written in an email.

Q. And okay. And subsequently you have now obtained -- obtained -- obtained space in that Chesapeake location at Military Avenue or Street? I forget what --

A. Yes. We've actually held classes there starting from a couple weeks ago. We were already active in transacting in that co-working spot.

Q. Did you take any action yourself to make any negative posts or otherwise posts onto Mr. Joos's Google My Business sites?

A. No.

Q. Can you just tell us briefly what the process is if in fact there is a dispute about a location with Google My Business? What -- what would what would somebody do?

A. From -- from what I understand, Google has a set of policies, and if there is a some sort of two companies, you know, that merge together like that, that they're both trying to claim a -- a -- a spot in a in a similar spot, that they have to prove physical -- physical -- you know, the physical aspect of being in there. They have to prove -- you know, produce as does -- as Mr. Joos's pointed out, the you know, there's a

cert -- there's policies that sort of change. But the -- but the -- the ones that are current, are they have to have, you know, written lease, they have to have physical presence, and they can't just be, you know, saying they're there and they're not actually there.

MR. DIETRICH: I have no further questions, Your Honor.

THE COURT: Okay. Thank you. Right. Any cross?

MR. SOUTHRON: None, Your Honor.

THE COURT: Okay. You can return to your seat. Thank you. All right. Any other witnesses you're going to turn to put on? I got a minute left or you want use that for closing?

MR. DIETRICH: I'll use that for closing.

THE COURT: Okay. So I would appreciate a couple of minutes of closing from each side. So you want to take the lectern or you can do it from table, whatever you want to do. So let's say three minutes each.

MR. SOUTHRON: Three? First with the speed and the delay, the client did not delay. My client went through extensive efforts to try and protect his mark, both through pre-suit efforts, which are required by the contract, and also by filing a

registration with the USPTO, which was opposed by Mr. Halabi and has incurred already more than a year of litigation in that forum. The urgency to come here was the depositions that took place in the USPTO proceeding revealed evidence about these violent threats by Mr. Halabi that led my client to believe that the threat interfering with his business by intentionally misleading the consumer public was significantly greater than he even thought, which led us to immediately come here. And we filed this suit six months ago.

THE COURT: So what would you have -- so let's to skip forward to the form of the injunctive relief and the form of the temporary injunction. What would you have that say, ignoring the portion of the use of the logo, but responding to Mr. Dietrich's opening on the prior restraint concerns and the fact that there's not in the current version of the complaint, a non- disparagement, either count or reference in the breach of contract count to the non-disparagement provision?

MR. SOUTHRON: Well, it -- it's a breach of contract claim. And so the -- the non-disparagement violation is a breach of contract.

THE WITNESS: But in the complaint, the breach

of contract is premised on the logo.

MR. SOUTHRON: It is, but we think the pleadings are sufficient to prove any breach of contract and we can prevail. One of the reasons we -- we're in this posture is because of delay tactics by the defendants. We filed this six months ago. They immediately moved the state of the case. We set the -- we usually file ex parte for an immediate injunction. They appeared at the last day. So we set a hearing with Judge Bowman and they filed for a transfer. And then after the transfer, they filed a motion to dismiss. And at the last hearing, which was not properly done as an evidentiary hearing and we take fault for that, they complained about not being able to subpoena witnesses and then they never subpoenaed them.

THE COURT: So let me just ask one another question because I want to -- an answer before the end of the closing. So with respect to the prior restraint concerns, how -- how are you asking this Court to address that? And then lastly, on the fact that you're asking for the no contact order in business court versus going before downstairs, a judge on a petition for --

MR. SOUTHRON: The way we look at this is a

status quo anti injunction, which are common in business dissolutions. This is not a dissolution, but it's an argument about a dissolution.

THE COURT: A status quo to preserve what?

MR. SOUTHRON: To preserve what they promised each other in the contract, not to disparage each other and not to try and ruin each other's business by intentionally interfering.

THE COURT: I -- I -- I interrupted you, but I'll give you a minute just to summarize.

MR. SOUTHRON: Okay. I -- I just want to go through some of the elements of the injunction here to show why the Court's on solid ground with respect to the logo, right? Irreparable harm is presumed when the consumer public is at issue. We've cited cases that say that. One is Laboratories C -- laboratories C4 vs Texas International 902 Federal supplement. Courts have found the likelihood of consumer confusion constitutes irreparable harm as a matter of law.

And that's what's at stake here. You look at Section 8 of the dissolution agreement. It says that the logo and some elements of the website must be changed so that a reasonable person would not confuse the two brands. They negotiated a truce to

where they would not confuse people. And what Mr. Halabi has done is intentionally tried to confuse people because the secrets to this business, which is a brilliant business model, is they set up a Google profile. They get a virtual office and then they just hire instructors from that city. They don't have to put people on that city. And so the ability to scale this business purely through the branding creates a very high margin and both of them are very profitable right now.

But if one of them were to knock the other out or confuse people so that they don't really know who's who, there's a lot to gain by doing that. And that's why I said at the beginning, this is about consumer confusion. They made promises to each other, yes, but the public is a third party beneficiary of that dissolution agreement. And as a matter of law, that constitutes irreparable harm.

Second with regard to no adequate remedy of law, again, the Courts have found there's a likelihood of consumer confusion, an inadequate remedy of law can be presumed. That's 847 2nd at 459. This is fully briefed in our a amended motion. That's the Woolley case. With regard to substantial likelihood of success on the merits, Judge, we just

need to have some common sense here. Those logos aren't different. I mean, they're different, but they're the same. They're also the same. Somebody looking at those two logos on the web is going to presume they're from the same source because it's not how you compare them to each other, it's how you compare them to many other logos and how the distinct they are from other providers. And other provider logos don't look that similar. You know, you have some hex code differences. There's no -- the colors are the same. They look nearly identical but for a couple of things. While every single major brand in the United States slightly changes their logo on purpose, because when the consumer sees the logo the same, it doesn't look fresh anymore. The most likely assumption by a consumer is, oh, they're just going with a fresh new logo. It's similar enough to let people know.

THE COURT: Okay. I'll cut you off. I need to hear from Mr. Dietrich, but I -- I -- I thank you very much.

MR. SOUTHRON: Thank you.

THE COURT: All right, Mr. Dietrich, three minutes.

MR. DIETRICH: Your Honor, this is not a

confusion case. There's no trademark claims. There's breach of contract and tortious interference. Likely no confusion, irrelevant Your Honor. The cases that were just cited to you are trademark cases. We all agree, in a trademark case, there is a confusion element there. Not in a breach of contract, tortious interference. If I may, Your Honor, if -- if we can look at the dissolution agreement, this is important. They keep trying to conflate Section 7 and Section 8. What I want to point out is Section 8. If we look at that, look at the second sentence. This was carefully drafted by the attorneys. It says, "In addition to changing the logo as set forth above, so that comma is specifically placed there. What you look at after that is that he agreed to change the hero picture. He agreed to change the icons. That was all done, Your Honor. That is the only part of Section 8 that refers to whether or not there will be consumer confusion.

They keep trying to say the logo is causing confusion. Not only there -- is there no evidence, we just heard that it will -- it will confuse people. Who? What people? There is zero evidence to show who these people are that are confused, Your

Honor. But it doesn't matter if the confusion relates to whether or not Mr. Halabi changed the Hero picture and changed those icons. Other than that, the confusion element is irrelevant, Your Honor. If you look at the next sentence in Paragraph 8, what Mr. Joos and his attorney have not pointed out is that Mr. Joos agreed that he had to change things on the website, the text and things like that. This all comes back to the logo.

Common sense? Uh-uh, Your Honor. There's a merger clause in this agreement. So common sense, what anybody thought happened or what they thought they were entering into, you don't have to consider that, nor can you, Your Honor. There's no ambiguity here. The contract that was negotiated and agreed to says that Mr. Halabi's logo has to be different. That's it. If they wanted more, they should have drafted it differently. But they can't come here now and ask you to go back in time and rewrite the contract for them. Different is what it is. It means not the same. It doesn't mean anything else.

You heard the testimony from Mr. Halabi. There's a number of things that are different, not just the color, not just the font. Okay. There's other things. The placement of the words, the

placement of the sinusoidal waive all plays a role into this. And it doesn't matter. It's different. Whether or not they confuse people, that's not what the contract says. It's not what they pled, Your Honor. So those arguments do not need to be considered.

We -- we talked about trying to keep the status quo to go forward, Your Honor. Well, that's exactly what the case law says you can't do. We can't prevent somebody from speaking. They don't have a claim. They don't need to address that anymore. But you can't tell somebody they can't speak. An injunction is to enforce somebody to stop doing something that's already been done, not to stop somebody from doing something. That -- that's exactly what the case is -- say is a restraint of trade. To stop somebody from continuing to breach an agreement, well.

Your Honor, if -- if we can get an injunction for that, your courthouse would be flooded with injunctions on every breach of contract case, I can assure you. But that's not what an injunction is for, to stop somebody from breaching. They have to prove a breach first of all. There's no proof here. They have to prove that. And that's what the trial

301729 Hearing before Judge Farfante 12-20-2023 Page 101

of this case is for, Your Honor. And we will get there at some point, but not today. We're not at the trial. They have to prove their breach. They have to prove their tortious interference and everything else.

Your Honor, it's a steep burden for them to -- to get the remedy they're asking for. They have to with competent, substantial evidence, tick off each one of those elements. They haven't done that. We have to -- we have to dismantle one of them. The delay factor, Your Honor. I think that on its own wipes this out. A two and a half year delay to try to put the blame on -- on us, on my firm and the attorneys for delaying this, Your Honor, please. We were simply following the procedures. We had nothing to do with any of the delay. They filed three motions. Three of them. I don't know why they didn't set the first one for a hearing right away. They could've done that. We didn't prevent that. They filed an emergency motion incorrectly I would submit, but we appeared for that. We moved it to your division, which we're permitted to do.

So to put the blame on us for the delay that they caused, which by the way, they haven't explained the delay from this -- from the time in

301729 Hearing before Judge Farfante 12-20-2023 Page 102

February, 2021, when Mr. Woods sent that email, which is Exhibit 13 to the filing of the complaint. That's the delay that's at issue here. Not anything that happened subsequently. That's the two and a half year delay. Your Honor, we'd ask that the motion be denied in its entirety. Let's get forward with the trial. We'd also ask that we be awarded attorney's fees, which are permitted under the contract for a legal proceeding like this.

In the event that Your Honor does want to or is inclined to grant the injunction in any way whatsoever, we would ask for a -- a significant bond be posted, Your Honor, that we can submit, but we would ask that if we can provide evidence, if necessary. We didn't get to this during this hearing, but based on financials for my company, we -- we would request a bond in the -- in the amount of $3.8 million, which we can support with the financials of our company because having an injunction on the logo, which is my -- my client's business, would significantly impair the business going forward, Your Honor. Thank you.

THE COURT: Okay. So what's the proper -- thank you. So what's the proffer on the bond because Mr. Dietrich a valid point? There's been no

301729 Hearing before Judge Farfante 12-20-2023 Page 103

evidence today on any of the financial information that would support as to grant the motion with respect to any of the relief. There would need to be a bond posted for that preliminary injunction to be effective, so.

MR. SOUTHRON: We -- we believe a $5,000 bond is more than sufficient. This $3.8 million number comes out of nowhere with no evidence to support it whatsoever.

THE COURT: I mean, what's the counter? I'm not -- I'm asking you for your proffer.

MR. SOUTHRON: $5,000, Your Honor.

THE COURT: Based on what?

MR. SOUTHRON: Based on what is standard and custom.

THE COURT: All right. So the Court had before it the motion that was filed for preliminary injunction. First I'll recap the arguments Mr. Dietrich made. This is a request for extraordinary relief. And there are multiple factors that the Court must take into account in considering the requested relief, including the threat of irreparable harm, likelihood of success, and the merits where there's an adequate remedy at law otherwise in public interest in support of the

injunction. With respect to the arguments today and the evidence presented before the Court, the Court working backwards is not going to entertain the entry of what was deemed a request for a no contact order.

This Court is not a court that has jurisdiction over petitions for protection from any sort of violence, stalking, any other issue that would typically be before Courts downstairs, which would require evidentiary hearings, which are recorded and sufficient safeguards for the due process, which would also, if successful, result in the entries of orders granting the petitions. It would be -- it could be enforceable by law enforcement if they're breached. This Court has none of those powers. And frankly, the jurisdiction of this Court is not going to be invoked for the entry of the no contact order based on the testimony that was presented today.

Again, working backwards with respect to the request for relief on a preliminary basis with respect to the dis -- non-disparagement clause in the agreement. As Mr. Dietrich points out, there is no allegation in the complaint citing the non-disparagement clause. There is, in the motion -- the amended motion that was reasonably filed, a citation

of the non-disparagement clause. But this Court is not going to enter a preliminary injunction with respect to the non- disparagement clause. It's not an issue in the case. And by that, I mean, it's not cited as an allegation of support of the breach of contract claim. It's not a separate count asserted in the complaint at this time. So with respect to that request for relief, the Courts deny that request without prejudice.

If pleadings change or if additional issues arise in the case that would bring that non- disparagement clause within the Court's purview is without prejudice to that. With respect to the first argument that Mr. Southron is making with respect to the logo, the Court has reviewed the evidence. I have considered the dissolution agreement. And with respect to Paragraph 7, the ownership of the company logo, which was entered into evidence, that agreement as Defendant's Exhibit 9 and Plaintiff's Exhibit 3, that language does specifically say that the current logo operated by Fit shall become the sole and exclusive property of Mr. Joos. There is testimony before the Court today that -- that logo was in fact the logo that Mr. Southron held as a demonstrative in his opening and

also to the questioning of Mr. Joos that reflected a logo that was nearly identical in color, orientation, font. Mr. Dietrich's raised several points on his examination of Mr. Halabi and there was cross-examination of Mr. Joos with respect to some slight differences.

It was clear to the Court, based on looking at the demonstratives, in fact highlighted by the fact that Mr. Joos on cross-examination, the -- I think he can -- referred himself as possessing some digital design skills, he was a creator of the original logo. Even Mr. Joos with a difficult, granted maybe smaller copy of the logo, was unable to discern whether that was his original logo or the logo that Mr. Halabi is currently using. I found Mr. Joos credible with respect to his testimony about his concerns about the logo, his receipt of issues arising from what appears to be confusion about the logo. I do understand this is not a trademark case, but there is before this Court a count for breach of contract.

