# EXHIBIT A

SH [illegible]

# DISSOLUTION AGREEMENT

THIS DISSOLUTION AGREEMENT (this "Agreement") is made this 8th day of February 2021 (the "Effective Date") by and among (i) Fit Industries, LLC, a Florida limited liability company ("Fit" or the "Company"), (ii) Douglas K. Joos ("Joos"), and (iii) Sami Halabi ("Halabi").

## RECITALS

**WHEREAS,** Joos and Halabi (the "Members") formed Fit in or around February 2017.

**WHEREAS,** Fit offers CPR certification classes in cities throughout the United States. The Company currently operates twenty-two (22) websites in twenty-two (22) cities.

**WHEREAS,** the Members now desire to amicably dissolve the Company as set forth herein.

NOW, THEREFORE, intending to be legally bound hereby and in consideration of the mutual agreements, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and accepted, the Members hereby agree as follows:

## AGREEMENT

1. Dissolution of the Company. The Members agree that the Company shall dissolve in accordance with the terms of this Agreement. The Members further agree that they shall each take all actions that are necessary to dissolve the Company, including distributing or liquidating any Company assets, paying any Company liabilities, closing all Company accounts, filing any applicable dissolution documents with the Florida Department of State, and otherwise winding up the Company in accordance with this Agreement. Upon the termination of the Company, all of the Members' privileges, obligations, and interests as members in Fit shall terminate.

2. Membership Interest Percentages. The Members agree that each Member's percentage of ownership of the Company for purposes of distribution on liquidation is as follows: (a) Joos = fifty percent (50%); (b) Halabi = fifty percent (50%).

3. Liquidation of the Company.

   a. The Company will distribute each non-cash asset of the Company listed in Schedule 3, in kind, to the Members (the "Distributed Websites" as defined below, and "The Company's Remaining Assets").
   b. The Company will use cash balances to satisfy any liabilities, debts and liquidation expenses and to distribute the remaining balance to the Members in equal amounts. If there is a shortfall in cash funds to settle all liabilities, debts and liquidation expenses, the Members will make cash contributions in equal amounts sufficient to cover the shortfall.
   c. As soon as possible after the payment and satisfaction of all Company liabilities, and the distribution to the Members of remaining cash (if any), in the "Reserve" as described below in Section 15 below, Shumaker, Loop and

SH 28

Kendrick shall file a Certificate of Dissolution of the Company under Chapter 605, Florida Statutes. The Members are authorized, and agree to execute all documents necessary in connection with that filing and the dissolution.

4. Members' Financial Responsibilities Post Dissolution. On the Transition Date (defined below) at 12:01AM,, the Members shall each become solely responsible for the payment of their respective liabilities and obligations relating to the operation of the businesses associated with the websites as listed on Schedule 3 (a) (the "Distributed Websites") assigned to them under this Agreement as provided for in Section 3 and as set out in Schedule 3, including, among other expenses the cost of office space and training associated therewith, as well as any federal, foreign, state, local and other taxes, tax returns, reports and declarations of every nature resulting from liquidation of their respective membership interests in Fit as provided for in this Agreement.

5. Post Dissolution Restrictive Covenant.

The Members acknowledge and agree that each of them has a legitimate business interest in protecting the active Distributed Websites they receive through this Agreement, and that reasonable protection includes a restriction on the other Member's engaging in Prohibited Activities (as defined below) within the geographic area of the market served by the business operated under each Distributed Website. The geographic area in which competition is prohibited includes the county in which the domain name city for each Distributed Website is located (the "Restricted Territory"). The Members acknowledge and agree that the geographic scope of the Restricted Territory is reasonable in light of the scope of the business operated by the Company.

