# EXHIBIT A

IN THE CIRCUIT COURT, THIRTEENTH JUDICIAL CIRCUIT, IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CASE NO.: 23-CA-013691
DIVISION: L

DOUGLAS K. JOOS,

Plaintiff,

vs.

SAMI HALABI,

Defendant.

_______________________________________/

LIVE/IN-PERSON & HYBRID VIDEOCONFERENCE

| | |
|---|---|
| DEPOSITION OF: | DOUGLAS KEITH JOOS, JR., PLAINTIFF |
| TAKEN BY: | COUNSEL FOR THE DEFENDANT, SAMI HALABI |
| DATE: | TUESDAY, DECEMBER 12, 2023 |
| TIME: | 10:03 A.M. - 6:12 P.M. |
| PLACE: | GUNSTER, YOAKLEY & STEWART, P.A.<br>401 EAST JACKSON STREET<br>SUITE 1500<br>TAMPA, FLORIDA 33602 |
| VIA: | MICROSOFT TEAMS VIDEOCONFERENCING |
| STENOGRAPHICALLY REPORTED BY: | COURTNEY N. LANGHOFF, RMR, CRR, FPR-C<br>ORANGE LEGAL/VERITEXT LEGAL SOLUTIONS<br>201 EAST KENNEDY BOULEVARD, SUITE 712<br>TAMPA, FLORIDA 33602 |

Page 2

APPEARANCES:

JOSEPH F. SOUTHRON, ESQUIRE
JULIA HANNAH WEBER, ESQUIRE
OF: Four Rivers Law Firm
400 North Ashley Drive
Rivergate Tower, Suite 1720
Tampa, Florida 33602
(813) 773-5105, FAX-(813) 773-5103
joe@fourriverslaw.com
julia.weber@fourriverslaw.com
APPEARING ON BEHALF OF THE PLAINTIFF, DOUGLAS K. JOOS, JR.

DANIEL P. DIETRICH, ESQUIRE
OF: Gunster, Yoakley & Stewart, P.A.
401 East Jackson Street
Truist Bank Building, Suite 1500
Tampa, Florida 33602
(813) 228-9080, FAX-(813) 228-6739
ddietrich@gunster.com
APPEARING ON BEHALF OF THE DEFENDANT, SAMI HALABI

ALSO PRESENT:

Sami Halabi, Defendant (Via Videoconference)

Laura Ahammer, Corporate Representative for CPR Certification, LLC

------

STIPULATIONS

It is hereby stipulated and agreed by and between the counsel for the respective parties and the witness that the reading and signing of the deposition transcript be reserved.

*****

Page 3

INDEX


| EXAMINATION OF DOUGLAS KEITH JOOS, JR.: December 12, 2023 | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. DIETRICH | 8 |
| CERTIFICATE OF OATH | 229 |
| CERTIFICATE OF REPORTER | 230 |
| READ & SIGN LETTER | 231 |
| ERRATA SHEET | 233 |

| DEPOSITION EXHIBITS | INITIAL REFERENCE |
|---|---|
| Exhibit 1 Complaint filed by Douglas K. Joos vs. Sami Halabi dated 7/10/23 | 32 |
| Exhibit 2 Plaintiff Joos's Motion for and Memorandum of Law in Support of Temporary Injunction dated 8/11/23 | 33 |
| Exhibit 3 Plaintiff Joss's Emergency Motion for and Memorandum of Law in Support of Ex-Parte Temporary Injunction dated 9/8/23 | 36 |
| Exhibit 4 Sunbiz Division of Corporations Detail by Entity Name page for CPR, LLC | 48 |
| Exhibit 5 Correspondence between Divine Hearts CPR, LLC, and CPR, LLC, from Thursday 4:16 a.m. - 11:34 p.m. (SUPP000004 - 7) | 71 |
| Exhibit 6 Complaint in this case dated 7/10/23 with Exhibits A-D attached | 82 |


Page 4

INDEX (Continued)


| DEPOSITION EXHIBITS | INITIAL REFERENCE |
|---|---|
| Exhibit 7 Plaintiff Joos's Motion for and Memorandum of Law in Support of Temporary Injunction dated 8/11/23 with Exhibits A-D attached | 82 |
| Exhibit 8 Plaintiff Joss's Emergency Motion for and Memorandum of Law in Support of Ex-Parte Temporary Injunction dated 9/8/23 with Exhibits A-E | 82 |
| Exhibit 9 Trademark/Service Mark Application, Principal Register TEAS Plus Application for CPR, LLC, dated 12/23/21 | 89 |
| Exhibit 10 Dissolution Agreement between Fit Industries, LLC, Douglas K. Joos, and Sami Halabi dated 2/8/21 | 101 |
| Exhibit 11 Color printouts of the CPR, LLC's Tampa website | 103 |
| Exhibit 12 Color printouts of CPR Certification's Orlando website | 104 |
| Exhibit 13 Color printouts of CPR, LLC's Orlando website | 105 |
| Exhibit 14 Plaintiff Joos's Amended Motion for and Memorandum of Law in Support of Temporary Injunction 11/2/23 | 132 |
| Exhibit 15 Printouts from CPR, LLC's CPR Certification Orlando website | 133 |
| Exhibit 16 E-mail correspondence between Doug Joos and Tonya Hahn with The Yes Working Team dated 2/25/21-2/26/21, CPR class information (000610 - 612) | 139 |


Page 5

INDEX (Continued)


| DEPOSITION EXHIBITS | INITIAL REFERENCE |
|---|---|
| Exhibit 17 Letter from Jeffrey M. Gitchel to Joseph F. Southron dated 1/13/23, Re: Infringement of CPR PITTSBURGH trademark | 156 |
| Exhibit 18 Printout showing CPR Certification Chesapeake location with Aviation Institute depicted in photograph | 169 |
| Exhibit 19 Google Maps printout of CPR Certification Chesapeake with address of 2211 South Military Highway | 173 |
| Exhibit 20 Printouts of CPR, LLC's CPR Certification Chesapeake website | 176 |
| Exhibit 21 Office Services Agreement for Chesapeake Virtual Office dated 6/2/23 for CPR Certification Chesapeake (000487) | 179 |
| Exhibit 22 Printouts of CPR, LLC's Contact CPR Certification Chesapeake website | 181 |
| Exhibit 23 Affidavit of Douglas K. Joos in Support of Plaintiff's Motion for Temporary Injunction dated 8/10/23 | 183 |
| Exhibit 24 E-mail chain between Thomas Wood, John Schifino, and Doug Joos dated from 2/23/21-2/24/21, Subject: E cards Reclaimed | 186 |
| Exhibit 25 Letter from Joseph Southron to John Schifino and Sami Halabi dated 3/17/22 | 186 |

I N D E X (Continued)


| DEPOSITION EXHIBITS | INITIAL REFERENCE |
|---|---|
| Exhibit 26 Printout of the Google stock photo for CPR Certification Tampa | 198 |
| Exhibit 27 Chamber of Commerce website printout for CPR Certification Philadelphia with the PureHeart CPR logo | 205 |
| Exhibit 28 Printout of CPR Certification Philadelphia's contact page | 207 |
| Exhibit 29 Composite of Certificates of Recognition for Certification CPR classes | 209 |
| Exhibit 30 Verification page with Sami Halabi's signature dated 11/13/23 (Page 22 of 22) | 216 |
| Exhibit 31 Text message conversation between Sam Halabi and Douglas Joos dated 7/18/21-9/16/21 | 217 |
| Exhibit 32 Video of GlassDoor profiles for CPR, LLC, and PureHeart CPR with audio by Contractor Gail | 225 |

(Attached to original and copy transcripts.)
* Exhibit 32 not attached *

| PREVIOUSLY MARKED DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| (None) | |




I N D E X (Continued)


QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
(86, 25)
(88, 20)
(97, 11)
(126, 3)
(126, 11)
(126, 25)
(127, 9)
(128, 17)
(129, 9)
(188, 3)
(188, 25)
(189, 13)

CERTIFIED QUESTIONS (ATTORNEY DIETRICH)
(131, 21)
(133, 2)




P R O C E E D I N G S

*********

THE COURT REPORTER: Would you raise your right hand, please?
Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
THE COURT REPORTER: Thank you.

DIRECT EXAMINATION

BY MR. DIETRICH:
Q. Can you please state your name for the record?
A. It's Douglas Joos, Junior.
Q. And, Mr. Joos, when was the last time you ever saw Mr. Halabi?
A. I don't recall.
Q. Was it in the last few weeks?
A. No.
Q. Last few months?
A. I don't believe so.
Q. Over six months ago then?
A. That seems correct.
Q. Do you know if you saw him at the beginning of 2023?
A. I don't recall seeing him.



Q. Do you know the last time you ever spoke with Mr. Halabi?
A. I don't know the date.
Q. Do you know approximate time period?
A. I don't.
Q. Was it in 2023?
A. No.
Q. So 2- -- prior to 2023?
A. That would be -- yeah.
Q. You didn't want Mr. Halabi to attend today's deposition in person, correct?
A. That's correct.
Q. Can you tell me why?
A. Mr. Halabi has demonstrated himself to be very volatile and has made several remarks about wishing to harm me.
Q. And when were those remarks made?
A. Well, the last time I saw Mr. Halabi that I -- the date escapes me, but he mentioned something about wanting to kick my ass. And also, through his former employee's testimony, I learned that he frequently made death threats against me in his executive meetings.
Q. Okay. Let me ask about each one of those.
So I think we just discussed the last time you saw Mr. Halabi was probably sometime in early 2023,

Page 10

earlier this year, correct?
A. You mean are you saying I saw him earlier this year?
Q. I believe that's what you testified about earlier, that you may have seen him earlier this year, but not --
A. I don't believe I have seen him in 2023.
Q. So when would this statement have been made by him, that he wanted to kick your ass? in 2022?
A. Potentially.
Q. Was there --
Would it have been prior to 2022?
A. I don't know.
Q. What were the circumstances in which he made that comment?
What were you guys doing?
A. We were meeting to discuss trying to find a resolution between the two companies as to -- to not have these issues that we're currently having.
Q. And when he made that comment, what did you do in response?
A. I left.
Q. Immediately?
A. Pretty much.
Q. Was that the last time that you've ever seen

Page 11

Mr. Halabi?
A. I believe so.
Q. And you have not spoken to him since?
A. I have no desire to do so.
Q. These several remarks that you said the former employee discussed, who is the former employee?
A. That would be --
MR. SOUTHRON: Objection. Form.
THE WITNESS: -- Rich Bussey, I believe, his name is.
BY MR. DIETRICH:
Q. And when did Mr. --
Tell me the circumstances that Mr. Bussey mentioned these comments were made -- well, let me strike that.
You said death threats were made.
What were the actual death threats?
A. Well, saying that you wanted someone to choke on your cock till they die would constitute a death threat.
Q. Did you actually believe that he was going to make you do that till you died?
A. Yeah. I -- I -- I believe, yes.
Q. As you sit here under oath, you legitimately believe that that act that you just described was going

Page 12

to take place and cause your death?
A. I believe he would have done something violent, perhaps iss- -- perhaps resulting in death.
Q. And when did you learn that this comment was made?
A. Recently.
Q. It was in October of this year, was it not?
A. I don't recall the exact date.
Q. Was it at the deposition of Mr. Bussey?
A. That's correct.
Q. Did you attend that deposition?
A. I did.
Q. And what did you do -- well, strike that.
Were there any other death threats that were made or was there just that one?
A. Well, I mean, saying that you want to F someone in the ass till they bleed would also, perhaps, result in death, or at the very least, an incredibly violent behavior.
Q. And same question: Did you believe that that act that Mr. Bussey said Mr. Halabi mentioned was actually going to take place?
A. I believe Sam's intentions are both violent and dangerous toward me.
Q. That's not what my question was.

Page 13

My question was: The F'ing you in the ass, did you think that that act was actually going to take place?
A. He, perhaps, would attempt to do something along those lines.
Q. And do you know when these alleged statements were made to Mr. Bussey?
A. I do not.
Q. They were made to Mr. Bussey while he was an employee of the company, correct?
A. That's correct, as far as --
Q. Do you know when --
Do you know when Mr. Bussey ceased being an employee of the company?
A. I do not.
Q. If I told you it was in early 2023, do you have any reason to dispute that?
MR. SOUTHRON: Objection. Form.
THE WITNESS: No.
BY MR. DIETRICH:
Q. And you never actually heard Mr. Halabi make either one of those statements, did you?
A. Not those particular statements.
Q. Okay. Those are the two I'm talking about.
Those are the two death threats that you

Page 14

mentioned, correct?
A. Well, Mr. Halabi would make death threats while -- to me all the time, while we were working together.
Q. Okay. We'll get to those. I'm talking to these two death threats that Mr. Bussey mentioned.
You never actually heard Mr. Halabi make either one of those comments, did you?
A. No.
Q. And Mr. Bussey is a former employee of Mr. Halabi's company, correct?
A. I -- I don't -- I don't know his employment status.
Q. Do you know how Mr. Bussey even knows Mr. Halabi?
A. I know that he worked for Mr. Halabi for several years.
Q. Have you ever met Mr. Bussey?
A. No.
Q. Have you ever spoken to him?
A. No.
Q. Did you attend the deposition in person or by video?
A. I attended the deposition via Zoom, as everyone else did.

Page 15

Q. And just to clarify, I'm talking about the deposition of Mr. Bussey.
You attended that by Zoom?
A. Yes.
Q. Do you have any reason to know why Mr. Bussey would have made those two statements?
A. Well, judging from Mr. Bussey's insistence that Mr. Halabi not be in the room and his own testimony that he also had received death threats or was afraid for his life for Sam -- from Sam, I'd -- I'd have no reason to not believe what he said.
Q. And is it your position today that you fear Mr. Halabi based on comments made during a deposition by Mr. Bussey of statements made in early 2023 that you never actually personally heard?
A. In part.
Q. Okay. And what do you mean, "In part"?
A. That is not the only reason.
Q. Okay. What are the other reasons?
A. As stated prior, Mr. Halabi had a history of public outbursts and frequently mentioned killing anyone who interfered with his business.
Q. Okay. Who did he make those statements to?
A. Me.
Q. And who was he going to kill if they interfered

Page 16

with his business?
A. Me.
Q. And what did he --
What exactly did he say to you about killing you?
A. He just would look -- and, again, he would do this randomly, so without prompting seemingly, just to sort of, you know, reiterate frequently that he should not be crossed; that, you know, If anyone ever messes with my business, I'll kill them, and he would look at me directly and say that.
Q. And those would have been statements made during your employment?
I'm sorry. Let me clarify.
During your employment of -- with Fit, F-i-t?
A. Fit Industries began as a -- a partnership and then -- so at the time, some of it I was not an employee, and in other cases, we were both S corp employees.
Q. So Fit dissolved when?
A. Early 2021, I believe.
Q. And these other statements that you alleged were made by Mr. Halabi about killing you, would they have been made prior to the dissolution of Fit in early 2021?

Page 17

A. Yeah, they would have.
Q. Any other statements of why you fear Mr. Halabi?
A. He frequently made multiple public outbursts in which he would sort of run around like a lunatic and slam doors and cause a scene pretty much everywhere we went together. (Witness indicates.)
Q. So he was loud?
A. Hmm, not -- not simply loud.
Q. Well, what -- explain for me, please.
A. Well, in our interrogatories, I outlined several instances of -- of multiple occasions in which he behaved in highly irregular ways in public.
Q. And those acts took place, again, prior to the company dissolving in early 2021?
A. They would have to because I haven't really spoken to Mr. Halabi after that.
Q. And these outbursts were made to other people, not you, correct?
A. He -- when he would have an outburst, he would outburst at other people. But he would also outburst to anyone in his vicinity, which included me.
Q. So these statements that were made prior to dissolution in 2020- -- early 2021 had you fearful of Mr. Halabi; is that correct?

Page 18

A. That's correct.
Q. And what have you done since early 2021 to protect yourself from Mr. Halabi?
A. I don't necessarily think it's reasonable to tell you how I'm protecting myself and my family from a threat and give that person knowledge of how to circumvent it.
Q. Have you taken acts to protect yourself?
A. Yes.
Q. Do you have a security system at your house?
A. I'm -- I have taken acts to protect myself.
Q. Do you have a gun?
THE WITNESS: Joe, do I need to answer this?
MR. SOUTHRON: May I just have five minutes with him?
MR. DIETRICH: Sure.
(At this time, Plaintiff's Counsel and the witness exited the deposition room.)
(Recess taken from 10:17 a.m. to 10:19 a.m.)
MR. DIETRICH: Okay. Back on the record?
THE COURT REPORTER: (Indicates affirmatively.)
MR. DIETRICH: Okay.
THE WITNESS: Sir, can you reph- -- repeat the question?
BY MR. DIETRICH:

Page 19

Q. So my first question was: Do you have a security system at your house?
A. I do.
Q. And my next question was -- well, let me --
Do you actively use that security system?
A. I do.
Q. And how long have you had that security system?
A. After the Dissolution Agreement.
Q. So did you get that security system in response to these actions that you're alleging took place by Mr. Halabi?
A. Yes.
Q. When did -- when did you have -- when -- sorry.
When did you have the security system installed?
A. I don't have the dates.
Q. It was after early 2021, though, is your position?
A. Yes.
Q. And my next question was: Do you --
Do you own a gun?
A. I do.
Q. And do you carry it on you?
A. Not today.
Q. And how long have you had a gun?

Page 20

A. Prior to the Dissolution Agreement.
Q. Any other acts that you've -- that you take to protect yourself?
A. I stay far away from areas that I know Mr. Halabi to frequent, and I -- there's -- there's -- there's nothing really else that I feel comfortable going into.
Q. And what areas does Mr. Halabi frequent, that you know of?
A. The Carrollwood area.
Q. Is that where he lives?
A. I believe so.
Q. Where do you live?
A. The Wesley Chapel area.
Q. Are there any other acts or comments that you are aware of that Mr. Halabi has allegedly said that causes you fear?
A. Yeah. His -- his general demeanor, from -- from seemingly happy one moment to completely erratic the next. In general, being around said person and knowing said person has a -- basically a vendetta against you causes me fear.
Q. Have you ever yourself had any outbursts or aggressive moments during discussions with Mr. Halabi?
A. No.

Page 21

Q. None at all?
A. (Witness shook head from side to side.)
Q. One of the issues that you've raised in the motion for injunctive relief is that Mr. Halabi is disparaging you.
Are you aware of that?
A. I'm aware of that.
Q. And is there anything, other than what we've discussed here, that would support Mr. Halabi disparaging you?
A. Well, I mean, Richard Bussey's testimony was that he essentially told the entire staff that I was the enemy and to do things like leave false reviews for me on platforms that allowed reviews.
There's also conversations with instructors that have gone, that they have indicated that they had spoken to Mr. Halabi and he had informed them about me and, quote, unquote, my -- my wife's practices in business. And then they -- after -- after having spoke to Mr. Halabi, this person threatened to report me to police over reasons that I -- I don't -- I -- I had nothing to do with, so --
Q. I'm sorry. I didn't really follow that.
You -- that was an instructor?
A. Yes. An instructor that we were interviewing

for a -- for a job.
Q. And where was this instructor located?
A. North Carolina.
Q. And do you know the instructor's name?
A. Not off the top of my head.
Q. And what was the disparaging comment that Mr. Halabi allegedly made?
A. Well, according to her, she said that he told her that him and my wife were scammers -- or me and my wife were scammers.
Q. So the instructor, whose name you don't recall, in North Carolina, told you that Mr. Halabi said that you and your wife were scammers?
A. She sent a text message.
Q. What does that mean, "scammers"?
A. She effectively said that we set up locations all over the country and -- with no intention of holding classes and charge people money and do not refund them.
Q. And did you end up hiring this instructor?
A. No.
Q. Okay.
A. The relationship was soured by that.
Q. And do you, in fact, have locations that are not open around the country?
A. You'll have to be more specific.



Q. Do you have locations for CPR services anywhere in the United States where you actually do not hold CPR classes?
A. We're not always holding an in-person class. There's downtime occasionally between instructors, instructor availability. So we're not always holding a class in every city.
Q. I understand. And I'm not talking about downtime; I understand there's ups and downs. I'm talking about any locations where you've never held a class, yet you have a location in a specific city.
A. We have locations we were in the process of setting up where we are attempting to hold cl- -- in-person classes. But we offer other services to those locations in -- in the meantime.
Q. And then did this instructor specifically say it was Mr. Halabi that was discussing this with her?
A. She said, "I spoke to Sam."
Q. And how did she know Sam?
A. I'm not sure.
Q. And when did that -- when was this?
When -- time period? when did this occur?
A. I don't know the date.
Q. Was it -- can you give me a year?
A. I believe that was this year.



Q. Okay. You said another statement was -- another statement was that Mr. Halabi said you are the enemy.
Did I hear that correctly?
A. I believe so.
Q. Is that disparaging? Is that your position?
A. Well, he has a non-disparagement agreement against me, and to tell his staff to treat me as an enemy and to take actions reflecting that, I believe, would be disparaging.
Q. And what actions are you referring to that would -- that you -- are disparaging?
A. Leaving negative reviews, potentially flagging my locations on Google to try to get them removed.
Q. Okay. Have any false reviews been published?
A. I believe so.
Q. Where?
A. On Google.
Q. For what locations?
A. We had some in Pittsburgh.
There's -- there's various locations. I don't recall them all off the top of my head.
Q. But you know for a fact there was a negative review left in Pittsburgh?
A. We had a negative review in Pittsburgh, yes.



Q. And how do you know it was Sami that instigated that review?
A. I don't.
Q. Do you know of any reviews, negative reviews, that as you sit here today, you know Mr. Halabi instigated or otherwise put in motion to have published?
A. I know that his -- his Google profile is the one that attempted to flag my location down in -- in Chesapeake.
Q. Okay. Well, we'll get to the flagging. I'm talking on just negative false reviews, though, before we get to the flagging issue.
Any false reviews that you know, as you sit here today, that Mr. Halabi is the one that instigated or otherwise had that false review published?
A. I -- I -- I don't know that for sure.
Q. Okay. The flagging location you mentioned was in Chesapeake?
A. That's correct.
Q. And what is that referring to?
A. Are you asking what -- for me to define what that -- the flagging of a location means?
Q. No. I'm asking you to define what the disparaging comment was that supports your position on disparagement.

Page 26

A. I think attempting to have a competitor's location closed is -- is disparaging.
Q. What was the actual disparaging comment that Mr. Halabi made?
A. There's no actual words involved in that.
Q. Do you know what "disparagement" is?
A. I believe so.
Q. And how would you define "disparagement"?
A. Deliberately or --
Saying something that's with the intention of making somebody else look in a negative light.
Q. Okay. So under your definition of disparagement, what exactly did Mr. Halabi say about Chesapeake that supports your claim for disparagement?
A. There's no words involved in that.
Q. So if you define "disparagement" as saying something and Mr. Halabi actually didn't say anything, what is your position or what is your support that he disparaged you on the Chesapeake location?
A. I'm not -- I -- I don't know.
Q. Any other disparaging comments that support your position?
A. Do you mean like that he's made in general or at all?
Q. I'm just trying to ask or get what facts you

Page 27

have that support your position that Mr. Halabi disparaged you.
A. In our last meeting, aside from mentioning kicking my ass, he has called me low IQ and -- and said a few other things that were negative comments.
Q. What "other things"?
A. I can't recall them at the moment.
Q. And this would have been at your meeting that took place?
Remind me, when did that take place? Prior to dissolution?
A. This would've been after dissolution.
Q. After dissolution?
A. (Witness nodded head up and down.)
Q. Do you remember -- so dissolution was early -- why don't we just say when the dissolution was.
I have the Dissolution Agreement dated February 8th, 2021.
Is that your recollection?
A. It seems correct.
Q. When would --
This last meeting that you are referring to, when would that have taken place? in 2021?
A. I don't recall.
Q. Do you remember where it was?