With respect to Paragraph 7 of Exhibit -- defendant's Exhibit 9 and Plaintiff's Exhibit 3 that is before the Court, there is within the Court's purview, based on the applicable law, there is a

301729 Hearing before Judge Farfante 12-20-2023 Page 107

basis to deem that there is a rep -- potential irreparable harm to likelihood of success and that the Plaintiff does not possess an adequate remedy at law considering what's transpired based on the evidence for the Court thus far as respect to the logo and that the public interest would be sup -- would be supported by the entry of a preliminary injunction limited solely to the enforcement of Paragraph 7, the ownership of the company logo.

Mr. Dietrich points out in closing that the Court has no evidence today to support the amount of the bond. So the Court is going to direct the parties to reset this for a Zoom hearing to present evidence exclusively on the bond amount. So Mr. Southron, I'm going to ask you to be prepared and Mr. Dietrich be prepared. Give me testimony on the bond amount.

I do not take Mr. Dietrich's concerns lightly with respect to the impact of the preliminary injunction to this extent, but I'm going to ask for proposed forms of injunction from both Mr. Southron and Mr. Dietrich prior to that resumed hearing on the bond testimony that the Court was prepared today received evidence. I didn't hear any evidence on today's record based on anything that the Court can

hang its hat -- hat on with respect to the entry of a bond amount. This injunction will not be effective absent posting of this bond. So you'll resume this hearing by Zoom at some point to be coordinated with Counsel and then email to my assistant with a request for sufficient hearing time to have a presentation of evidence on the bond amount. And at that time, I'll have the proposed forms of injunction in front of me, and I'll be in a position to enter the amount of the bond of the blank provided in the proposed order.

So I'll ask Mr. Southron first. How much time would you need to be in a position to have that evidence ready for presentation to the Court, along with my receipt of the proposed form of injunction to resume this hearing to take testimony on the bond amount?

MR. SOUTHRON: 45 days, Your Honor.

THE COURT: Okay. Mr. Dietrich, what are your thoughts?

MR. DIETRICH: That should be fine.

THE COURT: Okay. So confer with one another. Get back on my calendar. It can be -- Fridays I typically reserve for evidentiary hearings. I'm not saying it has to be a Friday, but you should have

availability on a Friday if you're not using the full morning or full afternoon. You can squeeze into one of those slots, even if there's something else scheduled. Just let my assistant know that you're requesting the resumption of this hearing and that I want at least three days prior to that agreed hearing date, your forms of the proposed.

For preliminary injunction, I'm not granting it on anything other than the ownership of company logo provision. So you can propose that. I'll supplement as necessary. I've taken notes throughout the testimony, but I'm making these findings to assist you in the prep -- preparation of your proposed order. And then the hearing will be limited solely to the evidence presented on the amount of the bond. But that, as I said, will be a prerequisite for the effectiveness of this preliminary injunction, again, without prejudice to the Court receiving further evidence on any of these findings, I've made it today's hearing for purposes of the case in chief. So I'm not making any findings today that are dispositive with respect to the main case and the cause of action asserted in the complaint.

If there's additional evidence present a later

date, the Court will consider that and evaluate that in making any other findings at any appropriate dispositive motion or trial in this matter. So any clarification needed with respect to the ruling from today's hearing?

MR. SOUTHRON: No, Your Honor.

MR. DIETRICH: I -- I do, Your Honor.

THE COURT: Sure.

MR. DIETRICH: Is the -- is your order today simply that Mr. Joos owns the prior Fit logo in accordance with section 7?

THE COURT: No, my -- my ruling today is based on the competent substantial evidence presented to the Court today, I'm granting the emergency plus really the amended motion for a preliminary injunction exclusively as to the logo. I'm going to require the parties to submit proposed orders. I'm denying the remainder of the relief requested in the motion without prejudice. And so I am ruling on more than just that there's an ownership provision in -- I'm granting the motion as to the requested relief on the logo. I'm reserving on the form of that order until I see a proposed orders. And I'm also reserving on the entry of the injunction until I've taken testimony on the amount of the bond. So

there's been no testimony today to allow the Court even by proffer to make an informed decision on what the amount of that bond is. And the bond will not be effective absent posting of -- excuse me. The injunction will not be effective absent posting of that bond.

MR. SOUTHRON: I have -- have one question, Your Honor.

THE COURT: Go on.

MR. SOUTHRON: I'm presuming the bond hearing will be evidentiary, but may take place on Zoom?

THE COURT: It's not going to be in person. You can have by Zoom.

MR. SOUTHRON: Okay.

THE COURT: You just need to be prepared at that hearing to present the evidence. I need to have the proposed order from today's hearing at least 72 hours prior to that hearing.

MR. SOUTHRON: And -- and may we bring witnesses if needed?

THE COURT: You can have witnesses on the bond amount. Are -- are you asking for it to be in person? I'm not trying to point you in the wrong direction --

MR. SOUTHRON: No, actually, I -- I prefer it

on Zoom. I just I want to follow your Court's procedures correctly and preparing for it to happen on Zoom.

THE COURT: All right. Does everyone stipulate to have -- if there's going to be witness testimony presentation, to have it by Zoom or do you want it in person, Mr. Dietrich?

MR. DIETRICH: Zoom would be fine.

THE COURT: Okay. So I don't have a problem if that's the sole issue being presented at that evidentiary hearing is the amount of the bond. You can have the testimony by the witnesses by Zoom, which how many witnesses are you proposing?

MR. SOUTHRON: I don't have any at this time, but I -- I'm just trying to foresee what -- what the parties may --

THE COURT: All right. So confer about the form. I'm not requiring to come back in, if that was your original question, in person.

MR. SOUTHRON: Yeah. Yeah -- yeah.

THE COURT: Okay. All right.

MR. DIETRICH: I have any more question, Your Honor.

THE COURT: Sure.

MR. DIETRICH: And again, I'm -- I'm just want

to be expressly clear. Is your order today that my client has to change his logo?

THE COURT: No, the injunction is not affected absent the posting of this bond. So there's no order that will issue from this court absent the continuation of the hearing on the bond. I would be prepared to at least evaluate a form of order, but I don't have any bond testimony. So I'm not directing anything be done. The hearing is going to resume, but it'll be limited solely to presentation of evidence on the bond. So nothing will be done until the Court enters its order.

MR. DIETRICH: I understand. If a bond proceeding goes forward and a bond is posted and the order is entered, is the -- is the ruling today that that order will require my client to change his logo?

THE COURT: I'm going to enter an order granting the motion with respect to the use of the logo that was presented to the Court today, based on the testimony before the Court. What action your client takes in response to the order, I -- I don't know what it's going to be, but I haven't entered the order yet. So --

MR. DIETRICH: I understand.

THE COURT: -- it's going to be tied to the presentation of the evidence today and the issue solely before the Court for purposes of the entry. The order is going to be the logo denying the requested relief. Otherwise, all the non-disparagement, no contact, all of that as denied. But yes, I'm going to enter an order with respect to the logo if that's your question, Mr. Dietrich.

MR. DIETRICH: Yes. Thank you.

THE COURT: If you-all want to confer in the interim about something, you can bring it back in front of me and tell me you've reached some sort of agreement. I'm not going to require the hearing of the bond to go forward if you-all work out something. But there will be relief from this court coming with respect to that requested relief in the motion on the logo. Okay.

MR. SOUTHRON: Thank you, Your Honor.

THE COURT: All right. Thank you very much. Good luck.

(HEARING CONCLUDED AT 4:50 P.M. ET)

C E R T I F I C A T E

STATE OF FLORIDA)
COUNTY OF ORANGE)

I, MAYRA HERNANDEZ, Court Reporter and Notary Public for the State of Florida at Large, do hereby certify that I was authorized to and did report the foregoing proceeding, and that said transcript is a true record of the said proceeding.

I FURTHER CERTIFY that I am not of counsel for, related to, or employed by any of the parties or attorneys involved herein, nor am I financially interested in said action.

Submitted on: January 8, 2024.



______________________________
MAYRA HERNANDEZ
Court Reporter, Notary Public

$

**$3.8** 102:18 103:7

**$5,000** 103:6,12

|

**|** 3:13,14

0

**02-24-2021** 3:13

**02-25-2021** 3:14

1

**1** 73:8,9

**1.100** 22:21

**1.110** 22:19

**10** 6:14,19 9:1,20 89:17

**100** 2:15

**11** 3:10,11 9:20 73:14,20 74:9

**12** 9:20 19:20 75:14

**1244** 19:12

**13** 3:13 9:2,12,20 11:14 18:1 46:19,22 48:15,16,17

**1350** 19:22

**14** 3:14 9:3,12,20 11:14 18:18 19:11 20:24 49:7,11

**15** 6:14,19 9:20 26:10

**1500** 2:10

**16** 19:15 20:18 21:7

**1701** 19:17

**1720** 2:4

**17th** 10:8 19:1 49:14

**18** 19:19

**188** 19:22

**189** 23:7

**19** 64:3

2

**2** 48:9

**2:31** 4:6

**20** 1:21 10:1 21:13 45:23 49:14 64:2 71:9,10

**2003** 19:15

**2020** 29:12 67:12

**2021** 10:7 18:2,10 19:5,18 24:19 40:4,16 48:1 49:2 55:2,25 56:6,17,24 61:20,21 67:20 102:1

**2022** 10:8 19:1,7 24:19 49:15 58:21 59:13 69:24

**2023** 1:21 4:5 18:13,15 24:17 25:19 67:5,8,16,17 80:15,19

**2024** 115:17

**20th** 4:5

**21981990** 19:15

**21st** 19:4

**228-9080** 2:11

**23** 20:10

**23-CA-013691** 1:4

**23-CA-13691** 5:5

**24** 18:2 22:16

**24th** 10:6 18:2,10 47:25 48:14 49:1

**25** 71:8

**25th** 56:17,24

**26** 71:10

**27** 3:3 45:24 46:14

**28** 3:14 56:11 57:4,7,8

**2nd** 19:22 21:17 22:20 25:13 96:22

3

**3** 3:10 10:24 11:5,11 33:2 73:23 105:20

**30** 31:5

**30th** 23:8

**32** 25:11

**33** 20:12 25:12

**331-5056** 2:5

**33602** 2:5,10 4:5

**33701** 2:16

**3409** 66:14

**35** 20:14 71:7

**3618227** 19:18

**372** 21:17

**3rd** 19:12,22 25:12

4

**4** 9:14,23

**4:50** 114:21

**400** 2:4

**401** 2:9,16

**422** 22:20

**43** 24:24

**45** 6:7,12,17 45:24 108:18

**459** 96:23

**47** 3:4 46:15

**48** 3:13

**487** 21:17

**49** 3:14

**4th** 18:2 19:4

5

**5** 3:2 24:7

**5:13** 56:17,24

**500** 24:10 25:6

**508** 4:4
**55** 26:12
**565-0316** 2:17
**57** 3:14 48:12
**571** 22:20

6

**6** 3:11 11:2,5,11 74:11
**605** 66:1,9
**662** 25:11

7

**7** 33:16 35:25 36:1,2 38:7 50:4,6 98:10 105:17 106:22 107:9 110:11
**700** 25:12
**71** 23:8
**72** 3:5 111:18
**727** 2:17
**784.064** 24:8

8

**8** 9:14 34:5 35:25 36:1,3 95:22 98:10,11,18 99:6 115:17
**80** 3:6
**800** 4:4
**813** 2:5,11
**813-362-6455** 67:24
**816** 59:19 61:22 62:3
**840** 19:12
**842** 43:10,11 44:2,6 64:13,21
**847** 96:22
**86** 3:7

9

**9** 3:12,13 8:20,23 9:12,20 10:21 73:23 105:20
**902** 95:17
**909** 25:13
**917** 25:12

A

**ABC** 45:14
**ability** 41:16 79:18 96:8
**able** 31:4,6 36:15 40:17 50:18,23 94:15
**abruptly** 77:1
**absent** 108:3 111:4,5 113:4,5
**absolutely** 17:6
**abusing** 79:7
**accents** 52:19
**access** 64:17
**accident** 59:9
**accordance** 22:19 110:11
**according** 68:23
**accosting** 45:15
**account** 40:4,16,17,21 43:3 55:6,14,18 56:3 57:22 58:3,25 64:15 103:21
**accredited** 30:1 31:5
**accurate** 46:16
**acquaintance** 28:10
**across** 28:24 43:25
**act** 24:14 76:4
**action** 23:23 81:10,12 89:8 91:10 109:23 113:21 115:15
**actions** 21:1,8 67:11 89:1
**active** 91:9
**acts** 24:20
**actual** 88:14
**actually** 16:3 24:23 25:3 26:11 30:19,20 31:2 32:25 33:24 38:25 39:19 40:25 41:17 51:20 55:16 56:2,16 61:6,24 62:7 63:8 65:5 76:8,18 80:21 81:18 82:1 83:6,9 88:11 91:7 92:5 111:25
**added** 43:22
**addition** 23:2 25:21 34:6,10,11 98:13
**additional** 9:3 25:22 105:10 109:25
**address** 8:15 11:13,19 40:19 41:4 43:13 55:6 59:5,19 60:10 61:22 62:4,14 63:15 64:17,19 65:12,15,18,19,21 66:1,11,12,13,15 94:21 100:11
**addresses** 66:18
**adequate** 20:2,22 23:25 96:19 103:24 107:3
**adjust** 72:5 86:14
**administered** 29:25
**administration** 15:8