The Members hereby agree that they will not, in any Restricted Territory, during the twelve (12) month period following the Effective Date of this Agreement ("Restricted Period") engage in, be associated with, employed by, perform services for or have any type of ownership interest in, directly or indirectly, a business in any manner similar to, or in competition with, the Company's business of providing training and certification for CPR, First Aid, and Bloodborne Pathogen ("Fit's Business Services"), or other acts of competition which include, (i) the pursuit of customers through the use of websites or by any other means where such customers are solicited for any Fit's Business Services in the other Member's Restricted Territory, and (ii) setting up training sites in the other Member's Restricted Territory (collectively "Prohibited Activities"). Prohibited Activities do not include the ownership of domain names that are not in active use. For sake of clarity, this Agreement does not prohibit either Member from selling CPR training as part of a more expansive training program such as Certified Nurse Assistant in the other Member's Restricted Territory, and does not prohibit either Member from conducting online CPR training. Halabi and Joos agree that they will not advertise for online training for any of Fit's Business Services in the other Member's Restricted Territory.

The Members agree that that they will not, during the Restricted Period, be connected, directly or indirectly, with any person, firm, corporation, or other entity engaged in, and will not have any financial interest in, the Prohibited Activities. Each Member further agrees that during the Restricted Period, he will not, directly or indirectly, be employed by or become a partner of, or a stockholder of or act as an officer, director, independent contractor, consultant, principal, agent, proprietor, or in any other capacity for any partnership, company or other entity engaged in the Prohibited Activities. This covenant will be applicable to the Members within the Restricted Territory only. Each Member acknowledges and agrees that if his association with any

SH 28

partnership, corporation or other entity is enjoined in accordance with the time and geographical limitations contained in this section, that it will not adversely affect the public health, safety or welfare of the community covered by the covenant not to compete.

This covenant on the part of each Member shall be construed as an independent agreement, and the existence of any claim or cause of action of each Member against the other Member, shall not constitute a defense to the enforcement by the other Member of this covenant. If any portion of this covenant is held to be unreasonable, arbitrary or against public policy, the covenant herein shall be considered diminishable both as to time and geographical area; and each month of the Restricted Period shall be deemed a separate period of time, and each Restricted Territory shall be deemed a separate geographical area, and shall remain effective so long as the same is not unreasonable, arbitrary, or against public policy. The Members further understand that this covenant may be enforced by the entering of a temporary or permanent injunction. The Members represent and warrant to each other that his experience and capabilities are such that he can obtain employment in a business without breaching the terms and conditions of this section, and that his obligations under the Restrictive Covenant provisions of this Agreement (and the enforcement thereof by injunction or otherwise) will not prevent him from earning a livelihood.

Nothing herein shall prevent Members from competing with each other in geographic markets other than the geographic markets that comprise the Restricted Territories and there will be no competitive restrictions for any customer, consultant, supplier or other business relationship if any such stakeholder applies for training in a Member's geographic market or would prefer to conduct business with a Member in their markets.

6. Transition Period. Commencing on the February 22, 2021, ("the Transition Date"), the following steps will occur to transfer the business operations of the Company to the Members:

a. At 12.01 AM. on the Transition Date (the "Transition Date"), each Member shall insert their individual Stripe API keys into the websites currently in use by Fit for each Distributed Website he is assigned and all new sales revenues will flow into each Member's respective account and count as business for their own company thereafter.

b. Immediately following the updating of the Stripe API accounts on Members' Distributed Websites, all costs and expenses to support continuing training will be borne on a cash basis by the applicable Member based on location of training and assigned Distributed Websites.

c. On the Transition Date, each Party will make contact with the office space/co-working providers for their assigned Distributed Websites to have the accounts switched to their business and to change the billing information to their own accounts commencing on 12:01 AM on the Transition Date .

d. The three Filipino contractors and the U.S. contractor currently providing administrative backup services for Fit are free to continue working for either Member or both Members starting on the Transition Date. Each Member may choose to issue employment offers to these contractors on the Transition Date, however, the Members agree that any offer of employment or any continuing working relationship between the Member and any or all of the contractors will **not require** that the contractor stop working for the other Member for at least 60 days,