Page 28

A. Yeah. It was at the Avila Country Club.
Q. Would that have been in 2022?
A. Could've been.
Q. And, Mr. Joos, if you were fearful of Mr. Halabi because of your past relationship with him and things that he'd said and was doing, why were you meeting with him in person at Avila?
A. Well, I was desperate to find a solution to -- to stop Sam from essentially stealing my entire business identity. And in an effort to protect my family's livelihood, I tried to reason with Sam.
Q. Who was at that meeting in Avila?
A. Laura Ahammer and my father-in-law.
Q. What is your father-in-law's name?
A. Gary.
Q. And what's his last name?
A. Viljoen.
Q. And just for the court reporter, can you spell that last name?
A. V-i-l-j-o-e-n.
Q. And then yourself and Mr. Halabi?
A. Correct.
Q. Did you have a -- any police officer or security guards attend with you?
A. No. It's a -- it's a relatively secure complex

Page 29

with security guards roaming around.
Q. Did you carry your gun with you at that meeting?
A. I did not.
Q. Did you meet with him just the one time at Avila?
A. We might have met a couple of times.
Q. So you met with Mr. Halabi on multiple occasions in person, notwithstanding the fact that you feared for your life?
A. Well, after the first meeting, both Sam and Laura had given us hope that we might be able to come to a -- a solution to the issues that we were having.
And after our second meeting where Sam made his outbursts and ran around slamming doors and -- and in my face, telling me he would kick my ass and that he was seeing two therapists now because of me, we decided that it was no longer worth the -- the danger and the -- the trouble of trying to -- to meet with him anymore.
Q. Okay. Let me -- let me try to ask again because I believe you testified earlier that during your business relationship with -- business relationship with Mr. Halabi prior to dissolution, he was making all sorts of comments that you feared, correct?
He had outbursts?

Page 30

A. That's correct.
Q. And post dissolution, after all these alleged statements were made by Mr. Halabi, you proceeded, notwithstanding your fear of him, to meet in person with him on multiple occasions; is that --
A. Twice.
Q. Twice?
A. (Indicates affirmatively.)
Q. Did you also -- well, strike that.
Were there any outbursts made at that first -- by Mr. Halabi at that first meeting at Avila?
A. There were some.
Q. Did he say anything that caused you fear during that first meeting?
A. He stood up and slammed some doors as part of it, and then eventually he came back in and settled down in the corner.
Q. Didn't cause you enough fear, though, because you decided to attend a second meeting with him after that --
MR. SOUTHRON: Objection. Form.
BY MR. DIETRICH:
Q. -- is that correct?
A. I decided that, based on Laura's comments and her seeming ability to try to keep him calm, that it was

Page 31

worth the risk to try to get something done to essentially save my business.
Q. You filed a Complaint in this lawsuit, in July of 2023, correct?
A. I believe so.
Q. I'll represent that's when it was. I'm not trying to trick you on that.
Do you know what claims you asserted in that lawsuit? in the initial Complaint that's on file?
A. I do.
Q. And what are those claims?
A. It's a fairly lengthy document, so I -- I don't know that I could give it to you verbatim. But -- but there's an intentional breach of contract and misuse of my logo and interference, amongst other things.
Q. Is there a disparagement claim in that Complaint?
A. There could be.
Q. You don't know offhand?
A. I don't. I'm under a tremendous amount of stress.
Q. Did you file -- hmm.
You also filed an initial temporary restraining order.
Do you recall filing that?

Page 32

A. Yes.
Q. And that was filed in August, so about a month after your Complaint, correct?
A. That sounds correct.
Q. And do you recall in that initial temporary restraining order motion that you filed if you're seeking any injunction in connection with any disparaging comments made by Mr. Halabi?
A. The restraining order, I believe, is based on his -- his violent comments.
Q. In the initial restraining order that you filed?
A. I'm not sure. Was there an initial restraining order?
(Deposition Exhibit 1 was marked.)
BY MR. DIETRICH:
Q. I'll hand that to your -- that's for you. You can give that to your attorney.
What we've identified as Exhibit 1 is the initial Complaint that was filed in this matter on July 10th, 2023.
MS. AHAMMER: Can I have one?
MR. DIETRICH: (Indicates affirmatively.)
BY MR. DIETRICH:
Q. You can take a look at that, Mr. Joos.

Page 33

And all I'm asking you is if you can point me to where there's a claim for disparagement?
MR. DIETRICH: Okay. There.
MS. AHAMMER: (Marked on document.)
THE WITNESS: (Perused document.)
MR. SOUTHRON: Objection. Form.
THE WITNESS: As of right now, I don't see the word "disparagement" used in here.
BY MR. DIETRICH:
Q. I don't either.
(Deposition Exhibit 2 was marked.)
BY MR. DIETRICH:
Q. You can look at this. What we've marked as Exhibit 2 -- one for your counsel. You can have the one with the marker on it -- is your initial motion for temporary injunction that was filed on August 11th, 2023.
This one's lengthy. You can read as much as you want. It's going to be the same question. I'd like you to point me to where in this filing you make any mention of any of these alleged disparaging comments.
MR. SOUTHRON: Objection. Form.
BY MR. DIETRICH:
Q. And if it helps, I'll point you to Page 17, which is the relief you're requesting. But you read

Page 34

whatever it is you need to read to answer the question.
MR. SOUTHRON: Objection. Form.
THE WITNESS: (Perused document.)
MR. DIETRICH: Well, actually --
(Discussion held off the record between Defense Counsel and Ms. Ahammer.)
THE WITNESS: (Perused document.)
I don't see the word "disparagement" on this document.
BY MR. DIETRICH:
Q. And in either of those documents, Exhibits 1 or 2, did you see anything talking about these death threats that Mr. Halabi made to you, or otherwise the fear that you have of Mr. Halabi?
A. (Witness perused document.)
I don't see that specifically mentioned on here.
Q. And can you tell me why, if you were in such fear of Mr. Halabi, you would not have mentioned any of this in the initial filings that you have in front of you in this lawsuit?
MR. SOUTHRON: Objection. Form.
THE WITNESS: My primary --
MR. SOUTHRON: I further object. He hasn't --
You're not showing him all the filings; you're just showing him old filings.

Page 35

MR. DIETRICH: Joe, you can just state your objection and --
MR. SOUTHRON: Okay. But you just said, "based on your filings," and gave him a stack of papers.
MR. DIETRICH: I understand what I gave him.
MR. SOUTHRON: It doesn't matter if it's not there.
MR. DIETRICH: I don't need a speaking objection.
BY MR. DIETRICH:
Q. I'm just asking if you see in any of those two documents, Exhibits 1 or 2, any mention of the death threats or the fear that you have mentioned of Mr. Halabi.
A. No, I don't. I don't see them mentioned on these documents.
Q. Are you aware you filed an emergency motion for temporary injunction subsequent to the initial motion?
A. Yes.
Q. And the initial motion you have there is not an emergency, correct?
You don't see the word "emergency" in the top?
A. Where would I see the word "emergency" on either of them?
Q. Strike that. We'll move on.

Page 36

(Deposition Exhibit 3 was marked.)
BY MR. DIETRICH:
Q. What we've marked as Exhibit 3 is the emergency motion that you filed in this matter on September 8th, 2023.
MR. DIETRICH: Joe, do you want copies?
MR. SOUTHRON: Yeah.
BY MR. DIETRICH:
Q. And it's the same question.
MR. SOUTHRON: I need a bathroom break whenever you get a chance.
BY MR. DIETRICH:
Q. Same -- same question: If you can look through that, Mr. Joos, and I just want to know where, in that emergency motion that's in front of you, there's any mention of either disparagement or the fear and the death threats and the fear that you have with Mr. Halabi as we've been discussing.
A. (Witness perused document.)
(Discussion held off the record between Plaintiff's Counsel.)
MR. DIETRICH: That should be 3.
That should be 3. (Indicates.)
MS. AHAMMER: (Indicates affirmatively.)
THE WITNESS: Exhibits 2 and 3 are different

Page 37

documents?
BY MR. DIETRICH:
Q. Exhibits 2 and 3, I'll represent, are different documents.
A. (Witness perused document.)
And can you repeat the question, just so I refresh my memory?
Q. Absolutely.
In Exhibit 3, that emergency motion that you filed, I'm asking where in that is there any mention of either disparagement by Mr. Halabi or mention of the death threats or otherwise your fear of Mr. Halabi?
A. (Witness perused document.) I don't -- I don't see either of those specifically mentioned.
Q. Okay.
MR. DIETRICH: We can take a bathroom break.
MR. SOUTHRON: All right.
(Recess taken from 11:00 a.m. to 11:07 a.m.)
MR. DIETRICH: We are back on the record.
BY MR. DIETRICH:
Q. Mr. Joos, is there any other statements of disparagement that you are alleging support your position that we have not discussed to this point?
A. I'm not sure.
Q. Any that come to mind as you sit here right

Page 38

now?
A. Not at the moment, no.
(Telephonic interruption.)
MR. SOUTHRON: Sorry.
BY MR. DIETRICH:
Q. Are there any other statements that you're relying on that Mr. Halabi allegedly made to support your -- to support your position of fear in the restraining order that you're seeking?
A. Any other statements?
Q. Any other statement?
A. Do e-mails count as statements?
Q. Statements, e-mails, actions.
How about we categorize it as: Is there anything else that you know of that supports your position of the fear that you have of Mr. Halabi?
A. Well, during the -- the Dissolution Agreement -- or prior, just prior to the Dissolution Agreement, Sam would send me e-mails repeatedly with sort of ominous deadlines, in bold letters, Do such and such by 4:00 p.m. These are kind of -- the implication there was that there was a threat being made.
Q. Was there any actual threat expressly mentioned in the e-mail?
A. I don't recall. I just remember the -- the --

Page 39

the bold letters of the 4:00 p.m. and the deadlines and the -- the way it was implied.
Q. Is it possible he was just emphasizing the deadline?
A. It's an arbitrary deadline that he set, so there was definitely a "or else" sort of a vibe to that.
Q. Did you ask him about it?
A. No.
Q. So that's the way you read the e-mail, but you never actually asked Mr. Halabi the reason why he had something in bold letters?
A. I -- I did not have a conversation with him about that.
Q. What is the relief that you're seeking at the hearing on December 20th in connection with these disparaging comments that you allege are being made?
A. You're asking what I -- I would have granted?
Q. Yeah. What are you asking the Court to do?
A. Well, in -- in part, to enjoin him from making further disparaging comments.
Q. Okay. I'm just talking solely on the disparagement part.
You just want him to stop making disparaging comments?
A. And -- and I'm not -- I'm not sure of

Page 40

the en- -- the entirety of -- of what that would entail yet.
Q. And when do you plan on determining the entirety of what that entails?
A. I don't know.
Q. In the next eight days, I presume?
A. Potentially.
Q. And what are you asking the Court to do on December 20th in connection with the fear that you have of Mr. Halabi?
A. The entirety of that remains to be determined, but in part, no contact and stay away from me; be formally required to stay away from me.
Q. But you actually have not seen him in the last six months we already established, correct?
A. Nor do I want to.
Q. Regarding the disparaging comments that we've gone over, have you been able to determine if you've actually been damaged by any of those comments?
A. Well, the conversation that -- that was had with the -- the North Carolina instructor directly impacted my ability to open that location in North Carolina.
Q. Why is that?
A. Because the instructor won't work with us now

Page 41

based on the comments that were made --
Q. Do you --
A. -- by Sam to her.
Q. Do you have a location in North Carolina?
A. I -- I have a location in North Carolina.
Q. And where was this location that this instructor was located in North Carolina?
A. She was in Fayetteville.
Q. Do you have a location in Fayetteville?
A. I have a location without an instructor.
Q. Is she the only instructor in Fayetteville, North Carolina that can perform these services that you need?
A. She's not necessarily the only instructor in Fayetteville, but she's one of the few that had applied.
Q. Have any others applied for that position in Fayetteville?
A. Off the top of my head, I'm -- I'm not sure. I don't believe that we've had -- she was -- she was far along into the process of hiring her. And after her conversation with -- with Sam, she began threatening to take us to the police and all these other things.
Q. What is the process to hire an instructor?
A. It's a process similar to hiring any other person to do a job.

Page 42

Q. Can you walk me through exactly what you would do to hire an instructor in Fayetteville, North Carolina?
A. We would collect resumes from various job sites and conduct interviews and see if they have the qualifications for the role.
Q. So when you say you were far along in the process, it's not a lengthy process to hire somebody, is it?
A. It's fairly lengthy.
Q. You post an ad, correct?
A. It's -- it's more to it than that. We search through databases of available people and read through all their qualifications, and then we go through attempting to make contact with them and scheduling appointments to go over their qualifications and availability and their desire for the -- for the role. And then there's negotiations and pay and all sorts of things.
Q. So did you solicit this instructor?
A. I -- I believe she responded to one of our -- one of our job posts, but I -- I'm not certain.
Q. And where was she in the process of being hired?
A. She had -- we were ready to open classes with her as the instructor.
Q. And do you have other instructors that have applied since for this location in Fayetteville?
A. I don't believe we've had any success in Fayetteville since then.
Q. Do you have a current ad seeking employment for an instructor in Fayetteville?
A. I'm -- I'm not sure. She also stated in -- in her text messages that she -- you know, we had entered the wrong state after -- after sh- -- after her conversation with Sam, that she essentially said she was going to make it her goal to -- to make sure that, you know, everybody knew about us and knew our -- knew that we were scammers.
Q. And remind me: This is all based on a conversation that Mr. Halabi had with this instructor?
A. According to her text messages, yes.
Q. And is it your position that because Mr. Halabi said that you were a scammer, that she's brought it to this level to want to call the police?
A. Yeah. Because she -- she saw both of our websites, and, you know, she assumes that I'm -- because she has a prior relationship with Sam, she assumes that I'm the one who's -- who's intentionally copying them, which is -- the inverse is true.

Page 44

Q. And remind me -- if I asked this, I apologize -- did you say you personally spoke with the instructor?
A. I did not speak with her.
Q. Did somebody from your company speak with the instructor?
A. Yes.
Q. And who was that?
A. It would be one of my -- my contractors in the Philippines.
Q. And do you know for a fact that somebody in the Philippines contacted her?
A. It was via text message, so we have a chat -- there's a chat log. (Witness indicates.)
Q. And was it explained to this instructor that whatever these comments that were made were not coming from you?
A. She was -- she did -- she was aware that I was not the one speaking to her.
Q. And how was she aware of that?
A. Well, she referred to "the owner" in the third person, knowing that she wasn't talking to me, and referring to me as "the owner, the owner and his wife."
And the people who conduct my interviews use their names, and they -- she knew she was not speaking to me.
Q. Who's the owner and his wife?
Who are you referring to?
A. Me and my wife is --
Q. Oh, okay.
A. -- is what she referred to. (Witness indicates.)
Q. Got it. Okay. Any other --
Well, let me go back to that.
So you're saying you lost business because that instructor was not able to be hired?
A. It has delayed me in -- in opening in Fayetteville, which --
Q. And how long has it delayed you?
A. I -- as long as it's been since we had that conversation. It's been months, I believe.
Q. And is that something that -- do you -- strike that.
Do you have any projected revenue figures when you open up an office?
A. They're -- it varies.
Q. In other words, if -- I'm not going to ask you to do it, but -- right now, but would you be able to sit down and calculate -- if this conversation with this instructor took place three months ago, you'd be able to

Page 46

determine how much money you lost in three months because of these disparaging comments?
A. I would be able to determine what an average location earns and project out three months of that.
Q. So you'd be able to put a dollar figure on it, approximately?
A. Only on the -- on the part of -- of the class not being open.
Q. Correct. That's what I'm asking.
A. Potentially.
Q. Are there any other instances that you can explain of how you've been damaged by any disparaging comments made by Mr. Halabi?
A. Any other instances? I don't recall any at this time.
Q. CPR, LLC, that's your company?
A. It is.
Q. What is your position with CPR, LLC?
(Coughing causes an interruption.)
THE WITNESS: Well --
MR. DIETRICH: Did you get that?
THE COURT REPORTER: (Indicates affirmatively.)
BY MR. DIETRICH:
Q. Owner? CEO? president? I'm just --
A. I mean, I own it in its entirety, so all

Page 47

partic- -- positions are essentially arbitrary.
Q. So you're the 100 percent owner of CPR, LLC?
A. Yes.
Q. Okay. Any other shareholders or members or anything?
A. No.
Q. Okay. Do you have any emp- --
Does CPR, LLC have any employees?
A. No. Unless you want to count myself.
Q. Other than you.
Other than you, no other employees?
A. There is nobody who gets a W-2 from me.
Q. Are all the contractors -- sorry. Strike that.
Are all the instructors hired for your locations independent contractors?
A. They are.
Q. And are they independent contractors with CPR, LLC?
A. As opposed to what other -- I don't understand the question.
Q. Is there another company that they would be an independent contractor for other than CPR, LLC?
A. They -- they get paid from CPR, LLC.
Q. Okay. And I -- I saw Cindy's Florida LLC as the registered agent.

Page 48

Is that one of your LLCs as well?
A. Cindy's Florida is just a -- a service that registers LLCs.
Q. Okay. What is Venture Capital Holdings, LLC?
A. It's just a -- a disregarded entity.
Q. The public filings that I looked at show that being a member of CPR, LLC; is that accurate?
A. I mean, I don't know. It's -- if it is, I'm the sole owner of it, so --
Q. The sole owner of Venture Capital Holdings, LLC?
A. Yes.
Q. When you say "disregarded entity," what does that mean? it's not operating?
A. No. It means it's -- it's not -- it's not used for anything for tax purposes; it just exists for privacy.
(Deposition Exhibit 4 was marked.)
BY MR. DIETRICH:
Q. I'll show you --
MR. DIETRICH: I have just only one copy.
MR. SOUTHRON: (Indicates affirmatively.)
BY MR. DIETRICH:
Q. I just printed this off this morning, I'll represent, which is the Sunbiz records for CPR, LLC.

Page 49

And if you'll look towards the bottom there, it mentions Venture Capital.
Is that accurate, the Sunbiz records that you're looking at?
A. (Witness perused document.) I -- I believe so.
Q. Do you know who Andrew Kearse is?
A. Is that on this document somewhere?
Q. Not on that doc- -- I -- that's all. I just wanted to show you that document. I'm done with that one.
A. Oh, okay. The name does not ring a bell.
Q. Do you know who Cloud Peak Law, LLC is?
A. I believe that they -- they're associated with Cindy's Florida LLC.
Q. Could they be affiliated with Venture Capital Holdings?
A. They -- I believe that they are the registered agent service that handles the -- the Wyoming LLC part.
Q. How did you get --
How did you come to know anybody at Cloud Peak Law to assist with Venture Capital Holdings, LLC?
A. Google.
Q. So you were looking to set up an LLC in -- is it Wyoming? -- in Wyoming?

Page 50

A. I was looking to figure out ways to have privacy for my family. And this is in part due to my -- my fear of Sam and his continued, what seems to be, obsession with trying to mess with me in any way possible. So I wanted to find at least some way to have at least an increased level of privacy.
Q. And how does setting up an LLC in Wyoming assist with privacy?
A. It's a -- it's a private registration.
Q. I'm not following. Well, what --
What is it about setting up an LLC that's -- you're trying to protect privacy for?
A. It's -- it specifically --
Well, I mean, it specifically prevents the general public from just seeing who -- who is behind a particular LLC. And Sam, being a member of the general public, is -- that was the reason it's set up.
Q. Are you aware that anybody can go on the Wyoming corporate records, pull up the Venture Capital filings and then track it back to Sunbiz that you have there in front of you?
A. Yeah. But my name's not on Sunbiz.
Q. I understand. But that's your company, CPR, LLC.
A. Correct. And -- and Sam would not be able to

Page 51

tell if that was my company or anyone else's company.
Q. So you're suggesting Mr. Halabi doesn't know CPR, LLC is your company?
A. He didn't for a time. He eventually did. He eventually found out about it.
Q. So you're saying there's nothing in the public -- on the Internet or anywhere else in the public that has you being affiliated with CPR, LLC?
A. Not under my name directly I don't believe.
Q. When did you form CPR, LLC?
A. I don't recall.
Q. Was it prior to the Dissolution Agreement?
A. Certainly. The dissolution required me to take steps to have my own company in place upon dissolution.
Q. And why does it -- I'm trying to figure out, why does it matter if Mr. Halabi knows of your company or not?
The name CPR, LLC, why would that matter in your mind?
A. Because it gives him a target to harass.
If he knows which company is mine, then he knows which company to harass and direct his employees to harass.
Q. But even if that is all true, couldn't he --
He knows of you, so if he really had an intent

Page 52

to harass, why wouldn't he just harass you rather than your company?
A. This was strictly a safeguard to try to protect the company and protect its well-being.
Q. On your website, you use the logo that we're going to talk about that Fit Industries used, correct?
A. Correct.
Q. Couldn't anybody go on the website, see the logo being used and track that back to CPR, LLC?
A. Not unless they were a client of ours.
Q. Okay. The logo that Fit Industries used --
And when I say the logo, you know what I'm -- you know the logo I'm talking about? We'll see --
Well, if you want to look at Exhibit 1, just to make sure we're talking about the same thing.
A. (Witness complied.)
Q. You can look at Exhibit 1 on Page 4, Photograph 11.
Do you see that?
A. (Witness perused document.)
Q. Do you see the logos there?
A. Yeah, this has the logo. It also has the city name attached to it. But the logo is present here.
Q. Correct. So there's a logo on top of -- there's two logos, one on top and one on bottom.

Page 53

The one on top is the one that CPR, LLC and you use, correct?
A. The one on top is the one that I use, with the addition of the city name added to it.
Q. And the one on the bottom is the one that Mr. Halabi and his company, CPR Certification, LLC, uses, correct?
A. I believe so.
Q. So when I say logo -- well, let me strike that.
What of those is the actual logo?
Is it every -- is it --
Can you explain? You said that it's the logo plus the city name.
What is the logo, in your mind, looking at what's on Page 4 of Exhibit 1 there?
A. Everything that's not the city name.
Q. So is the term, the word "certification," part of the logo?
A. It's part of the logo, yes.
Q. Are the letters "CPR" part of the logo?
A. Yes.
Q. And the heart is part of the logo?
A. Yes.
Q. And that sinusoidal wave is part of the logo?
A. Correct.

Page 54

THE COURT REPORTER: I'm sorry.
Could you say that again?
MR. DIETRICH: "Sinusoidal" -- somebody in this room will correct me -- s-i-n-u-s-o-i-d-a-l.
BY MR. DIETRICH:
Q. So it's really everything but the --
And what's on Exhibit 1, everything is a logo except the words, in this example, "Tampa"?
A. Correct.
Q. And is that the logo that Fit Industries used, the one that's on top there that you currently use?
A. Yes.
Q. And has anything changed in the logo that you're using from the one that Fit Industries used?
A. No.
Q. And the Dissolution Agreement that was entered into was entered on February 8th, 2021, correct?
A. I don't know for certain dates.
Q. Why don't you look at Exhibit 1, Paragraph 8.
A. (Witness complied and perused document.)
Yep, that appears to be the date.
Q. And when did you start -- I say "you" -- either you or CPR, LLC start using the logo that was previously Fit -- Fit's logo?
A. I never stopped.

Page 55

Q. Who actually owns that logo? is it you individually or CPR, LLC?
A. Well, the Dissolution Agreement gives me sole and exclusive property rights to that logo, and I have licensed CPR, LLC to use it.
Q. So you licensed CPR, LLC? Is that what you said?
A. I've given permission.
Q. Okay. Is that --
Is there a written license agreement?
A. It's verbal and implied, as the sole owner.
Q. So verbal between who, you, individually, and you as the sole owner of CPR?
A. Correct.
Q. Does Venture Cap (sic) Holdings have any ownership of the logo?
A. CPR, LLC is -- is the -- the entity that registered the logo with the USPTO.
Q. So Venture Cap -- let me ask this.
Venture Cap Holdings is identified, as -- Exhibit 4 -- a member of CPR, LLC.
Are you a member of CPR, LLC as well, or is Venture Holdings (sic) the sole member?
A. Venture Holding (sic) is a disregarded entity. And so, in -- in effect, Venture Cap Holdings is me.

Page 56

Q. So is Venture -- I understand you say disregarded. I'm just going off what the public filing is there that I showed you.
Is Venture Cap Holdings then the 100 percent member of CPR, LLC?
A. Yes.
Q. And then you, Joos, individually, through your ownership of Venture Cap Holdings, LLC, then has an interest in CPR, LLC through that relationship?
A. I believe so.
Q. One of your claims in the injunctive motion is that Mr. Halabi is misusing your logo; is that accurate?
A. I believe that is one of the claims.
Q. One of them. I mean, just one of them; that's right.
Can you explain how Mr. Halabi is misusing your logo?
A. Well, he uses a logo that is, in essence, indecipherable and identical to the one I already use and own, and he uses it everywhere.
Q. When you say "indecipherable," what do you mean by that?
A. I mean that consumers and potential business partners, as well as competitors, cannot tell the difference between us.