**admissibility** 47:15
**admit** 10:21 46:19 48:14 68:7,10 69:22
**admitted** 16:23 37:3 48:15 49:13
**ads** 29:2
**advertise** 29:1 39:21,23
**advertised** 54:19
**advertisements** 29:2
**advertises** 53:18
**aerial** 88:5
**affected** 113:3
**affidavits** 24:13
**affirm** 27:10 71:25 86:5
**afraid** 45:7
**afternoon** 5:11,14,16,18, 21,25 27:16 71:21 72:7,16 80:6 109:2
**against** 14:20,21 26:12
**agents** 63:4
**ago** 68:18 69:16 91:8 93:11 94:6
**agreed** 70:20 98:16,17 99:7,15 109:6
**agreement** 3:10,12 8:20,25 9:14 10:6,15 11:8 14:11 16:13 17:9 18:9,12 26:17 32:25 33:5,12,17 36:9 48:23 49:3 50:3,6 73:10,14 75:11 87:14 95:22 96:17 98:9 99:11 100:18 104:22 105:17,19 114:13
**AHA** 29:20
**Ahammer** 2:19
**ahead** 27:22 31:16 47:10 71:15 72:13 73:25 86:17
**aid** 28:23 34:15
**akin** 42:22
**Aleah** 2:20
**alias** 31:8
**allegation** 104:23 105:5
**allegations** 25:8
**allege** 22:1
**alleged** 21:24 22:4,24,25 24:23 54:24 58:20 70:2 80:11
**allegedly** 45:19
**alleging** 24:17
**allocation** 6:25
**allow** 58:15 111:1
**allowed** 75:9
**alone** 20:1
**already** 17:13 33:4 47:3 50:1 62:13 69:14 91:8 93:2 100:14
**am** 45:8 46:7 71:2 110:19 115:12,14
**Amazon** 19:12
**ambiguity** 99:14
**ambiguous** 35:17 38:11
**amended** 22:7,10 96:23 104:25 110:15
**Amendment** 23:12,14
**American** 30:2
**amongst** 36:5
**amount** 90:4 102:17 107:11,14,17 108:2,8,10,17 109:16 110:25 111:3,22
112:11
**angle** 77:20
**angry** 39:18
**answer** 27:20 31:15,16 35:24 54:6 57:20 58:6,13 61:17 63:17 69:4 72:10 74:17 78:4 83:18 84:2,11 94:18
**answered** 54:3 56:5
**anti** 95:1
**anybody** 76:7 81:19 87:8 99:12
**anymore** 97:16 100:11
**anyone** 7:2,5,11,16 26:14,21 46:10 59:16 63:8 78:24
**anything** 12:4 16:22 32:6 49:18,21 55:16 76:21 79:11,21 82:13 99:21 102:3 107:25 109:9 113:9
**appearance** 34:12 80:8
**appearances** 2:1 5:7
**appeared** 94:9 101:21

**appears** 106:18
**applicable** 106:25
**appreciate** 8:7 92:16
**approach** 49:9 56:12 59:17,21 68:1 83:22
**approached** 29:12
**appropriate** 110:2
**approximately** 40:19 72:23
**arduous** 87:21
**aren't** 69:2 90:4 97:2
**argue** 11:25 13:15,18,21
**argument** 11:22 21:22 95:3 105:14
**arguments** 6:9 13:8 100:5 103:18 104:1
**arise** 105:11
**arising** 106:18
**armed** 70:22,25
**arrows** 60:15
**artist** 87:16
**Ashley** 2:4
**aspect** 91:23
**ass** 75:5
**asserted** 81:4 105:6 109:23
**assessment** 29:23
**assign** 89:21
**assist** 109:13
**assistant** 108:6 109:4
**associated** 29:17 37:7 41:20
**Association** 30:3
**assume** 31:10 77:24
**Assuming** 58:11
**assumption** 97:16
**assure** 100:22
**attack** 77:5,6,20 88:20,21
**attacks** 77:8
**attempt** 60:25
**attention** 32:3
**attorney** 18:3,4,20,21 27:20 47:24 49:15 50:5,16 51:11 72:9 80:9 86:11 99:6
**attorneys** 98:13 101:14 115:14
**attorney's** 102:8
**Audrey** 2:8
**August** 18:15
**Austin** 66:1,9
**authenticity** 60:4 68:4
**authority** 64:16
**authorized** 115:8
**availability** 109:1
**Avenue** 2:15 66:1,10,14 91:5
**Avila** 69:25 70:21 71:1,3
**award** 20:20
**awarded** 18:8 21:3 48:23 102:7
**aware** 38:11 48:3,5,6 53:17 54:19 77:8
**away** 24:10 78:15,17 88:7 101:19
**awkward** 12:10

B

**backwards** 104:3,19
**bailiff** 7:17 8:9 27:6
**BALIFF** 27:8,15 71:23 72:4 86:3
**based** 16:4 21:10 26:6 47:8 102:16 103:13,14 104:18 106:7,25 107:4,25 110:12 113:20
**basic** 32:1 54:12
**basis** 104:20 107:1
**become** 34:2 105:22
**begin** 28:11 30:20 72:5
**beginning** 96:14
**behalf** 2:2,7 5:9,12,19,22 63:5
**behavior** 70:18
**behind** 7:8
**believe** 9:6,7 16:2 26:6 29:4,5 33:23 38:6,20 41:14 44:21 62:5 65:24 71:7 73:3 76:3,4 88:1 93:7 103:6
**believed** 35:25
**believes** 35:21
**bench** 33:3
**beneficiary** 96:17
**Bennett** 2:8

5:21 85:4
**besides** 78:5
**best** 61:16 87:23
**binder** 8:24 9:24 19:11,15,19 21:18 22:17 23:6 33:8
**bit** 15:12 88:2
**bizarre** 78:12
**black** 35:20
**blame** 101:13,23
**blank** 108:11
**bled** 75:6
**BLS** 34:14 39:21,23 54:9,13
**bmaxeyfisher@maxeyfisher.com** 2:17
**bond** 102:12,17,24 103:4,6 107:12,14,17,23 108:2,3,7,10,16 109:16 110:25 111:3,6,10,21 112:11 113:4,6,8,11,13,14 114:14
**bought** 37:23
**bound** 35:19
**Bowman** 94:10
**boxes** 60:16
**boyfriend** 82:4,7 83:6
**branches** 30:15
**brand** 15:4 29:16 37:7 97:13
**branding** 13:3 96:9
**brands** 39:10 95:25
**breach** 20:7,10 49:23 93:20,22,24,25 94:3 98:2,6 100:17,21,24 101:3 105:5 106:21
**breached** 104:15
**breaching** 100:23
**break** 75:1
**Bridge** 88:5
**brief** 21:20
**briefed** 96:23
**briefly** 27:6 28:20 40:7 71:21 86:1 89:24 91:14
**brilliant** 96:4
**bring** 7:19 21:9,10 32:16 105:11 111:19 114:11
**bringing** 19:13
67:22
**brings** 41:21
**Brittany** 2:13
**Broadway** 59:19 61:23 62:3
**brought** 12:23 19:25 20:5,6 32:11 53:2
**building** 43:12,15
**burden** 15:17 25:25 101:6
**business** 21:25 28:7,15,19,20,22 29:9 33:20 36:14 37:15 40:18 41:6,9,12,21 42:5,23 44:8,17 45:5,13 46:10 55:5 57:15,18 58:10,22 62:12 63:10,14 64:19,20 65:5 70:24 76:22 91:12,16 93:8 94:23 95:2,7 96:3,4,8 102:21
**businesses** 39:1 43:25 44:11 45:1 64:24
**Bussey** 1:19 3:5 7:8 14:17 26:24 71:19,20 72:16 73:13 74:8 79:23
80:6 81:13 86:22,24

C

**C4** 95:17
**calculated** 21:3
**calendar** 108:23
**calm** 79:6
**card** 79:15
**care** 89:22
**carefully** 98:12
**case** 1:4 5:4 12:23 15:9,19 16:6,7,12 17:3,25 19:11,12,14,21,22 20:3 21:14,17,23,25 22:16,17,22 23:3,7,19,20,22 25:11,12 73:4 78:19 94:7 96:24 98:1,5 100:9,16,21 101:1 105:4,11 106:20 109:21,23
**cases** 19:9 21:18,19 25:11 95:16 98:4,5
**Castro** 2:19
**caught** 12:11
**cause** 23:23 87:1 109:23
**caused** 30:23 101:24

Page 122 of 149


**causing** 98:21
**center** 2:15 53:22,24
**cert** 92:1
**certain** 12:24 75:13 90:5
**certainly** 8:19 21:21 22:1
**certification** 28:23 32:1 37:18 50:8 52:21,23 88:10,11,13
**certifications** 31:18
**certified** 69:2
**certify** 115:8,12
**chair** 27:7
**change** 34:10,13 35:5 92:1 98:16,17 99:8 105:10 113:2,16
**changed** 65:17 95:24 99:2,3
**changes** 8:4 97:13
**changing** 34:6,11 98:13
**character** 79:24
**charge** 28:18 32:10
**check** 32:5 64:1
**checked** 62:6
**checking** 62:1
**Chesapeake** 43:1,2,9 44:5 63:20,24 64:8 65:4,14 66:1 90:6,10,11,15,18,22 91:5
**chess** 6:24
**chief** 109:21
**choice** 12:1
**choke** 76:2
**chose** 78:14,17 81:11
**CIRCUIT** 1:1,3
**circumstance** 54:13
**citation** 104:25
**cite** 19:10 23:20
**cited** 19:9 21:19 95:15 98:4 105:5
**cities** 28:24 41:23 42:6,24 90:5
**citing** 104:23
**city** 2:15 43:1 50:13 83:1,5 88:12 96:6,7
**civil** 1:3 4:7 22:21
**claim** 19:21,25 22:14,24 45:18,20 85:15 91:21 93:23 100:11 105:6
**claimed** 39:17
**claims** 20:6 21:4 23:1 25:24,25 31:4 49:22 81:4,7,9 98:1
**clarification** 110:4
**clarify** 11:13
**class** 29:25 39:18,19,20,21,22 53:11,12,14,16 54:18
**classes** 28:23 34:14 36:18 39:23,24 53:18 57:23 90:19 91:7
**classic** 23:11
**clause** 99:11 104:21,24 105:1,3,12
**clear** 8:12 21:6 23:3 73:21 106:7 113:1
**Clearly** 63:4
**clerk** 2:19 27:10,14 71:23,25 86:1,4,5
**Cleveland** 66:14
**click** 44:7,9 64:22
**clicked** 43:23
**client** 14:6,21 15:7 16:16,18 17:7 18:11 20:16 23:5 24:10,17,24 25:3,5 49:3 53:9,14,20 58:20 59:2,11 61:23 62:18,22 63:1 64:14 92:22 93:6 113:2,16,22
**clients** 53:25
**client's** 13:13 15:4 20:25 21:8 50:24 51:4,7,23 52:6,10,16,23 102:20
**close** 19:24
**closing** 6:9,15,22 92:14,15,17 94:19 107:10
**Club** 71:1
**cock** 76:2
**code** 13:17 52:12,14 88:6 97:10
**colleague** 18:4,21
**collecting** 40:25
**color** 17:15 38:18,19 51:12 52:3,6,10 88:4 99:24 106:2

**colors** 13:16 97:11
**comes** 99:9 103:8
**coming** 36:19 114:16
**comma** 98:14
**comment** 75:17
**comments** 74:24 75:2 80:11
**commissioned** 87:16
**common** 13:6,10 75:23 95:1 97:1 99:10,11
**companies** 36:12 91:20
**company** 14:7 16:17 18:8 33:25 34:18,21 40:23 44:2 48:22 74:22 75:24 77:12 78:10,24 79:15 80:13,15 87:6,10,24 88:14 89:3 102:16,19 105:18 107:9 109:9
**company's** 34:1
**compare** 97:6,7
**compensated** 20:20
**competent** 15:21 26:4 101:8
110:13
**competitor's** 43:15
**complain** 78:11
**complained** 94:14
**complaint** 18:13 20:6,8,10,15 22:8,19,22,23, 24 93:19,25 102:2 104:23 105:7 109:24
**complaints** 78:13
**completely** 13:20 36:14 40:12
**completion** 26:16
**compliance** 17:8 18:11,17 87:13
**complying** 49:3
**component** 29:22 30:10 54:15,16,17
**compulsion** 76:5
**computer** 12:8 61:14
**concept** 37:16
**concern** 13:9
**concerned** 15:7 32:13
**concerns** 18:11,16 19:4 23:12 30:8 49:2 93:17
94:20 106:17 107:18
**CONCLUDED** 114:21
**conduct** 59:15
**confer** 48:12 108:22 112:17 114:10
**confirmed** 53:24
**conflate** 98:10
**confuse** 13:3 35:7 95:25 96:1,2,12 98:23 100:3
**confused** 14:4 34:9,17,20 36:16 40:22 98:25
**confusingly** 14:24 16:21 42:4
**confusion** 10:19 12:23 13:5,9 36:4,12 38:25 39:9 95:19 96:15,21 98:1,3,6,20,22 99:1,4 106:18
**conjecture** 21:11
**connecting** 17:16
**connection** 87:5
**connects** 17:17 51:21 61:8
**consider** 78:16
99:13 110:1
**consideration** 87:19
**considered** 85:19 100:6 105:16
**considering** 103:21 107:4
**constitutes** 95:19 96:18
**consulted** 81:11
**consumer** 12:23 13:5,9 39:10 93:8 95:15,19 96:15,21 97:14,16 98:19
**consumers** 13:24 29:16 36:5,13
**contact** 63:17 94:22 104:4,17 114:6
**contacted** 40:20 58:21
**contingent** 21:16
**continuation** 36:1 113:6
**continue** 20:14 31:21 37:6
**continued** 9:20
**continuing** 100:17
**contract** 20:7,11 21:23 35:17,19,20 49:23 92:25

93:20,23,24 94:1,4 95:6 98:2,7 99:15,20 100:4,21 102:9 105:6 106:21

**contractors** 87:9

**conversation** 30:14 32:17 75:17

**convince** 30:25

**convinced** 30:13,14

**COO** 79:3

**coordinated** 108:5

**copies** 69:1,2

**copy** 20:9 23:6 33:3,7,9,11 46:23 61:10 106:13

**correct** 10:24 34:22 39:14 40:2 47:9 49:4,5,24 50:19,24 51:8,11,15,21,24 52:7,21,24 55:4,7,17 58:23 63:10 65:21,23 67:6,7,8,12,17,18 68:24 69:9 70:4 75:12,15,18 80:9,14,16,17,20 81:3 83:17 84:5