SH 20

and each Member will make reasonable use of the staff member's times. However, any contractor will have the option to work for just one of the Members immediately if they so desire. Joos and Halabi represent and warrant that, prior to execution of this Agreement, each party, and any person acting on either Member's behalf, has not solicited the Company's staff, contractors, vendors, marketing firms, etc. for work at what will by the party's new business entity following execution of this Agreement, and the Members agree that they, and all persons acting on their behalf, will not make any such solicitations prior to the Transition Date .

e. On the Transition Date at 11:59 PM, Joos will prepare an updated statement together with supporting documentation showing sources and uses of funds ("Funds Flow Statement") as shown on Exhibit 6 to satisfy the provisions of Section 3 above. Halabi shall continue to have access to The Chase bank account and credit card accounts to validate the accuracy of the information independently. Both parties will acknowledge, in writing, their consent to the Funds Flow Statement before 2 PM on the day following the Transition Date.

f. On the day following the Transition Date at 3:55 PM, Joos will take actions necessary to execute the flow of funds as set forth in the Funds Flow Statement ("Funds Flow Date") provided Halabi consents as provided for in subparagraph "e" above, has been obtained.

g. Until Halabi successfully migrates the Distributed Websites assigned to him under this Agreement, but in no event later than three (3) days following the Transition Date, Halabi will continue to have sales for the Distributed Websites assigned to him processed through the existing websites on which he will be the WordPress Administrator and under which Halabi's Stripe API will process transactions related to those Distributed Websites. Upon written direction received from Halabi, but in no event later than three (3) days following the Transition Date, Joos will delete all files related to the Halabi Distributed Websites from his server.

h. On the Transition Date, Joos will initiate a transfer of Halabi's domain names using his Namecheap account for Halabi's assigned Distributed Websites. Halabi must provide his Namecheap username in order to receive the transferred domain names.

i. On the Transition Date, Joos will provide the logins for Google My Business profiles for Halabi's allocated Distributed Websites unless they are tied to his personal account. In that event, he will transfer the Google My Business profile to Halabi's personal Gmail account. In certain instances, Halabi may have Google My business profiles tied to his personal Gmail account in which case Halabi will transfer the related Google My Business profile to Joos' personal Gmail on the Transition Date, if that profile has been assigned to Joos. All transferred Google My Business profiles will be transferred in an "as is" condition, and the Members represent and warrant to each other that they have made no changes to the business name(s) for any of the transferred profiles. Included in Schedule 3 is a list of existing Google My Business profiles as of February 8, 2021 for all of the Company's Websites. The list shall contain the name of the Google My Business city, whether Joos has the login information for each city (including passwords), and the current status of each profile (i.e., whether the Google My Business profile is suspended or not).

SH / 80

j. Three days (3) following the Effective Date, a zip file containing all code, Administrator WordPress logins, plugins, sql database files, website images, and themes needed to transfer hosting shall be provided by Joos for each of the 11 domains of the active Distributed Websites that Halabi has been assigned, as well the 2 of the inactive Distributed Websites assigned to Halabi –Wesley Chapel and Boston. No other inactive Distributed Websites are actually websites, they are only domain names. The Distributed Websites will be provided in an "as is" condition and all updates, maintenance, troubleshooting and any other amendments after the Effective Date shall be the responsibility of the Member to whom a particular Distributed Website was assigned. The "as is" condition will be exactly how the website was operating at all times prior to the transfer.

k. On the Effective Date, Joos will open a support ticket on the Twilio site to request a transfer of phone numbers corresponding to Distributed Websites allocated to Halabi. Halabi must open a support ticket on his Twilio sites in order to accept the transfers. Joos will cooperate with Halabi's delegate for the transfer of the phone numbers, and, for a period of no more than 14 days, will not terminate the phone numbers to Halabi's Distributed Websites until Halabi's Twilio account is fully active.