Page 57

Q. When you say "identical," what do you mean?
A. I mean that the -- the likelihood of confusion between the two is extremely high.
Q. When you say "likelihood of confusion," what -- is that a term that you know of?
A. Is it a term I should be aware of?
Q. Well, I'm asking you. You used it. I'm trying to figure out where that term came from.
A. Well, my brain, my mind.
Q. Do you know in the Dissolution Agreement what's required of Mr. Halabi regarding the logo that he was going to use post dissolution?
A. I believe so.
Q. And what was required of him --
A. Well --
Q. -- just regarding the logo?
A. Well, the requirement is that he acknowledge my sole and exclusive ownership of it, as my property of it, and then, taking that into consideration, create a completely different logo.
Q. As you sit here, do you know what the terminology in the Dissolution Agreement required of Mr. Halabi's logo?
A. It says he must use a different logo.
Q. And that's, in fact, all it says, is different,

Page 58

correct?
A. Well, just prior to that line, it -- it establishes the current logo as my sole exclusive property.
Q. And then Mr. Halabi's had to be different than that logo, which is the Fit logo, correct?
A. Correct. But to change it only slightly would be to infringe upon my ownership exclusively and render the first line basically useless.
Q. And why is that?
A. Because it -- I no longer own it exclusively. It's not my sole property if someone else has created a nearly identical logo.
Q. We just established that the Dissolution Agreement says "different," correct?
MR. SOUTHRON: Objection. Form.
THE WITNESS: It doesn't specify on that line that -- how different it needs to be other than that the previous line says that it must be -- you're acknowledging that I have sole, exclusive ownership of it.
I didn't give him a license to use my logo. That -- it says that I own it exclusively, and you should act as such.
BY MR. DIETRICH:

Page 59

Q. And it says that his has to be different?
A. Yes, it says his must be different.
Q. So you used the word "indecipherable"; that's nowhere located in the Dissolution Agreement, is it, that term?
A. The word "indecipherable" is not in the Dissolution Agreement.
Q. You used the term "identical"; that term is nowhere located in the Dissolution Agreement, is it?
A. No. But it does say that he cannot base his new logo on the existing one and that the two -- the two web pages and -- need to be different enough so that a consumer wouldn't be confused.
Q. Okay. I'm not talking about the website yet; I'm focused solely on the logo.
A. The logo is an element on the website.
Q. I'm not talking about the website; I'm talking solely on the logo.
A. (Witness nodded head up and down.)
Q. I've seen in other filings that you say the logo is not -- is "indistinguishable."
Do you remember ever using that term, "indistinguishable"?
A. It's possible.
Q. The term "indistinguishable" is not located

Page 60

anywhere in the Dissolution Agreement in connection with the logo, is it?
A. I don't believe so.
Q. If the Dissolution Agreement, as it does, only says that Mr. Halabi's logo has to be different from your logo, in your mind, what does that mean?
A. Different enough that it still acknowledges the first part of that sentence, which is "sole exclusive property."
Q. Have you ever looked up the definition of the term "different"?
A. I can't say that I have.
Q. You don't contest that Mr. Halabi can use the word "certification" in his logo, correct?
A. He is able to use the word "certification" in his logo.
Q. And he's able to use the word "CPR" in his logo, correct?
A. Correct. And it is possible to do both of those things without mirroring my logo.
Q. And he's allowed to use a city name in the logo?
A. Correct.
Q. So if we take out those three pieces -- and let me --

Page 61

Are those in color?
Are Exhibits 1, 2, or 3 in color? I want to get you a color copy.
A. (Witness perused documents.) Some of this is in color.
Q. That one's in color?
What exhibit is on the first page there?
A. 2.
Q. 2? Okay.
MR. DIETRICH: 2 is the initial motion, right?
MS. AHAMMER: Yes.
MR. DIETRICH: Okay.
BY MR. DIETRICH:
Q. While you look at the two logos there, the color copy, and if you take out the word "Certification," you take out the word "CPR," and you take out the city name "Chicago," what is left in that logo?
A. A heart icon.
Q. And the sinusoidal wave within the heart, correct?
A. That's correct.
Q. If you look at the sinusoidal wave --
And we understand those are the replication of, what, a heartbeat within the heart?

Page 62

A. Uh-huh.
Q. Are those sinusoidal waves in the two logos different?
A. They appear to be different.
Q. Do you know what color font your logo is?
A. Not off the top of my head.
Q. Do you know what color font Mr. Halabi's logo is?
A. Not off the top of my head. They appear to be identical. They might be a different hex number, but visually they are the same.
Q. But if they're a different hex number, then they would be different shades of red, correct?
A. Not in real-world use.
Q. That's not what I'm asking; I'm asking if it's a different hex code, then they're different shades of red?
A. I'm not sure.
Q. Well, if -- why would two different hex codes be the same shade?
A. The way they render it on the screen, the way they render it on a printer; there's a limited color amount that can be produced by those devices.
They could, essentially, be the same color.
Q. Have you ever done an Internet search of other

Page 63

hearts similar to this in the CPR or medical field?
A. Can you rephrase your question?
Q. Yeah. Have you ever done a search for hearts as they're used in connection with this logo?
If you plug in Google, for instance, the term CPR --
Have you ever done that?
A. I have.
Q. And have other hearts for other companies come up in your search?
A. It's not uncommon for CPR companies to use a heart.
Q. And would you agree that those hearts that come up in that search are some shade of red?
A. Some of them are.
Q. Do you remember answering interrogatories that we served on you in connection with this injunction motion?
A. I believe so.
Q. And do you recall a question asked of you as regarding the logos and your position as far as them being the same or indistinguishable or not in compliance with the Dissolution Agreement?
A. So can you repeat what you just said?
Q. Yeah, I will. I'm sorry.

Page 64

Do you recall, in answering the interrogatories, a response that the logos are the same color?
A. I seem to recall that.
Q. And as you sit here today, you don't know if that's actually a true statement because you don't know what the hex codes are for the two logos, correct?
A. To the layman and to, yeah, any consumer or competitor or potential business partner, they are -- they are the same color.
Q. And I understand you want to say that for the record.
What I'm asking you is: If they're different hex codes, they are not the same color, correct?
A. I don't know.
Q. Do you know what size the two logos are?
A. Not off the top of my head.
Q. Do you recall, in that interrogatory response, you said they're the same size?
A. Yes. You can -- you can see that they both take up the same amount of space.
Q. But have you done any measurements to determine the size of the logos?
A. I have not taken a ruler to them.
Q. You're just doing a visual inspection, based on

Page 65

a filing that you made, to determine that they're the same size?
A. Visually, they're the same size.
Q. And -- let me see -- visually, in that exhibit that you're looking at, do the letters visually look to be the same?
I guess, is it the same font?
A. They appear very similar.
Q. Do they appear to be the same font?
A. The certification piece appears to be the same font. The C and the P also appear to be the same font. The R might be different.
Q. And the term "Chicago" is different, too, isn't it?
A. The Chicago part is not part of my logo.
Q. But I'm looking at -- if that's not part of your logo, why is that included in your filing here?
A. It's a reference point showing the two websites and what's happening on the two websites.
Q. Okay. Bring that aside, would you agree that the term "the Chicago" in each of those are not the same font?
A. They appear to be in the same font family, but not the exact same font on the word "Chicago."
Q. Well, what does that mean, "font family"?

Page 66

A. Fonts have families, different type faces.
Q. What font is yours?
A. I believe it's some variation of Arial, which are most of these.
Q. And do you know if, in fact, that is the font that Mr. Halabi uses?
A. I don't.
Q. And you agree, obviously, that the term certification is in a different location on both logos, correct?
A. He has moved the word certification to below the word CPR.
Q. So with your logo, should we be --
And as far as your claim for injunctive relief, should we only -- should we block out the term "CPR" and "Chicago" and only be looking at the heart and the sinusoidal wave?
MR. SOUTHRON: Objection. Form.
THE WITNESS: No. They should be looking at my logo that I was awarded and making sure that whatever logo is being used is different enough to respect my sole exclusive property of it.
BY MR. DIETRICH:
Q. And is your logo then everything except the city name?

Page 67

So if I block out Chicago, the rest of what's there is the logo that we should be focusing on to determine if the Dissolution Agreement is being complied with?
A. That would be my logo, yes.
Q. Okay. But we've already --
And so how do you reconcile the fact that certification and CPR are permitted to be used by Mr. Halabi?
How does that come into your analysis of whether or not the logos are in compliance with the Dissolution Agreement?
A. It's entirely possible to use both of those words and not have it be this visually similar.
Q. But all that's required under the dissolution is that they be different, correct?
A. What's required is that my sole exclusive property be acknowledged.
Q. Okay. Mr. Halabi's sinusoidal wave does not connect to the "R," does it?
A. Does not appear to connect to the "R."
MR. SOUTHRON: Hey, Dan --
BY MR. DIETRICH:
Q. Do you know what --
MR. SOUTHRON: Dan --

Page 68

MR. DIETRICH: Yeah.
MR. SOUTHRON: -- can we get another bathroom break?
THE COURT REPORTER: I'm sorry. What?
MR. DIETRICH: Yep. One --
MR. SOUTHRON: Another bathroom break.
MR. DIETRICH: One minute. I'm almost done with this line.
BY MR. DIETRICH:
Q. In your interrogatory response, you mention that the logos have the same proportions.
Can you explain to me what you mean by "proportions"?
A. Sure. The -- the size of the heart is essentially the same, the CPR is essentially the same, the certification has been made smaller, similar to -- into how I have it. It's essentially a complete knockoff of the original Fit logo.
Q. You say "essentially the same," but they're not the same, correct?
A. I -- I don't believe that you can change a pixel in an image and then argue that they're not the same.
Q. Why not?
A. I don't think that would stand up in court.

Page 69

Q. Did you have an attorney represent you in connection with the Dissolution Agreement?
A. I did.
Q. Over at Shumaker, correct?
A. Correct.
Q. Do you remember his name?
A. There were several that worked on the case.
Q. Tom Wood, does that ring a bell?
A. He's one of them.
Q. And you worked with your attorneys. Again, I don't want to hear any discussions you had, just you did -- your attorneys negotiated with Mr. Halabi's attorneys on the terminology in that Dissolution Agreement, correct?
MR. SOUTHRON: Objection. Form.
Don't discuss anything you discussed with your attorneys.
MR. DIETRICH: Yeah. No, it's --
BY MR. DIETRICH:
Q. I'm not asking what you discussed; just a "yes" or "no."
A. And what was the question again?
Q. Your attorneys over at Shumaker negotiated the Dissolution Agreement with Mr. Halabi's attorneys here at Gunster, correct?

Page 70

A. Yes. Over a lengthy time period and back and forth a bunch, with many unreasonable demands from Sam.
Q. And you ultimately agreed on the form of the Dissolution Agreement that you both signed, correct?
A. Yes, we ultimately signed on it. I believed that sole exclusive ownership was clear, as did -- I believe John Schifino was -- was pretty confident that it was clear and that -- (Witness indicates.)
Q. And why do you say that?
A. He had said that, you know, it was a stated goal of our mediation and our Dissolution Agreement that the two companies have complete separation from each other.
Q. Do you think there's anything in the Dissolution Agreement that's not clear?
A. Not off the top of my head.
MR. DIETRICH: Okay. We can take a break.
MR. SOUTHRON: What time do you want to do lunch?
MR. DIETRICH: When it gets here.
MR. SOUTHRON: Okay. Did you order it?
MR. DIETRICH: It has been ordered.
MR. SOUTHRON: Okay.
(Discussion held off the record.)
MR. DIETRICH: Is that it; is it here?

Page 71

Okay. We can take a lunch break now then.
(Lunch break was had from 11:49 a.m. to 12:49 p.m.)
MR. DIETRICH: Back on the record?
THE COURT REPORTER: Yes, sir.
BY MR. DIETRICH:
Q. Mr. Joos, just a couple of things I want to clean up from the prior questioning. You mentioned in connection with the disparaging comments that there was an instructor in Fayetteville.
Do you recall that testimony?
A. Yes.
Q. And was that instructor's name Brittany Willard?
Do you remember?
A. It could have been.
Q. Are you -- do you know the name of the company Divine Hearts CPR, LLC?
A. Not off the top of my head. I usually --
Are you -- well, not off the top of my head.
MR. DIETRICH: And let me enter Exhibit 5.
(Deposition Exhibit 5 was marked.)
BY MR. DIETRICH:
Q. If you can give a copy to Mr. Southron.
And what's been marked as Exhibit 5 --

Page 72

MR. DIETRICH: It's not on there.
BY MR. DIETRICH:
Q. -- is an e-mail correspondence --
MR. SOUTHRON: Can I have a copy?
MR. DIETRICH: Yeah, here.
BY MR. DIETRICH:
Q. -- that was produced, I believe, in the trademark case, Bates-labeled SUPP 4, SUPP 6, and SUPP 7; "SUPP" being S-U-P-P.
And if you take a look at this, Mr. Joos, I just want to see if this is the correspondence you were referring to as far as disparaging comments.
A. (Witness perused document.)
MR. SOUTHRON: I'm objecting to the exhibit as hearsay and not authenticated.
MR. DIETRICH: We're in a deposition, but okay.
THE WITNESS: This appears incomplete.
THE COURT REPORTER: Did you say "incomplete"? I'm sorry. It's hard to hear you.
THE WITNESS: Yeah. I was going to say this appears incomplete to me.
(Pause in the proceedings.)
BY MR. DIETRICH:
Q. Just let me know when you're done reviewing it.
A. (Witness perused document.)

Page 73

I'm done reviewing it.
Q. Have you seen this correspondence before?
A. I have.
Q. And where have you seen this correspondence?
A. At work. I mean, I don't know.
Q. Is this correspondence between -- well, strike that.
Are you corresponding in what's been marked as Exhibit 5?
A. No.
Q. There are some gray boxes and some green boxes.
Do you see the different colored boxes?
A. I do.
Q. Do you know whose -- whose writing in the gray boxes?
A. The gray boxes, I believe, are Brittany.
Q. Ms. Willard?
A. Willard, yeah.
Q. And whose in the green boxes?
A. One of my customer's support staff.
Q. Do you know who it would be?
A. I do not.
Q. And I think you mentioned, maybe under your breath, that it was incomplete.
Is there more to this that --

Page 74

A. I don't -- it's just to me, it looked like not the whole thing, but --
Q. It may not be. This is all I have, though.
So my question is: Is this, what's been marked as Exhibit 5, what you're relying on to support the disparagement claim in connection with the instructor in North Carolina?
A. (Witness perused document.) In part.
Q. And what -- what part of this?
Just what page? And if you can just read to me what you're referring to that is the disparaging part of this exhibit.
A. Well, she mentions -- she said that she "spoke to them yesterday," and "I know who y'all are now," and "everything makes sense why y'all have been operating how you have been. I get it and the students that paid you all that you canceled on will be reporting y'all and that is wrong!"
So after a conversation with Mr. Halabi, she is under the impression that we post classes to make a profit under the AHA with no intention of holding the actual classes and that we were not conducting any classes in -- in Raleigh and that we have no instructors in Raleigh.
Q. And where in this does it say that she spoke

Page 75

with Sami?
A. Well, as it begins, says -- she said, "Let Sami know I will be sending him the invoice," and then we mentioned that, "We don't have a Sami that works here." And then she said she "spoke to them yesterday."
Q. Okay. The word "them" is plural, correct?
A. Many people use a plural, meaning a company. They're still going to speak to one person.
Q. So you're basing your whole disparagement claim on the sentence, "No, you're right! I spoke to them yesterday" to point back to --
MR. SOUTHRON: Objection.
BY MR. DIETRICH:
Q. -- to Sami?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I'm not -- I don't know.
BY MR. DIETRICH:
Q. What do you mean, you don't know?
A. I'm not aware of the -- the -- the entirety of what we're basing it on.
Q. Okay. But you -- I only get to depose you on this right now, and the injunction hearing is in eight days.
So are you suggesting that you don't have all the facts necessary to go forward on your disparagement

Page 76

claim?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I am not suggesting that.
BY MR. DIETRICH:
Q. In fact, is it --
In that same text message where it says, "You're right," she says right up front, "I know who y'all are now," responding to your customer service representative. So she knows she's talking to you and not Sami, correct?
MR. SOUTHRON: Objection. Form.
THE WITNESS: Her first line, she said, "I spoke to them yesterday," meaning -- meaning Sam.
BY MR. DIETRICH:
Q. But you don't know if that's what she's referring to by "them," correct?
A. "Them" --
MR. SOUTHRON: Objection. Form.
THE WITNESS: "Them," meaning Sam or his company. And she had mentioned that she -- "Let Sami know I will be sending him the invoice directly" -- earlier, implying that she has a personal relationship with him and would be reaching out to him.
BY MR. DIETRICH:

Page 77

Q. Okay. Well, you bring up two points.
I have to ask you: What suggests that she has a personal relationship by saying his name?
MR. SOUTHRON: Objection. Form.
THE WITNESS: She's aware of who the company owner is, and so -- and as such is asking about him directly.
BY MR. DIETRICH:
Q. And where does it say that she asked the -- she asks your customer service person to reach out to Sam; it doesn't say she's going to be reaching out, correct?
MR. SOUTHRON: Objection. Form.
THE WITNESS: She says that she was --
She had asked -- asking us to let Sami know something because she was confused that we were the same company initially. And then she reached out to Sami and was told by Sami that we were different companies, amongst other things, that brought her to the conclusion that we were a scam that doesn't actually hold classes in Raleigh.
And for some reason now, she is mentioning both myself and my wife, which is -- she wouldn't have that knowledge from anyone other than Sam.
BY MR. DIETRICH:
Q. And you're getting all that from this one

Page 78

little blurb in Exhibit 5?
MR. SOUTHRON: Objection. Form.
THE WITNESS: You have a conversation with some company and then immediately call a different company a "scam" and mention the owner and his wife is now being investigated for fraud.
BY MR. DIETRICH:
Q. Where is the word "scam" used?
A. On the third page, "So if I were y'all I would tread lightly. Y'all didn't know you were walking into when you came to North Carolina. I am contacted (sic) to people who will make you all pay for the SCAMS you have been running!!!"
Q. And did you actually receive any money from any students as she references on Page 2?
A. We had operated classes in -- in Raleigh at the time.
Q. You did?
A. Yeah, we were running classes in Raleigh.
Q. And do you know if the students that she's referring to here in the middle of Page 2 --
A. Well, as I --
Q. -- are refer --
A. -- as I said --
Q. Let me finish my question.

Page 79

A. Sure.
Q. Let me finish.
Do you know if she's referring to students that paid you, CPR, LLC, that were canceled on?
A. That's what she's referring to, yes.
Q. Okay.
A. She's saying that people were canceled and we -- we weren't -- we never actually intended to hold those classes because we had no instructor in Raleigh.
Q. Okay.
A. And that -- so that was all post a conversation with Sam. She was now under the impression that we do not actually do business in Raleigh and never did, and that there is an owner and a wife to discuss and that we are running scams.
Q. Did in fact the students that she's referring to here -- referring to here in Exhibit 5 pay you for classes that were canceled?
A. I --
Q. Do you --
A. I don't know because we -- that's why I say this is incomplete; because there's more of a conversation below this where we specifically ask her for the names of the students so we can address their concerns and give anyone a rewu- -- refund who needs it,

Page 80

and she refused to give it.
Q. Have you ever canceled any classes in Raleigh?
A. Sure. We cancel classes all the time for various reasons. It happens, but --
Q. So is it possible that the students did, in fact, pay you and the class was canceled?
MR. SOUTHRON: Objection. Form.
THE WITNESS: If we canceled a class, we contact all students and offer them to reschedule or a refund, in all cases and all people.
BY MR. DIETRICH:
Q. Would you have business records to go back to, whatever the time period is on this e-mail, to evidence what's -- what classes were held and canceled and if, in fact, any students paid, as she references here, that went to a canceled class?
Would you have business records for that?
A. I would have transaction logs of people who paid, and I wouldn't have logs of who requested a refund or not because those are done verbally on the phone, typically.
But, again, our policy is if we move a class, we always offer a refund or rescheduling. And we do not -- we don't argue with the students about it.
Q. Do you know who Mike Wilson is?

Page 81

A. Mike Wilson is the name of the -- one of the Filipino staff. And it's -- I'm not sure which one it is. It -- it's whoever -- I believe it to be whoever is handling specific operations/duties that day.
Q. For CPR, LLC?
A. Correct.
Q. So I just wanted -- when I was asking you earlier -- I'm done with that, by the way.
I was asking you to look at the Complaint and some of the filings to see if there was disparagement or issues relating to the death threats.
Do you remember me asking you about those documents?
A. I'm sorry. Can you repeat that?
Q. Yeah. At --
Earlier in the deposition, exhibits -- some of the initial exhibits, I asked you to look at the Complaint and the two motions for injunctive relief --
A. Yes.
Q. -- and asked you to look and point to where disparagement or death threats are mentioned.
Do you remember that?
A. Yes.
Q. And Mr. Southron objected that you didn't have the complete filing. So based on that, I'm going to

Page 82

give you the complete filing.
MR. DIETRICH: So Exhibit 6 is the initial Complaint with the attached exhibits.
(Deposition Exhibit 6 was marked.)
MR. DIETRICH: Exhibit 7 is the initial motion for temporary injunction with exhibits.
(Deposition Exhibit 7 was marked.)
MR. DIETRICH: And Exhibit 8 is the emergency motion for injunctive relief with exhibits.
(Deposition Exhibit 8 was marked.)
BY MR. DIETRICH:
Q. So I'm only doing this, Mr. Joos, because I was objected to, so I want to give you the complete filing. You can look at it as much as you want, as much as you need, and it's going to be the same question.
If you could look at those three filings, which are the same as the initial deposition exhibits, but these have the exhibits attached to it as well, and I want to know if there's anything in those complete filings now that address the disparagement issue, the death threats, or this alleged fear of Mr. Halabi that you have.
And if you want to take a five-minute break, we can go off the record and you can look at them and we can come back, whatever you'd like.

Page 83

THE WITNESS: Do you have an opinion on that, Joe?
THE COURT REPORTER: I'm sorry. What?
THE WITNESS: I'm just asking if Joe has an opinion on that.
Do we need a break to read me through this?
MR. SOUTHRON: Can you --
Can you restate the question, what you want him to do?
THE COURT REPORTER: I can't hear him when he looks that way.
MR. DIETRICH: Can you read back what my question was?
THE COURT REPORTER: Just a moment.
MR. DIETRICH: I can just restate it.
Is it easier?
THE COURT REPORTER: No, just a second.
"Question: I'm only doing this, Mr. Joos, because I -- I was objected to, so I want to give you the complete filing. You can look at it as much as you want, as much as you need, and it's going to be the same question."
"If you could look at those three filings, which are the same as the initial deposition exhibits, but these have the exhibits attached to it

Page 84

as well, and I want to know if there's anything in these complete filings now that address the disparagement issue, the death threats, or this alleged fear of Mr. Halabi that you have."
"And if you want to take a five-minute break, we can go off the record and you can look at them; we can come back, whatever you'd like."
MR. SOUTHRON: Okay.
THE WITNESS: These are three separate things.
THE COURT REPORTER: I'm sorry.
Can you please talk so I can hear you?
THE WITNESS: Sorry.
I said these are three separate things.
MR. SOUTHRON: These are not the complete filings. You haven't given him his amended motion. You continue to ask him questions, the answers of which are in the one document you won't give him.
MR. DIETRICH: And --
MR. SOUTHRON: Is this a memory quiz?
MR. DIETRICH: Okay. You can --
MR. SOUTHRON: You give him the document --
MR. DIETRICH: Mr. Southron --
MR. SOUTHRON: -- you want him to see.
MR. DIETRICH: -- I'm not asking for a speaking objection. You can make your objection.

Page 85

BY MR. DIETRICH:
Q. My question is: In the three filings that you made that you have in front of you, I want to know the answer to my question.
MR. SOUTHRON: Objection. Asked and answered.
MR. DIETRICH: It has not been asked and answered --
MR. SOUTHRON: You spent an hour --
MR. DIETRICH: -- because you objected that he didn't have the exhibits.
MR. SOUTHRON: -- on it this morning.
MR. DIETRICH: You objected that he didn't have the exhibits to those.
MR. SOUTHRON: He still answered.
MR. DIETRICH: He did not answer; you objected.
If his answer is the same, he can simply say, My answer is the same.
THE WITNESS: (Perused document.)
BY MR. DIETRICH:
Q. Mr. Joos, is your answer the same?
A. Well, there's a lot of pages here now, so --
Q. If you need to take a break, we can take a break. You can -- I can -- you can go in the other room and read as much as you want. It's an important question, though.