**corrected** 65:21

**correctly** 48:24 112:2

**correspondence** 9:3,4 55:23 56:1,7,15

**corresponding** 55:20

**co-space** 58:22

**could've** 101:19

**counsel** 6:4 7:7 8:5 16:15 108:5 115:12

**count** 93:19,20 105:6 106:21

**counter** 103:10

**country** 28:24 43:25 54:20 71:1

**COUNTY** 1:2 4:3 115:4

**couple** 8:17 26:9 65:22 81:13 83:12 87:22 89:16 91:8 92:17 97:12

**course** 54:16 74:24

**court** 1:1 2:19 5:2,11,14,16,25 6:10,16,20,23 7:5,9,11,14 8:8,12 9:5,11 10:2,16,20 11:5,10,17,21,24 12:7,15,17,19,21 14:12,23 15:10,18 24:7 26:8,21 27:3,16,18,19 31:12,14 33:4,8,22 34:25 35:10,15,23 36:22 39:4 42:1,9,11 45:22 46:5,14,21,25 47:4,7,10,14,21 48:11 49:10,24 53:21 54:6,11 56:13 57:6,20 58:13 59:22 60:2,8,12,20,22 61:17 64:2 67:5 68:3,6,11 69:3,18,21 71:9,14,17,20 72:7,8,13 73:9,11,21,25 74:4,16 78:2 79:9,12,25 80:3 83:23 84:13,16,20,22,25 85:4,19,25 86:10,14,17 87:12,25 89:13,15 92:8,11,16 93:12 94:17,21,23 95:4,9 97:19,23 102:23 103:10,13,16,21 104:2,6,15,16 105:1,15,23 106:7,20,24 107:5,11,12,23,25 108:14,19,22 109:19 110:1,8,12,14 111:1,9,12,15,21 112:4,9,17,21,24 113:3,5,12,18,20,21 114:1,3,10,15,19 115:6,24

**courthouse** 4:3 100:20

**courtroom** 4:4 7:6,22,23 8:3,13 28:4 72:19 84:23

**Courts** 95:18 96:20 104:9 105:8

**Court's** 61:13 95:13 105:12 106:24 112:1

**covenant** 75:10

**covenants** 12:24 13:1,2 14:10,11

**coworking** 58:15,22 59:12 65:19 90:2,7

**co-working** 40:5,9 41:18 43:4 55:8,14,18 90:5 91:1,9

**Coworking** 55:21 62:4,8

**Co-Working** 61:25

**CPR** 13:25 28:22 29:13,18 30:21 31:19 32:1 34:14 36:17 37:4,18 39:18,19,20,21 ,22,23 43:11,25 44:6 46:11 50:11 52:21,24 53:16 54:14,18 61:3 64:13,21 88:10,11,12,13 90:19,25

**create** 37:22 40:18 51:4,7,9 59:4

**created** 37:14,24,25 41:3 45:4 50:25 51:3,5 59:7

**creates** 96:9

**creating** 37:3

**creator** 106:11

**credible** 106:16

**criteria** 30:5 87:17 90:1,3

**cross** 26:19 27:2 46:17 79:25 92:9

**cross-examination** 3:4,6 47:16 80:4 106:5,9

**crying** 79:3

**culture** 74:21 78:25

**cunt** 79:3

**cured** 20:5

**current** 34:1 92:2 93:18 105:21

**currently** 42:25 106:15

**custom** 103:15

**customer** 63:12

**customers** 28:25 41:10

**cut** 97:19

D

**damaged** 41:12

**damages** 20:5,12,14,20, 21 21:3,5,24 22:1 23:23 24:2 43:18

**damaging** 42:16

**Dan** 5:18

**Daniel** 2:7

**Darren** 2:18

**data** 10:3 11:5,11 52:5

**date** 1:21 54:25 56:23 58:24 109:7 110:1

**David** 23:7

**David-Textor** 23:19

**Dawn** 81:22 82:5,6,21 83:7

**Dawn's** 82:4

**day** 4:5 27:17 75:4 77:13,19 79:19 94:9

**days** 108:18 109:6

**ddietrich@gunster.com** 2:11

**dealing** 42:25

**death** 32:11,13

**debit** 79:15

**December** 1:21 4:5 61:21

**deceptive** 29:15

**decision** 111:2

**deduct** 6:14,21

**deem** 107:1

**deemed** 104:4

**defamatory** 23:21

**defendant** 1:13 2:7 5:17 9:13 14:8 40:20 44:13

**defendants** 94:6

**defendant's** 3:12 8:24 9:11,17 10:21 13:8 41:6 43:24 48:9,15 49:7,13 57:3,7 73:22 105:19 106:23

**definition** 17:1

**delay** 19:7,13,16,18, 20,23,24 26:7 85:12 92:22 94:5 101:11,12,16,2 3,25 102:3,5

**delaying** 101:14

**deliberately** 64:9

**demand** 20:23

**demanding** 32:9

**demonstrative** 105:25

**demonstratives** 106:8

**denial** 20:22 85:17

**denied** 102:6 114:6

**deny** 16:3 17:21 26:3,6 105:8

**denying** 20:1 85:12,20 110:18 114:4

**deposed** 83:12,14

**deposing** 66:6,7
**deposition** 66:3,17,25 67:2,23 75:25 76:25 78:20 83:25 84:15
**depositions** 93:4
**deputy** 2:19 71:21 86:1
**describe** 28:20 42:13 45:12 74:20 75:22
**describing** 36:3
**design** 16:19 28:13 37:21 106:11
**desire** 36:18
**desperate** 70:23
**despite** 29:9
**destroy** 15:3
**determine** 90:18
**developed** 74:23
**diagnosed** 77:7
**die** 32:18
**died** 76:2
**Dietrich** 2:7 3:4,6,7 5:15,18,19 6:11,17,21 7:13 8:17,23 9:2,7,18,23 10:11 11:11,12,20,23 12:5 15:11 26:10,25 31:11,13 33:12,14 34:23 35:9,13,16 36:21 39:3 41:24 42:7,10 45:16 46:17,18 47:2,12,17,23 48:7,17,18 49:6,9,12 54:1,4,8 56:11,14 57:2,9 58:1,17 59:21,23 60:6,11 61:1,12,18 64:3,5 68:1,9,13 69:6,13,23 71:12,19 74:15 77:23 79:8 80:1,5 83:22,24 84:18 85:6,24 86:19 89:20 92:6,15 97:20,23,25 102:25 103:19 104:22 107:10,16,22 108:19,21 110:7,9 112:7,8,22,25 113:13,25 114:8,9
**Dietrich's** 93:16 106:3 107:18
**difference** 16:25 51:2
**differences** 17:11,14,18 88:1,3 97:10 106:6
**different** 10:4 13:11,14,16,19,22 14:1 16:20,23,24 17:2,3,6,10,17 18:7 36:4 37:19 38:17,18,19,20,21 39:8 48:22 50:17,21,22 51:13,17,19 87:15 88:4,5,24 97:2 99:16,20,23 100:2
**differentiator** 88:9
**differently** 99:18
**difficult** 42:15 106:12
**digital** 106:11
**direct** 3:3,5,7 26:19 27:24 64:21 72:14 73:13,20 86:18 87:8 107:12
**directed** 23:9 85:8
**directing** 113:8
**direction** 76:8 82:24 111:24
**director** 43:10,11 44:6 64:13,21 72:25
**dis** 104:21
**disability** 77:7
**disagree** 29:14
**discern** 106:14
**discovered** 30:24
**discuss** 45:19 63:9,11
**discussion** 6:4 36:10 81:15
**dismantle** 101:10
**dismiss** 94:12
**dismissal** 85:16
**disparage** 95:6
**disparagement** 22:5,23 23:10,22 49:19 93:19 104:24 105:3,12 114:6
**disparaging** 63:24 64:7 85:13
**dispose** 11:24
**dispositive** 109:22 110:3
**dispute** 91:15
**dissimilar** 16:21
**dissolution** 3:10,12 8:20,24 9:14 10:6,15 11:8 14:9,10 16:13 17:9 18:9,12

29:10 30:23 32:7,23,25 33:5,12 48:23 49:3 50:3,6 73:10 87:14 95:2,3,22 96:17 98:8 105:16

**dissolutions** 95:2

**dissolved** 16:17

**distinct** 97:8

**divided** 38:9

**division** 1:3,5 101:22

**document** 10:24 38:10 48:11 60:11,24 61:21 68:14,23

**documents** 66:18

**done** 42:24 50:2 65:22 78:4 82:9 94:13 96:2 98:17 100:14 101:9,19 113:9,11

**doors** 70:17

**Doug** 2:20 5:10 14:6 18:5,8 48:20,23 56:17 75:5,20,24 76:1 79:17

**Douglas** 1:7,18 2:2 3:3 5:15 28:3

**Doug's** 76:12

**downstairs** 94:23 104:9

**drafted** 47:25 98:12 99:18

**drill** 86:11

**Drive** 2:4

**due** 30:17 104:11

**duplicate** 41:2 57:25 63:16

**duration** 29:25

**during** 45:13 53:2 70:7 74:24 76:25 80:12 81:14 102:15

**duty** 89:25

**dying** 32:12

E

**early** 77:1

**East** 2:9 4:4 59:19 61:22 62:3

**edit** 51:9

**educational** 31:23

**effective** 103:5 108:3 111:4,5

**effectiveness** 109:17

**efforts** 30:18 92:23,24

**egregious** 75:25

**either** 7:21

27:1 35:21 61:7,13 66:15 67:12 75:24 84:22 93:19

**Electric** 21:14

**element** 16:6 20:2 36:5 98:6 99:4

**elements** 15:21,23 16:1,5 22:13 25:23 26:1 37:22 85:11 95:12,23 101:9

**eligible** 44:24

**else** 7:11 12:4 16:22 32:6 41:3,6 59:17 76:21 78:24 79:11,21 81:21 99:21 101:5 109:4

**email** 9:2 10:6,7 18:1,5,16,19 47:18,22,25 48:3,5,6,13,19 55:23 56:1,6,17,18 63:13 64:17,19 67:19 91:2 102:1 108:5

**E-mail** 2:6,11,17 3:13,14

**emergency** 22:9 101:20 110:14

**empire** 46:11

**employed** 80:12 115:13

**employees** 14:20 82:6 87:9

**enemy** 74:22

**enforce** 12:24 100:13

**enforceable** 35:19 104:14

**enforcement** 104:14 107:8

**engage** 78:18

**enjoin** 14:18,24 19:6 23:10,16 25:5 49:24,25 85:14

**ensure** 87:13

**enter** 8:19,25 49:6 57:3 105:2 108:10 113:18 114:7

**entered** 105:18 113:15,23

**entering** 9:10 75:13 99:13

**enters** 113:12

**entertain** 104:3

**entire** 54:20

**entirety** 67:13 102:6

**entity** 44:13

**entries** 104:12

**entry** 104:4,17 107:7 108:1 110:24 114:3

**environment** 77:12,14 81:5,10
**erratic** 45:10
**Ersek** 2:19
**especially** 90:5
**Esquire** 2:2,3,7,8,13,14
**essence** 85:7
**essentially** 42:20
**establish** 40:20 58:21 59:13 89:5
**established** 40:5 43:3,8 54:24 55:5 56:3
**establishing** 62:9
**ET** 4:6 114:21
**evaluate** 110:1 113:7
**event** 102:10
**eventual** 21:11,16
**everybody** 35:18
**everyone** 38:11 112:4
**everything** 9:5 20:21 24:17 88:24 101:5
**evidence** 6:8 15:22,25 16:4 17:25 26:4 27:11 46:20 47:13 48:8 57:3 58:12 59:1,11 62:7,21 63:1 64:25 65:3,8,10 69:13 72:1 85:10 93:5 98:22,24 101:8 102:14 103:1,8 104:2 105:16,19 107:5,11,14,24 108:7,14 109:15,19,25 110:13 111:16 113:11 114:2
**evidentiary** 5:5 6:1 47:8 94:13 104:10 108:24 111:11 112:11
**ex** 94:8
**exactly** 13:18 100:8,16
**examination** 3:3,5,7 27:24 72:14 86:18 106:4
**example** 13:10,15 23:11 44:22
**exclusionary** 7:2,15
**exclusive** 20:17 33:19,23 34:3 36:2 38:22 105:22
**exclusively** 38:1 107:14 110:16
**excuse** 7:23 8:3 111:4
**exhibit** 3:9 8:25 9:3,14 10:21 11:21 18:1,18 20:24 33:2 46:19 48:8,9,15,16 49:7,11 50:3 56:11 57:3,7,8 59:24 73:7,9,23 105:19,20 106:22
**Exhibit 13** 102:2
**Exhibit 14** 49:14
**Exhibit 3** 11:2,3 73:22 106:23
**EXHIBIT 6** 11:4
**Exhibit 9** 9:17 106:23
**exhibits** 3:8 8:15,18 9:12 10:23 11:8 17:23
**exist** 14:11
**existing** 37:23
**expensive** 90:8
**explain** 14:10 41:20 87:12,25 89:24
**explained** 15:14 101:25
**explains** 22:17
**exposed** 77:10
**expressly** 113:1
**extensive** 92:23
**extent** 107:20
**extraordinary** 15:18 17:7 103:19
**Extremely** 77:15
**eye** 13:17,20

F

**face** 27:8 71:23 86:3
**Facebook** 28:12
**facing** 64:20,22
**fact** 35:17 37:2 38:21 39:19 61:19 91:15 93:17 94:21 105:24 106:8
**factor** 36:18 85:12 101:11
**factors** 103:20
**facts** 58:11
**faded** 61:6
**failure** 88:19
**fake** 79:14,15
**false** 15:2 81:19,25 82:11 87:5,10
**familiar** 50:25