l. At 12:01 AM. on the Transition Date, Joos will suspend Google AdWords marketing campaign for all Distributed Websites assigned to Halabi at the time the domain names are transferred. This is required to ensure that Joos is not charged for the campaigns on his personal email account.

m. In the week following the Effective Date, Joos will provide Halabi a list of the keywords that are used to advertise on Google AdWords. In order to ensure that Halabi is aware of how the advertising campaigns are designed, Joos will coordinate with Halabi's IT delegate/expert, and will login to his (Joos) personal google account and then share his screen with Halabi's IT delegate/expert using Zoom such that (i) the IT delegate can review in real time the AdWords campaigns specific to Halabi's allocated Distributed Websites; and (ii) the IT delegate can review in real time the Google Analytics, Google AdWords, and Google Tag Manager account data (provided there is any). Additionally, Joos will provide Halabi with a CSV flat file, which will be an export of all campaign data for each of Halabi's Distributed Websites). .

n. In the week following the Effective Date, Joos will provide Halabi with a CSV flat file which is an export of all campaign data for each of Halabi's Distributed Websites.

o. With respect to Facebook Pages, a business owner must use their personal Facebook accounts in order to establish a Facebook Page for the business. In the week following the Effective Date, for any Facebook Page that exists on Joos' personal account in respect of Distributed Websites that have been allocated to Halabi, Joos will invite Halabi to become an Administrator for that Facebook Page. Halabi will take the same action for any Facebook Pages on his personal account in respect of Joos' allocated Distributed Websites on the same date.

p. On the Effective Date, Joos will transfer the annual subscription of Local Viking to Halabi. The Local Viking software tool is an annual subscription service, and Halabi will be responsible for any renewal fees after the Effective Date.

SH 780

7. Ownership of Company Logo. The Members agree that the Company's current logo as seen on the websites currently operated by Fit shall become the sole and exclusive property of Joos. Halabi may use the words "CPR," "Certification," and the unique city name in a new logo, but the design (as used for the websites operated by Halabi, and as used in other documents and materials for the operation of the business, such as Certificates of Completion and business cards) cannot incorporate the logo and must be different than the one currently used by Fit. Joos and Halabi agree that both members may use existing printed material for a period of 14 days from the Effective Date for their Distributed Websites, thus allowing them sufficient time to order and obtain new printed materials for their Distributed Websites.

8. Additional Changes to the Websites. For their respective Distributed Websites, the Members agree to make changes to all of their websites. In addition to changing the logo as set forth above (i.e., appearance only and not the words), Halabi agrees to change the hero picture on his websites, and change the icons above the words "BLS CPR Classes," "CPR + First Aid Training," and "Group Lessons and Private Training" so that a reasonable person viewing websites operated by Halabi will not be confused that the websites are operated by the same company as the ones operated by Fit. Joos agrees to change the text on his websites so that a reasonable person viewing websites operated by Joos will not be confused that the websites are operated by the same company as the ones operated by Fit.

9. Mutual Releases. The Members hereby release one another, including as member, employee, and/or agent of the Company, from any and all claims, demands, obligations, penalties, filings, suits, liabilities, damages, losses, costs or expenses (including without limitation, attorney's fees, costs, and other expenses), of whatever kind or nature, known or unknown, contingent or otherwise, arising out of or related to, directly or indirectly, this Agreement, the management and operation of the Company prior to the effective date of this Agreement, and the distribution of the assets of the Company pursuant to this Agreement. Notwithstanding any other provision of this Agreement, the Members do not waive (i) claims to enforce the terms of this Agreement; or (ii) claims that may arise after the date of this Agreement.

10. Representations and Warranties. The Members represent and warrant to each other that they have not heretofore taken any action, and will hereafter take no action to alter and/or modify any or all of the Distributed Websites in any regard or in any manner that is intended to adversely affect the other Member's business.