Page 86

A. (Witness perused document.)
MR. SOUTHRON: We'll take a moment to read it.
MR. DIETRICH: Okay. We can take as long as you need, five, ten minutes, as long as you need.
We'll come back.
(Recess taken from 1:10 p.m. to 1:16 p.m.)
BY MR. DIETRICH:
Q. Mr. Joos, do you remember the question?
A. I believe so. Yeah, I -- I can't remember, and this -- this doesn't refresh my memory. I'd like to see my amended motion.
Q. Okay. What I --
We all understand what's in the amended motion, Mr. Joos. That's -- and we'll get to that. That's not what I'm asking.
What my question is, is your amended motion was filed in July. The initial Complaint, the earliest filing that you have in front of you, was back in July -- I'm sorry -- the amended motion was filed in November. The initial Complaint was filed in July. I've looked at the initial Complaint, the initial TRO, and your emergency TRO, and I personally do not see any representations about disparagement, death threats, or fear. That was my initial question.
And I want to know: If you in fact did feel

Page 87

there were disparaging comments and you feared for your life, why isn't any of that mentioned in any of those prior filings?
MR. SOUTHRON: Objection. Privileged.
Don't answer.
THE WITNESS: (Indicates.)
MR. SOUTHRON: Don't answer.
BY MR. DIETRICH:
Q. Mr. Joos, is the reason that you didn't include it based entirely on discussions you had with your attorney?
MR. SOUTHRON: You can answer that, just say "yes" or "no."
THE WITNESS: Yes.
BY MR. DIETRICH:
Q. You'd agree with me, though, that the information that you have to support disparagement, death threats, and your fear of Mr. Halabi was known to you prior to filing the initial Complaint in July of 2023, correct?
MR. SOUTHRON: Objection. Form.
You can answer.
THE WITNESS: Not all of the information was known to me then.
BY MR. DIETRICH:

Page 88

Q. You had some of the information, correct?
A. I had some of the information.
Q. What information did you not have?
A. I believe that this conversation took place between those two time periods, the one you referenced in Exhibit S (sic). Also, Richard Bussey's testimony was not, to my knowledge, before when the initial motions were filed.
Q. Anything other than those?
A. Not that I can recall at the moment.
Q. Do you remember when those convers- -- that conversation took place, what's in Exhibit 5, approximately?
A. Not off the top of my head.
Q. And other than the comments made by Mr. Bussey at his deposition, why didn't you include any of the other alleged statements or actions of Mr. Halabi that took place, as you've testified earlier, earlier in 2023, and even going back to 2022 and '21?
Why didn't you include any of that in your initial filings?
MR. SOUTHRON: Objection. Privileged.
Don't answer.
BY MR. DIETRICH:
Q. And, again, is the reason for not including

Page 89

that based entirely on discussions you had with Mr. Southron --
MR. SOUTHRON: You can answer --
BY MR. DIETRICH:
Q. -- or his law firm?
MR. SOUTHRON: -- "yes" or "no."
THE WITNESS: Yes.
MR. DIETRICH: Are we on Exhibit 8?
Do you have 8?
THE COURT REPORTER: Just a moment, please.
MR. DIETRICH: I thought so, but I --
THE COURT REPORTER: Exhibit 8 is the emergency motion.
MR. DIETRICH: Oh, okay. Then I got thrown off.
Okay. So we're on 9.
(Deposition Exhibit 9 was marked.)
MR. DIETRICH: Here's Exhibit 9, with a copy for Mr. Southron. And what's been marked as Exhibit 9 is a trademark application filed on December 23rd, 2021.
Oh, yeah, 19 is 9.
BY MR. DIETRICH:
Q. And let me ask you first, before we even get to that, Mr. Joos.
Is it your position that the placement of the

Page 90

word "certification" in Mr. Halabi's logo is in violation of the Dissolution Agreement?
A. Yeah, I'm trying to understand.
Are you trying to ask me to come up with a legal conclusion?
Q. I'm not asking you any legal conclusions; I'm asking you a factual basis of your claim.
A. Okay.
Q. Are you --
Is it your position that Mr. Halabi's placement of the word "certification" in his logo somehow violates the Dissolution Agreement?
A. It's -- it's all of the elements combined, including the placement of certification.
Q. And is --
What we marked as Exhibit 9, is that a CPR, LLC's trademark application?
MR. SOUTHRON: This says, "Exhibit N."
MR. DIETRICH: It's Exhibit 9.
MR. SOUTHRON: "N," as in 9?
Is that what the "N" means?
MR. DIETRICH: No. 9, as in the Number 9.
MR. SOUTHRON: Okay. I'm just saying that this sticker says "N," as in Nancy.
MR. DIETRICH: I understand.

Page 91

BY MR. DIETRICH:
Q. Will you show him your exhibit page, please, Mr. Joos?
A. (Witness complied.)
MR. SOUTHRON: Okay. Understood.
BY MR. DIETRICH:
Q. Do you remember my question?
MR. SOUTHRON: I -- I don't. Could you --
Could the court --
Madam Court Reporter, could you --
MR. DIETRICH: I'll repeat it.
BY MR. DIETRICH:
Q. Is this your trademark application, Mr. Joos, for CPR, LLC?
A. (Witness perused document.) It appears to me.
Q. And if you look on the second page -- hold on. Not the second page. Hold on. Let me go -- actually, the first page.
Do you see at the top there, "Mark Statement"?
A. (Witness nodded head up and down.)
Q. You're not making any claim, according to this, regarding any particular font, style, size, or color.
Do you see that?
A. (Witness perused document.) That's because this is a word mark application.

Page 92

Q. Okay. And what does that mean?
A. This is an application for word mark as opposed to a graphical mark.
Q. And what are the -- what --
What word mark?
What are the words that you were seeking in this application?
A. All of this conversation was had with my attorney at the time, so --
Q. I'm not asking that; I'm asking what were the words that you were trying to get trademarked?
A. Based on this document, it appears to be the CPR Certification.
Q. Okay. That's the -- you're looking at the literal element?
A. Right. Because this is a word -- this is a word mark application, so you would be applying for words.
Q. Got it. And you --
Did you obtain that word mark, or was that dismissed?
A. I don't recall.
Q. Are you still pursuing a word mark?
A. I don't recall.
Q. You don't know what you're trying to get

Page 93

trademarked? Just want to make sure I understand.
A. Any further plans I have with Mr. Holder, I believe, subject to attorney-client privilege.
Q. Okay. Will you look back at Exhibit --
Could I see yours? I don't know which one it is.
Can I see the two big ones? That one and the one underneath it?
A. (Witness provided the document.)
Q. Let me see that one.
A. (Witness provided the document.)
Q. Okay. Not that.
Okay. So if you'll look at -- it appears to be Exhibit A to your affidavit that's attached to your emergency motion for temporary injunction that we marked as Exhibit 8.
THE COURT REPORTER: We're on 9.
MR. DIETRICH: But we previously marked that one.
THE COURT REPORTER: Oh.
BY MR. DIETRICH:
Q. And if --
Is that your trademark application dated September 8th, 2021?
A. It appears to be.

Page 94

Q. And if you look at the description on the first page there, you see where the box, "Description of the Mark"?
A. Uh-huh.
Q. Will you read that for us?
A. "The mark consists of the stylized word 'CERTIFICATION.' Below are the stylized letters 'CPR' followed by a solid heart with a sinusoidal wave begins in the middle of the 'R' and flows through the solid heart. The white in the mark is merely background not claimed as part of the mark."
Q. So according to this, if -- the word certification would be above the letter CPR?
Am I reading that correctly?
A. Yes.
Q. And Mr. Halabi's --
In Mr. Halabi's logo, the term certification is, in fact, below the term CPR.
Would you agree with that?
A. He has put the word certification below the word CPR.
Q. And you're not seeking any trademark for the location of the word certification below the term -- or the letters CPR, correct?
MR. SOUTHRON: Objection.

Page 95

Can we just let the record show this is a dead trademark application?
It's not being pursued anymore.
THE WITNESS: This one is.
MR. SOUTHRON: Well, is there a second --
THE WITNESS: Yes.
MR. SOUTHRON: Is this the two attachments?
THE WITNESS: It's a different -- I handed you this.
MR. SOUTHRON: Hang on, hold on, hold on.
THE WITNESS: It's not in there. It's in this Exhibit 8 thing.
MR. SOUTHRON: Okay. Go ahead. Continue.
Go ahead.
BY MR. DIETRICH:
Q. Do you remember my question?
A. Can you repeat it?
MR. DIETRICH: I'm sorry. I'm going to ask you to repeat it because I don't remember exactly what it was.
THE COURT REPORTER: Just one moment.
"Question: And you're not seeking any trademark for the location of the word certification below the term -- or the letters CPR, correct?"
THE WITNESS: As far as I understand it, this

Page 96

is just merely a description of the mark. And what I'm seeking is to register a trademark for my logo likeness as it is.
BY MR. DIETRICH:
Q. With the term certification above CPR?
A. That is how the logo appears.
Q. In the relief you're requesting for the hearing on December 20th, what is it you're asking the judge to order in connection with Mr. Halabi's logo?
A. As of this moment, as far as I understand, it would be for the logo to be different enough to respect my sole exclusive ownership of the logo as seen on the websites operated by Fit Industries, which is identical to the logo that I filed for in this trademark application. (Witness indicates.)
Q. And --
A. And that adheres to Paragraph 8 of the agreement, which requires the websites to be presented in such a way as to not cause confusion between the two brands between the companies.
Q. That relates to the website, right, not the logo?
A. The logo is an integral part of the website and the branding.
Q. When you say branding, what do you mean by

Page 97

branding?
A. Paragraphs 7 and 8 are really together, even if they are separate paragraphs. They were negotiated as one big piece. They were just broken up into separate paragraphs for ease of reading. They are -- they're not really addressing different things. They're talking overall about the brand of this -- of -- of -- of the company and that essentially, that I would be keeping the brand and Mr. Halabi would have to establish a new brand that is not likely to cause confusion.
Q. And who told you that they were separated for ease of reading?
MR. SOUTHRON: Objection. Form.
Don't disclose anything you talked about with your prior lawyers.
THE WITNESS: Yeah.
BY MR. DIETRICH:
Q. Well, I think you opened that door, though. If you're going to testify -- is that your position? -- I'd like to know the basis.
MR. SOUTHRON: The question is leading.
You're saying, Who told you that?
How do you know anyone told him that?
BY MR. DIETRICH:
Q. How do you know that it was --

Page 98

MR. SOUTHRON: Who else would tell him, if not his lawyers?
BY MR. DIETRICH:
Q. How do you know it was done for ease of reading, Mr. Joos?
A. I don't recall at the moment.
Q. What's captured under the term breeding (sic) with respect to the logo, or are you using those interchangeably, logo and -- I said "breeding"; branding.
Are you using branding and the logo interchangeably?
A. When you discuss a company's brand, you are typically, at the very least, referring to their logo.
Q. Is there more to it with respect to this matter?
A. The websites as well, which is why they're mentioned in Paragraph 8. But the logo is a part of the website, so it is encapsulated in Paragraph 8 as well.
Q. So the website as well is part of your -- part of the branding; is that correct?
A. I believe so.
Q. Is it your position that Mr. Halabi has to change his logo in order to now comply with the Dissolution Agreement?

Page 99

A. Well, as his current logo does not acknowledge my sole exclusive ownership of it, then yes, he would need to change his logo.
Q. Is Mr. Halabi using the logo in other places other than the website that you're seeking an injunction on?
A. Yes.
Q. And where else is the logo being used?
A. Various social media accounts. I can't know for certain where he uses all -- it all. But any place that he's currently using it would need to be changed.
Q. And have you seen the social media accounts where it's being used?
A. I believe so.
Q. Do you know what they are?
Is it, like, Facebook, or is it something else?
A. Facebook, Google My Business profiles, Pinterest. There's probably 100 of them that --
Q. Let me ask you about the websites because you keep mentioning that.
What is it that --
What is it about the websites that you contend violates the Dissolution Agreement?
A. The logo on them primarily at the moment, among them, is what I'm talking about right now.

Page 100

Q. And that was my --
Is that it?
Is it just the logo being used on Mr. Halabi's CPR Certification, LLC's websites that you contend is the violation?
A. I don't recall if that is the entirety of it.
Q. Well, there are --
Are there other requirements that Mr. Halabi had to do pursuant to the Dissolution Agreement with respect to his websites?
A. Let's find out. (Witness perused document.)
I don't recall.
Q. What, you're looking at the Dissolution Agreement there, I see.
A. I am currently.
Q. And are you looking at Section 8?
A. I'm looking at several sections.
Q. I just want to know what it is that you're going to ask the judge in connection with the December 20th hearing that you want Mr. Halabi to do with respect to his website.
If it's just changing the logo, then, you know, that's what I'm getting at, or is there more to it?
A. I don't know for certain.
Q. Well, what are the requirements there?

Page 101

One of them is the hero image?
A. Change -- changing the logo is part of it, but also to get to the point that a reasonable person viewing the websites will not be confused that the websites are operated by the same company.
Q. Okay. So let me ask you. I mean, it's -- let me give you this because I want to have it as a separate exhibit. You know, that's --
And here's a copy for your attorney.
MR. DIETRICH: So Exhibit 10 is a copy of the Dissolution Agreement.
(Deposition Exhibit 10 was marked.)
BY MR. DIETRICH:
Q. Same thing you're looking at except it's separately identified.
So if we're looking at Section 8, one of it was that Mr. Halabi had to change the hero picture.
Do you see that?
A. I do see that.
Q. Did he, in fact, change the hero picture?
A. There is a different hero image on there.
Q. So that's not at issue now, correct?
A. The hero image is not something I would be asking to modify.
Q. Did he change the icons above the words BLS CPR

Page 102

classes?
A. I believe so.
Q. And did he change the icons above the words CPR, plus sign, first aid training?
A. I believe so.
Q. And did he change the icons above the words, group lessons and private training?
A. I believe so.
Q. So does the confusion that you're referring to in Section 8 have to do with solely the logo?
A. At this time, I believe that is what I'm referring to.
Q. You were granted the rights to the Fit website; is that correct?
A. Well, I -- I created all the websites, so --
Q. Did you continue to use the same website that Fit was using after the Dissolution Agreement?
A. Not the same. Because I -- I followed Section 8 and changed all the text on the website.
Q. Did you use the same hero picture?
A. Yeah. Because I wasn't required to change mine.
Q. And do you continue to use that same hero picture on your websites today?
A. Not on all of them.

Page 103

Q. Why did you change some of them?
A. For various reasons.
Q. Can you tell me some of them?
A. It's mostly testing.
Q. Are you going to be changing all of them to the new --
A. I don't know.
Q. -- website that you're using?
A. I don't know yet. I've been quite distracted with this.
(Deposition Exhibit 11 was marked.)
BY MR. DIETRICH:
Q. What we've marked as Exhibit 11 are some -- just some shots of the websites. And it says "Exhibit" on top. I don't know. This came through one of the productions, I believe. I don't know.
But is the first page of Exhibit 11 an accurate representation of, in this case, your CPR Tampa website?
A. It appears to be.
Q. And do you know on Page 2 if that's an accurate representation of Mr. Halabi's Tampa website?
A. I don't know, for certain.
Q. What's on Page 1, is that the same --
Is that the hero image when we refer to that, or hero picture?

Page 104

Is that what that is, that picture on Page 1?
A. Just for clarification, which picture are you referring to?
Everything's technically a picture, so --
Q. Yeah. And what's a hero picture?
Can you explain what that is?
A. A large, predominant photo on a home page.
Q. Is what's on Page 1 of Exhibit 11, would you consider that a hero picture? all of it or any portion of it?
A. The background image is the hero image; the people, the image of the people conducting training is the hero image.
Q. Got it. And is --
What's on Page 1, is that the same hero image that Fit Industries used?
A. At the time of dissolution, yes.
(Deposition Exhibit 12 was marked.)
BY MR. DIETRICH:
Q. What we've marked as Exhibit 12 are some pages of Mr. Halabi's Orlando website.
Do you have any reason to dispute that that is a printout of some of the pages from his website?
A. (Witness perused document.) I supp- --
I don't have a reason to dispute that at this

Page 105

time.
(Deposition Exhibit 13 was marked.)
BY MR. DIETRICH:
Q. What we've marked as Exhibit 13 is a printout of some pages of --
A. Uh-huh.
Q. -- your Orlando website.
Do you agree that that appears to be some -- a printout of some of the pages from your website?
A. (Witness perused document.) I do.
Q. And is --
What's in Exhibit 13, is that your website that you're testing?
A. Is there an exhibit number on this?
Q. It should be on the first page.
A. (Witness indicates.)
Q. Maybe you gave Mr. Southron your copy with the exhibit page (sic).
A. (Witness perused document.)
This appears to be of my website. It's missing some elements from it.
Q. For clarity, I'm not representing that I printed out every page of your website.
A. Okay.
Q. This is just some of the pages, including the

Page 106

home page, I believe.
A. Yeah, no. And I'm -- what I'm saying is that the home page is missing elements. Some of the images are just blank spaces on your document where there would ordinarily be images. (Witness indicates.)
Q. Okay. I understand.
That's just the way it printed out. I didn't delete anything.
A. I know.
Q. It's just the way it printed.
A. I know. I -- I understand.
Q. Looking --
A. You're asking me that -- if this is an accurate representation, so I'm --
Q. I got it.
A. -- clarifying that it's not.
Q. I -- I understand. Thank you for that clarity.
Is there anything missing from, like, the top half where the hero image is, the gentleman appearing to give CPR to the dummy?
A. Nope.
Q. And back to my question:
What's in Exhibit 13, is that your new website that you're still testing?
A. That is the new design, yes.

Page 107

Q. And comparing Exhibit 12 to 13, is it your position that consumers or the public are confused by these two website pages?
A. (Witness perused document.)
It's hard to answer the question with the missing images from this document.
Q. Let me ask you: What is it about the websites that a reasonable person will be confused about between yours and Mr. Halabi's websites?
A. Without seeing them with a -- with a unique logo on it, it's difficult to answer the question because the logo has a very large influence on -- on the websites.
Q. I don't know that I follow.
The logos are on there, correct?
A. They are, but they're the same, so it's -- that's a major influence on -- on the websites looking the same.
Q. Is there anything else on the websites that you know of that a reasonable person will be confused about, other than the logos?
A. Well, I mean, their layouts are similar. The placements of the calendars are similar. The -- the fonts are similar. But that, in conjunction with the logos being the same, adds up to strong website

Page 108

confusion.
Q. Do you know when Mr. Halabi --
Do you know when Mr. Halabi prepared his website?
A. I don't.
Q. Would it have been soon after the Dissolution Agreement?
A. I don't know when he switched to this design. (Witness indicates.)
Q. When did you switch to your design that's in Exhibit 13?
A. I don't know that date either.
Q. Do you know approximately the date?
A. I don't.
Q. Look back at --
Well, do you know if your website design in Exhibit 13 was started to be used after Mr. Halabi's design in Exhibit 12?
A. I don't know that either.
Q. If you look back at the exhibit -- I think that was 10.
Can you look back in Exhibit 10? Yeah.
Yeah, that one there. Is that 11? You gave your copy to Mr. Southron.
What exhibit is that on the bottom?

Page 109

A. 11.
Q. Would you agree with me that your website, at least what's on Exhibit 11, is -- well, strike that.
Other than the logo, are there any similarities between your website on the first page of Exhibit 11 and Mr. Halabi's on Page 2?
A. Well, this is -- this is only showing me the hero image at the top of the page of that design.
Q. Okay. Just looking at that, are there any similarities?
A. (Witness perused document.) I mean, the --
The way the -- the headers are arranged at the top with a red stripe at the top is similar. The spacing and how the -- the menu is presented is similar at the top. The locations of the buttons being stacked vertically on the left-hand side is similar with a right-hand side hero image.
And these are -- these are similar elements. But that, and combined with the -- the fact that the logos are the same, makes it impossible for consumers to know the difference between us.
Q. How do you know it's impossible?
A. It happens more often than would be reasonable.
Q. Okay. You're going to have to explain what that means and what evidence you have.

Page 110

A. Well, we have negative reviews that were -- were -- were meant for Mr. Halabi that have been left on my profiles. And we have consumers who issue complaints to us, and they're not about us; they're about Mr. Halabi, so --
There's people who call in all the time who think they bought a class from us or there's -- or when they didn't, or they show up to our classes thinking that we're the same company and are not -- not thrilled that they're in -- they're in the wrong place and they didn't pay the right company. And they don't understand how it could be the same and how could we possibly be different companies.
These are the kinds of conversations that we have.
Q. Do you have those conversations?
A. We have some of them. I believe they've been produced.
Q. And who do you have those conversations with?
Can you tell me the names?
A. Not off the top of my head.
Q. And who are these reviews by?
A. Customers.
Q. For the hearing on December 20th, are you bringing any of these customers to the hearing?

Page 111

A. I -- I don't think so.
Q. And I haven't seen any of these either reviews or other written materials that you're referencing as being part of the evidence.
Are you bringing any written evidence to support what you're saying here to the hearing on December 20th?
A. I'll have to look through the discovery. But there is -- there are reviews that were left intended for Mr. Halabi that were left on my profiles.
Q. And how do you know they were intended for Mr. Halabi?
A. Because they referenced only things that Mr. Halabi sells that I do not.
And he's the only one in the area that represents his BLS classes as infant CPR classes, which they are not. The -- the lady who left the review was very disgruntled about the fact that she'd signed up for an infant CPR class and took what was a general CPR class, and that is the review that was left on my profile.
Q. And did you lose business because of that review?
A. Probably.
Q. But you don't know?

Page 112

A. Would you do business with a company that has a review that says that they scammed a -- a new -- a new mother?
Q. I'm asking you. You're -- you're --
You're the one seeking to enjoin my client, so I'm asking you if -- the question.
A. Our reputation was harmed by that review.
Q. And what ev- --
A. Like the -- go ahead.
Q. What evidence do you have that your reputation was harmed?
A. Because it's on public display with a one-star review saying that this company sold me an infant CPR class that is not an infant CPR class.
Q. And you're just basing it because there's a review out there; that's your support for your reputation being harmed?
A. Well, it is -- it's a review specifically intended for Mr. Halabi.
Q. Is there anything about -- else about the websites that you contend a reasonable consumer will be confused by?
A. It's not present on my copy of mine. But this first aid certification card that is in use for Mr. Halabi is the same as the one I use. And it's

Page 113

because I designed it, so those are the -- those, I -- those look the same.
Q. And say that again? The what is --
The what looked the same?
A. It's the -- the first aid card, which is not present on any of your printouts of my website, but it is present on my website. (Witness indicates.)
Q. And you're suggesting that consumers are confused because you have similar looking first aid cards?
A. It's not similar looking; it's the same card. It's the -- it's the card that I designed as part of Fit and --
Q. And why was it that Mr. Halabi had to make that change on his website to comply with this agreement and not you?
A. Well, it wasn't specifically addressed in the agreement, but seeing as how it is something that I created prior to the formation of the LLC and was never conveyed to the company and not addressed in the Dissolution Agreement, Sam knows it to be the card that I created, so --
Q. So you're basing it on something that's not in the agreement, though, because it's not specifically addressed there, correct?

Page 114

A. It would be part of making the websites appear different. And if someone is going to change it, it shouldn't be the one who designed it.
Q. That's your interpretation?
A. It's an element on the page that is identical between the two companies, and so that's --
Q. You agree in Section 8 of the Dissolution Agreement that you also had an obligation to change the text on your websites so that a reasonable person would not be confused, correct?
A. I did. And I -- and I changed all the words on my page in order to reword them as best I can but still keep them about AHA, BLS, CPR. I can't --
Q. You contend that Mr. Halabi is interfering with your domain names; is that correct?
A. In several instances, Mr. Halabi has registered confusingly similar domains.
Q. Is there anything in the Dissolution Agreement that restricts him from obtaining any URL domain name that he wants?
A. Domain names are not specifically addressed.
Q. So you similarly can go out and obtain any URL domain that you want as well, correct?
A. Based on the Dissolution Agreement, potentially, provided those websites that I built on top

Page 115

of them would be different enough to not be mistaken as Mr. Halabi's.
Q. You were talking about the website, not the domain?
A. If I got a domain -- if I purchased a domain name that was confusingly similar to Mr. Halabi's domain name and then built a website on it that was very similar to Mr. Halabi's website, I think those two things combined is -- is problematic.
Q. Take a look at the Dissolution Agreement there that you have. And if you look at --
Can you pull up Schedule 3 towards the back? It's the list of cities and websites.
Do you see that?
A. I do.
Q. If I'm looking at, actually, all of it, every one of those websites has CPR Certification and then a city name.com, correct?
A. They're not all .coms.
Q. Okay. Some are --
A. There are a few that are --
Q. One or two are .org?
A. That's correct.
Q. So regardless of .com or .org, the rest of them are CPR Certification, city name.com or .org, correct?