57:16 59:8,20 60:10 66:12
**families** 79:18
**family** 24:25 77:18
**family's** 25:1
**Farfante** 2:18
**fatal** 16:1 17:19 19:13,16,20 22:25
**fault** 94:14
**FD0100** 88:6
**fear** 22:5,25 24:18 25:16 49:19 66:22 79:13
**feared** 24:25
**fearful** 25:4,8 67:11,13
**February** 10:6 18:2,10 19:4 40:4,17 47:25 48:14 49:1 55:2,25 56:6,17,24 61:20 80:15,19 102:1
**federal** 78:14 95:17
**feel** 36:8 41:19 79:16
**fees** 102:8
**feet** 24:10 25:6
**felt** 88:14
**FF0000** 88:6
**figure** 70:23
**file** 18:12,13 78:12,13 94:8
**filed** 22:10,23,24 23:23 93:11 94:6,10,11 101:16,20 103:17 104:25
**filing** 92:25 102:2
**filings** 21:6 25:9
**financial** 28:19 103:1
**financially** 115:14
**financials** 102:16,19
**findings** 109:13,20,22 110:2
**fine** 11:20,23 89:15 108:21 112:8
**finish** 27:2,20 72:9 86:12
**firm** 2:3 60:16 101:13
**first** 5:8 23:12,14 28:23 29:7 34:14 54:2 61:3 70:12,15 72:25 73:18 75:19 77:11 80:25 92:21 100:24 101:18 103:18 105:14 108:12
**firsthand** 39:9 53:3 54:5 73:2 74:13 79:5
**fit** 3:10,12 14:7 28:21,22 29:3,11 34:2,19,20 35:8 37:24,25 38:1,4 39:1 90:4 105:22 110:10
**five** 19:13 82:14 85:22
**five-minute** 6:7
**Fiverr** 37:16,20
**five-year** 31:23
**five-year-old** 78:6
**fixated** 32:10
**flagged** 41:2 57:24
**fled** 77:11,14
**flee** 78:18
**flexible** 90:3
**flooded** 100:20
**floor** 12:7
**Florida** 1:2 2:5,10,16 4:4,7 24:7 32:20 115:3,7
**focus** 30:15,18
**font** 17:15 38:20 51:13 52:16,18 88:5,6 99:24 106:3
**fonts** 13:19 88:4,23
**force** 42:5
**foregoing** 115:9
**foresee** 112:15
**forever** 75:4
**forget** 91:6
**form** 34:23 35:9 36:21 39:3 41:24 47:20 57:19 74:2,15 93:13,14 108:15 110:22 112:18 113:7
**formed** 14:8
**former** 28:7
**forms** 107:21 108:9 109:7
**forth** 22:12 34:11 87:21 98:14
**forum** 93:3
**forward** 15:20 22:15 42:18 93:13 100:8 102:6,22 113:14 114:14
**foundation** 47:1 68:7,12
**frankly** 104:16
**fraudulent** 37:8

**free** 7:21 84:23
**Freedom** 75:3
**frequently** 32:12 46:9 58:15
**fresh** 97:15,17
**Friday** 108:25 109:1
**Fridays** 108:23
**front** 12:3 27:8 43:12,14 50:4 52:5 65:8 108:9 114:12
**fuck** 75:5
**full** 34:5 70:22 109:2
**fully** 96:23
**Funding** 19:17
**Furthermore** 14:15
**future** 23:16 24:4 34:21 37:6
**futuristic** 21:11,12,16

G

**Gail** 81:22 82:22
**gain** 96:13
**Gangloff** 2:8
**gears** 29:13
**general** 14:14,19 39:20 51:1 70:17
**girl** 79:15
**girls** 79:2
**giving** 30:18 46:3
**goal** 82:14
**God** 63:7
**Goldschmidt** 22:17
**gone** 14:25
**Google** 29:1 39:17 40:6,18 41:1,2,8,11 42:5 43:8,19 44:22 57:10,13,15,18 58:10 59:4,5,7,16 62:1,9,11,23 63:9,10,18 64:10,11,15,18 ,19 65:4 81:15 87:5 91:11,16,18 96:5
**Google's** 58:14
**grant** 102:11 103:2
**granted** 15:19 20:15 21:15 23:18 38:7,22 106:13
**granting** 104:13 109:8 110:14,21 113:19
**grants** 33:23
**graphic** 37:21
**great** 6:10 27:3 83:21
**greater** 93:9
**ground** 95:13
**group** 34:15 79:3
**guards** 70:22,25
**guess** 48:8
**gun** 77:19
**Gunster** 2:9 5:19,22 79:4 81:8

H

**Halabi** 1:12,20 2:7 3:7 5:20,22,23,24 14:20 15:1,6 28:4,12 30:8,20 31:10 34:8,12,17 35:5 37:2,4,15,18 39:22 41:23 42:4,13 44:1 45:7,10,14 46:9 49:20 50:7 54:20 56:2 57:24 63:4,23 64:7,14 66:22 67:4,19 69:24 70:24 72:17,19,22 74:14 76:7,11 77:8,17,18 80:11,13 81:18 85:24,25 86:11,20 93:2,6 96:2 99:2,22 106:4,15
**Halabi's** 18:3,21 35:7 36:17 37:1 38:13 44:8,11 51:10 53:11,25 64:23 99:16
**half** 6:18 18:15 19:25 72:23 101:12 102:5
**hallway** 7:18 14:16
**Halper** 31:8,9
**hand** 27:9 71:24 86:4
**handed** 65:10
**handled** 32:21
**hands** 30:11
**hands-on** 30:10
**hang** 108:1
**happen** 32:18 112:2
**happened** 39:12,15 40:1,3,15 76:10 99:12 102:4
**happy** 11:13
**hard** 20:9 62:11 88:3
**harm** 16:5 21:9,11,12,15

67:21 76:21 87:2 95:14,19 96:18 103:23 107:2
**hat** 108:1
**haven't** 17:13 25:16,18,19 67:4,8 73:15 77:10 101:9,24 113:23
**having** 18:16 41:20 57:14 61:24 67:20 77:5 88:19 102:19
**head** 52:15 53:8 60:10 65:16 75:4
**heading** 33:24
**heads-up** 46:3
**hear** 13:11 14:15 17:6,18 24:16,22 25:2 97:20 107:24
**heard** 75:19 79:5 82:23 86:22 89:1 98:23 99:22
**hearing** 1:15 4:3,6 5:6 6:2 7:17 47:8 94:10,12,13 101:18 102:16 107:13,22 108:4,6,16 109:5,7,14,20 110:5 111:10,16,17,18 112:11 113:6,9 114:13,21
**hearings** 104:10 108:24
**hearsay** 47:5 54:2 68:5
**heart** 13:21 17:16 30:3 51:15,20,24 52:3 61:9 88:7,19,20,21,22
**heartbeat** 88:16
**he'd** 31:1
**held** 22:18 91:7 105:25
**he'll** 27:21 72:10 86:1,12
**help** 28:13 30:19 59:25
**hereby** 115:7
**herein** 115:14
**HERNANDEZ** 1:22 115:6,23
**hero** 34:13 98:16 99:3
**he's** 14:6,8,10,16,17 15:2 16:1 24:17 25:7 28:10 41:25 45:18 62:20 64:9 71:9 77:22 84:11 89:15
**hesitation** 6:11
**hex** 13:17 52:12,14 88:6 97:10
**high** 28:10 96:9
**highlight** 60:17
**highlighted** 106:8
**highly** 37:5
**Hilliard** 2:19
**HILLSBOROUGH** 1:2 4:3
**hire** 96:6
**hiring** 30:15
**hold** 13:12 57:23
**home** 31:6
**honest** 78:20,21
**Honor** 5:18 6:6,11 7:4,10,13 8:18 9:13 10:11,25 11:12 12:5,6,13,22 15:11,15 16:2,4,9 17:1,12,19 18:5 19:2,8,23 20:1,4,9,18,21 21:2,7,9,14,17,18 22:3,11,16,19 23:2,5,15,19 24:5,11,15,19,21 25:11,20,25 26:5,7,25 31:11 33:1,7 34:23 35:9,14,22 36:21 39:3 41:24 42:7 45:16 46:18,24 47:6 48:7 54:1 56:12 57:2 59:21 60:5,7,12 61:12 63:25 66:21 68:1,2,25 71:6,13,16 73:6 74:1,15 79:8 80:2 83:22 84:10,19,21,24 85:3,6,9,15 89:12 92:7,10 97:25 98:4,8,18 99:1,5,10,14 100:5,8,19 101:1,6,11,14 102:5,10,13,22 103:12 108:18 110:6,7 111:8 112:23 114:18
**Honorable** 2:18
**hostile** 81:4,10
**hour** 6:18 26:12
**hours** 111:18
**housekeeping** 8:14
**hundreds** 59:7
**hurdles** 15:20 25:21,22
**hurtful** 42:17

I

**icons** 34:14 98:17 99:3

**I'd** 33:1 47:12 48:7 49:6 57:2 69:13 73:6

**idea** 53:19

**identical** 11:1 14:2 97:11 106:2

**IDENTIFICATION** 9:17 11:3,4 48:16 49:11 57:8

**identity** 42:22,23

**ignoring** 93:15

**I'll** 6:21,23,24 9:10 10:21 11:19,25 12:7 19:21 20:8 31:14 34:25 35:13,23 36:22 39:4 42:1 45:22,25 47:15 48:14 56:16 57:20 60:8,12,22 61:20 68:6 69:3,21 74:16 77:23 78:2 85:19 92:15 95:10 97:19 103:18 108:8,9,12 109:10

**illegible** 61:11

**I'm** 5:4,24 7:25 10:5 11:13,15 15:11 17:13 19:9 21:20 25:23 26:12 33:6 43:6 46:2 48:4,6,11 50:2,25 53:17 54:1,6,19 57:11,16 58:6,24 59:8,20,24 60:9 63:7 65:3 67:1,13 68:9 69:19,21 70:8,19 76:14 88:25 89:15,17 103:10,11 107:15,20 108:24 109:8,12,21 110:14,16,17,21,22,23 111:10,23 112:15,18,25 113:8,18 114:7,13

**immediate** 94:8

**immediately** 93:10 94:7

**imminent** 25:15,16,19 32:12

**impact** 43:17 107:19

**impacted** 41:16

**impair** 102:21

**important** 12:25 16:8,19 17:20 19:10 36:8 41:8 79:12 98:9

**impossible** 59:9

**impression** 45:5

**improper** 84:15,16,17

**inadequate** 96:21

**inclined** 102:11

**included** 15:8 24:7

**includes** 18:25 49:22 54:14 55:18

**including** 103:22

**incorporate** 21:21

**incorporated** 36:6

**incorrectly** 101:20

**increasingly** 32:8

**incurred** 93:2

**independent** 36:15 87:9

**INDEX** 3:1

**indicated** 16:11

**indicative** 88:19

**individual** 8:9 53:23

**induced** 77:6

**Industries** 3:10,13 14:7 28:21,22 29:3,11 37:24,25 38:1,4 44:2

**infant** 39:18,19,21,22,23 53:15,16 54:18

**infants** 54:14

**information** 82:8 86:6 103:1

**informed** 111:2

**infringement** 23:14

**initial** 18:13 20:23 22:7,8

**initially** 28:15

**initiated** 32:24

**injunction** 5:7 15:15,16 17:22 18:14 19:7 20:15 21:8,10,15 23:9,17 24:3,6 25:14 45:20 62:25 93:14 94:9 95:1,12 100:13,19,22 102:11,20 103:4,18 104:1 105:2 107:8,20,21 108:2,9,15 109:8,18

110:16,24 111:5 113:3
**injunctions** 100:21
**injunctive** 20:7 23:3 93:13
**injury** 19:14 20:3,4
**in-person** 29:22 32:4
**instantaneously** 43:20
**instruct** 76:16
**instructed** 76:11 81:19
**instructor** 30:1,17
**instructors** 96:6
**intend** 7:11
**intention** 15:3 57:23 67:21 87:1
**intentionally** 15:3 42:17 62:16,18 63:2 93:8 95:8 96:2
**interest** 103:25 107:6
**interested** 115:15
**interfere** 64:10
**interference** 20:7,13 21:25 22:2 49:23
98:3,7 101:4
**interfering** 93:7 95:8
**interim** 114:11
**internal** 9:19
**International** 95:17
**internet** 65:11
**interrupt** 40:7
**interrupted** 95:9
**intimately** 50:25
**introduce** 33:2
**invoked** 104:17
**invoking** 7:2,15
**involved** 78:22 115:14
**irrelevant** 35:21 55:9 98:3 99:4
**irreparable** 16:5 19:14 20:3 21:9 25:14 95:14,19 96:18 103:23 107:2
**Isn't** 33:4 65:17
**isolated** 88:7
**issue** 15:13 16:11,12 18:24,25 19:10 21:5 26:7 39:12,25 53:2
95:15 102:3 104:8 105:4 112:10 113:5 114:2
**issues** 18:24,25 19:2,6 22:13 73:3 85:13 86:21 105:10 106:18
**It'd** 84:1
**it'll** 113:10
**I've** 10:4 49:17 64:2 70:18 77:11 78:19 80:25 85:19 89:18 109:11,20 110:24

J

**Jackson** 2:9
**Jacksonville** 21:13
**January** 58:21 59:13 115:17
**job** 78:9,11
**joe@fourriversl aw.com** 2:6
**John** 3:14 18:4,21
**Joos** 1:7,18 2:2,20 3:3,14 5:10,15 14:6 18:10 20:12,13,19 22:25 24:16,25 25:3 26:24 27:4 28:1,3,4
33:16 34:3 37:9 46:18 47:18 48:19 49:13 53:19 55:20 57:10 58:2,5 59:1,25 61:19 66:21 68:14 74:22,25 76:8,21 78:1 80:9,21 87:2 89:3 99:6,7 105:23 106:1,5,9,12,16 110:10
**Joos's** 18:3,20 87:5,10 91:11,25
**Joseph** 2:2 5:9
**Joseph's** 16:20
**Jr** 5:15 28:3
**judge** 2:18 94:10,24 96:25
**JUDICIAL** 1:1
**Julia** 2:3
**July** 18:13 67:20
**jump** 70:17
**June** 29:12 43:9
**jurisdiction** 104:6,16
**Justin** 2:8 5:21