11. Non-Disparagement Commitments. The Members agree that they shall not disparage, report, and/or demean one another, and/or the other's owners, officers, directors, members, instructors, agents, industry governing boards/memberships (e.g., AHA) or employees in any manner whatsoever, to include but not limited to speech, writings, online platforms, negative SEO, emails, postings to social media, blogs, and websites. This prohibition includes, but is not limited to, disparaging and/or demeaning comments regarding the other Member and the other Member's respective business and/or financial operations. Notwithstanding the foregoing, this Agreement shall not prohibit either Member from taking actions to comply with state or Federal law, or with the policies and regulations of AHA, OSHA, American Red Cross, ASHI and similar organizations. The Members represent and warrant to each other that as of the date of execution of this Agreement, neither member has initiated or caused to be initiated against the other Member any administrative claim, investigation, or proceeding of any kind, and that neither

SH 78

Member will make any such claims for any matters occurring prior to the execution of this Agreement.

12. Future Disagreements. The Members agree that should there be a dispute in the future regarding the obligations and prohibitions in this Agreement and for any other matter arising out of or connected to this Agreement, the non-breaching party will first contact the alleged breaching party directly in writing to resolve the dispute short of litigation. The alleged breaching party will then be given fifteen (15) days to cure the alleged breach condition.

13. Escrow. The Members agree that, the Company will enter into the Escrow Agreement attached as Exhibit A and incorporated by reference into this Agreement, providing for $42,000.00 to be held in an escrow account in accordance with the terms of the Escrow Agreement. Funding of the escrow account will come from the Company's Chase checking account and will occur on or before the Transition Date.

14. Use of Company Email Address. For 30 days, beginning on the Transition Date, at 12:01 AM, the Company email (cprdirector1@gmail.com) shall be left open and remain in operation, however, the Members agree that while both parties to this Agreement will have equal access to the Company email during the 30 day period for purposes of monitoring email traffic, neither party will be permitted to use the Company email to send any emails during that time, or to respond to emails addressed to their own Designated Websites or the other Member's Designated Websites. On the Transition Date, at 12:01 AM, emails received on the Company email (cprdirector1@gmail.com) shall be responded to with an automatic "out-of-office" message which will state as follows: – "Thank you for your email. If you are attempting to contact us regarding any of the following websites (Halabi's Distributed Websites), please contact us at (Halabi's new email). If you are attempting to contact us regarding any of the following websites (Joos' Distributed Websites), please contact us at (Joos' new email)." Upon the expiration of the 30-day period contemplated by this paragraph, the Company email shall be terminated and permanently shut down. Additionally, for 30 days, beginning on the Transition Date, at 12:01 AM, the following email addresses shall be left open and remain in operation: Cprdirector3@gmail.com, cprdirector4@gmail.com, and cprdirector6@gmail.com; and for 30 days the Company's Plutio account shall remain open and unchanged.

15. Post Transition Date Reserve and Distribution of Excess Funds. In addition to the funding of the Escrow Account as described in Section 13 above, the Members agree to use funds in the Company's Chase checking account ("Checking Account") to pay any and all outstanding debts and liabilities of the Company through the Transition Date, including but not limited to, the full balance due and owing on the Company credit card account with Chase, Rents, and all payments due to instructors/contractors of the Company for services performed prior to the Transition Date.. Any remaining funds in the Checking Account as of the Transition Date, up to $8,000.00, shall be maintained in the Checking Account as a "Reserve" for a period of thirty (30) days following the Transition Date. The Reserve shall be used solely for purposes of paying any tax preparation and/or filing fees for the Company's federal taxes for tax years 2020 and 2021, including taxes due from the Company (or estimated to be due from the Company) for tax years SH 2020 and 2021 stripe refunds for sales occurring before the Transition Date; and charge backs for Company sales occurring before the Transition Date. As of the Transition Date, to the extent there are funds in the Checking Account in excess of the $8,000.00 to be held in the Reserve, such funds

SH 78

shall be immediately distributed evenly to the Members with each to receive 50% of such excess funds. Upon completion of the thirty (30) day Reserve period called for herein, to the extent there are any funds remaining in the Checking Account, such funds shall be immediately distributed evenly to the Members with each to receive 50% of such excess funds, and the Checking Account shall be closed in accordance with Section 16. Any contemplated payments from the Reserve shall require written notice to both Members prior to any payment actually being made.