Page 116

A. Correct.
Q. Is it your contention that Mr. Halabi's use of the words "CPR Certification" and then the city name, he's not permitted to do that?
A. In most cases, I own a lot of CPR Certification city name domain names. So what he has done is labeled purchased CPR Certification, city name, and then state abbreviation following it.
So they're similar to the point where they're just two letters difference. And then once you end up on the site, you're presented with two websites using the same business name and the same logo. I don't think a reasonable person can differentiate at that point.
Q. But you don't dispute that he's permitted to use CPR Certification and then some other extension after that?
A. In -- in regards to what?
Q. In regards to the website landing pages.
A. I would say intentionally naming your company the same as another company is -- is confusing and, at the very least, problematic, and at the most, various other issues arise.
Q. I don't follow that, Mr. Joos.
What company name? He's specifically permitted, under Schedule C, to use the term

Page 117

CPR Certification and then a city name. He was, in fact, awarded those websites.
A. He was awarded 11 websites.
Q. And you were awarded 11 websites?
A. Correct.
Q. Are you suggesting he cannot go out and now use another website with CPR Certification in a city where you have also a location?
A. He was permitted to use the words CPR and certification in the creation of a new logo, not to copy the company name that I was already using that corresponds to the logo that I received in the Dissolution Agreement.
We were -- Mr. Halabi, prior to the Dissolution Agreement, had already begun competing against Fit Industries for over a year, unbeknownst to me, under various other brands and had other logos. And the bill of goods that I was sold in the Dissolution Agreement was that he was going to be using one of those logos. And instead, he copied my name and logo.
Q. That wasn't my question, Mr. Joos.
My question is: Mr. Halabi is, in fact, permitted to use CPR Certification followed by some extension, whether it's a city or state, in connection

Page 118

with forming a website, correct?
A. In connection with -- with creating a new logo.
Q. Okay. I'm not talking about logos; I'm talking about solely the domains because you've repre- --
You've alleged that Mr. Halabi is violating the agreement because he is interfering with your domains, correct?
A. Correct.
Q. So what it is that you're relying on that Mr. Halabi cannot form a website using CPR Certification followed by a city or state?
A. Domain names are not specifically addressed in the Dissolution Agreement.
Q. In fact, "CPR Certification" is the name of Mr. Halabi's company, isn't it?
A. That's the name of his LLC that he registered after the fact, knowing full well that that's the same name I was using.
Q. CPR Certification?
A. That's my d/b/a.
Q. And where is that identified?
A. What do you mean?
Q. That's your d/b/a?
A. I have a d/b/a on file for that, as well as the -- prior to the Dissolution Agreement and for the

Page 119

entirety of our business together in Fit Industries, that logo that I received corresponded with the -- the name of CPR Certification.
Q. And where -- well, I haven't seen that identified in any filings.
Is it your position, as you sit here today, you now have a filing that says CPR Certification is your d/b/a for CPR, LLC?
A. I've had that filing for a long time.
Q. Okay. And is that -- is that a d/b/a --
Is that filed in Florida, that d/b/a?
A. It is.
Q. Is it filed anywhere else?
A. Not that I'm aware of at this time.
Q. And are you seeking to enjoin Mr. Halabi from utilizing any certain domains?
MR. SOUTHRON: Objection. Form.
THE WITNESS: (Perused document.)
I don't remember.
Is it possible to go to the bathroom?
BY MR. DIETRICH:
Q. Yep, yep. I just want to finish this line of questioning because I'm trying to understand what exactly it is you're asking the Court to do on December 20th with respect to the domains.

Page 120

Are you asking the Court to restrict Mr. Halabi from using CPR Certification in any website domain name?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I -- I don't know.
BY MR. DIETRICH:
Q. Are there any other domain names that you take issue with that Mr. Halabi uses?
A. I'm not aware of necessarily all of Mr. Halabi's domain names. He has created hundreds of websites at this point.
Q. When did you get that d/b/a?
When did you file for that d/b/a?
A. I don't recall.
Q. Was it before or after the Dissolution Agreement?
A. It would have been after.
Q. Would it have been recently?
A. No.
Q. Would it have been soon after, in 2021?
A. It was a reasonable amount of time. I don't know exactly when.
Q. You mean a reasonable time after the Dissolution Agreement?
A. Correct. Also, the name -- the names that were in use on the websites were always on the websites prior

Page 121

to dissolution. And, again, the name corresponded to the logo. And --
Q. When did --
A. -- yeah.
Q. You purchased a lot of CPR Certification domain names, didn't you?
A. Yeah, as -- that they are associated with my logo, yes, I own several CPR Certification domain names.
Q. And do you know when you purchased those?
A. I don't.
Q. Didn't you purchase a lot of them prior to the Dissolution Agreement?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I don't believe so.
BY MR. DIETRICH:
Q. Did you purchase any of them before the Dissolution Agreement?
A. I mean, part of my job at Fit Industries was to purchase domain names, so -- so I purchased all of them, all the 22 of those that were on the list that we've -- that we split, so --
Q. And did you purchase any additional outside of the 22 that are on the list?
A. I don't recall.
Q. And the ones that you purchased prior to

Page 122

dissolution, did you purchase those personally or with company funds?
A. Several of the domain names that were split were purchased in my -- with my own money because, again, we worked together for two years prior to forming the LLC. And then the LLC was a partnership until it became an S corp.
So several domains that were specifically mentioned in the Dissolution Agreement were purchased with my own funds.
Q. And then any that were purchased, not included on the dissolution list that were purchased prior to dissolution, would those have been purchased with company funds, company meaning Fit funds, or your personal funds?
A. I'm sorry. Can you rephra- -- rephrase that?
Q. Yeah, I'm -- I'm trying to best summarize it.
Any CPR Certification domain names that you purchased prior to dissolution in February 2021 that you currently use, would those domains have been purchased with Fit funds or your personal funds?
A. I don't recall.
MR. DIETRICH: Do you need to take a bathroom break?
THE WITNESS: I do.

Page 123

MR. DIETRICH: Okay. We can.
This is a good break.
(Recess taken from 2:27 p.m. to 2:35 p.m.)
MR. DIETRICH: Okay. We're good?
THE COURT REPORTER: All set.
BY MR. DIETRICH:
Q. Mr. Joos, we were talking about domain names before we took a break.
Mr. Halabi also utilizes the domain name CPR classes followed by a city name, correct?
A. Potentially.
Q. You don't know?
A. It -- that -- that seems correct.
Q. I'm just asking if you know or not, not what seems or what's possible.
A. I have seen domain names with CPR classes, followed by a city name.
Q. And have you ever clicked on one of those links?
A. I try to avoid going to his websites.
Q. And is it your contention that Mr. Halabi's use of CPR classes, followed by a city name, is somehow confusing with your domain of CPR Certification, followed by a city name?
MR. SOUTHRON: Objection. Form.

Page 124

THE WITNESS: Have I not answered this question already?
BY MR. DIETRICH:
Q. (Indicates negatively.) First time I'm bringing up CPR classes as a domain name.
A. I think our legal documents that we filed speak for themselves.
Q. Hmm. That's great, but I'm here at a deposition, so I'm going to have to ask you for an answer.
MR. SOUTHRON: Objection. Asked and answered.
THE WITNESS: I -- I think our documents speak for themselves.
BY MR. DIETRICH:
Q. Can you remind me what the documents say about this issue? Because I don't know what document you're referring to.
A. Our amended motion, perhaps, or the --
Q. Let me ask this, Mr. Joos.
Are you trying to restrict Mr. Halabi's use of the domain that starts with CPR classes?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I think our documents and our -- what we are attempting to do is -- speak for themselves.

Page 125

BY MR. DIETRICH:
Q. Mr. Joos, I can ask the question over and over again, but I'm -- I mean --
MR. SOUTHRON: No, you can't. You'll be badgering the witness, and I think that's the 50th time you asked the same question.
MR. DIETRICH: And I've asked him to point me to the document.
MR. SOUTHRON: He did.
MR. DIETRICH: What document?
MR. SOUTHRON: You can answer him one more time.
THE WITNESS: Our amended motion.
BY MR. DIETRICH:
Q. And what does it say?
MR. SOUTHRON: You can answer that question as well.
BY MR. DIETRICH:
Q. Can you repeat how you answered that question? I don't recall, Mr. Joos, other than, "It speaks for itself."
MR. SOUTHRON: Well, that's an answer.
BY MR. DIETRICH:
Q. Did you draft that motion?
A. Did I draft the motion?

Page 126

MR. DIETRICH: Strike that.
BY MR. DIETRICH:
Q. I just want the answer to my question on what it says in your motion regarding whether or not you are trying to restrict Mr. Halabi's use of the -- the domain CPR classes, followed by the city name.
MR. SOUTHRON: Objection. Asked and answered.
THE WITNESS: Well, I feel like I've answered this question already.
BY MR. DIETRICH:
Q. You can -- you have the document in front of you. If you can just read it for me, because I've looked at it and I don't see it in there. And I may have missed it, so I just want to make sure I'm not missing something.
MR. SOUTHRON: He answered the question.
MR. DIETRICH: No, he didn't.
MR. SOUTHRON: You can't make him answer it the way you want him to.
MR. DIETRICH: I want an answer, not, "It's in the document."
MR. SOUTHRON: It's been going on an hour of you asking the same question.
BY MR. DIETRICH:
Q. Just answer the question, and we can move on.

Page 127

MR. SOUTHRON: He did.
MR. DIETRICH: Mr. Southron, an answer, "It's in the document," isn't an answer. This is a fact deposition.
MR. SOUTHRON: It's an answer.
BY MR. DIETRICH:
Q. Show me in the document where it is, Mr. Joos. That is the answer I want.
You have it in front of you. You can flip through all the pages. You point me to the page, and I'll be satisfied, reading it.
A. (Witness perused document.)
MR. SOUTHRON: You don't need to do this.
MR. DIETRICH: Yes, he does.
MR. SOUTHRON: No, he doesn't.
MR. DIETRICH: You are seeking --
MR. SOUTHRON: Excuse me.
MR. DIETRICH: -- to enjoin my client.
MR. SOUTHRON: Excuse me.
MR. DIETRICH: This is my deposition.
MR. SOUTHRON: He's answered based on what he knows as he sits here now.
MR. DIETRICH: Okay.
MR. SOUTHRON: He doesn't need to read anything for you; you can read it.

Page 128

MR. DIETRICH: No, I can't because I don't read it in that.
MR. SOUTHRON: You're a lawyer.
MR. DIETRICH: You're relying --
MR. SOUTHRON: Read the document.
MR. DIETRICH: Okay. This is not your deposition. If you're not --
MR. SOUTHRON: Well, you're harassing my client, and I'm tired of it.
MR. DIETRICH: I'm not harassing anybody.
MR. SOUTHRON: You are. You asked him the same question 50 times.
BY MR. DIETRICH:
Q. What is your --
MR. SOUTHRON: You don't like his answer.
BY MR. DIETRICH:
Q. Mr. Joos, do you understand on December 20th, I'm going to ask you this exact same question, and you're not going to be able to say, "The document speaks for itself"?
That is not permitted, and your attorney knows that. So I'm going to ask you the same question on the stand.
MR. SOUTHRON: Don't threaten my client.
MR. DIETRICH: I'm not threatening him; I'm

Page 129

telling him --
MR. SOUTHRON: Yes, you are.
MR. DIETRICH: That's a fact; that's not a threat. That's --
MR. SOUTHRON: That's not a fact.
MR. DIETRICH: That is a true statement.
MR. SOUTHRON: It's your opinion.
BY MR. DIETRICH:
Q. Are you going to answer the question or are you relying on your prior testimony?
A. I believe I've already answered this.
Q. You, in fact, use this, the domain name CPR classes, as well, don't you?
MR. SOUTHRON: Objection. Asked and answered.
MR. DIETRICH: I did not ask that question.
MR. SOUTHRON: You did. Come on, man, you've been doing this for an hour.
MR. DIETRICH: When did I ask that question? I'm not going to get into this.
MR. SOUTHRON: Before the break, after the break.
BY MR. DIETRICH:
Q. Your attorney seems to be confused because I did not ask this question.
Mr. Joos, do you utilize the domain CPR

classes, followed by a city name?
A. In some cities, yes.
Q. And when did you start utilizing that domain name?
A. I don't recall.
Q. Do you have an approximate date?
A. I do not.
Q. It was, in fact, after Mr. Halabi started utilizing that domain, isn't it?
A. No.
MR. SOUTHRON: Objection. Form.
BY MR. DIETRICH:
Q. Why did you start utilizing CPR classes as opposed to CPR Certification in your domain names?
A. I don't know.
Q. Do you know if Mr. Halabi utilizes the domain just CPR followed by a city name?
A. I believe that he does. I think there are many companies that do that particular thing. I don't know.
Q. And are you trying to enjoin my client from utilizing CPR followed by a city name in connection with your motion?
THE WITNESS: Which one of these giant things is the amended motion?
MR. SOUTHRON: I don't think you have it in



front of you.
Madam Court Reporter, has the amended motion been admitted as an exhibit?
MR. DIETRICH: It has not.
You don't have to look.
THE COURT REPORTER: (Indicates affirmatively.)
MR. SOUTHRON: No, you don't have that in front of you. They haven't given it to you.
BY MR. DIETRICH:
Q. Can you answer the question?
A. I'd like to see the amended motion because it -- it speaks to what it is we're seeking.
Q. Okay.
MR. SOUTHRON: Doug, you can also say you don't know or you don't remember, if you don't.
THE WITNESS: I don't.
MR. DIETRICH: Mr. Southron, that was --
MR. SOUTHRON: Well, you didn't tell him that.
MR. DIETRICH: That was complete --
MR. SOUTHRON: I can tell him that.
MR. DIETRICH: That was completely out of bounds, Mr. Southron --
MR. SOUTHRON: No, it wasn't.
MR. DIETRICH: -- and it will be noted.
MR. SOUTHRON: Okay.



MR. DIETRICH: You just told your client how to testify at a deposition.
MR. SOUTHRON: I told him --
MR. DIETRICH: It is on the record. It will be addressed.
MR. SOUTHRON: I told him what an acceptable answer is.
MR. DIETRICH: Uh-huh. That is on the record, and that will be addressed immediately.
MR. SOUTHRON: Okay.
MR. DIETRICH: Completely out of bounds.
MR. SOUTHRON: It's customary for you to tell the witness that.
MR. DIETRICH: It's not customary anything.
MR. SOUTHRON: It is.
MR. DIETRICH: I can conduct this deposition how I want.
(Deposition Exhibit 14 was marked.)
BY MR. DIETRICH:
Q. There is the amended motion, Mr. Joos.
I'd like you to point me where CPR classes is addressed in that, and I'd like you to point me where CPR followed just by the city name is addressed in that.
A. (Witness perused document.)
MR. DIETRICH: Can you tell me what page that



is that you're on right now?
Are you able to tell what page, approximately?
THE COURT REPORTER: (Indicates affirmatively.)
126; it'll be further in with the index.
MR. DIETRICH: Got it.
THE WITNESS: (Perused document.)
Yeah, I don't know.
BY MR. DIETRICH:
Q. In your review, did you see the domain CPR followed by a city name anywhere mentioned in your motion that's been marked as Exhibit 14 -- I believe 14?
A. (Witness perused document.) I do not see CPR followed by a city name marked in -- in the injunction section of this document.
Q. Do you, in fact, also utilize the domain CPR followed by a city name?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I'm not sure.
(Deposition Exhibit 15 was marked.)
BY MR. DIETRICH:
Q. Exhibit 15 is a copy of some pages from your Orlando website. You can look on Page 2.
Is that your logo on the top there of Page 2?
A. Yes.
Q. Is that your address for your location in

Page 134

Orlando at 14 East Washington Street, Suite 200?
A. Yes.
Q. And if you look in the footer, do you see CPR classes Orlando?
A. I do.
Q. So that's one website that you've used CPR classes Orlando, correct?
A. Correct.
Q. And you don't know if you also used CPR just city name?
A. Not that I recall.
Q. Do you own the website CPRclassesGainesville.com or .org?
A. I don't recall.
Q. One of the cities that you've mentioned in your amended motion is Louisville.
Louisville is not one of the restricted cities under the Dissolution Agreement; is that correct?
A. That's correct.
Q. What is it that you are alleging Mr. Halabi did in Louisville for which you are seeking relief on December 20th?
A. I had a location in Louisville that I had established with the office and had gotten it on to -- that I established with the office and Google. And

Page 135

approximately a year after that was established, Mr. Halabi contacted that office and sought to -- to set up an account there under the same name and logo as me. And two businesses cannot exist at the same place with the same name and the same logo. So that person was confused at the office and thought they were speaking to someone from my company and proceeded to assist them in beginning to establish an account for them.
Prior to that account being established, my listing on Google was flagged as a duplicate and removed and replaced with Mr. Halabi's listing under the same name at the same address.
At that point, the office was also made aware of that and we had a conversation on the phone, to which she essentially expressed her confusion and her -- the fact that she was sort of horrified that someone would try to do this knowing that someone else is there, and also that -- that they had not even paid her for services yet, so they weren't entitled to an address at all there.
Based on the fact I had an account there already and she was confused and did not want to do business with someone who was using the same logo and name as another company, she sent an e-mail to them in which she told them essentially those things and told

Page 136

them they weren't welcome there.
Q. When you say same name, what name are you referring to?
A. CPR Certification in Louisville.
Q. And whose name is that?
A. Mine.
Q. Isn't it CPR, LLC?
A. No. All our websites are CPR Certification.
Q. Are -- are we --
Are you talking about Google, or are you talking about the --
It's Yes Working in Louisville, correct? that's the space?
A. Correct.
Q. Are you talking same name, CPR Certification Louisville, was being used in connection with Yes Working?
A. CPR Certification Louisville was what I had my name under at -- at the office and on Google and on our website.
Q. When you say under your name -- the name under the office, under what? You had a written contract?
A. At Yes Working we had a -- a -- a co-working membership because it's a co-working space.
Q. What name is it that Mr. Halabi was using?

Page 137

A. CPR Certification Louisville.
Q. He wouldn't have been using his name, CPR Certification, LLC?
A. He did not do that. He used CPR Certification Louisville.
Q. And how do you know that?
A. Because mine was flagged as a duplicate and replaced by his listing under the name CPR Certification Louisville.
Q. On Google?
A. On Google. And on his website. He -- his website says CPR Certification Louisville.
Q. Do you have a written contract with Yes Working?
A. I had an account with her.
Q. Was it under the company name?
A. It was mentioned under C- -- it was under CPR Certification Louisville.
Q. So it wasn't in the company name CPR, LLC?
A. We have a d/b/a of CPR Certification.
Q. Louisville?
A. The -- the Louisville part is an addition. It's the specific geo modifier. It's just -- it's the city name.
Q. And when you say same logo, we're talking about

the logos that we looked at already?
A. Yes.
Q. Those same two logos?
A. Yes.
Q. Okay. And did you actually have rented out space at Yes Working?
A. I had an account with them that offered time and a mailbox.
Again, they're a co-working space, so any account I had there would've been the same level of account that Sam was just trying to establish.
Q. Were you going to have classes conducted at that Yes Working facility?
A. Yes, my intention was to hold classes there.
Q. So it wasn't just a mailbox at Yes Working that you were looking to obtain?
A. No. We es- -- we established an account there with the intention of holding classes there as soon as we were ready to do so.
Q. And can you explain the setup of this shared office spacing?
Are there separate rooms that you would have had these classes?
A. They have a -- a work space.
Again, it's the same level of account that Sam



was establishing.
Q. And how do you know that?
A. Because they don't offer -- they don't have leases; they don't do things like that. It's a membership.
MR. DIETRICH: 16.
(Deposition Exhibit 16 was marked.)
BY MR. DIETRICH:
Q. So 16, what we've marked as Exhibit 16 is e-mail correspondence that is Bates-labeled 610 to 612.
A. Okay.
Q. And are you familiar with this e-mail correspondence?
A. I am.
Q. And you're one of the participants in the e-mails? you personally?
A. It appears so, yes.
Q. And do you see on the second page, kind of towards the bottom, the February 25th, 2021, at 5:13; it's an e-mail from you?
A. I see it.
Q. And it says, "Sorry.. a mailbox.. a plan for just mailing.. so I can email the Google postcard there just to confirm our address.."
A. Yeah, I --



Q. Did you --
A. -- I do see that.
Q. Did you change what plan you were ultimately looking to obtain from just a mailbox to actual renting space?
A. Well, it says my -- on February 25th, at 4:03, that my intention is to hold classes there two days a week and under the name CPR Certification Louisville, so --
Q. So how do you reconcile that with the 5:13 p.m. e-mail saying you just want a plan for mailing?
A. Just we are waiting to hear -- trying to find an instructor. And as soon as that -- she -- he had taken -- gone to do --
As soon as we were ready, we would have opened actual classes in the space.
Q. So initially, you were just doing a mailbox until you could secure an instructor to hold classes?
A. Again, it's a co-working space, so it's a mailbox at a co-working space; it's not like a PO box somewhere. It's --
Q. And --
A. It's the use of her address in business is what I was paying her for.
Q. Did you ever pay her for anything other than



just a mailbox?
A. I never got to the point of doing so.
After this took place, where my listing was flagged as a duplicate, I have thus far been unable to get it back onto Google. And I am not currently holding classes at her office.
Q. And what is it that you contend Mr. Halabi did to interfere with your relationship with Yes Working?
A. Well, he set up his business at the same place with the same name at this -- with the same logo, which cannot be done.
It just becomes you just impersonating someone else, essentially. So to do that is to essentially hijack my Google listing, which is exactly what transpired. I was flagged as a duplicate, and his was put in its place.
Q. Do you know, under Google policies, if you are required to have a physical office space in order to be listed under Google My Business?
A. Google has a lot of different policies.
You don't have to necessarily -- I'm not familiar with all of them.
Q. Are you familiar with that one?
A. Which one again?
Q. Do you know if you're permitted to have a

Page 142

Google My Business listing absent having a physical office space?
A. I'm not sure.
Q. Do you have any evidence that Mr. Halabi took any action to have your listing on Google My Business removed?
A. Yeah, he -- you get flagged as a duplicate when someone creates a profile that's identical to yours. And his profile was ali- -- was live and existed; it replaced mine. And --
Q. Did you --
A. -- and according to the people at Yes Working, he had never paid them for an account there. So prior to even paying her, that was done. (Witness indicates.)
So he had no account there at the time of doing that.
Q. Who is responsible for making the listing on Google My Business?
A. Whoever works for -- well, potentially Sam, whoever does it for Sam; someone at his company.
Q. Did you set up the Google My Business for your Louisville location?
A. Yes.
Q. And who is --
Who would remove the listing? is it Google?

Page 143

A. Yeah. If you -- it's -- it's hard to explain, but if you --
Q. Let me ask this: Could Mr. Halabi go in and somehow personally remove your Louisville Google My Business listing?
A. Yes.
Q. And how would he do that?
A. You log in and you flag things as not existing there, or you flag things as doesn't exist here or --
Yes, it's a -- you can -- an individual can log in and -- and do that.
Q. So he would just flag it?
He doesn't actually remove it himself; he flags it?
A. It gets reported to Google, and then Google takes action based upon the report.
Q. Google ultimately is the one that removes the listing?
A. Not in the case of a duplicate. In a duplicate, somebody has to specifically cause that to happen.
Q. Right.
But Google ultimately makes the decision on whether or not to remove it?
A. I don't know.