K

**Kathleen** 5:12
**keyboard** 30:11
**kill** 46:11

**knew** 37:5 59:2,11 62:7
**knock** 26:1,2,3 96:11
**knowledge** 53:3 54:5 76:18

L

**laboratories** 95:16,17
**lack** 13:8,10
**lacked** 30:17
**lady** 53:10
**language** 33:22 36:9 60:18 105:20
**Large** 115:7
**largely** 12:22
**last** 19:21 22:3 24:15 65:22 66:4,6,7,17 79:14 81:13 83:12 94:9,12
**lastly** 24:5 66:21 94:21
**later** 18:14 40:19 43:5 109:25
**Laura** 2:19 81:24
**law** 2:3,19 15:19 16:6 17:3 19:11 20:2,3,22 22:16 23:3,25 95:20 96:18,20,22 100:9 103:24 104:14 106:25 107:4
**lawyers** 79:4
**lay** 68:6
**laying** 47:1
**lays** 18:23 24:8
**lead** 79:13
**leading** 42:10
**lease** 92:3
**least** 23:13 29:22 30:13,25 32:4 46:19 63:5 109:6 111:18 113:7
**leave** 76:12 81:19 84:23
**leaving** 78:10
**lectern** 12:1 92:18
**led** 29:10 32:6 93:6,10
**leeway** 74:2
**leftover** 6:22
**legal** 18:6 48:21 81:10,12 102:9
**legitimate** 18:6 29:18,20 48:21
**less** 17:5 31:5 88:20,21
**lessons** 34:15
**lets** 62:11
**let's** 10:20 11:24 92:19 93:12 102:6
**letter** 3:14 18:19,22 19:5 20:24 35:20 49:14,16,17,18,22 51:21 88:7
**letters** 17:17
**level** 32:1
**levels** 16:25
**liable** 22:18
**life** 32:1 54:12
**lifetime** 59:8
**light** 12:15
**lightly** 107:18
**light's** 12:18
**likelihood** 95:18 96:21,25 103:23 107:2
**likely** 13:25 14:1,2 37:5 97:16 98:3
**limited** 58:6 107:8 109:15 113:10
**line** 33:24 34:5 56:25 57:1 77:23 83:15
**list** 59:24
**listing** 41:4 57:15,18 58:10 63:15
**lists** 26:22
**litigation** 93:3
**little** 15:12
**lived** 79:1
**LLC** 3:10,13 44:2
**located** 89:4
**location** 45:5 57:24 89:4 90:18,19,22 91:5,15
**locations** 30:16 89:22
**locker** 76:1
**logged** 64:9,11,15
**logo** 13:11,12 14:25 16:17,19 18:7,8,17 19:3 20:18 33:20,25 34:1,7,11 35:5 36:3,5 37:1,9,13,14,22,24 38:3,5,6,8,10,12,14,23 40:21 42:5,21 48:21,22 49:4 50:8,11,14,19 51:4,5,7,9,10,20,23 52:4,7,10,16,23 61:3 62:13 64:24 87:15,17,23 93:16 94:1 95:14,23 97:14,15,17 98:14,21 99:9,16 102:20 105:15,18,21,2

901729 Hearing before Judge Parfante 12-20-2023 Page 134

4 106:2,12,13,14,15,17,19 107:6,9 109:9 110:10,16,22 113:2,17,20 114:4,8,17

**logos** 16:12 17:5,11 37:16,20,23 51:17 52:20 61:7 88:1 97:1,4,7,9

**London** 88:5

**long** 18:22 72:21 87:20

**loss** 21:25 41:12

**lost** 6:16

**lot** 15:5 58:7 88:15 90:8 96:13

**Louisville** 40:1,5,10 41:13 42:14 54:21,25 59:19 61:3,22 89:2,3,9 90:6,14

**lower** 88:22

**lowered** 88:8

**luck** 114:20

**lunch** 45:13

M

**Machine** 60:13

**Madam** 5:2

**mail** 56:21

**mailbox** 55:3,7,12,15,17,25 56:8,20 57:11,17 59:2

**mailing** 55:19

**main** 16:11 109:23

**maintain** 31:25

**major** 97:13

**Management** 19:17

**March** 10:8 19:1 49:14

**margin** 96:9

**mark** 92:24

**MARKED** 9:17 11:3,4 48:16 49:11 57:8

**market** 13:24 39:10

**marketing** 28:18

**marquee** 44:16

**matches** 68:21

**materials** 12:3

**matter** 8:22 95:20 96:18 99:1 100:2 110:3

**matters** 8:14 28:19

**Matthew** 2:19

**Maxey-Fisher** 2:13,14,19

**may** 6:13,18 7:6 10:17 34:21 40:7 45:16 49:9 56:11 60:1 61:13 68:1 74:1 80:1 83:22 98:7 111:11,19 112:16

**maybe** 25:17 106:13

**MAYRA** 1:22 115:6,23

**mean** 28:16 31:22 54:11 62:24 65:2,6 79:1 81:9 84:8 88:11 97:2 99:21 103:10 105:4

**means** 17:3,4 54:9 99:21

**mediation** 36:10

**medical** 87:18

**meet** 25:6 28:9 48:12 70:20

**meeting** 69:24 70:9,12,13,15

**meetings** 70:11

**member** 71:3

**members** 34:1

**memory** 84:12

**mentioned** 30:9 46:9 50:1 63:20 81:14 90:10

**merge** 91:20

**merger** 99:11

**merits** 22:16 96:25 103:24

**message** 68:17

**messages** 68:15,22 69:7,11,16

**met** 25:3 81:1

**mic** 12:13 72:5

**microphone** 27:18 86:14

**Military** 65:18 91:5

**Millennium** 19:17

**million** 102:18 103:7

**mind** 8:4 76:24

**mine** 8:22 32:14 66:20

**Mine's** 12:21

**minimum** 30:5

**minute** 92:13 95:10

**minutes** 6:8,12,14,18,19 26:10,11 31:5 45:23,24 64:2 71:7,8 85:22 86:20 89:16,17,18 92:17,20 97:24

**misappropriating** 21:1

**misleading** 93:8
**mistakenly** 53:11
**misuse** 20:16
**model** 96:4
**modest** 29:7
**moment** 45:14 59:20
**monetary** 20:5,20
**month** 18:14 79:14
**months** 19:13,20 24:15 75:14 83:13 93:11 94:6
**morning** 109:2
**mortgage** 78:8
**motion** 5:6 12:24 16:3 18:14 19:13 20:1,18,23 21:7 22:7,11,21 24:23 26:3,5 85:13,16,17,20 94:12 96:23 101:20 102:6 103:2,17 104:24,25 110:3,15,19,21 113:19 114:17
**motions** 88:21 101:17
**move** 11:18 16:7 17:22,23 45:20 47:12 48:7 69:13 85:7,16 88:25
**moved** 94:7 101:21
**moving** 16:7 47:11
**multiple** 64:23 103:20
**myself** 78:5

N

**naked** 13:17,20
**narrowed** 90:9
**nature** 76:5
**nearly** 97:11 106:2
**necessarily** 26:25 43:20
**necessary** 102:15 109:11
**negative** 29:6 39:16 45:4 74:24 75:1 76:12 82:15 87:4,10 91:11
**negotiated** 16:14 95:25 99:15
**newfound** 24:18
**news** 79:20
**nickname** 74:23
**nine** 71:10
**Nobody** 7:13
**no-contact** 15:5 46:5
**non** 29:17 93:19 104:23 105:3,11 114:5
**non-disparagement** 93:21,23 104:21 105:1
**none** 22:11 92:10 104:15
**nonsense** 14:24
**nor** 99:14 115:14
**North** 2:4
**Notary** 115:6,24
**note** 45:22
**notebook** 21:13
**notes** 12:8 109:11
**nothing** 17:4,5 22:13 24:20 25:16,19 27:12 63:11 72:2 85:14 86:7 101:16 113:11
**Notice** 3:11 9:15 11:8
**notwithstanding** 25:2 70:19
**November** 22:10
**nowhere** 103:8
**numerous** 45:11
**nurse** 31:7,18,21,24
**Nurses** 31:25

O

**object** 10:14 34:23 35:9,13 36:21 38:13 39:3 41:24 45:17 47:5 54:1 74:15 77:23
**objected** 17:24 47:7
**objecting** 10:1
**objection** 9:11 10:18 11:16 31:11,12 35:15,23 42:7,9 46:1 47:20 48:13 49:8 57:5,19 58:11 60:4,19,20,21 68:2,3,4,25 69:18 84:10,14 89:11,13
**objections** 10:10 11:14 69:20
**Observer** 2:20
**obsessed** 79:17
**obsession** 79:14,16
**obtain** 23:3,5
**obtained** 91:4
**obtaining** 57:11 89:22 90:11
**occasion** 70:20
**occasions**

25:4,7 45:11
**October** 43:9
**offensive** 44:20
**offer** 6:8 8:20 17:24 39:21 73:7
**offering** 30:20 90:19
**office** 40:11,12 42:21 57:14 58:9 96:5
**oh** 32:17 34:25 73:11 89:15 97:17
**okay** 6:10,20,23 7:5,11 8:8 9:5,11,22 10:16,20 11:24 12:7,14,17,19 25:6 26:8,18,21 27:3,8,23 28:9 29:9 33:1,17 34:4 35:2,23 37:13 38:2 39:25 40:13 44:1 45:7,22 46:14 47:4,7,10 48:11,15 57:2 60:3 67:3 68:6,11 69:18 70:14 71:14,17 72:4 73:2,11,25 74:12 85:19,25 91:3 92:8,11,16 95:11 97:19
99:24 102:23 108:19,22 111:14 112:9,21 114:17
**O'Keeffe** 2:14
**old** 60:14
**ones** 23:20 34:18 70:6,9 92:2
**one-year** 19:16
**ongoing** 43:18
**online** 15:2 30:20 31:3
**online-only** 29:13 31:3 36:17 37:4
**onto** 64:11,15 91:11
**open** 41:17 75:9
**opening** 6:15,19 8:15 12:4 30:15 46:15 85:11 93:17 105:25
**openings** 6:7 11:25
**operate** 35:8 44:1
**operated** 34:2,8,16,18 105:21
**operations** 72:25 73:1 74:25
**opinion** 38:24
39:8 42:22 45:3 74:13
**opportunity** 78:12
**opposed** 50:23 93:1
**opposition** 3:11 9:15 10:17 11:9,10,12
**options** 90:9
**ORANGE** 115:4
**order** 15:1,5,9 22:9,10 25:10 30:6 46:6 47:8 48:10 57:14 58:9 63:25 71:7 94:22 104:5,17 108:11 109:14 110:9,23 111:17 113:1,5,7,12,15,16,18,22,24 114:4,7
**orderly** 15:8
**orders** 104:13 110:17,23
**organization** 41:22
**organizations** 29:21 30:5,7
**orientation** 106:3
**original** 106:12,14 112:19
**others** 9:8
75:22
**other's** 95:7
**otherwise** 81:2 82:25 91:11 103:25 114:5
**ours** 88:5,12,18,20
**outbursts** 24:24,25 25:2,3 67:10 70:14,16
**outside** 7:17 8:13
**overall** 77:9
**overcome** 15:17
**overlap** 26:15
**overlapping** 26:17
**overrule** 31:14 35:23 39:4 57:20 60:8 69:3 74:16 78:2
**Overruled** 31:15 47:21 58:13
**overruling** 54:6
**ownership** 33:19,25 36:2 38:22 105:18 107:9 109:9 110:20
**owns** 110:10

P

**P.A** 2:9
**p.m** 4:6

56:17,24 114:21
**page** 3:1,9 20:18 21:7 61:4 68:20 69:10 74:10 83:25
**pages** 18:22 66:19 69:9,17
**paid** 29:2 32:3 55:16
**panic** 77:5,6,8
**paragraph** 20:10,12,14 24:23 33:16,18 34:4 35:4,12 38:7 48:20 73:13,20 74:9,14 99:6 105:17 106:22 107:9
**parking** 90:3
**parte** 94:8
**partial** 29:22
**partially** 20:19
**particular** 53:23 78:19
**parties** 13:2 16:14 107:13 110:17 112:16 115:13
**partner** 28:7
**partners** 38:3
**party** 16:7 35:21 96:16
**Patrick** 2:8
**pause** 27:6 71:21 86:1
**pay** 55:18
**payment** 41:1
**people** 14:4 15:6 30:16,18 39:1 62:10 82:22 96:1,3,7,12 97:18 98:24,25 100:3
**permission** 61:13
**permit** 8:1,5
**permits** 50:7,10,13
**permitted** 17:2 101:22 102:8
**person** 25:4,7 29:23 32:4 34:7,16 35:6 44:5 53:13,17 69:25 70:21 95:24 111:12,23 112:7,19
**personal** 90:11
**personally** 76:15 89:7,8,10 90:12
**Petersburg** 2:16
**petition** 94:24
**petitions** 104:7,13
**Philippine** 76:11
**Philippines** 79:2
**phone** 67:24 68:21,23 69:8,10,14,16
**phonetically** 88:11
**photo** 43:11,14,22 44:5,12,14,15 65:11
**physical** 57:14 58:9 76:4 91:22,23 92:4
**physically** 51:9,19 63:3
**picture** 34:13 45:3 98:16 99:3
**pieces** 37:20
**Pippen** 19:14
**Pittsburgh** 39:13 53:1,4
**Pizza** 45:14
**placed** 98:15
**placement** 88:22 99:25 100:1
**places** 90:6,15
**plaintiff** 1:8 2:2 5:8,10,13 14:8 15:17,20 16:7 20:12,13,17,19 21:2,4 24:11 107:3
**Plaintiff's** 3:9 5:6 10:23 11:1,3,4,5,11 33:2 73:7,22 105:20 106:23
**plan** 27:1 56:21
**Playboy** 19:14
**plays** 100:1
**pleading** 22:21,22
**pleadings** 21:6 25:9 94:3 105:10
**please** 5:8 27:19 28:1,6 72:4,9 74:8 86:10 101:14
**pled** 22:11,14,18 25:24 45:18,21 85:14,15 100:4
**PLLC** 2:14
**plugged** 12:12
**plus** 110:14
**point** 9:9 11:1 13:24 16:3 19:3 24:5 28:6 29:17 41:19 50:18 63:25 64:3 71:6 72:21 98:11 101:2 102:25 108:4 111:23
**pointed** 53:20 91:25 99:7
**points** 20:21 104:22 106:4