16. Company Credit Card. The Company credit card account with Chase ("Credit Card") shall be closed on the Transition Date at 11:59PM. At any time between 9 PM and 11:30 PM on the Transition Date, each Member shall be entitled to log in to the Credit Card and convert 50% of the then existing award points into cash to be distributed to that Member.

17. 2020 and 2021 Federal Taxes. The Members agree that Joos' accountant shall prepare and file the 2020 federal income taxes for the Company at a cost of $500.00, which will be pre-paid to the accountant prior to the Transition Date, upon receipt of a written quote for performing such services. The Members further agree that Joos' accountant shall also prepare the 2021 1099-NEC forms required for contractors performing services for the Company prior to the Transition Date, as well as preparing and filing 2021 federal income taxes for the Company at a cost of approximately $600.00, which will be pre-paid to the accountant prior to the Transition Date, upon receipt of a written quote for performing such services. Any amounts estimated to be due for the Company's 2020 and 2021 federal taxes shall be pre-paid to the accountant, and held in trust by the accountant (pursuant to a written engagement agreement between the accountant and the Members) pending actual filing of the Company's federal taxes for 2020 and 2021. To the extent there are any excess funds remaining after the Company's 2021 federal taxes are paid, the engagement agreement with the accountant shall provide that the accountant shall distribute the excess funds evenly between the Members.

18. Notices: For the purposes of this Agreement, any notices in writing shall be sent to:

Doug Joos – strat505@gmail.com

Sami Halabi – samdesignatedemail@gmail.com

19. Governing Law. This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without regard to principles of conflict of law.

20. Further Assurances. The Members hereby agree from time to time to execute and deliver such further and other transfers, assignments and documents and do all matters and things which may be convenient or necessary to more effectively and completely carry out the intentions of this Agreement. Time is of the essence with respect to the acts contemplated under this Agreement.

21. Amendments. This Agreement may not be amended except upon the unanimous prior written consent of the Members.

SH 20

22. Jurisdiction and Venue. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought in the courts of record of the State of Florida in Hillsborough County or the United States District Court, Middle District of Florida. Each Member consents to the jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such court. **THE MEMBERS EACH HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH MEMBER MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**

23. Enforcement Costs. If any civil action, arbitration or other legal proceeding is brought for the enforcement of this Agreement, or because of a material breach in connection with any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, court costs, sales and use taxes and all expenses even if not taxable as court costs (including, without limitation, all such fees, taxes, costs and expenses incident to arbitration, appellate, bankruptcy and post-judgment proceedings), incurred in that proceeding, in addition to any other relief to which such party or parties may be entitled. Attorneys' fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes and all other charges billed by the attorney to the prevailing party (including any fees and costs associated with collecting such amounts).

24. Entire Agreement. This Agreement represents the entire understanding and agreement between the Members with respect to the subject matter hereof, and supersedes all other negotiations, understandings and representations (if any) made by and between such Members.

25. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Confirmation of execution by electronic transmission of a facsimile signature page shall be binding upon any party so confirming.

**IN WITNESS WHEREOF**, the Members hereto have caused this Agreement to be executed, both individually and on behalf of Fit, and effective as to the date written above.