Page 144

Q. I'm just trying to figure out if -- can I --
Can I go on Google My Business right now and remove one of your listings?
A. You might be able to.
Q. You don't know, though?
A. It's not a guaranteed thing.
Q. Are there any circumstances where it's -- I could do that?
A. Yeah, you could do that.
Q. And what would I have to do to guarantee that I personally could go on and remove your listing?
A. I don't know specifically.
Q. Do you know if Google removed your Google My Business Louisville listing because you did not have a physical office presence in Louisville?
A. No. We -- or they did not because it's a -- it was flagged as a duplicate, not -- meaning that somebody else has now established themselves at that address with the same name at the same address.
Q. And have you contacted Google to support that?
A. I have attempted to, but they -- it's -- Google is hard to work with.
Q. So other than your belief, you don't know for sure if by Google (sic) removed it, whether it was the flagging or it was whether you --

Page 145

A. No, it's -- because it's a duplicate and they specifically at the time were registering themselves at that address, it is clearly attributed to Mr. Halabi.
Q. So I guess I can go on -- to answer my own question, I can go on your dup- -- your Google My list -- Google My Business listing, I could do a duplicate location and that would guarantee that your site is removed?
A. It's -- it's not a guarantee, but it's certainly an attempt to have it removed. And it's -- it is definitely the expected outcome.
Q. Do you have a current location in Louisville?
A. I do.
Q. And how long after this Yes Working situation did you secure a space in Louisville?
A. I don't recall.
Q. Was it soon after?
A. I don't believe so.
Q. Well, this is Febru- --
According to this e-mail, it's in February 2021.
A. Yeah, I don't -- I don't recall the date that we moved to a different location.
(Discussion held off the record between Defense Counsel and Ms. Ahammer.)

Page 146

BY MR. DIETRICH:
Q. Do you think you had secured other office space in Louisville before the Yes Working situation and not letting you have space there?
A. I'm sorry. Can you repeat that?
Q. Sure. Do you think you secured other office space in Louisville before the Yes Working situation in February 2021?
A. I don't believe so.
Q. What would you have to look at to determine that?
A. I'm not sure.
Q. You don't have any corporate records that identify when you opened up office space in Louisville?
A. No, I don't keep specific records like that.
Q. Do you have a lease agreement with another location in Louisville?
A. At this time, I have some account at some other place. I'm not sure the -- what they call it. It's probably a membership.
Most places have moved to a co-working model; they're not leased space.
Q. So if I asked you in discovery in connection with this motion to provide me the date that you secured office space in Louisville, what would you have to look

Page 147

at to answer that question?
A. You mean my -- my additional space or my replacement space?
Is that what you're asking?
Q. Or whatever current space you have.
A. I don't know.
Q. And do you know how long you've been operating in Louisville?
A. I don't know that either.
Q. And are you able to make a calculation as far as what business you have lost because of this -- of not being able to secure space in Yes Working?
A. I don't know.
Q. Well, if you have other office space in Louisville, wouldn't you be able to look at the business generated from that space and equate it over to lost business in Louisville at Yes Working?
A. I'm not sure.
Q. Are you seeking damages in connection with these alleged acts that Mr. Halabi took with respect to Yes Working?
A. I believe that that's in -- in our motions. It's listed in our motions.
Q. And you just at this time have not made a calculation of those damages; is that accurate?

Page 148

A. Maybe.
Q. What do you mean, "maybe"?
A. The -- the damages would have to be calculated, if they can be.
Q. Why wouldn't they be able to be?
A. I mean, there's reputational harm.
There's the relationship with Yes Working, just being associated with that was not a positive thing for us. So there's -- there are things that I can't put a -- a figure on.
Q. Well, what are you seeking at the hearing on December 20th with respect to what you want the Court to order Mr. Halabi to do in connection with Louisville?
A. I -- I think our documents speak for themselves.
Q. Well, the act is already done, isn't it?
I mean, is there anything else that you want the Court to order Mr. Halabi to do or not do in Louisville?
A. It's also an example of the sort of behavior that he conducts. So -- so conceivably, I would want further behavior like that behavior, which is flagging of listings or intentionally seeking to set up at the exact same location with the exact same name and all that, with the same logo, to cease; amongst, not limited

Page 149

to that.
Q. Putting aside the name and the logo, is there anything that restricts either one of you from opening office space in the same location?
A. Well, I don't know.
Q. In other words, if you would have went to CPR -- strike that.
If you would have went to Yes Working and said, Hey, Yes Working, I'm CPR, LLC, and Sami went there and said, hey, I'm CPR Certification; we're different companies, would there have been anything wrong with doing that at Yes Working?
A. Aside from the fact that we --
Well, there's -- there's not limited to, but some things to consider are the fact that we have the same schedule and we offer the same products, and that's problematic. It's -- I -- I -- I'm fairly certain that if I went out and attempted to set up at all of Sam's offices using the name and logo that I currently use and caused the same situation that he caused in Louisville across multiple of his locations, that I would receive a letter from you.
Q. And that's why I asked to put aside the name and the logo.
If everything was laid out, Yes Working would

Page 150

certainly be --
A. Provided it was -- there's -- there's problematic things. Mr. -- Mr. Halabi is somewhat unreasonable and dangerous. Us being in the same location is not ideal.
Q. Mr. Joos, I'm putting all of that aside.
What if I opened up a CPR location in Yes Working, and you did as well.
Is there anything wrong with that?
A. Well, you -- you don't have a Dissolution Agreement with me.
Q. Is there anything in that Dissolution Agreement that says Mr. Halabi cannot open up a location in the same spot that you have?
A. I don't know.
Q. Can you look at it and let me know? You have it there as an exhibit.
A. I think I already answered the question with "I don't know." I will say that these are the sorts of things that I brought up at our Avila meeting, and these -- everyone at that meeting was in agreement that these were avoidable things and things to be avoided, except for Mr. Halabi.
Q. Do you recall at that meeting, there was some discussion of amending the Dissolution Agreement?

Page 151

A. I believe the word amending the Dissolution Agreement was used. I'm not sure of the exact amendments.
Q. Do you know why it would need to be amended if this was all already addressed in the Dissolution Agreement?
A. Largely to avoid -- just to be abundantly clear so that even someone like Sam would be compelled to follow his agreement.
Q. And, again, I know you said it's in there, but you're now suggesting he's not following the agreement. I've looked at the agreement. I don't see anything that restricts -- after the restrictive period ended, that restricts where either one of you can set up a location, so that's why I'm asking the question, outside of the restrict -- after the restricted period ended.
A. I -- I think that -- that that leans itself toward causing confusion and -- and not -- it's certainly not a -- a good business practice, at the very least. But it's --
The spirit of this agreement was essentially that we would leave each other alone as best as possible. And setting up in the same offices would be counter to that.
MR. SOUTHRON: Dan, can we do a restroom break?

Page 152

MR. DIETRICH: Yeah, yep. Go on break.
(Recess taken from 3:23 p.m. to 3:33 p.m.)
MR. DIETRICH: So we can go back on the record.
THE COURT REPORTER: Yes, sir.
BY MR. DIETRICH:
Q. Mr. Joos, can you look back at Exhibit 10, the Dissolution Agreement, and towards the back, the Schedule 3 that we were looking at earlier? Just the last couple pages, the list of websites or cities.
A. (Witness complied.)
Q. And if you look at that, CPR Certification Fort Lauderdale and CPR Certification West Palm Beach were both assigned to Mr. Halabi, correct?
A. That appears, yeah.
Q. Does CPR, LLC have offices in Fort Lauderdale and West Palm Beach?
A. I believe -- I believe we do.
Q. And do you maintain a website for each of those locations?
A. I believe we do.
Q. Do you know what the website domain is?
A. Not off the top of my head.
Q. If I told you the Fort Lauderdale one was CPRFortLauderdale.org, do you have any reason to dispute that?

Page 153

A. Not necessarily. I'd have to see it.
Q. If I told you the one in West Palm was CPRWestPalmBeach.com, do you have any reason to dispute that?
A. Not that I know of.
Q. Can you tell me, assuming --
Assuming my representations are accurate, can you tell me why you chose CPR, followed by the city name, for both of those cities?
A. No.
Q. If -- okay.
One of the other issues that you have raised in your motion has to do with Pittsburgh.
Can you tell me what the issue is in Pittsburgh?
A. Well, there are a couple of issues in Pittsburgh.
Is there a specific thing that you're asking about?
Q. I'm ask -- yes.
I'm asking what it is that you're asking the judge to order Mr. Halabi to do in connection with Pittsburgh at the December 20th hearing?
A. I believe the documents speak for themselves as to what we're asking for.
Q. And what document are you looking at?

Page 154

A. There's been several documents filed.
Q. I'm just asking what document you're relying on that it speaks for itself?
A. The most updated motion.
Q. Okay. Can you pull that up for me?
I believe it might be Exhibit 14.
Is that what you're looking at?
A. That's not what I'm currently looking at. But, again, I believe the documents do speak for themselves.
Q. That's why I'm asking you what document it is that speaks for itself.
A. (Witness perused documents.)
Yeah, the amended motion is what I'm referring to.
Q. Are you actually seeking any relief from Mr. Halabi in connection with Pittsburgh? Because all I see in that is reference to a cease and desist letter.
A. Pittsburgh, amongst other things, is a example of confusion caused by the logos being the same. And, also, the websites looking similar and the confusingly similar domain name in Pittsburgh is showing that I am now being subject to potential litigation due to someone who is angry with Sam mistakenly sending me legal letters based upon the logos.
Q. And have you been sued in Pittsburgh?

Page 155

A. I have not.
Q. Outside of this cease and desist letter that you received, have you received any further correspondence from the sender of that cease and desist letter?
A. I believe that's probably subject to attorney-client privilege.
Q. I don't think the receipt by you of any further correspondence is.
A. I did not personally receive correspondence from him.
Q. Do you know if your attorney received any correspondence from the sender of that letter?
A. I believe some time was spent corresponding with that person.
Q. With your --
Between your attorney and the attorney in Pittsburgh?
A. I'm not entirely sure, but I believe that that person spoke with somebody at the -- at my attorney's office.
Q. And is the issue resolved?
A. I don't know for sure.
Q. When did those communications take place?
A. I don't know that either.

Page 156

Q. When was the last time you heard anything about Pittsburgh from the attorney in Pittsburgh?
A. I don't know that either.
Q. Was it recently?
A. It hasn't been recently I don't believe.
(Deposition Exhibit 17 was marked.)
BY MR. DIETRICH:
Q. Here you go. What we've marked as Exhibit 17 is the cease and desist letter for Pittsburgh.
Is this, what's marked Exhibit 17, an accurate representation of the cease and desist letter that you received through your attorney?
A. It -- it appears to be.
Q. And if you look on the first page, isn't that your logo that's on the first page there?
A. Which one are you referring to?
Q. Either one of them.
Are either of those your logo?
A. Yep, one of those is my logo.
Q. Do you know who the other logo is?
A. Mr. Halabi's.
Q. And if you scroll down to the second page, you see how he identifies two websites? At the top of the second page.
A. (Witness perused document.) Correct.

Page 157

Q. Isn't the second website, CPRCertificationPittsburgh.com, your website?
A. It is.
Q. What is it about this, if the sender is sending a letter to CPR, LLC, that it contains your logo and your website that is at issue that you're claiming Mr. Halabi was involved with?
A. He's sending this letter in part due to the existence of CPRPittsburgh.org, the domain name. He's complaining about that. And he assumes that CPRPittsburgh.org is mine based on the similarities between the two. CPR Pittsburgh is not mine; it belongs to Mr. Halabi.
Q. Are you suggesting that CPRPittsburgh.org, the domain CPRPittsburgh.org and the domain CPRCertificationPittsburgh.com, the domain names themselves are confusing?
A. What I am suggesting -- or not even suggesting -- in the plain text of this cease and desist letter, he specifically believes himself to be the rightful holder of the mark of CPR Pittsburgh and is asking me to give him the CPR Pittsburgh domain name, assuming that I own it, based on the fact that he believes these two websites to be owned by the same person.

Page 158

Q. It's not your position that the two website domain names are similar, though, is it?
A. Mr. Halabi has two websites in Pittsburgh, at least, and they all, as far as I'm aware, go back to the same office. I imagine he does not have separate leasing agreements for those, which would be problematic for Google.
But the CPRCertificationPittsburghPA.com domain is particularly problematic, especially since, again, the logos are the same and the company names are the same, and I was in the Pittsburgh market a full year before Sam was. So if you're asking if it's possible to own CPRPittsburgh.org and still comply with this agreement, then it's possible to do that; however, Mr. Halabi has not done that.
Q. So again, your issue isn't the fact that he has CPRPittsburgh.org as a domain; that's fine because there's no restriction on that?
It's everything else that you've testified that's the issue that you have?
A. Yeah. My issue is that everything that he does ref- -- that is either unethical or illegal reflects back upon me, due to the fact that he uses the same name and the same logo across the entire United States.
Q. Mr. Joos, do you think people in

Page 159

Fort Lauderdale and West Palm Beach are confused with you now utilizing CPR West Palm Beach and CPR Fort Lauderdale as website domain names?
A. If they are confused, that responsibility lies firmly at the feet of Mr. Halabi, since I am using the logo that I own exclusively and is my sole property.
Q. So is it your position that you can now go into cities, the 11 cities that Mr. Halabi was awarded under the Dissolution Agreement, set up a website, and now claim that his already-in-use website is causing confusion on your newly entered website?
A. If it's -- it's continuing to use --
He's using the logo that I own. He was supposed to change it. So, yes, that causes confusion.
Q. I'm talking about the domain names -- strike that.
Look at Page 1 of that letter.
A. (Witness complied.)
Q. Do you believe those two logos that are on there are different?
A. Well, this is yet another variation of the logo that Sam is using.
Q. Not my question.
My question was: Are they different in your mind?

Page 160

A. I don't believe them to be different enough to not cause confusion and to respect my exclusive ownership of the existing company logo.
Q. So your position is that Mr. Halabi's logo, which is on the left-hand side of this exhibit, which we've marked as Exhibit 17, is in violation of the Dissolution Agreement?
A. Seeing as how the Dissolution Agreement gives me sole and exclusive ownership of the company logo, from that point forward he is required to make sure that his logo is different enough to comply with that.
Q. And your suggestion that he put a cross instead of a sinusoidal wave is not different enough?
A. I think I just answered your question.
Q. Just for my clarity, can you answer it one more time?
A. I don't believe these to be different enough either. (Witness indicates.)
Q. Hmm. What did you do in response to this cease and desist?
A. I believe I answered that question already as well.
Q. Your attorney had communications with the attorney in Pittsburgh; is that correct?
A. Yeah. We communicated pretty much all of his

Page 161

complaints don't really pertain to me in this cease and desist, so there really wasn't much for us to do, other than communicate that they were -- that we -- you know, I don't -- I do not own CPRPittsburgh.org.
Q. Right. But his other issue had to do with your logo on Page 1; so that did impact you. And also, it says, Point Number 3 on Page 1, using CPR Pittsburgh mark as part of the Google search results. So that does impact you.
A. Yeah, he -- he asked us to -- to stop using that, which required me to spend time on researching my advertising campaigns to see if we were bidding on that term or showing up for that term, and anything that he might be annoyed with. I did not see anything that I thought needed to be adjusted at the time of me looking at it.
But, yeah, it -- this was a disruption. We had to spend time and legal fees to address this.
Q. But if the attorney takes issue with your logo and your website, what does that have to do with Mr. Halabi?
A. Him having issue with my logo is not specifically about Mr. Halabi; it's the other things that he's alleging that were infringing upon his mark with CPR.org. And those appear to be his chief

Page 162

complaints here.
Q. Why do you say "chief complaints"?
A. Because that's the thing he wants in his bulleted -- or his numbered list of things. He wants the domain name withdrawal to him, and he wants CPR Pittsburgh, any filings in relation to that, deleted.
Q. Well, Mr. Joos, let's look on the bottom of Page 2. Bullet Point Number 1 says, "Cease all use of CPR Pittsburgh."
That relates to both of you, correct? you and Mr. Halabi?
A. Okay.
Q. Do you agree with that?
A. I'm not sure.
Q. Well, look up both of the marks. Both of the logos have "CPR Pittsburgh."
Isn't that what he's asking in Number 1, "Cease use of CPR Pittsburgh"?
A. The receipt of this document and him mentioning the two companies and asking things that relate to both of us is just -- is a further example of the confusion that exists and happens and is a liability to me, so --
Q. Mr. Joos, this letter is claimed by -- as I read it, the attorney in Pittsburgh claiming violations

Page 163

of the Lanham Act in connection with both your logo and Mr. Halabi's logo as identified on Page 1. He's not claiming confusion between the two marks; he's claiming that you've both engaged in a Lanham Act violation.
So my question back is: Doesn't that Lanham Act violation relate to both of you? you and Mr. Halabi's mark/logos?
A. There are things on here that he claims are related to both of us. But the fact that he included both logos on here and specifically calls out the -- the domain name that he wants to have ownership of, CPRPittsburgh.org, shows that this person believes us to be the same company.
Q. Mr. Joos, look at Bullet Point Number 2 on Page 2. He asked that you transfer to CPR Pittsburgh all domain names that include the CPR Pittsburgh mark.
A. Including, but not limited to, CPRPittsburgh.org.
Q. Correct. But he says all domain names including CPRPittsburgh.org, and all of them would include the one that is yours identified up on the page; no?
A. No. No. Further along in his document, he says, "Client does not object to your client's use of CPRCertificationPittsburgh.com."

Page 164

Q. Okay.
A. So his chief -- his complaint is solely with Mr. Halabi's domain and not with mine.
Q. Well, just on the domain. But look at Point 3.
A. Yeah, he's ask --
Q. That relates to both of you.
A. (Witness perused document.) Okay.
Q. Do you agree with that?
A. His request is geared toward both websites. Whether or not it's legitimate is -- I don't -- I don't know. But his request is about both the websites.
Q. So the only thing that is specific in this letter to Mr. Halabi is the website CPRPittsburgh.org; everything else is attributable to both of you, correct?
A. I don't know.
Q. Well, what is it that you need to review so that you can answer that question?
A. I don't think any amount of reviewing will have me draw a conclusion.
Q. Do you believe your logo violates the Lanham Act with respect to the logo at issue in this letter?
A. I don't know. I don't know what that is, and I'm not looking to learn today.
Q. Are there any other issues in Pittsburgh that you contend Mr. Halabi did that's at issue with your

Page 165

motion?
A. Again, I -- I think our amended motion speaks for itself.
Q. So you don't want to answer any further than that?
A. I think I answered your question.
Q. Do you have an issue with an instructor in Pittsburgh?
A. Yeah, we did have an issue with an instructor in Pittsburgh.
Q. Okay. And who is that instructor?
A. His name is Daniel.
Q. And what was the issue?
A. Well, Daniel, after he was recently hired, was researching our company to see if we were legitimate or not, which is something he chose to do, and he -- he went -- he ended up on YouTube and finding a video that was produced by Mr. Halabi in which he claims to offer CPR training that is equivalent to the AHA and accredited and able to be done in 30 minutes or less from home. And you would be suitable to work in professions such as nursing after completing said training.
He believed that that -- because in that video -- or he believed that video to be associated with

Page 166

me. I had to explain to him that that was not my company. And he was -- he was upset that he would -- he did not want to work for a company that would make blatantly false claims to solicit a sale and endanger people's lives.
Q. So he didn't believe your explanation that it wasn't you?
A. Well, he eventually believed it, but he -- he also was adamant that -- that that was a very unethical thing to have out there. And he made it clear that, had it been me, that he would not work for me.
Q. How do you know the video was prepared by Mr. Halabi?
A. Because I discovered it in our dissolution and he admitted it -- to owning it. And he used it to sell training on the Internet under the alias Samuel Halpern.
Q. And did that instructor ever sign on with you?
A. He is currently teaching for me.
Q. This took place in July 2023; is that accurate?
A. I believe so.
Q. Did you have a Pittsburgh location set up in July 2023 already?
A. I did.
Q. Did you have other instructors signed up for the Pittsburgh location in July 2023?

Page 167

A. I don't recall.
Q. Were you holding classes in Pittsburgh in July 2023?
A. I don't recall that either; because we had some intermittent time where we were without an instructor, or she wasn't available. But I don't remember the dates.
Q. And when did this Daniel sign up with you?
A. Shortly after that phone call.
Q. When was that phone call? in/around July 2023?
A. That's correct.
Q. Did you lose any business because of this alleged interaction with the video?
A. I don't know for sure. Because that video is public on the Internet, anyone could access it and attribute it to me, so it's -- it's not --
Q. Do you have any evidence that anybody's attributed it to you, other than this Daniel that you've mentioned?
A. No. But there was --
I can't imagine someone calling us specifically about that; they would just avoid us.
Q. Do you have a location in Tampa, Florida?
A. I do.
Q. And where is that location?

Page 168

A. On Armenia.
Q. Is that the only location you have?
A. I have another one on Busch.
Q. Any other locations?
A. Not that I recall.
Q. If I do a Google My Business for Tampa for your company, do you know what location will show up?
A. Not sure. (Witness shook head from side to side.)
Q. Are you still holding classes in Armenia?
A. Occasionally.
Q. Did you have any other locations, other than Armenia and Busch, at any time in Tampa?
A. I don't recall.
Q. One of the other locations that you've recently brought into this was Chesapeake.
Is that in Virginia?
A. It is.
Q. Do you have a physical address? Strike that.
What is your office location in Chesapeake, Virginia?
A. I don't remember the name of it off the top of my head.
Q. Do you have one location in Chesapeake?
A. We do have one location in Chesapeake.
Q. Is that on Military Highway?

Page 169

A. I believe so.
Q. Do you have a location on Austin Avenue?
A. In what city?
Q. In Chesapeake.
A. I don't recall that.
Q. Do you have an office on Cleveland Avenue in Chesapeake?
A. I don't recall.
Q. Do you know when your lease started for whatever location it is you have in Chesapeake?
A. I believe we established an account.
And, again, these places, by and large, don't have leases. But we established an account in, I -- I believe, June of last year.
(Deposition Exhibit 18 was marked.)
BY MR. DIETRICH:
Q. So just what we've marked as Exhibit 18 --
A. Uh-huh.
Q. -- is one of the attachments to your recently filed motion, I believe.
Is that a Chesapeake location that's identified in --
A. That's correct.
Q. And is that the location where you're currently operating?

Page 170

A. Yes.
Q. Let's see what else.
And what is the issue that you have with that exhibit that you're seeking relief on in connection with Chesapeake for the December 20th hearing?
A. Mr. Halabi logged on to his Google profile, and likely by mistake on his Google profile -- he probably meant to do it from some other anonymous profile -- he uploaded this photo of my location, likely in an effort to have it removed from Google.
Q. Was it ever removed?
A. The damages for that are still unfolding, as this was just recent. It takes Google time to evaluate.
Q. What damages will be associated with this?
A. The listing will be removed and we'll have no customer visibility in Chesapeake.
Q. And how will you calculate those damages? by lost customers?
A. I don't know.
Q. Have you been in contact with Google to have it not removed?
A. It doesn't work that way. They're a large multi- -- multinational corporation. They don't just pick up the phone.
Q. Is Mr. Halabi also at that location?