107:10
**policies** 30:4 91:19 92:1
**policy** 57:14 58:8,14
**portion** 93:15
**position** 49:1 63:23 64:6,9 78:19 108:10,13
**positive** 44:10
**possess** 37:21 107:3
**possessing** 106:10
**possible** 78:15
**post** 28:12 78:10 83:7,10,19 84:3,7 87:4,9
**posted** 15:2 44:5,14 53:4 82:1,3,7,17,22 102:13 103:4 113:14
**posting** 108:3 111:4,5 113:4
**posts** 91:11
**posture** 94:5
**potential** 21:1 22:2 107:1
**powers** 104:15
**practices** 37:8
**prefer** 111:25
**preference** 12:2
**Pre-Hearing** 48:12
**prejudice** 105:9,13 109:18 110:19
**preliminary** 103:4,17 104:20 105:2 107:7,19 109:8,18 110:15
**premised** 94:1
**prep** 109:13
**preparation** 109:13
**prepared** 107:15,16,23 111:15 113:7
**preparing** 112:2
**prerequisite** 109:17
**presence** 40:6 92:4
**present** 2:18 14:5 107:13 109:25 111:16
**presentation** 7:2 108:7,14 112:6 113:10 114:2
**presented** 104:2,18 109:15 110:13 112:10 113:20
**preserve** 13:5 95:4,5
**president** 73:1
**pressure** 77:10
**pre-suit** 92:24
**presume** 97:5
**presumed** 95:14 96:22
**presuming** 111:10
**prevail** 94:4
**prevent** 24:3 100:10 101:19
**prevented** 75:13
**previously** 70:3
**price** 90:2
**printed** 61:10
**printout** 61:16
**printouts** 65:7
**prior** 23:11 37:25 65:25 66:2 67:17 80:18 93:17 94:19 107:22 109:6 110:10 111:18
**private** 34:15
**probably** 10:4 12:13 13:19 73:14 75:3
**problem** 112:9
**procedure** 4:7 24:8
**procedures** 101:15 112:2
**proceed** 62:16
**proceeding** 22:6 93:5 102:9 113:14 115:9,10
**PROCEEDINGS** 3:2 5:1
**process** 87:21 91:14 104:11
**produce** 91:24
**proffer** 102:24 103:11 111:2
**profile** 39:17 40:18 41:1,3,8,13 42:6 43:8,10,13,15,16,17,22,24 44:9,10,11,12,22,24 59:4 64:10,12 96:5
**profiles** 29:2 59:7 62:9
**profit** 20:16 29:7,8
**profitable** 29:10 96:10
**profits** 21:2
**program** 31:23
**prohibit** 23:4
**prohibitively** 90:8
**projector** 61:14
**promised** 95:5
**promises** 13:1 14:13,14 96:15

**proof** 100:24
**proper** 23:23 44:23 102:23
**properly** 24:6 94:13
**property** 20:17 34:3 105:22
**propose** 109:10
**proposed** 107:21 108:8,11,15 109:7,14 110:17,23 111:17
**proposing** 112:13
**prospect** 32:11
**protect** 92:23
**protection** 104:7
**protective** 24:6,9
**prove** 15:23 22:2 24:1 91:22,24 94:3 100:24,25 101:3,4
**proved** 45:10
**provide** 15:21 79:18 102:14
**provided** 21:19 108:11
**provider** 97:9
**providers** 97:8
**proving** 15:25
**provision** 16:15 93:21 109:10 110:20
**provisions** 74:14
**public** 13:2,3 14:14 51:1 70:22 93:9 95:15 96:16 103:25 107:6 115:7,24
**publicly** 64:20,22
**pull** 50:2 61:13,15 66:8
**pulled** 60:16 61:21
**purchased** 37:16,20
**purely** 96:8
**purpose** 33:18 97:14
**purposes** 21:21 23:1 36:13 109:20 114:3
**pursuant** 4:6
**pursue** 81:12
**purview** 105:12 106:25
**pushed** 41:17

Q

**qualify** 31:20
**question** 7:1 18:6 26:14 27:20 31:16 38:2 39:5 41:22 48:4,21 54:3,7 56:4 58:5 59:10 61:17 64:4 69:4,5,22 72:10 79:9 81:1 84:1 94:18 111:7 112:19,22 114:8
**questioner** 84:2
**questioning** 77:24 81:14 83:16 106:1
**questions** 26:9 46:1,13 47:14 50:17 51:12 58:7 68:11 71:12 74:2,4 81:13 84:18 86:12 92:6
**quicker** 58:7
**quickly** 86:21 87:12
**quite** 32:12 61:6,10 88:2
**quo** 95:1,4 100:8

R

**raise** 11:18 27:9 71:23 86:4
**raised** 106:3
**randomly** 32:17
**rather** 30:18
**re** 73:19
**reach** 63:12
**reached** 90:17 114:12
**reads** 33:25 88:11,12,13
**ready** 5:2 7:19 8:10 30:16 108:14
**really** 29:6 32:21 45:1 53:16 96:12 110:15
**reason** 43:13 63:19 90:7
**reasonable** 34:7,16 35:6 95:24
**reasonably** 104:25
**reasons** 26:5 32:23 36:25 94:4
**recall** 45:2 53:4 54:22 55:20,23 56:1,10 63:20 65:12 66:3,5,6,7,9,17,23 67:19,21 68:15,16 69:12,15,24 76:23 77:1 81:15 82:18,21 83:11,12,15,18,20 84:9 86:23
**recap** 26:9 103:18

**receipt** 106:17 108:15
**receive** 31:20
**received** 39:2,16 107:24
**receiving** 29:23 109:19
**recently** 24:20 65:17
**recollection** 59:25 60:7,25 84:6,14
**record** 8:12 28:2 34:6 73:21 107:25 115:10
**recorded** 104:10
**red** 52:3,6,11
**redirect** 26:19 71:15 84:20
**reduced** 79:2,4
**refer** 33:16 34:4
**reference** 19:21 93:20
**referenced** 53:15
**referred** 106:10
**referring** 41:25 75:10
**refers** 98:19
**reflected** 106:1
**refresh** 59:25 60:6,25 83:20 84:6
**refreshing** 84:11,14
**regard** 96:19,24
**regarding** 63:24 81:10
**Regardless** 10:17
**registered** 43:12
**registration** 93:1
**regular** 75:23
**related** 115:13
**relates** 83:4 99:2
**relationship** 41:18
**relayed** 82:8
**relevance** 68:5 78:1
**relevant** 55:10,11 73:3
**relief** 13:4 16:1 19:16 20:8 22:24 23:4,17 93:13 103:3,20,22 104:20 105:8 110:18,21 114:5,15,16
**rely** 62:1
**remain** 8:2
**remainder** 110:18
**remaining** 6:9 85:22
**remedied** 23:22
**remedy** 15:18 20:2,22 22:1 23:24,25 24:2 96:19,22 101:7 103:24 107:3
**remember** 53:8 66:24 67:22 69:1
**remind** 55:1
**remove** 43:20
**removed** 41:2 43:16,19 63:9,16
**renditions** 87:20
**renew** 32:2 69:19
**Renewed** 68:25
**rep** 107:1
**repeat** 39:6 64:4
**rephrase** 35:1 36:23 42:2
**replace** 42:20
**report** 44:21 48:13 115:8
**reporter** 1:22 5:2 27:19 72:8 115:6,24
**represent** 60:12,17 61:20 87:23
**representative** 55:21
**request** 102:17 103:19 104:4,20 105:8,9 108:6
**requested** 19:17 103:22 110:18,21 114:5,16
**requesting** 16:2 109:5
**require** 29:21 104:10 110:17 113:16 114:13
**required** 31:23,25 92:25
**requirements** 16:16 24:12 30:2
**requires** 15:9 16:6
**requiring** 112:18
**reserve** 108:24
**reserving** 110:22,24
**reset** 107:13
**residence** 63:14
**respect** 16:16 38:21 49:4 87:14 89:8 94:19 95:13 103:3 104:1,19,21 105:3,7,13,15, 17 106:5,16,22 107:5,19 108:1

109:22 110:4 113:19 114:7,16
**respective** 26:22
**responding** 93:16
**response** 32:22 90:21,24,25 113:22
**restraining** 22:8,9 25:10
**restraint** 23:4,11 24:9 93:17 94:20 100:16
**restrictive** 12:24 75:10
**result** 24:24 30:22 31:6 41:5 104:12
**resume** 108:4,16 113:9
**resumed** 107:22
**resumption** 109:5
**retaining** 89:3,8
**retrieved** 60:13
**retrieves** 60:14
**return** 71:17 92:11
**revealed** 93:5
**revenue** 21:1
**review** 39:16
53:4,7,11,19 68:14 82:10,12,15,17,20,25 83:2,3
**reviewed** 49:16 66:18 83:19 105:15
**reviewing** 50:5
**reviews** 15:2 44:10 64:23 76:12 81:15,19,25 82:14 87:5,10
**revisions** 87:20
**rewrite** 99:19
**RICH** 1:19 3:5
**Richard** 14:17
**rights** 23:14
**Rivers** 2:3
**role** 28:14 90:11 100:1
**roles** 32:9
**room** 76:1
**ruin** 76:5,8 95:7
**rule** 7:3,15 22:19,21
**rules** 4:7 22:21 57:10,13
**ruling** 47:15 110:4,12,19 113:15
**run** 78:17
**running** 29:2

S

**safeguards** 104:11
**safety** 15:7 25:1
**Saint** 2:16
**Sam** 29:11 32:7,8,24 77:10 78:15,17 81:22 82:9
**Sami** 1:12,20 2:7 3:7 5:20,24
**Sami's** 18:7
**Sam's** 48:21 82:6
**Samuel** 31:8,9 37:4
**Santiago** 25:12
**sat** 87:22
**satisfied** 32:22
**satisfy** 22:12 25:25
**save** 70:23
**scale** 96:8
**scared** 77:17,18 79:17
**scheduled** 109:4
**Schifino** 3:14 10:7,9 18:4,21
**school** 28:10
**scoped** 90:15
**screaming** 79:5
**screen** 61:15
**screenshots** 65:6
**search** 59:15
**seat** 27:15 72:5,8 92:11
**second** 2:15 23:19 48:20 70:13,20 71:5 80:1 96:19 98:12
**secrets** 96:3
**section** 50:4,6 95:22 98:10,11,18 110:11
**seeing** 25:18 61:6
**seeking** 23:1,18 62:25 68:7
**seemed** 32:10
**seen** 34:2 47:18,22 49:17 67:4 73:14,17 77:11 80:25 81:2
**sees** 97:15
**Seiko** 19:22
**selling** 31:3 36:17
**send** 63:12
**sense** 13:6,10 36:2 88:15 97:1 99:10,11
**sent** 32:25 47:25 48:3,5,6

49:14 68:17,23 69:7,11 102:1
**sentence** 34:9 98:12 99:5
**SEO** 82:16
**separate** 25:4,7 105:6
**separated** 36:11 51:23
**serif** 52:18
**serious** 23:13 76:3,5 87:18
**seriously** 76:6
**serve** 20:23
**served** 80:9
**server** 45:15
**service** 63:12
**services** 13:25 14:4 55:19
**setting** 47:8 57:22 67:5 70:22
**settled** 87:24
**seven** 33:20
**several** 37:16 43:24 87:20 106:3
**severe** 75:3
**severely** 41:16
**shape** 88:3
**sheet** 10:3 11:6,11
**Shelathia** 2:19
**shift** 12:9
**short** 40:25
**shortly** 57:23
**showcases** 43:24
**showed** 50:18 73:23
**shows** 44:9 62:15 64:19,22
**sign** 43:11,14 44:19,25 45:2,4
**signage** 44:18,23
**significant** 15:16,19 19:8 102:12
**significantly** 41:18 42:10 93:9 102:21
**similar** 14:2,25 40:14 42:4 90:14 91:22 97:9,18
**simple** 55:12
**simply** 101:15 110:10
**single** 25:11 38:9 97:12
**sinusoidal** 17:16 51:14 88:15 100:1
**sir** 8:11 67:22 86:13,16
**sit** 7:22 17:10 84:22
**site** 64:20,22
**sites** 91:12
**sitting** 7:6
**situation** 88:20
**six** 24:15 93:11 94:6
**skill** 29:23 32:4
**skills** 37:21 106:11
**skip** 31:22 93:13
**Skype** 78:7
**slam** 70:17
**slew** 90:3
**slight** 51:25 106:6
**slightly** 97:13
**slots** 109:3
**small** 54:15 60:18
**smaller** 106:13
**snaps** 79:19
**sold** 37:3
**sole** 20:16 33:19,23 34:3 38:22 105:22 112:10
**solely** 26:6 62:2 107:8 109:15 113:10 114:3
**solemnly** 27:10 71:25 86:5
**solid** 95:13
**somebody** 23:16 24:3 42:17 91:17 97:3 100:10,12,13,15,17,23
**somebody's** 23:25
**someone** 7:24 8:4 29:22 39:17 40:23 41:3,6 59:5,6 63:5 64:16 76:5 88:19
**someone's** 62:13
**Sometime** 55:2
**somewhat** 55:9
**son** 78:6,8
**sorry** 43:6 48:4 56:20 57:11 70:8,19 71:10
**sort** 6:23 52:18 70:17 91:19 92:1 104:7 114:12
**sound** 88:16
**source** 14:4 36:19 97:5
**South** 2:15 65:18
**Southern** 21:17 22:20 23:8 25:12,13
**Southron** 2:2 3:3,5 5:9 6:6 7:4,8,10

8:7,21 9:1,13,22 10:1,9,13,17,25 11:7 12:6,11,16,18,20,22 16:10,23 18:20 20:24 26:11,18,23 27:25 31:17 33:1,6,10,13,15 35:2,3,11 36:7,24 39:7 42:3,12 46:4,12,23 47:5,9,20 49:8,15 57:5,19 58:11 60:4,19,21 63:25 68:2,4,25 69:19 71:6,16 72:15 73:6,10,12,24 74:1,6,7,19 78:3 79:10,23 81:14 83:14 84:10,15,21 85:2 89:11,14 92:10,21 93:22 94:2,25 95:5,11 97:22 103:6,12,14 105:14,25 107:15,21 108:12,18 110:6 111:7,10,14,19,25 112:14,20 114:18