**Fit Industries, LLC**

By: [signature]
Sami Halabi, Individually and as Member

Date: 02/08/2021

By: [signature]
Douglas K. Joos, Individually and as Member

Date: 2/8/21

## Schedule 2

## Fit Industries Dissolution Agreement

| *1/29/2021 16:00*<br>**Sources of Funds** | 25-Jan-21 | 29-Jan-21 | 5-Feb-21 | Wrap Up | Total<br>6-Feb-21 | Escrow |
|---|---|---|---|---|---|---|
| Cash in Chase Bank | 60,624 | 6,167 | - | - | 60,624 | - |
| Escrow Release | | | | | | 42,000 |
| Reserve brough forward | | | 7,500 | 7,500 | - | |
| Estimated Receipts | | 19,700 | 20,000 | | 39,700 | |
| | 60,624 | 25,867 | 27,500 | 7,500 | 100,324 | 42,000 |
| Credit Card Liability | (7,457) | - | - | - | (7,457) | |
| Refunds and Charge Backs | - | (700) | (1,500) | - | (2,200) | |
| Rental Payments | - | - | (4,501) | - | (4,501) | |
| Instructor Payments | (5,000) | (5,000) | (5,000) | - | (15,000) | |
| Payroll | - | - | - | - | - | |
| Escrow Fees | - | - | - | - | - | |
| Escrow Deposit | (42,000) | - | - | - | (42,000) | |
| Accounting Fees - Note 1 | - | - | - | - | - | |
| Form 1099s | - | - | - | (1,200) | (1,200) | |
| W2 | - | - | - | - | - | |
| Form 941 (Q4 2020) | - | - | - | - | - | |
| Form 940(Annual 2020) | - | - | - | - | - | |
| Form 940 | - | - | - | - | - | |
| FL RT-6 (Q4 2020) | - | - | - | - | - | |
| Form 1120 S 2020 | - | - | - | (1,200) | (1,200) | |
| Dissolution Filings | - | - | - | - | - | |
| Legal Fees | | | | (1,000) | (1,000) | |
| Form 1099s | - | - | - | (1,200) | (1,200) | |
| Form 966 - Note 2 | - | - | - | (500) | (500) | |
| Form 1120 S (final) | - | - | - | (1,000) | (1,000) | |
| Miscellaneous | - | (1,000) | (1,000) | (1,000) | (3,000) | |
| Reserve to Cover Closing Costs | | (7,500) | (7,500) | | | |
| | (54,457) | (14,200) | (19,501) | (7,100) | (80,258) | - |
| Cash after Disbursements | 6,167 | 11,667 | 7,999 | 400 | 20,066 | 42,000 |
| **Distribution per Agreement** | | | | | | |
| **Halabi** | | (5,834) | (4,000) | (200) | (10,033) | |
| **Joos** | | (5,834) | (4,000) | (200) | (10,033) | |
| **Remaining Cash** | | - | - | - | - | |
| **Reserve** | | 7,500 | 7,500 | - | - | |
| **Release of Escrow** | | | | | | |
| **Halabi** | | | | | | (21,000) |
| **Joos** | | | | | | (21,000) |
| | | | | | | (42,000) |

Note 1 Fit Industries uses QuickBooks Online's payroll service and will be used to prepare and file all payroll returns. There is no additional charges.

Note 2 Must be filed within 30 days after resolution to approve dissolution.