Page 171

Do you know?
A. As far as I'm aware, no. The office has told us over and over again that they are not.
Q. So as you sit here today, Google has not removed your Google My Business listing at that 2211 location?
A. No. But that image is prominent on my profile currently, and if you visit my profile, it shows this, "CPR Director 842," as a prominent thing on my profile and redirects traffic to that profile, which is linked to a bunch of listings for Mr. Halabi.
Q. Do you know about how many customers -- well, strike that.
When -- when did this --
When did you become aware of this?
A. The date is on the photo.
Q. What does it say? I don't have it.
What does it say?
A. October 6th.
Q. Of 2023?
A. Uh-huh.
Q. And how long is your --
How long have you been operating in Chesapeake at that 2211 address?
A. My account, as I have stated --

Page 172

I -- I already answered this question.
Q. Can you remind me? I just don't remember what you said.
A. June of 2022.
Q. Okay. So a little over a year.
And do you have any idea approximately how many customers you see at that location, on average, per month?
A. I, again, we're -- we're not --
I'm still in the process of trying to find an instructor there right now.
We -- we had a class intermittently. We do not currently have an instructor; we are looking for one.
Q. Oh, so you don't even operate at that Chesapeake location?
A. At this moment, we are not conducting in-person classes.
Q. Because you don't have an instructor?
A. Correct.
Q. Is it your contention that Mr. Halabi has anything to do with you not being able to retain an instructor for Chesapeake?
A. My contention is that Mr. Halabi has attempted to have my listing removed from Google.
Q. But he doesn't have anything to do with your

Page 173

inability to retain an instructor in Chesapeake?
A. Someone visiting my profile here that -- that is looking into My Business would end up clicking on Mr. Halabi's profile. And because they both say "CPR" something, he -- they'd probably imagine that -- that that's me who uploaded a photo to my listing and followed his link to his other sites.
So, yeah, that's problematic for attracting an instructor.
Q. I -- I didn't -- I don't know that I followed that.
What link is somebody going to click that leads to Mr. Halabi?
A. CPR director 842 is a clickable link. It's prominent on my Google profile right now as the uploader of that image. And if you click it, it will take you to other CPR locations run by Mr. Halabi.
MR. DIETRICH: Exhibit 19 is a website, Google My Business printout.
(Deposition Exhibit 19 was marked.)
THE WITNESS: Okay.
BY MR. DIETRICH:
Q. Mr. Joos, I went on Google My Business, and this is what I found.
Can you show me where --

Page 174

A. Click the image.
Q. Okay. I actually clicked the website underneath that.
A. Okay.
Q. And that leads to your website, doesn't it?
A. It does. If you click the image that was uploaded, that is now the largest image on my profile, which is the image that Mr. Halabi uploaded --
Q. Okay.
A. -- it'll take you to the enlarged image of that with a hyperlink to his profile. (Witness indicates.)
Q. Okay. I thought you testified that they would -- they would click on the 842 -- or the 842 --
A. It's --
Q. -- or the CPR director 842, but I don't see that anywhere on this.
A. After you click the image, it says CPR director 842 as the uploader of the image.
Q. Is it your contention that people using this are going to click on the image rather than the website underneath it?
A. Almost everyone browses the images of a business prior to engaging with them.
Q. Okay. That's not --
A. Do you look at the images of a restaurant before you call them?
Q. I guess I'm in the minority because I clicked on the website.
Are those images of -- to the right of the aviation institute, are those images of -- that you uploaded?
A. They are.
Q. And are those classes held at the Chesapeake location?
A. They're various images from various locations.
Q. All right. Do you have any sort of way to track who clicks the images?
A. Not really.
Q. Do you have an ad out there trying to employ an instructor for Chesapeake?
A. We're actively looking for people.
Q. And how are you doing that?
A. Resume searches.
Q. How often do people reach out to you to be employed as an instructor?
A. I'm not sure.
Q. Well, can you give me a percentage?
Of all the instructors you have, what percentage are ones that reached out to you to gain employment as opposed to you soliciting them, either

Page 175

directly or through an ad?
A. I don't know.
Q. Is it a small percentage or a large percentage?
A. I would say it's consistent with the number of people who apply in that manner to all CPR businesses, whatever that number is.
Q. How many job applicants have you received for the Chesapeake location --
A. I don't know.
Q. -- as an instructor? You don't know?
A. (Witness shook head from side to side.)
Q. And as you sit here today, you have no idea if any instructors are not seeking employment through CPR, LLC because of this GMB picture?
A. The picture is evidence of an attempt to remove my business from Google. Doing so I believe would amount to interference. And at -- at the very least, it's an attempt to interfere. And it's still ongoing and it is not finalized.
So, again, if -- if the situation was reversed and I was doing this across Sam's locations, I would hear from you.
(Deposition Exhibit 20 was marked.)
BY MR. DIETRICH:
Q. Mr. Joos, I just want you to -- you can look at

Page 176

it. Can you just put your finger on that page so I don't lose it?
A. (Witness complied.)
Q. Yeah. Here's a copy for --
What I've handed you as Exhibit --
I'm sorry. What's the number on there?
Because I lost -- on the bottom. I'm out of exhibit tabs.
A. 20.
Q. 20? Okay.
A. Yeah, I see the page.
Q. Okay. Is this --
You can look at the whole thing.
Is this your web page?
A. I believe so.
Q. And what is that address on that page that is -- I lost the page -- at 605 Austin Avenue?
A. It's just an incorrect address that's on the page.
Q. Do you know what that address is? what's located there?
A. Well, it -- it's --
Clearly, it's old data from some other site.
Q. Okay. Can you look at the second-to-last page?
There's an address of 3049 Cleveland Avenue.

Page 177

Page 178

What is that address?
A. Again, I believe that is just an error from the Contact Us page.
(At this time, Mr. Halabi exited the Microsoft Teams videoconference deposition room.)
THE COURT REPORTER: You lost your client, just so you know.
MR. DIETRICH: Oh, thank you. We'll give him a minute to jump back on.
BY MR. DIETRICH:
Q. Mr. Joos, this printout was recently done in the last couple weeks.
Do you know why, if you have an operation at 2211 South Military Highway in Chesapeake, that that address is not identified anywhere on the website?
A. I believe it has been added -- or corrected now.
Q. When was that done?
A. I don't know.
Q. Well, if you look at Page 1 of this, at the -- the top of the header, this was printed out on 11/27/23, so a couple weeks ago.
Are you suggesting that it was done in the last couple weeks?
A. Potentially, yes.

Page 179

When we come across mistakes, we fix them.
Q. And why would that have --
Who would have i- --
Who would have come to know about that, the ad?
A. Likely myself.
Q. Is your -- do you --
Do you have actual office space at the South Military Highway location in Chesapeake?
A. I have what they offer, which is rental space and business mailing services.
Q. Could you hold a CPR class at the South Military Highway address?
A. Yes.
(Dropping phone causes an interruption.)
THE WITNESS: Oops. Is that --
Just for clarification, it's not --
MR. DIETRICH: I'm just going to mark 21, then we can go back and add more formal numbers to it.
THE COURT REPORTER: (Indicates affirmatively.)
(Deposition Exhibit 21 was marked.)
BY MR. DIETRICH:
Q. Mr. Joos, what I've identified as Exhibit 21 is an office services agreement for the Chesapeake --
A. Okay.
Q. -- location.

Page 180

A. Uh-huh.
Q. And this was entered -- it looks like the start date, according to this, was June 2nd, 2023.
Do you see that on the first (sic) page?
A. That's correct.
Q. Well, I guess there's only one page.
Is that the first time you --
A. No, that -- that is the correct date.
Q. Is that the first time that you actually had office space at the 2211 Military Highway location?
A. This is when we established our business presence here under the name CPR Certification Chesapeake.
Q. And do you know -- this says on the top, "The Chesapeake Virtual Office."
What does that mean?
A. It's just the name of their company.
Q. Of the leasing facility?
A. It's the name of their business.
Q. Do you know when Mr. Halabi -- strike that.
(Discussion held off the record between Defense Counsel and Ms. Ahammer.)
BY MR. DIETRICH:
Q. Mr. Joos, do you -- I think you said you don't know if Mr. Halabi is operating at the

Page 181

2211 South Military Highway location; is that correct?
A. No, I -- I check to see if he's at a location before I establish myself there.
Q. And you --
A. I don't --
Q. And you checked for that 2211 address?
A. Correct.
Q. And what did you find?
A. That he was not.
Q. When did you check that?
A. Prior to establishing myself on Google.
If you try to create a location on Google with the same name at the same address as someone else, it gives you a giant warning before you do so. It tells you that you're about to create a duplicate; there's no excuse to do it.
MR. DIETRICH: What we've marked as Exhibit 22 are printouts of the CPR Certification Chesapeake locations.
(Deposition Exhibit 22 was marked.)
BY MR. DIETRICH:
Q. Now, Mr. Joos, this is from Mr. Halabi's website, correct?
If you look at the second page, you see the logo there that's at issue?

Page 182

A. I do. I see it.
Q. And do you see above that, that there is actually a physical presence at that same address?
A. I see that he put it on his web page.
Q. But as you sit here today, you don't know if --
Or do you contest that he has actual office space there?
A. I don't. They say that they -- he does not have office space there.
Q. Who says that?
A. The people who work there.
Q. The virtual office?
A. Correct.
Q. When did they say that?
A. As recently as a -- a couple days ago.
Q. You asked them?
A. We -- my staff asked them.
Q. Who did you ask?
Do you know who, specifically?
A. The owner, and I believe her name is Rosa.
Q. One of the other issues you contend is that Mr. Halabi is interfering with your instructors; is that accurate?
A. Which? What --
Do you have a specific one that you're --

Page 183

you're asking about?
Q. I don't. That was going to be my follow-up question to you. If you look at -- one second.
(Deposition Exhibit 23 was marked.)
BY MR. DIETRICH:
Q. What we've marked as Exhibit 23 is your affidavit in support of the motion for temporary injunction.
Look at it as much as you want, but if you look at Paragraph 14, I'm asking you what instructors you are alleging were interfered with.
A. (Witness perused document.) Well, that lady in Raleigh is an example, the lady in Fayetteville, North Carolina who was set to be an instructor and then had a conversation with Sam and began calling us "scammers" immediately afterwards.
Q. But she wasn't --
She wasn't -- was not one of your instructors at the time, though, correct?
A. She was about to teach her first class, so I don't know how you want to phrase that.
Q. Did you hire her?
A. We paid her for activities.
Q. Okay. Any others? any other instructors?
A. I don't recall.

Page 184

Q. You agree that there's no prohibition on you or Mr. Halabi from hiring any instructor that you want, correct?
A. These instructors are independent contractors. They are able to work for anyone they choose. However, to represent yourself under the same name with the same logo is -- is problematic, at best.
Q. Have you ever tried to retain any instructors that Mr. Halabi's company uses?
A. I don't generally ask them who else they teach for when they apply for us. They -- a lot of instructors teach for a lot of different places.
I do -- don't go out of my way to try and contact Mr. Halabi's instructors, if that's your question.
Q. Have you ever tried to retain the services of an Estella Reyes in El Paso as an instructor?
A. I believe she works for us in -- in El Paso, but she applied. I did not seek her out.
Q. And do you know if she previously or still works with Mr. Halabi in El Paso?
A. As far as I understand it, she, at one time, worked for Mr. Halabi and quit because she disagreed with how he conducted class.
Q. What about Leo Williams in Houston?

Page 185

Is that an instructor of yours?
A. He does do some instructing for us. I'm unaware of -- of his relation with Mr. Halabi.
Q. What about Brian DiRamio, D-i-R-a-m-i-o, in Boston?
Is that an instructor of yours?
A. I'm not sure.
Q. Are there any other instructors, other than the one in Fayetteville, that you contend in connection with your motion for injunction that Mr. Halabi has interfered with?
A. I don't know.
Q. Regarding the logo at issue in this case, do you recall when Mr. Halabi first started using his logo?
A. It was shortly after the Dissolution Agreement, I believe.
Q. In February or March 2021?
A. That's correct.
Q. And is it at that time when you first were aware of him using the logo that you took issue that he was not in compliance with the Dissolution Agreement regarding the logo?
A. We took issue with the logo almost immediately and have been attempting to work out some kind of solution ever since.

Page 186

(Deposition Exhibit 24 was marked.)
MR. DIETRICH: Whoops, sorry.
BY MR. DIETRICH:
Q. What we've marked as Exhibit 24 is an e-mail from Tom Wood to John Schifino dated February 24th, 2021.
And do you see that e-mail correspondence?
A. I do.
Q. Were you aware of this e-mail correspondence?
A. I was.
Q. And do you agree with the statement by Mr. Wood in the second paragraph, that "Doug thinks that there is a legitimate legal question of whether Sami's new logo is sufficiently different from the Company logo that Doug was awarded under the Dissolution Agreement"?
A. Yeah, there is a legitimate legal question as to whether Sam's current logo that looks identical to mine is different enough.
Q. And that's your current position as we sit here today is the same thing that you've identified in Exhibit 24, correct?
A. Well, I don't know if it's the entirety of my position, but it is certainly -- I do not disagree with what Tom wrote on this.
(Deposition Exhibit 25 was marked.)

Page 187

BY MR. DIETRICH:
Q. What we've marked as Exhibit 25 is a March 17th, 2022, cease and desist letter from your attorneys, which is attached as an exhibit to one of the filings that you made in this case.
Do you recognize this correspondence?
A. (Witness perused document.) I do.
Q. And have you read this?
Are you familiar with the contents of this letter?
A. I am.
Q. And I don't see anything in here regarding disparagement.
Would you agree with that?
A. I believe the document speaks for itself.
Q. And I don't see anything in here regarding death threats or the fear that you have of Mr. Halabi.
Would you agree with that?
A. I believe the document speaks for itself.
Q. I get that, but am I missing something?
Is there something in here that I just haven't seen regarding those issues?
A. They're not listed in here; they were always present, but they're not listed on here.
Q. And I'm not asking for any correspondence or

Page 188

communication you had with your attorney.
Aside from that, do you know why they were not listed in this?
MR. SOUTHRON: Objection. Privileged.
Those are questions for a lawyer, I mean, why it says what it says.
You don't have to answer that.
THE COURT REPORTER: I'm sorry. I can't hear you.
MR. SOUTHRON: I told the witness not to answer.
THE COURT REPORTER: Thank you.
BY MR. DIETRICH:
Q. Is the source of your answer communications you've had with your attorney?
A. Yes.
Q. Do you know --
Again, without revealing any attorney-client privilege, do you know why you didn't sue Mr. Halabi back in --
MR. SOUTHRON: Objection. Privileged.
MR. DIETRICH: I didn't even answer my question -- ask my question.
BY MR. DIETRICH:
Q. I said, aside from any privileged communications, do you know why you did not sue

Page 189

Mr. Halabi in or around February 2021 after Mr. Wood sent the e-mail to Mr. Schifino, as evidenced in Exhibit 24?
MR. SOUTHRON: Objection. Privileged.
Don't answer.
BY MR. DIETRICH:
Q. Is the source of your answer attorney-client communications?
A. Yes.
Q. I'm going to ask the same question for Exhibit 25.
If the source of your information is attorney-client privilege, you can answer that, but do you know why --
MR. SOUTHRON: I just want to state for the record there are other privileges beyond attorney-client privilege that he can invoke.
MR. DIETRICH: I understand.
BY MR. DIETRICH:
Q. I'm not holding you to just that. I'm --
Mr. Joos, I'm asking you: Is there any non-privileged information? I don't --
And whatever the privilege is, I'm not asking you to reveal a privilege. I'm asking you if there's any non-privileged information that you have as to why

Page 190

you did not sue Mr. Halabi in February 2021 after that e-mail in Exhibit 24 or in March 2022, after the cease and desist in Exhibit 25?
MR. SOUTHRON: Can I just clarify?
Are you re-asking the question?
MR. DIETRICH: I'm re-asking the question, if he has any non-privileged information that he can testify to today.
THE WITNESS: No.
BY MR. DIETRICH:
Q. Okay. And would you agree that the issues raised in Exhibit 25, that cease and desist letter, are, for a big part, similar issues that you're alleging in the Complaint and that you're seeking relief on, on December 20th?
A. I'm sorry. Can you repeat the question?
Q. Yes. Exhibit 25, the cease and desist letter, would you agree that a lot of the issues raised in that letter are the same issues that you're seeking relief on, on December 20th at the injunction hearing?
A. I believe the document speaks for itself.
Any overlap between the two would be apparent upon looking at both documents.
Q. I'll be honest with you. It wasn't apparent to me; that's why I'm asking you the question.

Page 191

MR. SOUTHRON: Can you repeat the question, please?
BY MR. DIETRICH:
Q. The question is: Are the issues raised in that Exhibit 25 cease and desist letter the same issues that you're seeking relief on in the injunction motion that's going to be heard on December 20th?
A. Some of the issues are in both of them, so --
Q. Are there any issues that are not in the letter that you're seeking relief on, on December 20th?
A. I believe the documents speak for themselves.
Q. I understand that, but I'm asking you.
A. I don't know. (Witness perused document.)
Q. You can take as much time as you want to read that.
A. I think I've taken enough time.
Q. And you can't answer the question?
A. I believe I've answered the question.
Q. That being "the document speaks for itself"?
A. Yes.
MR. DIETRICH: Give me --
Do you want to take a two-minute break? I have to use the restroom.
MR. SOUTHRON: Okay.
MR. DIETRICH: I'm not going to be done by

Page 192

5:00.
We can go off the record.
(Recess taken from 4:49 p.m. to 5:00 p.m.)
(At this time, Mr. Halabi reentered the Microsoft Teams videoconference deposition room.)
BY MR. DIETRICH:
Q. So just a couple issues to clean up what we were discussing before earlier.
We were talking about the instructor in --
Was it Raleigh or Fayetteville?
A. She was in Fayetteville. Well, but she was referencing Raleigh when she was mentioning --
Q. Got it.
A. -- things to us.
Q. And was she corresponding with Mike Wilson on behalf of your company?
A. I don't know which one that she was corresponding to. And since there's a text log of the conversation, it -- it doesn't really matter.
Q. Do you know if she was corresponding with anybody in the Philippines?
A. Most likely, yes.
Q. And in connection --
You said that you did pay her?
A. Yes.

Page 193

Q. Did you --
You paid her as an independent contractor?
A. I believe that we paid her. As far as I understand, she -- again, she was far along in the process. We paid her to take a tour and to do things, as -- as best as my memory serves me.
Q. Do you know if any --
Would the documents that she was to submit in connection with whatever independent contractor arrangement she had with you, would those have been sent overseas to the Philippines?
A. I mean, they get sent to our inbox.
If you're -- you're saying if she sent physical documents to the Philippines, I don't do that.
Q. Do you know if Ms. Willard had any concerns with corresponding with people in the Philippines --
A. I don't --
Q. -- as a reason for her not wanting to be an instructor?
A. I don't believe so, as she assoc- -- she works with -- she didn't mention that at all in any of her texts, and she works -- or apparently works with Sam, and Sam utilizes multiple Philippines employees as well.
Q. So you don't know the answer?
A. I would be highly surprised if that was her

Page 194

answer, considering she referred to us as a "scam" and specifically about charging people for classes that we weren't actually doing.
Q. At that meeting in Avila, what were you trying to resolve? I don't think we actually talked about the specifics.
A. The -- in broad terms, the confusion between the two companies.
Q. And let's narrow that in.
What specifically?
A. The logos being the same. The names being the same. Operating in the same cities with the same names. Potentially operating in the same locations, which, again, would result in all these problems with Google. And we were trying to come up with a solution for it.
And, again, we -- everyone in the room seemed to be in agreement that a solution was preferable to not having one, other than Sam.
Q. And you were going to enter into an amended agreement to address these various issues that you're discussing?
A. I don't know what we would have done.
Q. Do you know if one of the proposals was to have a joint website?
A. I don't recall.

Page 195

Q. Do you know if Gary ever discussed that with anybody at CPR Certification regarding having a joint website?
A. No, I'm not -- I'm not privy to his conversations.
Q. Would Gary have had authority on behalf of CPR, LLC to engage in any such discussions with CPR Certification?
A. No, because he doesn't work for me. However, he's my father-in-law, and he was invited to those meetings by Mr. Halabi as -- as referenced as being a -- I can't remember the exact details, but basically knowledgeable and a good source of -- of planning things out.
So, no, nothing he would say is binding. And nothing in a proposal is binding either.
Q. If there was discussion about sharing a website, what -- how would that have resolved any confusion?
A. I don't believe it would have.
Q. Did you ever discuss with Mr. Halabi conducting business together, either at the Avila meeting or anytime around that time period?
A. No.
Q. Do you have a location in Chicago?

Page 196

A. I do.
Q. And do you know what the address is?
A. Not off the top of my head.
Q. Is that at 3033 North Clark Street?
Does that ring a bell?
A. I don't recall. (Witness shook head from side to side.)
Q. Do you know who Richard Berg is?
A. I am aware of Richard Berg.
Q. And who is Richard Berg?
A. He is an instructor in the Chicago area.
Q. Is he one of your instructors?
A. He, I believe, taught a few classes for us.
Q. When was the last time you communicated with Mr. Berg?
A. Ages.
Q. You ever discuss Google reviews with Mr. Berg?
A. Someone from my staff did.
Q. And what was discussed?
A. He was teaching a class for us on a particular Saturday, I believe, and we asked him to, from that class, get reviews, as we ask most instructors who are teaching classes for us.
Q. Did you offer to pay him money in exchange for those reviews?

Page 197

A. Sure. We -- we -- it's an incentive to get them to go out of their way to get an in- -- get the students to do it. It's difficult to get them to do it, especially in a on-site training situation, which is what that was.
Q. And do you --
Is that permitted by Google, do you know, to --
A. We weren't paying students for reviews; we were paying him for reviews. So, no, there's nothing -- people incentivize their employees to get reviews all the time.
Q. Do you know if that's permitted by the FTC, to pay for reviews in this fashion?
A. To purchase them from a student, I don't know. But to offer compensation to a instructor to get legitimate reviews from students is fairly common practice in all businesses.
In fact, as far as I understand, it's just considered a -- like a -- it's -- it's just payment for -- for services rendered. They're having to do work, and you're paying them for the work. I didn't pay him to leave a review; I paid for him to ask and obtain reviews from students.
Q. And did he get any reviews for the Chicago location?

Page 198

A. He did not.
Q. Do you know why?
A. No.
Q. Do you know what your website domain is in Tampa?
A. In -- in Tampa?
Q. In Tampa.
A. CPRCertificationTampa.com.
Q. Is that still an active site?
A. Yes.
(Deposition Exhibit 26 was marked.)
THE WITNESS: Okay.
BY MR. DIETRICH:
Q. Do you recognize what's in Exhibit 26 that we've entered?
A. I do.
Q. And that's your website, CPRCertificationTampa.com, that you just testified about?
A. It is.
Q. And what is that hero image to the right?
Did you --
Where did you obtain that hero image from?
A. It's a stock photograph.
Q. Do you use that stock photograph on any other

Page 199

of your websites?
A. I didn't use it on this website. This is just a Google ad.
Q. So who's responsible for inputting that stock photo? Google?
A. Google suggests them. I can upload them.
Q. Do you --
A. They rotate them.
Q. Do you --
If Google suggests it, do you have to approve it?
A. I don't know.
Q. Well, do you recall what happened in this case?
Did Google propose that stock photo and you accepted it?
A. I don't recall. I know we don't use it currently. It's not a performer. It doesn't do well.
Q. Will you look at what we've previously identified?
Will you pull up Exhibit 11? It's website pages.
A. I'll try.
THE COURT REPORTER: They're in order.
THE WITNESS: Well, they might have been.
BY MR. DIETRICH:
Q. It's a two-page color website photo.

Page 200

A. Yep. 10, 11.
Q. If you look at Page 2 of that, that website, on Page 2 of Exhibit 11, is Mr. Halabi's website, we've already established, correct?
A. That's correct.
Q. And isn't that hero picture on Mr. Halabi's website the same hero picture that is in Exhibit 26 that's being advertised in connection with your website?
A. It appears to be the same stock photograph. But continue.
Q. Did you do anything to have Google remove that photo on your advertisement?
A. We cycle through stock photos all the time.
Q. Do you see any problem with you utilizing the same photo that Mr. Halabi uses on his website to advertise your website?
A. It wasn't being used as a hero image; it's used on a Google ad, and it's a stock photograph.
And, again, I don't believe we used it for long, and we don't use it now.
Q. Do you think there's a reasonable expectation of confusion if a consumer looks at your website link, as depicted in this exhibit, that has a picture that Mr. Halabi uses?
A. I don't know.

Page 201

Q. Well, if the roles were reversed and Mr. Halabi had a website that he was advertising that used your hero picture, would you have any issue with that?
A. In conjunction with his Google ad?
Q. (Indicates affirmatively.)
A. I think he may. He may use some images that I use in his Google Ads. I'm not sure.
Q. That wasn't my question, Mr. Joos.
I'm asking you if he --
If the roles were reversed and he was advertising his domain and using one of your photos, would you have an issue with that?
A. I don't know.
Q. You don't think that would cause confusion in the marketplace, the same photo being used for different companies?
A. Well, I -- I have -- I'll -- this photo I have seen on --
The photo that's used on Mr. Halabi's website I have seen on countless other CPR websites. So it is an extremely common stock photograph.
Q. Again, wasn't my question. I understand you want to explain more, but I just would like an answer to my question.
A. I -- I don't believe that I've taken any action

Page 202

here that was inappropriate.
Q. And if Mr. Halabi is advertising with his website using any of your pictures --
A. He already is. He uses my logo, which is far more confusing.
Q. Again, I don't know if that answers my question.
My question is: If he's using your photo in connection with his website, you wouldn't have an issue with that?
A. It would entirely depend on how it was being done.
Again, it's a stock photograph, and it's not being used in a hero image capacity, so I -- I can't speculate on how I would react.
And, again, I -- I don't believe this photo to have been used for any length of time; possibly a week, if -- a month, at best. I -- we go through them all the time and remove the losers. This photo was a loser.
Q. Does that impact your --
Does that impact your analysis of whether or not there's confusion, the length of time that something is up?
A. I'm sorry. Can you repeat the question?
Q. Yeah. Does -- you mentioned a couple times

Page 203

that this photo wasn't up for very long.
Does that impact your analysis of whether or not there's confusion, meaning the length of time that something is posted?
A. It would impact the amount of damages, if there were any, and also if it was done deliberately.
And, again, I received no communication that this was an issue. And had I done -- had I received that, I would have removed it.
Q. Why is this photo a loser?
A. It doesn't get clicks. It's an advertising photo, and you judge them based on how often they get clicked.
Q. So are you suggesting that Mr. Halabi, using this photo on his website, somehow impacts --
A. No.
Q. -- his website?
A. No. What I'm suggesting is that, in the context of a Google advertising campaign, this photograph was not deemed to be worth using. (Witness indicates.)
Q. Is that known in the marketplace, that this photo is not a good photo for the business?
A. I don't know what's known in the marketplace. I can only go by my -- my personal assessment.