**space** 40:9 41:19 43:4 51:25 52:1 54:25 55:8,9 57:14 58:9,23 59:12,13,17 61:24,25 62:4 65:19 89:3,5,9 90:11 91:4

**spaces** 58:15

**sparingly** 15:19

**speak** 12:14 55:22 100:12

**speaking** 27:21 100:10

**special** 90:1

**specific** 29:24 32:15 43:6,7 58:24

**specifically** 18:5 20:25 23:8 49:21 50:7,10,13 53:15 55:24 56:7 62:15,24 63:13 66:9,24 74:21 76:23 78:7 83:1 98:15 105:21

**specifics** 68:16

**Speculation** 31:13

**speech** 23:4,9,11,21

**speed** 16:8 17:21,23 74:2 92:21

**spoke** 53:22 63:8

**spoken** 24:16 25:17,19 67:8 80:21

**sport** 78:9

**spot** 90:2 91:1,9,21,22

**spots** 90:5

**squeeze** 109:2

**SR** 2:20

**staff** 74:23 76:11

**stake** 95:21

**stalking** 104:8

**stand** 27:5 86:3

**standard** 103:14

**stands** 54:7

**Stanford** 78:11

**star** 82:12,14,15,20

**started** 18:16 26:13 54:21 73:18 77:13

**starting** 34:6 91:8

**state** 28:1 78:13,14 81:11 94:7 115:3,7

**stated** 29:14 31:19 56:25 75:5,25 91:2

**statement** 65:5

**statements** 8:16 12:4 63:24 64:7 67:10 75:20 80:18 86:23

**States** 97:13

**status** 95:1,4 100:7

**statute** 24:7

**statutes** 32:20

**stay** 7:23 24:10

**steep** 101:6

**steps** 17:8 76:8 87:13

**Stewart** 2:9 5:19

**stipulate** 10:14 46:25 47:2 112:4

**stipulated** 8:15,18 9:6,8 11:21 47:3

**stipulation** 4:1 10:22 46:21

**stolen** 42:23

**stood** 76:24

**stop** 13:5 14:23 15:1 27:8 71:22 79:7 100:13,14,17,23

**stopped** 40:25

**stops** 59:5 62:11

**straight** 52:18

**strained** 41:19

**Strat505@mail** 56:18

**strategy** 28:19
**street** 2:9 4:4 44:17 91:5
**strike** 57:11 90:13
**stuck** 75:4,25
**subject** 83:3
**submit** 46:20 101:21 102:13 110:17
**Submitted** 115:17
**subpoena** 80:8 94:15
**subpoenaed** 94:16
**subsequently** 91:3 102:4
**substance** 82:23
**substantial** 15:22 96:24 101:8 110:13
**succeed** 21:4 22:14,15
**success** 22:12 96:25 103:23 107:2
**successful** 29:3 104:12
**suffer** 20:14
**suffered** 20:12
**suffice** 57:18
**sufficient** 15:25 26:4 30:12 94:3 103:7 104:11 108:6
**sufficiently** 18:7 48:22
**suggested** 30:17
**suggesting** 70:25
**suit** 93:11
**Suite** 2:4,10,16
**summarily** 16:3 17:21 26:6
**summarize** 95:10
**sup** 107:6
**superiors** 81:8
**supplement** 95:18 109:11
**support** 15:22 24:14 26:4 32:1 54:12 102:18 103:2,8,25 105:5 107:11
**supported** 107:7
**supports** 20:1 65:9 85:10
**supposed** 32:3,21
**sure** 11:15 17:8,9,13 43:8 49:10 54:18 56:13 59:22 60:2 80:3 83:23 87:14 88:2 90:20 110:8 112:24
**sustain** 34:25 36:22 42:1 46:1 60:22 69:21
**Sustained** 35:10 42:11 84:16,17
**swear** 27:10 71:25 86:2,5
**Swiss** 19:22
**switch** 29:13
**sworn** 24:13 27:6

T

**Tab** 8:20,23 19:11,15,19 21:13 22:16 24:7 25:11,12
**table** 11:25 71:18 92:19
**tactics** 94:5
**take-down** 42:5
**taking** 53:15 72:8
**talk** 14:9 23:20 25:13 76:1
**talked** 100:7
**talking** 53:1 54:21 66:22 67:1,20 72:6
**talks** 19:12,16,18,19,23 20:4,15,19,25 21:14 23:8 49:19
**Tampa** 2:5,10 4:4
**tarnish** 29:16
**task** 89:25
**taught** 28:22
**team** 63:12 87:22 89:21,24 90:13,14,17
**tears** 79:2,4
**telephone** 2:5,11,17 68:19
**temporary** 5:6 15:16 17:22 18:14 22:8,9 23:9 25:10,14 93:14
**tenants** 90:19 91:1
**term** 52:20
**territories** 75:9,14
**terroristic** 14:19
**Terry** 25:11
**testified** 7:21 67:14 69:14 86:24
**testify** 8:1 14:17
**testifying** 7:6,16
**testimony** 3:3,5,7 7:19 8:5 14:3,5,15 17:7 24:16 35:17 45:18,25

53:2 54:22 63:21 65:1 66:23 69:22 72:9 73:3 78:21 85:23 86:22 89:1 99:22 104:18 105:23 106:16 107:16,23 108:16 109:12 110:25 111:1 112:5,12 113:8,21

**Texas** 95:17

**text** 67:21 68:15,16,22 69:7,15 99:8

**texting** 67:19

**Textor** 23:7

**thank** 8:11 15:9,10,11 26:7,8 27:14 33:14 58:20 71:18 79:23 84:24,25 86:16 88:25 89:21 92:8,12 97:20,22 102:22,24 114:9,18,19

**Thanks** 71:14

**that'd** 83:20

**theft** 42:22

**theme** 13:7

**themselves** 9:24

**therefore** 44:23

**there's** 7:1 10:18 11:18 16:25 17:15,16,17 21:5 22:13 24:11 25:16 35:16,18 39:25 43:13 45:1,18 48:13 52:1 53:17 61:5,10 63:11,19 70:25 85:14 88:21 90:3 91:25 92:1 93:18 96:13,20 97:10 98:1,2 99:10,14,23,24 100:24 102:25 103:24 109:3,25 110:20 111:1 112:5 113:4

**they're** 11:1,7 13:14,15,17,18,20,21,22 14:1,2,12,13 19:6 23:1,5,10,18 24:4,9,10 25:17,24 50:17 52:8 91:21 92:5 97:2,3,5,17 101:7 104:14

**they've** 14:3 21:24 24:23

**thicker** 88:18

**thinner** 88:17,18

**third** 25:10 96:16

**THIRTEENTH** 1:1

**thoughts** 108:20

**threat** 22:4 93:7 103:22

**threaten** 19:7

**threatened** 77:22 78:10

**threatening** 78:5 86:23

**threats** 14:20 15:6 70:3,5,12,15 77:19,21,24 78:24 85:13 93:6

**three-month** 19:23

**throughout** 13:7 109:12

**thus** 107:5

**tick** 101:8

**tied** 114:1

**timeline** 41:17

**Timothy** 2:14

**today** 6:5 7:17 13:4,11 14:3,5 15:15 16:2 17:19 18:24,25 19:6 21:22 23:1,18 25:2,18 49:24 53:21 67:1,14 79:12 80:8 101:2 103:1 104:1,18 105:23 107:11,23 109:22 110:9,12,14 111:1 113:1,15,20 114:2

**today's** 107:25 109:20 110:5 111:17

**tolerable** 23:13

**Tom** 18:3

**ton** 90:7

**tone** 87:18

**Tonya** 55:21,22

**top** 27:21 52:15 53:8 60:10 61:2,3,4 65:15 68:20 69:8,10,17

**tortious** 20:7,13 21:24 22:2 49:23 98:2,7 101:4

**total** 71:7

**totally** 37:18

**touch** 22:3 88:7

**Toward** 29:11 32:8

**tracing** 88:17,18

**track** 46:16

**tracks** 62:11

**trade** 100:17

**trademark**

98:1,5 106:20
**training** 28:23 29:14,18,21,24 31:4,5,6,20 34:15 53:22,24 54:14
**trainings** 37:4
**transacting** 91:9
**transcript** 84:1 115:9
**transfer** 94:11
**transpired** 65:2 107:4
**tremendous** 90:4
**trial** 21:5 24:2 100:25 101:3 102:7 110:3
**tried** 31:1 64:10 96:2
**tries** 7:24
**triggering** 23:12
**truce** 95:25
**true** 65:5,17 115:9
**truth** 27:11,12 72:1,2 86:7,8
**try** 30:25 31:1 42:17 43:16 59:4 70:23 92:23 95:7 101:12
**trying** 23:5,10 24:4 30:24 44:21 59:13

79:6 91:21 98:9,21 100:7 111:23 112:15
**turn** 92:13
**turnover** 30:17
**TWIGGS** 4:4
**two-and-a-half-year** 19:24
**two-hour** 6:1
**type** 23:4 37:7
**typical** 70:17
**typically** 31:23 32:9 104:9 108:24
**typing** 12:8
**typo** 65:20 66:20

U

**UCPRA** 44:12 64:24
**Uh-uh** 99:10
**ultimately** 29:10
**umbrella** 87:8
**unable** 106:13
**unaware** 76:14
**underneath** 88:13
**understand** 8:2,6 9:23 11:22 12:25 14:12 39:5,12,25 45:3 46:2

57:17 61:16 69:15 72:12 73:2 91:18 106:19 113:13,25
**understanding** 35:4,12
**Understood** 73:19
**undisputed** 16:4
**United** 97:13
**unobjected** 18:18
**updated** 58:14
**upload** 43:14
**uploaded** 43:11
**urgency** 16:8 17:22,23 93:3
**username** 44:4 64:13,21
**USPTO** 93:1,5
**usually** 94:8
**utilizing** 55:9

V

**vague** 61:5
**vaguely** 12:18 57:16
**valid** 35:18 102:25
**validity** 41:22
**various** 28:23 30:5 44:10
**verbally** 91:1,2

**verdict** 85:8
**verified** 24:13
**version** 25:10 93:18
**versus** 94:23
**vice** 73:1
**viewing** 34:8,16 35:7
**violate** 74:14
**violation** 93:24
**violence** 15:6 24:14 25:13 78:25 79:6,20 104:8
**violent** 14:19 45:11 67:11 75:20 77:15 78:23,25 86:23 93:6
**Virginia** 43:1,2,4
**virtual** 40:11,12 59:2 96:5
**virtually** 41:10 59:8
**visible** 65:6,11
**visual** 17:14
**visually** 17:12 52:8
**Voldemort** 74:23
**vs** 95:17

W

**wait** 7:17 34:25

**waiting** 31:1
**waive** 100:1
**waived** 11:15
**walk** 7:18 8:9 14:6
**walked** 8:13
**warrant** 85:12
**warranting** 20:22
**wasn't** 32:21 47:7 58:5 59:10 84:8
**Watch** 19:22
**wave** 88:15
**waves** 17:16 51:14,15
**ways** 79:1
**web** 28:13 97:4
**Weber** 2:3 5:12 10:12
**webpage** 66:20
**website** 31:3 37:1,3,16 38:9 60:14 61:22,24 62:2 65:18,21 66:1,19 95:23 99:8
**websites** 28:18 29:13 34:2,8,13,16,17 35:7,8 36:3,6,18 51:6 60:14 76:12
**we'd** 102:5,7
**WEDNESDAY** 4:5
**week** 66:4,6,7,17
**weeks** 65:22 87:22 91:8
**we'll** 7:19 9:9 10:14 27:2 32:20 58:7 74:4 85:24
**wellbeing** 36:14
**we're** 5:5 6:1,6,17 7:14,15,16 8:4,10 10:1,13 13:4 14:5,18,22 15:4,15 19:23 26:18,23 32:19 42:25 48:9 49:25 78:1 94:5 101:2,22
**Westlaw** 19:15,18
**we've** 12:23 19:9 39:2 49:13 88:3 91:7 95:15
**whatever** 6:13,21 23:22 65:4 67:11 92:19
**whatsoever** 102:12 103:9
**whether** 18:7,11,16 48:21 49:2 51:12 55:8 58:8 63:3 65:2 69:11 83:19 84:6 98:19 99:2 100:3 106:14
**whistleblower** 14:16 78:16
**whistle-blower** 78:13
**white** 35:20
**whole** 24:5 27:12 72:2 86:7 90:3,7
**who's** 7:16 8:8 59:7 71:18 96:13
**wife** 78:6,8
**wife's** 78:11
**wipes** 101:12
**wire's** 12:11
**withdraw** 10:18
**witness** 7:1,8,25 8:11 26:15 27:4,13,17,23 35:25 39:6 45:25 46:2,20 47:11,22 57:22 58:14 60:3,9 64:4 69:5 71:18 72:3,12 73:7 74:13,18 75:2 78:23 84:24 85:21 86:9,13,16 93:25 112:5
**witnessed** 39:9
**witnesses** 1:17 7:24 8:3 26:16,17 85:1,2,5,7,9,18 92:12 94:15 111:20,21 112:12,13
**wondering** 33:6
**Wood** 10:7 18:3,5 47:24
**Woods** 102:1
**Woolley** 96:24
**work** 30:6 31:7 72:16,22 79:1,16 81:5,10 114:14
**worked** 28:21 40:24
**working** 3:14 10:5 28:11 31:21 40:8,15,20,22,23 54:24 56:7 58:21,22 59:2,12 73:18 77:9 104:3,19
**workplace** 77:15,16
**worry** 77:19
**would've** 59:15 68:22 70:2,3
**Wreal** 19:11
**W-R-E-A-L** 19:11
**written** 88:10 91:2 92:3
**wrong** 42:14,16 111:23

Y

**yelling** 79:5
**yet** 43:19 68:9 113:24
**Yoakley** 2:9 5:19
**you-all** 114:10,14
**you'll** 17:1 108:3
**yours** 8:22 9:21 37:1 50:19,23 52:14 66:19
**yourself** 74:8 78:16 83:9 87:4 91:10
**you've** 7:21 47:18 80:21 81:1,4 114:12

Z

**zero** 98:24
**Zoom** 107:13 108:4 111:11,13 112:1,3,6,8,12