SH DG

**SCHEDULE 3**

1. The non-cash assets include operating and non-operating Domain Names are as follows:

| Operating Businesses (noncompete provisions apply) | Assigned |
|---|---|
| cprcertificationatlanta.com | Halabi |
| SH cp~~i~~rcertificaitonaustin.com CPR | Halabi |
| SH cp~~i~~rcertificaitoncharlotte.com CPR | Halabi |
| cpircertificaitonclearwater.com | Joos |
| SH cprcertificationDallas.~~com~~ .ORG | Halabi |
| cprcertificationElPaso.com | Joos |
| cprcertificationFortLauderdale.com | Halabi |
| cprcertificationFortWorth.com | Joos |
| SH cprcertificationHouston.~~com~~ .ORG | Halabi |
| cprcertificationJacksonville.com | Joos |
| cprcertificationLasVegas.com | Joos |
| cprcertificationMemphis.com | Joos |
| cprcertificationMiami.com | Joos |
| cprcertificationNewOrleans.com | Joos |
| cprcertificationOrlando.com | Halabi |
| cprcertificationPhoenix.com | Halabi |
| cprcertificationSanAntonio.com | Halabi |
| cprcertificationStlouis.com | Joos |
| cprcertificationTallahassee.com | Joos |
| cprcertificationTampa.com | Joos |
| cprcertificationTucson.com | Halabi |
| cprcertificationWestpalmbeach.com | Halabi |
| | |
| **Non-operating Businesses (noncompete provisions DO NOT apply)** | **Assigned** |
| cprcertificationaugusta.com | Halabi |
| SH cprcertificationboston.com | Halabi |
| cprcertificharlestoncom | Joos |
| cprcertificationchicagocom | Joos |
| SH cprcertificationDenver.com | Halabi |
| cprcertificationnashvillecom | Joos |
| cprcertificationOmaha.com | Halabi |
| cprcertificationPhiladelphiacom | Joos |
| cprcertificationPortlandcom | Joos |
| SH cprcertification~~Raliegh.com~~ Raleigh.com | Halabi |
| cprcertificationSeattle.com | Joos |
| cprcertificationWesleyChapel.com | Halabi |

2. The software and tools used in the business follow:

   a. Wordpress (Free)
   b. Indeed (Free but you pay to advertise job opportunities)
   c. Paypal (will be closed upon execution of settlement agreement)
   d. Remitley (Free)
   e. Vimeo (Free)
   f. a3 Lazy Load (Free)

SH 28

g. Controlled Admin Access (Free)
h. PixelYourSite (Free)
i. PW WooCommerce Gift Cards (Free)
j. UpStroke: WooCommerce One Click Upsells ($299/year for 25 sites)
   UpStroke: WooCommerce Reports (Included with Upstroke license – see below)
k. URL Coupons for WooCommerce (Free)
l. W3 Total Cache (Free)
m. WooCommerce (Free)
n. WooCommerce AdWords Conversion Tracking (Free)
o. WooCommerce Appointments ($299/year for 25 websites)
p. WooCommerce Authorize.Net Gateway
q. WooCommerce Checkout Add-Ons ($79/year)
   WooCommerce Stripe Gateway (Free)
r. WooCommerce Twilio SMS Notifications (Free)
s. AutomateWoo ($99/year)
t. WP Control (Free)
u. WP Mail SMTP (Free)
v. WPForms Lite (Free)
w. Yoast SEO (Free)
x. Local Viking ($703/year)

The paid licenses are all in Joos' name and expire at various dates. The total annual cost is $1,479 and Joos will request that the license for Local Viking be transferred to Halabi. The value of that licence together with the value of the equipment that is being left with Halabi (see Section 3 below) exceeds the value of the licenses that will remain with Joos.

3. Office Equipment and Other Assets to be distributed as follows:

a. Canon Color imageCLASS MF644Cdw Printer – To remain with Halabi
b. Brother Black and White Laser Printer – To Remain with Halabi
c. Ikia Desks (4) – To Remain with Halabi
d. Canon PIXMA TR8520 Wireless All in One Printer – To Remain with Halabi
e. Various ink cartridges and Printer paper – to remain with Halabi
f. Various CPR Training equipment including but not limited to Mannequins, AED Machines, Booklets, training materials – to remain with the instructor(s) currently in possession of them and to be assigned to whichever location that instructor is associated with.

4. Status of Google My Business for Operating Businesses

None of the Google My Business profiles for the twenty-two (22) active Operating Business listed above have been, or are suspended. Of the Google My Business profiles for the twelve (12) non-Active, non-Operating Websites listed above – Omaha and Wesley Chapel are not suspended, Boston has a profile pending address verification, but it is not suspended, No 0other non-Active, non-Operating Websites have Google My Business profiles set up.