Page 204

Q. Why wouldn't you use your current photos on either one of your two websites as the photo to use in connection with advertising your domain?
A. I do. Like I said, they're rotated from a -- from a large group of photos.
Q. Why would you only use those two?
A. Because you load in as many photos as Google will allow you so you can do what's called split testing and see which ones, again, perform better than the others.
Q. So did you load in this photo that's in Exhibit 26?
A. I don't know.
Q. Well, where else would it have come from?
A. I'm not sure. Google could have suggested it.
Q. And did you know that that's the photo that Mr. Halabi uses?
A. If you're asking whether I intentionally put the photograph from his home page onto my Google advertising campaign, the answer is no.
Q. But my question is: Did you know that that photo was one that Mr. Halabi uses?
A. Not at the time.
Q. What is PureHeart CPR?
Is that your company?

Page 205

A. It's just an experimental brand.
Q. Is it one of your brands?
A. It is a word mark that we own.
Q. That "we," CPR, LLC owns?
A. Yes.
Q. How long have you owned that mark?
A. I don't know.
Q. Do you have offices in Philadelphia?
A. I don't know.
Q. Do you recall ever submitting an application to Philadelphia Chamber of Commerce in connection with the PureHeart CPR mark?
A. No.
Q. "No," you don't recall?
A. I don't recall doing that, no.
Q. Do you have an address location in Philadelphia?
A. As of this time, we are not holding classes in Philadelphia in person.
Q. Have you ever had a location in Philadelphia?
A. I don't recall.
MR. DIETRICH: What we've marked as Exhibit 68 (sic) is a printout from the Philadelphia Chamber of Commerce.
(Deposition Exhibit 27 was marked.)

Page 206

THE WITNESS: Well, it's chamberofcommerce.com, which is -- it's not actually a real chamber of commerce.
BY MR. DIETRICH:
Q. Okay. I apologize. Thank you for that clarity, the chamberofcommerce.com.
And is that the PureHeart CPR mark that we've been talking about?
A. No. I applied for a word mark, not a graphic mark.
Q. But is this your mark here, PureHeart CPR?
A. That is a logo that we had played around with. It's not something that I have filed for, and I do not recognize this profile as something that I created.
Q. So you don't know if you or somebody affiliated with you on behalf of PureHeart CPR made an application or submission to the chamberofcommerce.com?
A. No. This is just one of hundreds of websites online where people can post their information to.
Q. So whoever posted this, are they in violation of your mark?
A. I don't know.
Q. And you don't know if you had anything to do with this submission to the chamberofcommerce.com?
A. I don't believe I did, but I don't know.

Page 207

Q. Does it concern you that there's somebody making an application with your mark?
A. Well, it's not an application. It's a -- it's like a directory listing. It's a Yellow Pages listing, so it's --
Q. Does it concern you that somebody has made a listing with chamberofcommerce.com with your mark?
A. Well, it's conceivable that somebody from my organization made this, so I'm not overly concerned about it since that -- I believe that phone number forwards to one of our phones. So they're not -- they're not stealing customers from us.
Q. The phone number being, what, (856) 644-1443?
A. I believe that's one of our lines.
MR. DIETRICH: What I'd like to mark as Exhibit 28 is a printout of a page from CPR Certification, LLC's Philadelphia web page contact page.
THE WITNESS: Okay.
(Deposition Exhibit 28 was marked.)
BY MR. DIETRICH:
Q. And do you see --
Do you recognize this to be a printout from Mr. Halabi's Philadelphia website?
A. I don't know. I've never actually looked at

Page 208

Mr. Halabi's Philadelphia website.
Q. Well, do you see --
In the middle of the page there, do you see his logo?
It's not in color, but do you see his logo? Just in the top of the -- the black part.
A. I do.
Q. And is that the logo that Mr. Halabi uses?
A. It appears to be, yes.
Q. Do you have any reason to believe this is not a printout of a page from Mr. Halabi's website?
A. I guess not.
Q. And do you see the address that's at the top there?
A. Yeah. It's the same address.
Q. Does that concern you, that a posting has been made on chamberofcommerce.com for your mark using Mr. Halabi's Philadelphia address?
A. I'm not sure.
Q. And why would anybody --
Why would that be done, to use Mr. Halabi's address on a posting using your mark; do you know?
A. It could've been a mistake. It could've been somebody trying to create a posting on behalf of Mr. Halabi and accidentally put my logo on there.

Page 209

I really don't know.
Q. What evidence whatsoever do you have that that is even a possibility?
A. Because, again, I don't know.
Q. You have no evidence, right? I mean --
A. I -- I have no evidence of where this came from. I don't know where it came from. I certainly don't recall creating it.
It's possible that no one created it. Websites like this populate listings all the time in an effort to get you to visit them and pay them money. So -- and they could easily, in error, put the wrong logo on there because, again, they -- they automate that process by scraping the Internet. So I don't -- I don't believe that to be something that I did.
(Deposition Exhibit 29 was marked.)
BY MR. DIETRICH:
Q. I gave you two copies, one for your attorney, if you're wondering why I gave you two.
A. Yeah.
Q. What we've marked as Exhibit 29 is a composite of certificates.
A. Okay.
Q. And you've seen this document before?
A. Well, I haven't seen this particular document.

Page 210

There's several pages' worth here, so --
I'm familiar with a CPR certificate.
Q. And if you look --
If you look at each one --
A. Uh-huh.
Q. -- other than the city name, for the most part they appear to be the same type of certificate.
Would you agree with that?
A. Okay.
Q. And do you know whose -- you can look at any page, but look at the first page.
Do you know whose signature that is on the certificate?
A. I do not.
Q. Could it be Mr. Halabi's?
A. I don't know whose signature it is, so by definition, it could be anyone's.
Q. Who would be signing this certificate on behalf of your company?
A. Someone from the Philippines. This is a very old document.
Q. When you say "old," how old?
A. Well, most of these documents were in use when Fit was a company.
Q. If you look at the right-hand side of that

Page 211

Page 1, doesn't it have a creation date?
A. That creation date is meaningless. That is the date it was uploaded to Google Drive.
Q. Is that your Google -- your Google Drive?
A. I don't know. Because I'm not familiar with what I'm looking at here.
Q. Well, when it says, "Owner Doug J," in the bottom right, what are you the owner of?
A. That file. So this is potentially my Google Drive.
Q. Is Jackie Joos your wife?
A. She is.
Q. Who is Kid Kat?
A. My son.
Q. And CPR Customer Care, is that your company's customer care name?
A. That's correct.
Q. So with all that information, any reason to believe this is not your Google Drive?
A. No.
Q. Why would you have uploaded this to Google in February 2021?
A. No idea. I'm always moving files around in an effort to save them and keep -- keep them organized.
Q. If that, in fact, is Sami Halabi's signature,

Page 212

do you have any authorization to use this certificate with his signature on it?
A. These certificates, again, were in use in Fit Industries in their exact appearance as they are now. And they were mentioned in the Dissolution Agreement, and the only thing that needed to happen to them was that Sam needed to change his logo on them. There was no mention of updating anything else on them.
Q. You don't think you had an obligation to revise this, to remove Mr. Halabi's signature on a logo that he no longer has affiliation with?
A. As I said before, I don't know whose signature it is.
Q. For purposes of this question, let's all assume that that's Mr. Halabi's signature.
MR. SOUTHRON: Objection. Form.
BY MR. DIETRICH:
Q. I understand you don't know if it is, but for purposes of my question, if that is in fact Mr. Halabi's signature, don't you think you had an obligation post dissolution to update these certificates to remove his signature?
A. I don't know.
Q. Well, do you think that's a misrepresentation, to include his signature on a logo that's at issue in

Page 213

this lawsuit?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I don't know.
BY MR. DIETRICH:
Q. Are you using these certificates?
A. Not really. Very seldomly.
Q. So you have used them post dissolution?
A. We use certificates still.
Q. In the same form as what we have here, with the same signature?
A. I'm not sure.
Q. If you look at the third page, the one for Fort Worth, that has a created date of March 7, 2022.
Do you see that?
A. Right.
Q. That's over a year after the Dissolution Agreement, correct?
A. Again, those dates are meaningless; they're just when they're moved around in folders.
Q. No, I understand.
You said that's either moved around or when it's uploaded to Google, correct?
A. Right.
Q. Why would you be moving around this document or uploading it in March 2022 post dissolution?

Page 214

A. Well, again, I'm -- I'm always moving my files around for organization purposes.
Q. What does that mean on these dates that --
What does the modified date mean?
A. I have no idea. I don't believe it means anything. It seems to corres- -- correspond with -- I don't know what modified means.
Q. Why --
A. These documents do not appear modified.
Q. Why are you even --
Why do you even have these certificates in your Google Drive if Mr. Halabi, assuming that is his signature, no longer has any affiliation with that logo on yours?
A. Because we're not using them under the pretense that it is his signature; we use them just as a -- to signify that people took a class.
For anyone who wants to purchase this, it's additional; it's an add-on to class. It's not something that we sell many of or is a priority in the business.
Q. So just I'm over here -- I'm struggling because I'm trying to figure out why you continued to use a certificate, even on a very small basis, with Mr. Halabi's signature on it.
That's what I'm trying to figure out.

Page 215

A. I don't know whose signature it is. I believe it to be one of the staff members.
Q. Who? Which staff member?
A. I don't -- I'm not sure which one.
(Pause in the proceedings.)
BY MR. DIETRICH:
Q. Did your wife and son, according to this, also have access to this Google Drive?
A. They live with me, so by definition, they have access to everything on my computer.
Q. Do you know if they made any modifications to any of these, or would they have?
A. No.
Q. Do they have any reason to?
A. No.
Q. Are they affiliated in any way whatsoever with CPR, LLC?
A. No.
Q. Have either been paid by CPR, LLC for any services provided?
A. No.
Q. Mr. Joos, do you use a service called Glassdoor to advertise job openings?
A. I do not.
Q. Have you ever used Glassdoor to advertise for

Page 216

job openings?
A. I don't believe so.
(Discussion held off the record between Defense Counsel and Ms. Ahammer.)
(Deposition Exhibit 30 was marked.)
BY MR. DIETRICH:
Q. I only have one copy of this, Mr. Joos. What we have entered as Exhibit 30 is a verification page to one of the filings in this case signed by Mr. Halabi.
Do you see that signature?
A. I do.
Q. Would you compare that with one of the signatures on the certificates that we have entered as Exhibit 29?
A. (Witness perused document.)
Q. And would you let me know if they look to be the same signature?
A. I can't tell if they're the same or not.
(Witness indicates.)
Q. You can't tell by visually looking at those whether they're the same signature or not?
A. Nope.
Q. You don't contest that that's Mr. Halabi's signature, though, do you?
A. I don't know if it is or not.

Page 217

Q. I'll represent to you that it is. It was on one of the filings that was made in this case.
(Deposition Exhibit 31 was marked.)
BY MR. DIETRICH:
Q. If you'll look at Exhibit 31, this is a series of text messages.
Is your phone number (813) 362-6455?
A. Yes, it is.
Q. Are these text messages that you sent?
A. Hmm. (Witness perused document.)
They appear to be.
Q. And do you believe, by looking at these, that these are text messages that you were sending to Mr. Halabi?
A. (Witness perused document.) It appears that way.
Q. And if you look at this second page, it says, "I just talked to L.J."
Who is L.J.?
A. L.J. would be the person at the training center above us in -- as part of the AHA.
Q. And if you read on, it says, "I am down for working something out where we split up the country and stay out of each other's cities permanently."
Do you see that?
A. I do see that.

Page 218

Q. And it says, "I never had any intention to harm you, and I want to make this right so we can both be happy and healthy and safe and profitable."
What do you mean, you didn't mean to harm him?
A. I'm just trying to come up with a resolution to the issues. This is what led up to our meeting.
Q. My question is, what did you --
What do you mean, you didn't intend to harm him, though?
A. In case he had any perception in his head, which I'm sure he did, that I was the entire instigator for the separation and all that.
Q. Why would you admit to any intention to harm if you didn't believe you harmed him?
MR. SOUTHRON: Objection. Form.
THE WITNESS: I don't have any intention to harm. I'm saying I never had any intention.
BY MR. DIETRICH:
Q. Why would you even bring that up?
Was there a discussion about anybody being harmed?
Well, let me ask differently.
What are you referring to?
What was the perception of harm that you're referring to in this text?

Page 219

A. I don't know. This was sent two years and two months ago.
Q. So you don't know what this is referring to?
A. This is just referring to the ongoing confusion between the two brands. And when you --
Q. Well, how do you know that?
A. Because that's what I was having the conversation with L.J. about. Because he, as part of the training center, would indicate to me all that -- he -- they would constantly ask me if certain students were my students or certain students were Sam's students. And they were confused as well, and they -- they had asked me to try to resolve it with Sam and try to -- they didn't want two -- two training sites under their umbrella to have this issue that's occurred. (Witness indicates.)
Q. Mr. Joos, you can specifically remember that two years and two months ago, but you can't remember what the intended harm was that you're referring to in this text?
A. Because I'm not referring to anything specific. I'm stating that I have no ill will towards you is what I was saying.
Q. No. It says, "I had no intention to harm you."
A. I consider those to be the same statement.

Page 220

It's semantics.
Q. Okay. Well, semantics are important here.
So you're saying that you don't know?
You remember exactly what everything else in this text is about, but you don't remember what the perceived harm is that's being discussed here?
A. The harm is the confusion between the two brands.
Q. So what, in the last 30 seconds, made you remember that?
A. Well, you're -- it seems like you're trying to imply that I -- I harmed him and that I'm ad- -- admitting to harming him and that I -- and I'm saying that I have no intention to harm him, even though I did.
What I'm saying in this text is that I never have had any ill intentions towards you, is what I'm trying to say, and that I'm trying to schedule a meeting to where we can work out, again, a situation where we're not having this confusion. I go on to further talk about that in this text message.
Q. Is that something you regularly tell people, "I never had any intention to harm you"?
MR. SOUTHRON: Objection. Form.
BY MR. DIETRICH:
Q. My understanding is you would say that if there

Page 221

was a perceived harm; otherwise, there would --
MR. SOUTHRON: Objection.
BY MR. DIETRICH:
Q. -- there would be no reason for you to say that.
MR. SOUTHRON: Objection. Form.
BY MR. DIETRICH:
Q. Am I incorrect in that?
A. I don't know.
Q. Okay.
THE COURT REPORTER: Was your response "I don't know"?
THE WITNESS: Yeah. The confusion between the two brands is a harmful thing in general, so that's what I'm speaking about.
And, again, Sam was a very angry, violent person, so I wanted to make sure that -- and he also seems to not be in touch with reality somehow. So I wanted to make sure he understood very clearly that I mean no ill will.
MR. DIETRICH: Can we take a five-minute break?
I'll be wrapping up soon. I just want to make sure there wasn't anything that I'm missing.
(Recess taken from 5:50 p.m. to 6:02 p.m.)
MR. DIETRICH: Okay. We'll go back on.

THE COURT REPORTER: Yes, sir.
BY MR. DIETRICH:
Q. Mr. Joos, earlier today we were talking about some of your allegations that Mr. Halabi has instigated fake reviews or something to that effect.
Do you recall that? I'm summarizing it.
A. Possibly.
Q. Have you ever yourself or anybody on behalf of your company ever purchased either followers, subscribers, likes, or reviews for any of your social media platforms?
A. Not that I recall.
Q. Did you attend Gary's deposition?
A. I believe so.
Q. In the trademark case, is what I'm referring to.
A. Yes.
Q. Do you recall Gary testifying that -- testifying about you monitoring Mr. Halabi very closely, or words to that effect?
A. No.
Q. Have you done anything to monitor Mr. Halabi's actions post dissolution?
A. No.
Q. Do you know what TeamViewer is?



A. I'm familiar with TeamViewer.
Q. Did you --
Well, explain to me what TeamViewer is.
A. It's a way of sharing your screen with someone on a computer.
Q. Is it a program that gives you access to their computer?
A. Yeah.
Q. And did you have TeamViewer downloaded where you could access Mr. Halabi's computer at some point?
A. You mean in the past?
Q. In the past. (Indicates affirmatively.)
A. Maybe. Sam was always having computer issues and asking me to fix them.
Q. Did you uninstall that TeamViewer program post dissolution?
A. There would be no reason to.
Q. Why is that?
A. Because it's a -- it's a temporary password that's reset very frequently. Most people have it on their computer permanently.
I have it on my computer, and I'm not worried about someone accessing it because they would have to know the password that, again, cycles through and is reset frequently.



Q. So you would --
You no longer have access to Mr. Halabi's computer through TeamViewer.
Is that what you're suggesting?
A. If I ever had access to it, I certainly don't now.
MR. DIETRICH: Is it this one or this one?
Is it 9 or what's in 10?
MS. AHAMMER: Hmm?
MR. DIETRICH: Hmm, one sec.
I want to pull up something. I've just got to figure out which one it is.
(Discussion held off the record between Defense Counsel and Ms. Ahammer.)
BY MR. DIETRICH:
Q. Mr. Joos, do you know who Gail is in the Philippines?
A. I've only heard the name in relations to -- Mr. Bussey spoke about her.
Q. Have you ever spoken with Gail?
A. No.
Q. I want to show you a video.
MR. DIETRICH: It's a short video that we're going to mark as Exhibit -- I think I have some -- the next one, which I think is 28 (sic). We'll have



to do a blank page for it.
(Deposition Exhibit 32 was marked.)
BY MR. DIETRICH:
Q. And I'll represent to you in this video, Mr. Joos, is Gail speaking.
THE COURT REPORTER: So there is audio?
MR. DIETRICH: There's audio.
BY MR. DIETRICH:
Q. Now, it speaks for itself. I know you haven't seen this. Let's see if I can hit play.
(At this time the video was played.)
CONTRACTOR GAIL: So we found this on Glassdoor. This is our Orlando logo. We definitely did not create this account, and we do not have any Glassdoor profile. But let's take a look at this. I'll show you something more interesting.
Under jobs, there are three current job listings. Let's open Austin. Scroll down, and you see here the company name is CPR, LLC. When you click the hyperlink, it directs you to our Orlando website.
Now let's go back to jobs and check Tulsa. So, again, scroll down. And for this one, the company name is PureHeart CPR. Click the hyperlink again, and there, it directs us to our Orlando website

again.
(Video playback was concluded.)
MR. SOUTHRON: Is this -- hold on. Who are you saying this is?
MR. DIETRICH: I'll represent that that is Gail -- and I have to get her last name -- one of the people in the Philippines.
MR. SOUTHRON: How do you know that that's Gail?
MR. DIETRICH: That's the representation that I'm making on the record.
MR. SOUTHRON: Uh-huh. Okay.
THE WITNESS: Okay.
MR. SOUTHRON: We'll object to the exhibit.
THE COURT REPORTER: (Indicates affirmatively.)
MR. DIETRICH: You're objecting to my deposition exhibit?
MR. SOUTHRON: Uh-huh.
MR. DIETRICH: Okay.
BY MR. DIETRICH:
Q. I understand you've never seen that, Mr. Joos, but do you have any idea why CPR, LLC would be a link in this Glassdoor advertisement?
A. I have no idea.
Q. Does that concern you?



A. Oh, yeah. The Glassdoor clearly has some sort of a problem that I wasn't aware of.
Q. And you had nothing to do whatsoever with that?
A. No.
Q. Do you know when you first started operating in your Orlando location?
A. I don't recall.
Q. Do you remember a year? 2021? '22? '23?
A. It would have been after my -- the time period ended, so it was likely February of 2022.
March or February of 2022; sometime in 2022.
Q. So after the 12-month time period?
A. Correct.
(Discussion held off the record between Defense Counsel and Ms. Ahammer.)
MR. DIETRICH: Mr. Joos, I don't have any further questions today. I appreciate your time.
THE WITNESS: Okay.
THE COURT REPORTER: Any cross?
MR. SOUTHRON: No.
THE COURT REPORTER: All right. Would the witness like to read or waive?
MR. SOUTHRON: He'll read.
THE COURT REPORTER: And would you like this transcribed?



MR. DIETRICH: I do.
MR. SOUTHRON: You can have a chance to read your answers and verify that they've been transcribed correctly.
THE WITNESS: Okay.
MR. SOUTHRON: Would you like to read or waive?
THE WITNESS: Read.
THE COURT REPORTER: And would you like a copy, Mr. Southron?
MR. SOUTHRON: Yes.
THE COURT REPORTER: I'm assuming we're going to talk about an expedite.
MR. DIETRICH: I do. I want to take you off the record so you don't have to keep typing.
(Discussion held off the record.)
MR. DIETRICH: Okay. We need rush, even a rough draft.
THE COURT REPORTER: Okay.
MR. DIETRICH: That's probably sufficient.
THE COURT REPORTER: So I can get you a rough. It'll be a little later tonight, if that's okay.
MR. DIETRICH: Oh, that'd be -- oh, yeah, I don't need it tonight.
THE COURT REPORTER: Okay.
MR. DIETRICH: And what's the rush on a



standard copy, not rough?
(Discussion held off the record.)
THE COURT REPORTER: So for expediting, what I would do is send an e-mail with the page estimate, and they can send you a breakdown of Day 3, 4, 5, you know, and what that would run you.
MR. DIETRICH: Yeah.
THE COURT REPORTER: Would you like me to have them do that? And then you can get your rough draft right away.
MR. DIETRICH: (Indicates affirmatively.)
THE COURT REPORTER: Did you want a copy of the rough draft?
MR. SOUTHRON: No. We'll just wait for the final one.
THE COURT REPORTER: Okay. If he ends up expediting it, I'll let you guys know.
MR. SOUTHRON: Great. I appreciate that. Thank you.
(Deposition concluded at 6:12 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF HILLSBOROUGH:

I, COURTNEY N. LANGHOFF, RMR, CRR, FPR-C, Notary Public, State of Florida, do hereby certify that DOUGLAS KEITH JOOS, JR., personally appeared before me on December 12, 2023, and was duly sworn and produced his State of Florida driver's license as identification per FSC AOSC20-23.

Signed this 12th day of December, 2023.

________________________________
COURTNEY N. LANGHOFF, RMR, CRR, FPR-C

Notary Public, State of Florida
My Commission No.: HH 062066
Expires: 03/05/2025



CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF HILLSBOROUGH:

I, COURTNEY N. LANGHOFF, RMR, CRR, FPR-C, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of DOUGLAS KEITH JOOS, JR.; that a review of the transcript was requested; and that the foregoing transcript, pages 8 through 229, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 19th day of December, 2023.

________________________________
COURTNEY N. LANGHOFF, RMR, CRR, FPR-C



(JOSEPH F. SOUTHRON, ESQUIRE)
(joe@fourriverslaw.com)

(DECEMBER 19, 2023)

RE: (JOOS VS. HALABI)
(DECEMBER 12, 2023/DOUGLAS KEITH JOOS, JR./6324193)

The above-referenced transcript is available for review.

The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and e-mail to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com, and copies will be e-mailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).



(JOOS VS. HALABI)
(DECEMBER 12, 2023/DOUGLAS KEITH JOOS, JR.)

E R R A T A S H E E T

PAGE _____ LINE _____ CHANGE ____________________
______________________________________
REASON ________________________________
PAGE _____ LINE _____ CHANGE ____________________
______________________________________
REASON ________________________________
PAGE _____ LINE _____ CHANGE ____________________
______________________________________
REASON ________________________________
PAGE _____ LINE _____ CHANGE ____________________
______________________________________
REASON ________________________________
PAGE _____ LINE _____ CHANGE ____________________
______________________________________
REASON ________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

________________________ __________________
DOUGLAS KEITH JOOS, JR. DATE